**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MELBOURNE MUNICIPAL FIREFIGHTERS' PENSION TRUST FUND, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>EXPRESS SCRIPTS HOLDING COMPANY, GEORGE PAZ, TIMOTHY WENTWORTH, ERIC SLUSSER, DAVID QUELLER, and JAMES M. HAVEL,<br><br>Defendants. | Civil Action No. _____________<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Melbourne Municipal Firefighters' Pension Trust Fund ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Express Scripts Holding Company ("Express Scripts" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Express Scripts; (d) the complaint filed in *Anthem, Inc. v. Express Scripts, Inc.*, No. 16-cv-2048 (S.D.N.Y. filed Mar. 21, 2016); and (e) other public information regarding the Company.

**INTRODUCTION**

1. This class action is brought on behalf of all persons or entities that purchased or otherwise acquired Express Scripts' publicly traded common stock between February 24, 2015

and March 21, 2016, inclusive (the "Class Period"). The claims asserted herein are alleged against the Company's Chairman and Chief Executive Officer ("CEO"), George Paz, President, Timothy Wentworth, Chief Financial Officer ("CFO"), Eric Slusser, Senior Vice President - Sales & Account Management, David Queller, and Executive Vice President and Interim CFO, James M. Havel, and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

2. Express Scripts is the largest independent pharmacy benefit manager ("PBM") in the country. As a PBM, Express Scripts administers the prescription drug benefit component of its customers' health insurance plans. Express Scripts also negotiates drug prices with pharmacies and establishes a network of pharmacies through which patients can fill their prescriptions. As part of its core PBM business, the Company also provides Medicare Part D-related products and services to Medicare Part D plan sponsors. The Company's PBM services accounted for over 97% of Express Scripts' revenues over the past three years.

3. Express Scripts' most important client is Anthem, Inc. ("Anthem"), one of the largest health benefits companies in the United States, which represents approximately 14% of Express Scripts' annual revenues. Accordingly, the Company's relationship with Anthem and its ability to provide Anthem with high quality service is of paramount importance to investors.

4. Pursuant to the Company's contract with Anthem, Anthem may periodically conduct a market analysis to ensure that Anthem is receiving "competitive benchmark pricing" on drugs purchased through plans administered by Express Scripts. If Anthem determines that the pricing terms under the agreement with the Company are no longer market competitive, then Anthem may propose new pricing terms to ensure that Anthem is receiving competitive benchmark pricing, and Express Scripts is obligated to negotiate in good faith over the proposed new pricing

terms.

5. Throughout the Class Period, Express Scripts repeatedly assured investors that its relationship with Anthem remained strong and that it was providing Anthem, and all of its customers, with high quality service. Express Scripts also touted that it was performing at a high level financially and operationally. In addition, the Company addressed the ongoing drug pricing negotiations with Anthem, stating that Express Scripts was committed to reaching a mutually beneficial agreement, and continuing its successful working relationship with its most important client. As a result of these misrepresentations, Express Scripts stock traded at artificially inflated prices during the Class Period.

6. The truth began to be revealed on January 12, 2016, when Anthem publicly threatened to terminate its relationship with Express Scripts unless the Company would renegotiate its agreement with Anthem to deliver more than $3 billion in annual savings to Anthem. Anthem's statement made clear that Anthem and Express Scripts had engaged in contentious pricing negotiations for some time, and made clear that if Express Scripts remained unwilling to engage in good-faith negotiations regarding drug pricing, Anthem would terminate its relationship with Express Scripts and seek out a competing PBM. These disclosures caused the price of Express Scripts shares to fall $5.89 per share, or 7%, wiping out $3.9 billion in shareholder value. However, the Company's stock price remained inflated because Defendants offered false and misleading explanations for, and continued to conceal, the true extent of the Company's deteriorating relationship with Anthem.

7. Then, on March 21, 2016, Anthem sued Express Scripts alleging that the Company breached its contract with Anthem by failing to negotiate drug pricing terms in good faith. The lawsuit revealed a deep (and never before disclosed) conflict between Express Scripts and Anthem

dating back to at least February 2015, including allegations that Express Scripts was experiencing severe operational problems that interfered with its ability to adequately serve Anthem and exposed Anthem to increased regulatory scrutiny by the Centers for Medicare & Medicaid Services ("CMS"). More importantly, investors learned that Anthem would almost certainly either renegotiate its contract to pay billions of dollars less to Express Scripts, or worse, seek to engage a competing PBM resulting in the complete loss of Anthem's business. These disclosures caused the price of Express Scripts shares to decline by $1.82 per share, or 2.6%.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Express Scripts transacts business in New York and the Company's stock trades in New York on the NASDAQ Stock Market. In addition, a related action filed by Anthem against Express Scripts is currently pending in this District. *See Anthem, Inc. v. Express Scripts, Inc.*, No. 16-cv-2048 (S.D.N.Y. filed Mar. 21, 2016). Moreover, the contract between Express Scripts and Anthem—which is integral to Plaintiff's claims in this action—states that "[a]ny dispute arising out of or related in any manner to this Agreement shall be referred exclusively to the United States District Court for the Southern District of New York."

## PARTIES

### A. Plaintiff

11. Plaintiff Melbourne Municipal Firefighters' Pension Trust Fund is a pension fund based in Melbourne, Florida that provides retirement benefits for retired firefighters. As of October 1, 2015, Plaintiff managed assets in excess of $58 million on behalf of hundreds of active members, retirees, and beneficiaries. Plaintiff purchased Express Scripts stock on the public market during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B. Defendants

12. Defendant Express Scripts is a Delaware corporation with its principal executive offices located at One Express Way, St. Louis, Missouri. The Company's common stock trades on NASDAQ under ticker symbol "ESRX." Express Scripts currently has over 630 million shares of stock outstanding.

13. Defendant George Paz ("Paz") was, at all relevant times, Chairman and CEO of Express Scripts.

14. Defendant Timothy Wentworth ("Wentworth") was, at all relevant times, President of Express Scripts.

15. Defendant Eric Slusser ("Slusser") was, from September 2015 to the present, CFO of Express Scripts.

16. Defendant David Queller ("Queller") was, at all relevant times, Senior Vice President - Sales & Account Management of Express Scripts.

17. Defendant James M. Havel ("Havel") was, from January 2015 to September 2015 Executive Vice President and Interim CFO of Express Scripts. In September 2015, Havel became the Company's Executive Vice President of Finance.

18. Defendants Paz, Wentworth, Slusser, Queller, and Havel are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with Express Scripts, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## BACKGROUND

19. Express Scripts is the largest stand-alone PBM in the United States. Simply stated, a PBM is a company that administers the prescription drug benefit component of a health insurance plan. A PBM processes and pays for prescription drug claims and is responsible for assisting employers and other third-party payors with managing the prescription benefit. PBMs also negotiate drug prices with pharmacies and establish a network of pharmacies through which patients can fill their prescriptions. Through its core PBM business, the Company also provides Medicare Part D-related products and services to Medicare Part D plan sponsors. The Company's PBM services accounted for over 97% of Express Scripts' revenues in each of the past three years.

20. In December 2009, Express Scripts acquired certain subsidiaries of Anthem—formerly known as WellPoint, Inc.—that provide PBM services. In conjunction with the acquisition, Express Scripts entered into a ten-year contract under which it would provide PBM services to members of the affiliated health plans of Anthem. Subsequent to this acquisition, the

Company integrated Anthem's former PBM clients into Express Scripts' existing systems and operations. As a result of that contract, Anthem quickly became Express Scripts' most important client, alone representing approximately 14% of the Company's annual revenues. Accordingly, the Company's relationship with Anthem and its ability to provide Anthem with high quality service is critically important to investors.

21. The cost of drugs is a key driver in the health insurance industry and those costs change over time. As such, the Anthem contract contains a "repricing provision," under which Anthem or a third-party consultant retained by Anthem may periodically conduct a market analysis to ensure that Anthem is receiving "competitive benchmark pricing" on drugs purchased through plans administered by Express Scripts. If Anthem or its third-party consultant determines that the pricing terms under the agreement with the Company are no longer market competitive, then Anthem may propose new pricing terms to ensure that Anthem is receiving competitive benchmark pricing, and Express Scripts is obligated to negotiate in good faith over the proposed new pricing terms. Express Scripts and Anthem last engaged in a successful price check in 2012.

22. About halfway through the ten-year contract with Express Scripts, Anthem began discussing publicly the future of its relationship with Express Scripts. Specifically, Anthem executives on several occasions stated that they were developing a strategy and reviewing their options with respect to how Anthem might rework its PBM agreement once the contract with Express Scripts expires. Consistent with its prior statements concerning its relationship with Anthem, throughout the Class Period, Express Scripts repeatedly assured investors that its relationship with Anthem remained strong and that it was providing Anthem with quality service.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

23. The Class Period begins on February 24, 2015, the day after the Company filed its

annual report on Form 10-K for the year ended December 31, 2014 (the "2014 Form 10-K"). The 2014 Form 10-K was signed by Defendants Paz and Havel and contained certifications by Defendants Paz and Havel that attested to the purported accuracy and completeness of the 2014 Form 10-K. In the 2014 Form 10-K, the Company warned that:

> If one or more of our large clients either terminates or does not renew a contract for any reason or if the provisions of a contract with a large client are modified, renewed or otherwise changed with terms less favorable to us, our financial results could be materially adversely affected and we could experience a negative reaction in the investment community resulting in stock price declines or other adverse effects.

The Company omitted that, with respect to Anthem, such risks had already materialized.

24. In the 2014 Form 10-K, the Company also generally warned that "the administration of the Medicare Part D program is complex and any failure to effectively execute the provisions of the Medicare Part D program may have an adverse effect on our financial position." The Company omitted that such risks had already materialized.

25. On February 25, 2015, Express Scripts held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendant Queller assured investors of the closeness of the Company's relationship with Anthem. Specifically, Defendant Queller stated that "we've got a great relationship with Anthem. We're right now working with them very closely to help them prepare for their 1/1/16 business." Defendant Queller further stated that "[o]ur teams work together closely each and every day. The relationship is very, very solid." Defendant Queller also acknowledged the ongoing contract negotiations with Anthem, but assured investors that "we look forward to having them as a client through the end of the contract term which is at the end of 2019 and we'd love to have them for a longer time as well."

26. The statements and omissions set forth in ¶¶23-25 were materially false and

misleading because: (1) on February 16, 2015, Anthem served Express Scripts with a notice of default arising from material operational breaches caused by Express Scripts' systems defects, chronic failure to devote sufficient resources to the work, inadequate training of Express Scripts' personnel, inordinately high employee turnover, and lack of required expertise; and (2) as a result of those breaches, Anthem was exposed to increased risk of regulatory scrutiny from CMS. In addition, Express Scripts had failed to engage in good-faith negotiations with Anthem regarding drug pricing, and, in fact, had been intentionally stonewalling those negotiations. Moreover, pursuant to its contract with Express Scripts, Anthem was entitled to lower pharmaceutical pricing that would equate to an annual savings of more than $3 billion. As a result of the foregoing, Express Scripts' relationship with Anthem had seriously deteriorated, creating a significant risk that the Company would lose Anthem's business.

27. On April 28, 2015, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2015. In the press release, which was also filed with the SEC on Form 8-K, Defendant Wentworth touted that the quality of the Company's product offerings drove client retention, stating that "[c]lient retention starts with a simple concept: patient care," and that "[o]ur model . . . is embedded in our innovative solutions that are clearly differentiated and in high demand."

28. That same day, Express Scripts filed with the SEC its Form 10-Q for the first quarter of 2015, reiterating the financial results announced by the Company in its April 28 press release. The Form 10-Q was signed by Defendants Paz and Havel and contained certifications by Defendants Paz and Havel that attested to the purported accuracy and completeness of the 10-Q. In the quarterly report, the Company incorporated by reference the general risk warnings included in 2014 Form 10-K and set forth herein in ¶¶23-24. The Company omitted that such risks had

already materialized.

29. On April 29, 2015, Express Scripts held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendant Paz assured investors of the Company's strong relationship with Anthem, stating that "Anthem is an incredibly important client to us. And I think we do very good things together." Defendant Paz also stated that Express Scripts "really enjoy[s] that relationship" and "really enjoy[s] providing services to their members."

30. The statements and omissions set forth in ¶¶27-29 were materially false and misleading because: (1) on February 16, 2015, Anthem served Express Scripts with a notice of default arising from material operational breaches caused by Express Scripts' systems defects, chronic failure to devote sufficient resources to the work, inadequate training of Express Scripts personnel, inordinately high employee turnover, and lack of required expertise; and (2) as a result of those breaches, Anthem was exposed to increased risk of regulatory scrutiny from CMS. In addition, on April 1, 2015, Anthem served Express Scripts with a notice of breach arising from the Company's failure to negotiate drug pricing in good faith. Moreover, pursuant to its contract with Express Scripts, Anthem was entitled to lower pharmaceutical pricing that would equate to an annual savings of more than $3 billion. As a result of the foregoing, Express Scripts' relationship with Anthem had seriously deteriorated, creating a significant risk that the Company would lose Anthem's business.

31. On July 28, 2015, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2015. In the press release, which was also filed with the SEC on Form 8-K, Defendant Paz stated that the Company's "business model [is] fully aligned with client needs" and that Express Scripts' "focused size and scale helps us make prescription

drugs safer and more affordable which benefits everyone in healthcare – patients, plan sponsors and medical professionals."

32. That same day, Express Scripts filed with the SEC its Form 10-Q for the second quarter of 2015, reiterating the financial results announced by the Company in its July 28 press release. The Form 10-Q was signed by Defendants Paz and Havel and contained certifications by Defendants Paz and Havel that attested to the purported accuracy and completeness of the 10-Q. In the quarterly report, the Company incorporated by reference the general warnings included in 2014 Form 10-K and set forth herein in ¶¶23-24. The Company omitted that such risks had already materialized.

33. On July 29, 2015, Express Scripts held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendant Wentworth touted the Company's strong client retention rate, stating that Express Scripts' "performance to date and the positive feedback we continue to receive gives us confidence that we will have strong retention across the board." Defendant Wentworth also stated that the Company's "business outlook remains strong and our momentum continues" and touted the Company's "close collaboration with our clients."

34. The statements and omissions set forth in ¶¶31-33 were materially false and misleading because: (1) on February 16, 2015, Anthem served Express Scripts with a notice of default arising from material operational breaches caused by Express Scripts' systems defects, chronic failure to devote sufficient resources to the work, inadequate training of Express Scripts personnel, inordinately high employee turnover, and lack of required expertise; and (2) as a result of those breaches, Anthem was exposed to increased risk of regulatory scrutiny from CMS. In addition, on April 1, 2015, Anthem served Express Scripts with a notice of breach arising from the

Company's failure to negotiate drug pricing in good faith. Moreover, pursuant to its contract with Express Scripts, Anthem was entitled to lower pharmaceutical pricing that would equate to an annual savings of more than $3 billion. As a result of the foregoing, Express Scripts' relationship with Anthem had seriously deteriorated, creating a significant risk that the Company would lose Anthem's business.

35. On October 27, 2015, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2015. In the press release, which was also filed with the SEC on Form 8-K, Defendant Wentworth stated that the Company was "confident in the upper range of our expected retention rate, a reflection of the trust clients have in Express Scripts." Wentworth also touted that Express Scripts' "unique collection of cost-saving solutions and our business model of client alignment position us well for continued growth."

36. That same day, Express Scripts filed with the SEC its Form 10-Q for the third quarter of 2015, reiterating the financial results announced by the Company in its October 27 press release. The Form 10-Q was signed by Defendants Paz and Slusser and contained certifications by Defendants Paz and Slusser that attested to the purported accuracy and completeness of the 10-Q. In the quarterly report, the Company incorporated by reference the general warnings included in 2014 Form 10-K and set forth herein in ¶¶23-24. The Company omitted that such risks had already materialized.

37. On October 28, 2015, Express Scripts held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendant Wentworth touted Express Scripts' strong relationship with its clients. Specifically, Defendant Wentworth stated that "[b]ased on our results this year, we are confident about next year's selling and retention season." Defendant Wentworth also touted that, among other things,

the Company's "strong client relationships position us well for 2016" and that Express Scripts "will keep our clients and patients in the center of everything we do."

38. The statements and omissions set forth in ¶¶35-37 were materially false and misleading because: (1) on February 16, 2015, Anthem served Express Scripts with a notice of default arising from material operational breaches caused by Express Scripts' systems defects, chronic failure to devote sufficient resources to the work, inadequate training of Express Scripts personnel, inordinately high employee turnover, and lack of required expertise; and (2) as a result of those breaches, Anthem was exposed to increased risk of regulatory scrutiny from CMS. In addition, on April 1, 2015, Anthem served Express Scripts with a notice of breach arising from the Company's failure to negotiate drug pricing in good faith. Moreover, pursuant to its contract with Express Scripts, Anthem was entitled to lower pharmaceutical pricing that would equate to an annual savings of more than $3 billion. As a result of the foregoing, Express Scripts' relationship with Anthem had seriously deteriorated, creating a significant risk that the Company would lose Anthem's business.

39. On December 22, 2015, Express Scripts held a conference call with analysts and investors to discuss the Company's financial guidance for 2016. During the conference call, Defendant Paz addressed the ongoing pricing negotiation with Anthem. Specifically, Defendant Paz assured investors that Express Scripts was "fully committed to reaching a mutually beneficial agreement, and continuing our successful working relationship." Defendant Paz also stated that "[s]ince 2009, we have delivered quality care for Anthem's members." Finally, Defendant Paz stated that discussions with Anthem were "very early on" and that the Company was working its way through the repricing negotiations.

40. The statements and omissions set forth in ¶39 were materially false and misleading

because: (1) the relationship between Express Scripts and Anthem was not "working" and had seriously deteriorated; (2) Express Scripts had not been delivering quality care for Anthem's members; (3) on February 16, 2015, Anthem served Express Scripts with a notice of default arising from material operational breaches caused by Express Scripts' systems defects, chronic failure to devote sufficient resources to the work, inadequate training of Express Scripts personnel, inordinately high employee turnover, and lack of required expertise; and (4) as a result of those breaches, Anthem was exposed to increased risk of regulatory scrutiny from CMS. In addition, on April 1, 2015, Anthem served Express Scripts with a notice of breach arising from the Company's failure to negotiate drug pricing in good faith. Moreover, pursuant to its contract with Express Scripts, Anthem was entitled to lower pharmaceutical pricing that would equate to an annual savings of more than $3 billion. As a result of the foregoing, Express Scripts' relationship with Anthem had seriously deteriorated, creating a significant risk that the Company would lose Anthem's business.

## **THE TRUTH BEGINS TO EMERGE**

41. On January 12, 2016, Anthem publicly threatened to terminate its relationship with Express Scripts unless the Company would renegotiate its agreement with Anthem to deliver significant savings on drug costs. Specifically, Anthem's CEO, Joseph Swedish, stated for the first time that Anthem was entitled to lower pharmaceutical pricing that equates to an annual savings of more than $3 billion—a sum many multiples larger than Express Scripts had previously indicated to investors. Anthem's CEO also stated that if Express Scripts remained unwilling to renegotiate drug pricing, Anthem would terminate its relationship with Express Scripts and seek out another PBM partner. Both the scale of the pricing concessions Anthem was seeking and the threat to terminate the Express Scripts relationship provided investors with the first indication that relations between the two companies had seriously deteriorated during contract negotiations, and

that Express Scripts risked losing Anthem's business. As a result of these disclosures, Express Scripts shares fell $5.89 per share, or 7%, representing a $3.9 billion loss in market value.

42. Faced with Anthem's threat to terminate its relationship with Express Scripts, the Company reassured investors that it was providing all of its clients, including Anthem, with quality service and that the negotiations with Anthem were routine and would soon be resolved.

43. On February 16, 2016, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2015. In the press release, which was also filed with the SEC on Form 8-K, Defendant Wentworth stated that 2015 was the Company's "strongest retention year ever" and that "Express Scripts has momentum that maintains our confidence in our 2016 guidance and justifies our excitement about our future."

44. That same day, the Company filed its annual report on Form 10-K for the year ended December 31, 2015. The Form 10-K was signed by Defendants Paz, Wentworth, and Slusser and contained certifications by Defendants Paz and Slusser that attested to the purported accuracy and completeness of the 10-K. In the annual report, the Company warned that:

> If one or more of our large clients either terminates or does not renew a contract for any reason or if the provisions of a contract with a large client are modified, renewed or otherwise changed with terms less favorable to us, our financial results could be materially adversely affected and we could experience a negative reaction in the investment community resulting in stock price declines or other adverse effects.

The Company omitted that such risks had already materialized.

45. In the annual report, the Company also discussed the pricing review negotiations with Anthem. Specifically, Express Scripts stated that it was "actively engaged in good faith discussions with Anthem and intend[s] to continue to comply with the requirements of the agreement." The Company also generally warned that it was "unable to provide a timetable or an estimate as to the potential outcome of these events, any of which could result in a material adverse

effect on our business and results of operations." The Company omitted that such risks had already materialized.

46. In the annual report, the Company also generally warned that "[t]he administration of Medicare Part D is complex and any failure to effectively execute the provisions of Medicare Part D may have an adverse effect on our business and our results of operations." The Company omitted that such risks had already materialized.

47. On February 17, 2016, Express Scripts held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendant Paz assured investors that Express Scripts was "performing at a high level financially and operationally" and that "[o]ur team is delivering great service to Anthem and its members." Defendant Paz also stated that the Company "remain[ed] fully committed to good faith negotiations in hopes of reaching a mutually beneficial agreement within the framework of our 2009 contract." In addition, Defendant Paz quelled investor concern about the ongoing price-check noting that the pricing negotiations are "pretty routine" and noting that the Company conducts "bunches of those, every year."

48. The statements and omissions set forth in ¶¶43-47 were materially false and misleading because: (1) on February 16, 2015, Anthem served Express Scripts with a notice of default arising from material operational breaches caused by Express Scripts' systems defects, chronic failure to devote sufficient resources to the work, inadequate training of Express Scripts personnel, inordinately high employee turnover, and lack of required expertise; and (2) as a result of those breaches, Anthem was exposed to increased risk of regulatory scrutiny from CMS. In addition, on April 1, 2015, Anthem served Express Scripts with a notice of breach arising from the Company's failure to negotiate drug pricing in good faith. Moreover, pursuant to its contract with

Express Scripts, Anthem was entitled to lower pharmaceutical pricing that would equate to an annual savings of more than $3 billion. As a result of the foregoing, Express Scripts' relationship with Anthem had seriously deteriorated, creating a significant risk that the Company would lose Anthem's business.

49. Then, on March 21, 2016, Anthem sued Express Scripts alleging that the Company breached its contract with Anthem by failing to negotiate pricing terms in good faith. The lawsuit also alleges that Express Scripts materially breached its obligation to perform operational duties in a "prudent and expert manner," as required by the contract. Anthem attributed those breaches to Express Scripts' systems defects, chronic failure to devote sufficient resources to the work, inadequate training of Express Scripts personnel, inordinately high employee turnover, and lack of required expertise. As a result of those breaches, Anthem was exposed to increased risk of regulatory scrutiny from CMS.

50. In its complaint, Anthem also revealed for the first time that it had been trying to negotiate drug repricing since the beginning of 2015 and Express Scripts had been stonewalling those negotiations. The complaint also revealed that Anthem had served Express Scripts with notices of default on February 16, 2015 and April 1, 2015, arising from the Company's operational breaches and failure to negotiate drug pricing in good faith, respectively. In other words, at the start of the Class Period, the Company and its senior executives were aware that Express Scripts' relationship with its most important client, Anthem, had seriously deteriorated and that it had not been satisfying its contractual obligations, and Express Scripts had been stonewalling for months to delay the renegotiation of its most significant contract.

51. Analysts were surprised by Anthem's allegations and immediately questioned whether Express Scripts had adequately disclosed the precariousness of the Company's

relationship with Anthem. For example, analysts at Leerink Partners stated that the Company was "under-estimating [Anthem's] desire and willingness to walk away from their contract." The Leerink analysts also stated that the Company's "relationship with [Anthem] has deteriorated to a point where the most likely outcome is termination of the contract either before or at the 2019 end-date."

52. These disclosures caused the price of Express Scripts shares to decline by $1.82 per share, or 2.6%.

## LOSS CAUSATION

53. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Express Scripts stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on January 12, 2016 and March 21, 2016, the price of Express Scripts shares fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Express Scripts stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

54. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of Express Scripts during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of Express Scripts and their families and affiliates.

55. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court. Express Scripts has over 630 million shares of common stock outstanding, owned by hundreds or thousands of investors.

56. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e) Whether the price of Express Scripts common stock was artificially inflated;

(f) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g) The extent of damage sustained by Class members and the appropriate measure of damages.

57. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

58. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

59. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

60. Express Scripts' "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

61. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Express Scripts who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

62. At all relevant times, the market for Express Scripts' common stock was an efficient market for the following reasons, among others:

(a) Express Scripts stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Express Scripts filed periodic public reports with the SEC and NASDAQ;

(c) Express Scripts regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Express Scripts was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

63. As a result of the foregoing, the market for Express Scripts common stock promptly digested current information regarding Express Scripts from all publicly available sources and reflected such information in the price of Express Scripts common stock. Under these circumstances, all purchasers of Express Scripts common stock during the Class Period suffered similar injury through their purchase of Express Scripts common stock at artificially inflated prices and the presumption of reliance applies.

64. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's deteriorating relationship with Anthem—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Express Scripts' relationship with Anthem and the quality of service Express Scripts provides to its most important client, as set forth above, that requirement is satisfied here.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Defendants

65. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Express Scripts common stock at artificially inflated prices.

67. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Express Scripts common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

68. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

69. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

70. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Express Scripts' true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

71. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Express Scripts common stock. Plaintiff and

the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Express Scripts common stock had been artificially inflated by Defendants' fraudulent course of conduct.

72. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

73. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

74. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

75. The Individual Defendants acted as controlling persons of Express Scripts within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Express Scripts, the Individual Defendants had the power and ability to control the actions of Express Scripts and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: May 4, 2016

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Gerald H. Silk*
Gerald H. Silk
Avi Josefson
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Plaintiff Melbourne Municipal Firefighters' Pension Trust Fund*

**CERTIFICATION PURSUANT TO**
**THE FEDERAL SECURITIES LAWS**

I, Monte Rann, on behalf of Melbourne Municipal Firefighters' Pension Trust Fund ("Melbourne"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Melbourne. I have reviewed the complaint and authorize its filing.

2. Melbourne did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Melbourne is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Melbourne's transactions in the Express Scripts Holding Co. securities that are the subject of this action are set forth in the chart attached hereto.

5. Melbourne has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Melbourne will not accept any payment for serving as a representative party on behalf of the Class beyond Melbourne's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4th day of May, 2016.

Monte Rann
Chairman
*Melbourne Municipal Firefighters' Pension Trust Fund*

**Melbourne Municipal Firefighters' Pension Trust Fund**
**Transactions in Express Scripts Holding Co.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 4/10/2015 | 5,540 | 88.8377 |
| Purchase | 4/24/2015 | 1,550 | 87.4377 |
| Purchase | 5/15/2015 | 310 | 87.6844 |
| Sale | 1/22/2016 | (4,030) | 71.6894 |
| Sale | 2/23/2016 | (110) | 68.7200 |