**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE EXPRESS SCRIPTS HOLDING CO. SECURITIES LITIGATION. | Master File No. 16-cv-3338 (KMW) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 4

    A.    Express Scripts Enters Into A 10-Year Contract With Its Most Important
        Customer, Anthem, That Provides For Periodic Pricing Reviews.......................... 4

    B.    Investors Are Focused On Express Scripts' Relationship With Anthem .............. 5

    C.    Express Scripts And Anthem's Contentious 2011-12 Pricing Negotiations
        Cause A Lasting Rift In Their Relationship Before The Class Period .................. 6

    D.    Undisclosed To Investors, Express Scripts And Anthem's Second Round
        Of Pricing Negotiations Is Contentious "From The Outset" ................................. 6

        1.    Anthem Demands $15 Billion In Pricing Concessions Before Its
                Right To A Market Check Has Even Ripened............................................ 6

        2.    Defendants Misstate Existing Facts And Reassure Investors .................... 7

        3.    The Parties' Relationship Continues To Deteriorate And Anthem
                Serves A Second Formal Notice Of Breach ................................................ 8

        4.    Express Scripts Changes Its Senior Management As Negotiations
                With Anthem Deteriorate Further................................................................. 9

        5.    Mediation Fails And Continued Follow Up Is Unsuccessful .................. 10

        6.    Defendants Falsely Assure Investors About "Productive
                Discussions" With Anthem, But Propose A Pricing Increase ................. 11

    E.    The Truth Is Revealed To Investors...................................................................... 11

        1.    January 12-19, 2016: Express Scripts' Stock Price Drops As
                Investors Learn Of Anthem's Dispute And Litigation Threat ................. 11

        2.    After Anthem Threatens Litigation, Express Scripts' Already
                Strained Relationship And Negotiations With Anthem Worsen ............. 12

        3.    February 17, 2016: Defendants Falsely State That Express Scripts
                Was "Currently in Discussions" With Anthem ........................................ 13

        4.    March 21-22, 2016:  Anthem Files The Anthem Complaint.................... 14

    F.    Post-Class Period Developments ......................................................................... 14

        1.     Express Scripts Countersues Anthem ........................................................ 14

        2.     Express Scripts Belatedly Admits That Risk Of Non-Renewal Was Materially Understated In Its Financial Statements................................. 15

ARGUMENT ........................................................................................................... 16

I.     DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS ...................... 16

    A.     Defendants Were Obligated To Speak Truthfully To Their Investors ................ 16

    B.     Defendants' Anthem Contract Accounting Was False And Misleading ............. 19

    C.     Defendants' Misstatements Were Not Unactionable Opinions .......................... 21

    D.     Defendants' Misstatements Were Not Mere Puffery ........................................... 23

II.    THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER ................ 23

    A.     The Complaint Adequately Alleges A Strong Inference Of Scienter ................. 23

    B.     Defendants' Scienter Arguments Are Without Merit .......................................... 29

III.   THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ....................... 38

CONCLUSION....................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)....................................................................................37

*In re Am. Int'l Group, Inc.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010).....................................................................40

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004).....................................................................26

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).....................................................................31

*In re Bausch & Lomb, Inc. Sec. Litig.*,
592 F. Supp. 2d 323 (W.D.N.Y. 2008)....................................................................37

*Bd. of Trustees of City of Ft. Lauderdale Gen. Emps. Ret. Sys. v. Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011).....................................................................37

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011).........................................................20, 21, 35

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711, 728-29 (S.D.N.Y. 2015) .........................................................22

*Borochoff v. GlaxoSmithKline PLC*,
2008 WL 2073421 (S.D.N.Y. May 9, 2008) ...........................................................36

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008).....................................................................40

*In re Bristol-Meyers Squibb Sec. Litig.*,
312 F. Supp. 2d. 549 (S.D.N.Y. 2004).....................................................................37

*Burstyn v. Worldwide Xceed Grp., Inc.*,
2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002).......................................................29

*Caiafa v. Sea Containers Ltd.*,
331 F. App'x 14 (2d Cir. 2009) ...............................................................................37

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)....................................................................................38

*Casula v. Athenahealth, Inc.*,
    2011 WL 4566115 (D. Mass. Sept. 30, 2011) ....................................................37

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010)..........................................................26

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
    2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)...............................................30

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008)..........................................................33

*City of Monroe Emps. Ret. Sys. v. Hartford Fin. Grp., Inc.*,
    2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011)...............................................33

*City of Omaha Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
    679 F.3d 64 (2d Cir. 2012)........................................................................21

*City of Pontiac Gen. Emps.' Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*,
    806 F. Supp. 2d 1267 (N.D. Ga. Aug. 26, 2011) ....................................17

*In re Compuware Sec. Litig.*,
    301 F. Supp. 2d 672 (E.D. Mich. 2004)................................................27, 28

*Cosmas v. Hassett*,
    886 F.2d 8 (2d Cir. 1989)........................................................................25

*DeMarco v. Robertson Stephens Inc.*,
    318 F. Supp. 2d 110 (S.D.N.Y. 2004).......................................................40

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005).................................................................................38

*In re Dynex Capital, Inc. Sec. Litig.*,
    2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ...........................................29

*In re EDAP TMS S.A. Sec. Litig.*,
    2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015)............................................23

*Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*,
    440 F.3d 571 (2d Cir. 2006)....................................................................32

*In re Fannie Mae 2008 Sec. Litig.*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010).......................................................37

*Faulkner v. Verizon Commc'ns, Inc.*,
    156 F. Supp. 2d 384 (S.D.N.Y. 2001).......................................................23

*Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441, 557 (S.D.N.Y. 2015)................................................................22

*Ford v. Voxx Int'l Corp.*,
    2016 WL 3982466 (E.D.N.Y. July 22, 2016) .......................................................21

*Freeburg v. Wolf*,
    42 F. App'x 715 (6th Cir. 2002) .............................................................................17

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................26

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d. 367 (S.D.N.Y. 2012)....................................................................26

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................37, 38

*In re GLG Life Tech Corp. Sec. Litig.*,
    2014 WL 464762 (S.D.N.Y. Feb. 3, 2014)........................................................23, 32

*Globus v. Law Research Svc., Inc.*,
    418 F.2d 1276 (2d Cir. 1969)..................................................................................25

*Gross v. GFI Grp., Inc.*,
    162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016)............................................................40

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008).....................................................................21

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ................................................. *passim*

*Hoffman v. UBS-AG*,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008).....................................................................19

*Howard v. Galesi*,
    1987 WL 18460 (S.D.N.Y. Oct. 6, 1987) ...............................................................19

*Hutchins v. NBTY, Inc.*,
    2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012)........................................................27

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
    2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) ........................................................38

*In re Leapfrog Enter., Inc. Sec. Litig.*,
    2016 WL 4091395 (N.D. Cal. Aug. 2, 2016) .........................................................21

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011).................................................................16

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)..............................................................................39

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015)........................................................18

*Lopez v. Ctpartners Exec. Search Inc.*,
    173 F. Supp. 3d 12, 24 (S.D.N.Y. 2016) ......................................................22, 33

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)..............................................................................40

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir 2008) .............................................................................29

*In re MBIA, Inc. Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010)................................................................39

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014)..............................................................................16

*In re MF Global Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)...........................................................20, 23

*Nasyrova v. Immunomedics, Inc.*,
    2015 WL 382846 (D.N.J. Jan. 28, 2015) ...........................................................17

*In re Neustar Sec.*,
    83 F. Supp. 3d 671, 686 (E.D. Va. 2015) ..........................................................32

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).........................................................................18, 23

*In re Open Joint Stock Co. Vimpel-Cmmc'ns*,
    2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) ......................................................36

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 619, 621 (S.D.N.Y. 2014) ..........................................................32

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004).................................................................33

*Public School Emps. Ret. Sys. v. Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012).................................................................30

*Rahman v. Kid Brands, Inc.*,
  2012 WL 762311 (D.N.J. Mar. 8, 2012) ........................................................33

*Reiss v. Pan Am. World Airways*,
  711 F.2d 11 (2d Cir. 1983) ...........................................................................19

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ..........................................................................17

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ............................................................................29

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ............................................................................27

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) .......................................................21, 39

*SEC v. Caserta*,
  75 F. Supp. 2d 79 (E.D.N.Y. 1999) ...............................................................37

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) ..........................................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..........................................................................23, 24, 29

*In re Time Warner Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ..............................................................................17

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ..........................................................................22

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ............................................18, 30

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ..........................................................................19

*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) .............................................................23

*W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*,
  344 F. App'x 717 (2d Cir. 2009) ....................................................................37

*In re Yukos Oil Co. Sec. Litig.*,
  2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ...................................................30

*Zech Capital LLC v. Ernst & Young Hua Ming*,
    636 F. App'x 582 (2d Cir. 2016) ........................................................................37

**Other Authorities**

Fed. R. Civ. P. §8..................................................................................................38

Fed. R. Civ. P. §12(b)(6).................................................................................39, 40

Court appointed Lead Plaintiff, Teachers Insurance and Annuity Association of America ("Plaintiff"),[1] respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint (ECF No. 72).[2]

## PRELIMINARY STATEMENT

During a quarterly investor conference call at the start of the Class Period, on February 25, 2015, Defendants were asked by a securities analyst for an "update" on Express Scripts' relationship with its largest customer and most important client, Anthem. Defendants could have chosen not to respond or to defer any comment given the parties' very difficult private negotiations up until that time. But, Defendants spoke and, in violation of the securities laws, they misleadingly reassured investors and failed to make full and complete disclosure of the then-existing facts.

By the time of the February 25, 2015 investor conference call, Anthem already had demanded from Express Scripts (on October 17, 2014) a massive *$15 billion* in pricing concessions over the remaining four-year term of the Anthem Contract; the parties had reached a fundamental disagreement (by December 2014) as to whether the Anthem Contract imposed any affirmative obligation on Express Scripts to provide Anthem with "competitive benchmark pricing" at all; and Anthem had served Express Scripts with a notice of breach of the contract (on February 16, 2015) consisting of a 14-page single-spaced letter detailing numerous alleged operational breaches.

Defendants did not have to "predict the future" to understand that Defendant Queller's reassuring response on the February 25, 2015 conference call was neither complete nor accurate when made. Notwithstanding all of the then-existing facts, Queller told investors during the call

---

[1] Lead Plaintiff "TIAA" is defined in paragraph 16 of the Amended Class Action Complaint (ECF No. 67, the "Complaint"). References to "¶__" refer to paragraphs of the Complaint and all defined terms used here are the same.

[2] "Defendants" refers collectively to Express Scripts Holding Company ("Express Scripts" or the "Company"), George Paz, Timothy Wentworth, Eric Slusser, David Queller, and James M. Havel.

that Express Scripts had "a great relationship with Anthem;" "the relationship is very, very solid;" and "I know they've made mention in Investor Days about contract negotiations, things of that nature . . . I can tell you that we're helping them rollout new states . . . and it's business as usual."

Not only did Queller falsely describe Express Scripts' relationship with Anthem as "great," "very, very solid" and "business as usual," but Express Scripts' financial statements contained in the Company's 2014 Form 10-K, publicly-filed at the start of the Class Period, also misleadingly amortized the Company's existing 10-year Anthem Contract over a 15-year time period based on a purported "high probability" that the contract would be renewed by Anthem for at least an additional five years. Yet, the already-existing facts demonstrated that this accounting was misleading and not proper under Generally Accepted Accounting Principles ("GAAP").

In violation of GAAP, Defendants continued with this deceptive accounting treatment in repeated quarterly financial statements throughout the entire Class Period, failing to correct it until the very last day of the Class Period, and only after Anthem publicly filed suit against Express Scripts, on March 21, 2016. This misleading accounting treatment persisted throughout the entire Class Period notwithstanding: that Anthem served a second formal notice of breach of the Anthem Contract on April 1, 2015 (including for failing to confirm the validity of its $15 billion demand or proposing alternative terms); that the Presidents of Anthem and Express Scripts held an unsuccessful dispute-resolution meeting on May 27, 2015; and many other failed attempts at even beginning any meaningful progress regarding the parties' fundamentally different readings of the Anthem Contract including on September 15; October 2, 8 and 19; November 5, 9, 11 and 23; and December 2, 14, 15 and 17, 2015. As Anthem wrote to Express Scripts on December 2, 2015, "months have elapsed" since Anthem had proposed pricing terms on March 18, 2015, but Express Scripts simply "refused to negotiate for competitive benchmark pricing." At the same time,

Defendants Paz, Havel and Slusser repeatedly certified the Company's financial statements at each quarterly reporting period as purportedly presented consistent with the requirements of GAAP.

Thereafter, on December 22, 2015, Defendant Paz falsely told investors during the Company's quarterly earnings conference call that Express Scripts was "currently in discussions with Anthem regarding the periodic pricing provisions of the agreement" when that was not true, and "we are excited to continue productive discussions with Anthem" when that was misleading. In truth, Express Scripts had refused to engage in any "productive discussions" with Anthem for over one year, based on a fundamentally different reading of the contractual terms. Express Scripts finally made a counterproposal to Anthem's demanded $15 billion in savings, by offering Anthem an overall ***increase*** in pricing on January 7, 2016. While Defendants continued to keep the truth hidden, Anthem went public with its lengthy dispute with Express Scripts less than one week later.

Express Scripts investors were stunned with the massive $15 billion gap between the parties disclosed by Anthem and its threatened litigation. In response, Defendants again falsely reassured investors that they were "currently in discussions with Anthem" in the Company's 2015 Form 10-K on February 16, 2016, but Express Scripts had just refused to discuss Anthem's pricing proposal on February 3, claiming that it had no obligation to do so under the contract. Express Scripts again refused to engage with Anthem on March 1, and Anthem filed its lawsuit on March 21, 2016. In sum, all of Defendants' statements falsely and misleadingly reassured investors regarding Express Scripts' relationship with Anthem until the truth was revealed by Anthem.

Contrary to the arguments set forth in Defendants' motion to dismiss, it is these numerous misstatements of then-existing facts and circumstances that the Complaint correctly pleads as false and misleading under the securities laws, not hindsight or some failure to predict the future litigation. The law requires that when a party decides to speak publicly regarding a matter of

material importance to its investors, it speak fully and truthfully.  As set forth herein, Defendants repeatedly failed to do so in this case even though (or perhaps precisely because) investors paid such careful attention to this critical contractual relationship for the Company.

Defendants' attempts to claim a lack of scienter or knowledge of the true underlying facts fall flat, given all of the detailed facts pleaded in the Complaint, including facts summarized here, that demonstrate that Defendants' public statements were inconsistent with the then-existing facts.  Again, Defendants are not charged with a failure to predict the future, but to tell the facts accurately when they did speak to investors on investor calls or through their financial statements.

Finally, Defendants attempt to argue lack of loss causation by asserting that Defendants revealed the truth to investors when Defendant Paz falsely claimed on December 22, 2105 that the parties were "currently in discussions" regarding the periodic pricing provisions of the Anthem Contract.  But that was not true.  The truth was revealed only by Anthem's disclosures on January 25, 2016, when Anthem disclosed the massive size of the parties' dispute, and on March 22, 2016, when Anthem's partially unsealed complaint revealed numerous materially inconsistent facts regarding the parties' lack of any negotiations.  Regardless of when or how Anthem's litigation with Express Scripts pending before the Court is resolved, Defendants made materially false and misleading statements to their investors regarding that relationship and their contract-renewal negotiations with Anthem that harmed Express Scripts investors when the truth finally came out.

For the reasons set forth below, Defendants' motion to dismiss should be denied.

## STATEMENT OF FACTS

### A. Express Scripts Enters Into A 10-Year Contract With Its Most Important Customer, Anthem, That Provides For Periodic Pricing Reviews

Express Scripts is a pharmacy benefit manager ("PBM").  ¶ 24.  The Company's largest customer is Anthem, who represented 16.3% of Express Scripts' revenues for the year ended

December 31, 2015.  ¶¶ 34-37.  Express Scripts' relationship with Anthem is governed by a ten-year contract (the "Anthem Contract") that the companies entered into in 2009.  ¶ 26.

Section 5.6 of the Anthem Contract contains a "Periodic Pricing Review" provision that is designed "to ensure that [Anthem] is receiving competitive benchmark pricing."  ¶ 28.  It states:

> **5.6 Periodic Pricing Review.**  [Anthem] or a third party consultant retained by [Anthem] will conduct a market analysis every three (3) years during the Term of this Agreement ***to ensure that [Anthem] is receiving competitive benchmark pricing***.  In the event [Anthem] or its third party consultant determines that such pricing terms are not competitive, ***[Anthem] shall have the ability to propose renegotiated pricing terms to [Express Scripts] and [Anthem] and [Express Scripts] agree[] to negotiate in good faith over the proposed new pricing terms***.

*Id*.  As Defendant Paz has stated, such "routine" price checks give Express Scripts' customers "the right to look at pricing and make sure that we are doing the right things for them."  ¶ 31.

### B.    Investors Are Focused On Express Scripts' Relationship With Anthem

As Express Scripts recognized, including in its Form 10-K for the year ended December 31, 2015, "[a] substantial portion of [Express Scripts'] business is concentrated in certain significant client contracts," including with Anthem, and modification or non-renewal of the Anthem Contract could "materially adversely affect[]" Express Scripts' financial results.  ¶ 35.  Accordingly, the market was focused on that relationship, specifically on the likelihood that the parties would renew their contract past its scheduled expiration in 2019.  ¶¶ 37-45.

Analysts were attuned to any potential rifts in the Anthem-Express Scripts relationship, including with regard to drug pricing under the Anthem Contract.  For example, during an April 30, 2014 earnings conference call, in response to an analyst's question, Defendant Wentworth assured investors that "we have a lot of years left to work together, [and] we are very aligned in terms of growing our relationship."  ¶ 44.  Likewise, during an October 29, 2014 earnings conference call, Defendant Paz stated that "[O]ur relationship is very strong and sound.  We're going to continue this relationship, and we'll let you know as things unfold."  ¶ 45.

5

Less than two weeks earlier on October 17, 2014, however, Anthem demanded approximately **$15 billion** in pricing concessions over the four-year remainder of the Anthem Contract, which Paz viewed as "pretty ludicrous."  ¶ 46.  Rather than informing investors, Defendants, throughout the Class Period, repeatedly misrepresented the current facts regarding Express Scripts' contentious relationship with Anthem over the Periodic Pricing Review terms.

### C.    Express Scripts And Anthem's Contentious 2011-12 Pricing Negotiations Cause A Lasting Rift In Their Relationship Before The Class Period

The parties' first market check in 2011-12 pursuant to Section 5.6 of the Anthem Contract was highly contentious and protracted.  ¶¶ 65-69.  Anthem did not believe Express Scripts had negotiated fairly, and has since claimed that the negotiations "**unfairly resulted in Anthem paying above market pricing for almost an extra year**."  ¶ 68.  Even after they were resolved, the negotiations placed a substantial strain on the parties' relationship before the Class Period. ¶ 69.

### D.    Undisclosed To Investors, Express Scripts And Anthem's Second Round Of Pricing Negotiations Is Contentious "From The Outset"

#### 1.    Anthem Demands $15 Billion In Pricing Concessions Before Its Right To A Market Check Has Even Ripened

Anthem commenced the second round of pricing negotiations with Express Scripts on October 17, 2014 by demanding **$13 billion** in pricing concessions over the remaining four years of the Anthem Contract (**plus $1.8 billion** in pricing concessions in the post-termination period). ¶ 78.  The size of Anthem's demand – which would result in price changes of more than **$3 billion per year** – left no question that renewal of the Anthem Contract was in serious jeopardy.  *Id.*

By December 2014, with Anthem's **$15 billion** demand still outstanding, Anthem and Express Scripts had reached fundamental disagreements about whether the contract imposed an affirmative obligation on Express Scripts to provide Anthem with "competitive benchmark pricing," and whether Anthem's $15 billion claim reflected "competitive benchmark pricing."

¶ 80.  The parties' relationship continued to deteriorate, and on February 16, 2015, days before the start of the Class Period, Anthem served Express Scripts with notice of breach.  ¶ 81.  Anthem sent a 14-page single-spaced letter detailing numerous operational breaches by Express Scripts and threatening to terminate the Anthem Contract if such breaches were not cured.  *Id.*

### 2.    Defendants Misstate Existing Facts And Reassure Investors

The Class Period begins on February 24, 2015, eight days after Anthem served Express Scripts with its notice of breach of the Anthem Contract and when the Company filed its 2014 Form 10-K.  ¶ 86.  In the 10-K, signed by Defendants Paz and Havel, Defendants represented: "Customer contracts and relationships related to our 10-year contract with Anthem . . . under which we provide pharmacy benefit management services to Anthem and its designated affiliates are being amortized . . . over an estimated useful life of 15 years."  ¶ 87.  In other words, as detailed in Argument Section I.B. below, Defendants represented to investors that the Anthem Contract likely would be renewed for at least five years.  Defendants would continue to misleadingly represent this "high probability" of renewal by amortizing the Anthem Contract over a 15-year period in each of the Company's Class Period financial statements.  ¶¶ 203, 210, 217, 223, 231.

On February 25, 2015, Defendants Paz, Wentworth, Queller and Havel held an earnings conference call.  ¶ 204.  In response to an analyst's question, Defendant Queller assured investors that "***we've got a great relationship with Anthem***," and "[o]ur teams work closely each and every day.  ***The relationship is very, very solid.***"  *Id.*  Regarding the companies' negotiations and renewal of the Anthem Contract, Queller stated that "***it's business as usual***.  And we look forward to having them as a client through the end of the contract term which is at the end of 2019 and we'd love to have them for a longer time as well.  But we'll continue to work with them very, very closely just as we always do to make them successful."  *Id.*  Analysts fully credited those statements.  ¶ 91 (Express Scripts "has a great relationship with Anthem"; relationship "remains very positive").

In truth, however, by the beginning of the Class Period, Anthem already had demanded $15 billion in pricing adjustments over four years; the parties disagreed as to whether Anthem was even entitled to competitive benchmark pricing; and Anthem had served a formal notice of breach. As Express Scripts only later admitted in litigation, these troubles existed "from the outset." ¶ 78.

### 3. The Parties' Relationship Continues To Deteriorate And Anthem Serves A Second Formal Notice Of Breach

Under Section 16.5 of the Anthem Contract, the parties must first submit material contractual disputes to a Joint Operating Pharmacy Committee ("JOPC"). ¶ 85. If the JOPC does not resolve the dispute, it must then be referred to the companies' Presidents. *Id.* If the Presidents' meeting is not successful, the parties must then refer the dispute to non-binding mediation. *Id.* None of these various steps resolved the parties' disputes. ¶¶ 93, 104, 130.

On March 6, 2015, the JOPC attempted to resolve the parties' material dispute concerning Express Scripts' operational breaches of the Anthem Contract. ¶ 93. That attempt failed and the companies' relationship worsened, as Express Scripts accused Anthem of failing to negotiate in good faith. *Id.* Regarding drug repricing, on March 18, 2015, Anthem reiterated its $15 billion demand and requested a response by March 30, 2015. ¶ 94. Express Scripts did not respond and, on April 1, 2015, ***Anthem provided Express Scripts with formal notice of pricing breach*** that the Anthem Contract required Express Scripts to cure before June 22, 2015. ¶ 95. Express Scripts did not cure the alleged breach, and refused to negotiate drug pricing with Anthem. *Id.*

At the same time, Defendants continued to account for the Anthem Contract in the Company's financial statements as if it would likely be renewed and to falsely assure investors that Express Scripts' relationship with Anthem was sound. On April 29, 2015, Defendants Paz, Havel, and Wentworth held an earnings conference call during which, in response to an analyst's question, Defendant Paz assured investors that "Anthem is an incredibly important client to us,"

"we really enjoy that relationship," and "I do think it is a two-way street." ¶¶ 210-11. Investors again credited those statements, as Leerink reported, "We continue to believe ESRX will retain Anthem (OP) and management also noted the relationship is 'a two-way street.'" ¶ 101.

On May 27, 2015, the companies' Presidents met – the second step in the dispute resolution procedures in the Anthem Contract – but again did not resolve their dispute. ¶ 104. On June 22, 2015, nearly three months after Anthem had delivered its pricing proposal and after Anthem provided Express Scripts with formal notice of breach, Express Scripts rejected and refused to even negotiate Anthem's pricing terms. ¶ 106. Anthem and Express Scripts each accused the other of failing to negotiate in good faith, and understood that things were going badly. *Id*. Indeed, during a call on July 24, 2015, Anthem stated that it was "examining our optionality vis-à-vis our Express Scripts agreement." ¶ 110. But Defendants continued to assure investors. ¶ 226.

### 4.    Express Scripts Changes Its Senior Management As Negotiations With Anthem Deteriorate Further

On September 9 and 10, 2015, Express Scripts announced that: Defendant Paz would step down as CEO, but would remain on the Company's board of directors as non-executive Chairman; Defendant Wentworth (then President of Express Scripts) would succeed Paz as CEO; and Defendant Slusser had been appointed Executive Vice President and CFO. ¶¶ 118-19. Analysts reported that the shift in senior management "was announced sooner rather than later [to] allow[] new management to better address challenges that lie ahead, such as the company's relationship with [Anthem]," and would "make Express Scripts more likely to pursue early renewals with key clients such as Anthem." ¶ 120. In reality, the parties were still not negotiating at all.

On September 15, 2015, the parties still did not negotiate pricing and Anthem again accused Express Scripts of refusing to negotiate. ¶ 122. On October 2, 2015, Express Scripts contacted Anthem, but again refused to negotiate over pricing. *Id*. On October 19, 2015,

Defendant Wentworth asked Anthem to meet, but continued to refuse to negotiate the pricing terms of the Anthem Contract. *Id.* Yet, on October 27, 2015, Express Scripts publicly filed financial statements which continued to assume a "high probability" of renewal for at least five years. ¶ 223.

### 5.      Mediation Fails And Continued Follow Up Is Unsuccessful

On November 5, 2015, Anthem again asked Express Scripts to meet, but Express Scripts did not agree. ¶ 129. On November 9, 2015, as the third and final step in the Anthem Contract's conflict-resolution procedures, the companies held a mediation, but the mediation failed. ¶ 130. Shortly afterwards, on November 11, 2015, Anthem asked Defendant Wentworth personally to meet, but Express Scripts refused to meet or negotiate. ¶ 131. On November 23, 2015, Anthem again emailed Express Scripts to request a meeting, but did not receive a response. ¶ 132.

In another attempt to negotiate drug pricing, on December 2, 2015, Anthem sent Express Scripts a revised pricing proposal that expressly detailed Defendants' failure *since March 18, 2015* to negotiate competitive benchmark pricing *at all*, including Anthem's position that "*the current pricing terms of the [Anthem Contract] [a]re not even close to competitive*," and that Express Scripts "*has refused to negotiate for competitive benchmark pricing, as required*." ¶ 134. Anthem again asked Defendant Wentworth on December 14, 2015 whether Express Scripts "was willing to reconsider its position that it is not required to offer Anthem competitive benchmark pricing?" ¶ 135. Anthem's letter asked for a "meeting among the decision-makers." *Id.*

On December 15, 2015, *Express Scripts refused to meet, and stated that it was under no obligation to negotiate Anthem's pricing proposal and could veto any such negotiation.* ¶ 136. Express Scripts further stated that it would not respond to Anthem's December 2 revised pricing proposal for another two weeks (conveniently timed so that Express Scripts would not respond until after its upcoming December 22, 2015 investor conference call). *Id.* On December 17, 2015,

Anthem responded that Express Scripts "*already had nine months to consider the pricing issue and certainly must know its intentions*." *Id.* Defendants' investor call followed.

### 6. Defendants Falsely Assure Investors About "Productive Discussions" With Anthem, But Propose A Pricing *Increase*

Despite the lack of any negotiations and mutual allegations of bad faith, during an investor conference call on December 22, 2015, Defendant Paz falsely stated that Express Scripts was "*currently in discussions* with Anthem regarding the periodic pricing provisions of the agreement," and that "[w]e are excited to *continue productive discussions with Anthem regarding our relationship*." ¶ 226. During the same call, in response to an analyst's question, Paz falsely stated that the discussions were "*very early on*." *Id.* Paz also claimed that Express Scripts' practice was to "sit down" with its client and "identify opportunities for savings." ¶ 139. Analysts responded positively to these statements, with one analyst remarking that "the incremental commentary around ANTM [is] positive and . . . a resolution again here is more than likely," and another reporting that Express Scripts "anticipates another mutually beneficial outcome." ¶ 140.

On January 7, 2016, Express Scripts finally sent Anthem a counterproposal that lowered pricing by $1 billion (or less than 8% of the $13 billion that Anthem had demanded since October 2014), but *increased* prices overall by charging over $1 billion for the post-termination transition period. ¶ 143. Anthem went public with its disputes less than one week later. *Id*.

### E. The Truth Is Revealed To Investors

#### 1. January 12-19, 2016: Express Scripts' Stock Price Drops As Investors Learn Of Anthem's Dispute And Litigation Threat

On January 12, 2016, the truth began to emerge as Anthem's CEO took the terms of its long-running pricing dispute with Express Scripts public. ¶ 144. He stated:

> *[W]e are entitled to improved pharmaceutical pricing that equates to an annual value-capture of more than $3 billion. To be clear, this is the amount by which we would be overpaying for pharmaceuticals on an annual basis*. . . .

While our repricing provision was effective over a month ago, *we do not yet have an agreement with our current vendor to effectuate the savings. We have not yet received an offer from [Express Scripts] that we believe represents market-competitive benchmark pricing*. We're now trying to get them to engage in good faith negotiations as required under the terms of the repricing provision in our contract. To be clear, our shareholders are entitled to that value today and *our team has been and continues to be focused on exercising our contractual rights to capture that value*.

*Id.* After Swedish revealed the ***massive $15 billion*** gap between the companies, Anthem's General Counsel told reporters that Anthem was contemplating litigation against Express Scripts, asking rhetorically, "'***Do I sit here and overpay $3B a year? Or do I go file a lawsuit saying 'you've breached the agreement' by not giving the competitive pricing that Anthem is due?***" ¶ 145.

The market reacted negatively to the revelation of Anthem's dispute with Express Scripts. ¶¶ 147-60. In response, numerous analysts expressed surprise and concern, and the market price of Express Scripts common stock suffered statistically significant declines on four consecutive trading days, January 13, 14, 15 and 19, 2016. *Id.* Analyst reactions included: "Something Changed – The Relationship Seems Difficult to Salvage"; "Life Without ANTM Could Be More Likely Than Previously Thought"; and "***We can't true up ESRX's cautiously optimistic tone on its late-December guidance call and Anthem's increasingly strong public stance***." *Id.*

### 2.    After Anthem Threatens Litigation, Express Scripts' Already Strained Relationship And Negotiations With Anthem Worsen

Throughout January and February of 2016, the dispute between Express Scripts and Anthem only deepened. On January 13, 2016, the day after Anthem publicly threatened litigation or termination of the Anthem Contract, Anthem made a proposal to Express Scripts "[i]n the interest of getting to a resolution, . . . to accept less than competitive benchmark pricing." ¶ 162. Express Scripts did not respond. *Id.* On January 22, 2016, Anthem again proposed a below-market resolution to Express Scripts, and Express Scripts again refused to negotiate. ¶ 166.

In an attempt to move negotiations forward, on February 3, 2016, Anthem representatives traveled to St. Louis to meet with Defendant Wentworth and to offer a pricing reduction worth $9.7 billion, or $3.4 billion less than the $13.1 billion Anthem had previously demanded. ¶ 170. Again, Express Scripts refused to engage, and denied that it had any obligation to do so. *Id.* On February 5, 2016, Anthem submitted the same proposal in writing, telling Express Scripts that it had now spent "***almost one year***" trying to engage Express Scripts and that the current drug pricing terms were "***unsustainable***," and stressing that "***Anthem cannot continue under [Express Scripts'] current pricing, so please respond to Anthem's proposal by next week***." ¶ 171. On February 12, 2016, Express Scripts responded with the same proposal it had previously sent on January 7, 2016, showing the parties were nowhere near resolving their dispute. *Id.*

### 3. February 17, 2016: Defendants Falsely State That Express Scripts Was "Currently in Discussions" With Anthem

Publicly, Defendants continued to falsely reassure investors that the parties were working towards renewing their relationship. In the Company's 2015 Form 10-K, filed on February 16, 2016, Defendants falsely stated that Express Scripts was "***currently in discussions*** with Anthem regarding the periodic pricing review process pursuant to the terms of our PBM agreement with Anthem," and further reassured investors that "we are actively engaged ***in good faith discussions*** with Anthem and intend to continue to comply with the requirements of the agreement." ¶ 231. The Company's financial statements in the 2015 Form 10-K continued to treat contract renewal as "highly probable." *Id.* Likewise, on a February 17, 2016, Defendant Paz told investors that Express Scripts "***remain[ed] fully committed to good faith negotiations in hopes of reaching a mutually beneficial agreement within the framework of our 2009 contract. That has not changed.***" ¶ 232. Paz further stated that "***we are focused on reaching agreement***." *Id.* Yet Express Scripts refused to negotiate, even when Anthem CEO Swedish traveled to Chicago on

March 1, 2016 to meet with Paz directly.  ¶ 176.  Rather, Express Scripts merely recycled its previously rejected proposal, which actually ***increased*** prices in the post-termination period.  *Id.*

Not surprisingly, litigation followed with Anthem filing suit a few weeks later.  ¶ 177.

### 4.    March 21-22, 2016:  Anthem Files The Anthem Complaint

On March 21, 2016, the last day of the Class Period, Anthem commenced litigation against Express Scripts, the partial allegations of which did not become public until March 22, 2016.  ¶¶ 178, 183.  Anthem revealed for the first time that it had attempted to renegotiate drug pricing since early 2015, but negotiations with Express Scripts had never really commenced.  ¶ 179.  The Anthem Complaint also revealed that Anthem had served Express Scripts with notices of default on February 16, 2015 and April 1, 2015, concerning the Company's pricing and operational obligations.  ¶ 180.  Investors were shocked to learn that Express Scripts' relationship with Anthem was so damaged that the likelihood of contract renewal was exceedingly remote.  ¶¶ 181, 184-86.  For example, Leerink reported its "***surprise[]***" that the parties' relationship had "***deteriorated to a point where the most likely  outcome is termination of the contract***."  *Id.*  On March 22, 2016, in response to the news of Anthem's suit against Express Scripts, and that the parties' relationship was likely irreparable, the market price of Express Scripts common stock suffered another a statistically significant decline of $1.82, to close at $67.52 per share.  ¶ 187.

### F.    Post-Class Period Developments

### 1.    Express Scripts Countersues Anthem

On April 19, 2016, Express Scripts countersued Anthem, raising its own breach-of-contract claims and admitting the contentious nature of the parties' relationship and their repricing negotiations.  ¶ 188.  The counterclaims further confirmed that both companies believed their relationship was broken and a resolution was unlikely.  *Id.*  Express Scripts alleged "repeated failures" by Anthem "to comply with its contractual obligation to negotiate in good faith," called

Anthem's demand "unreasonable," accused Anthem of breaching the implied covenant of good faith and fair dealing, and demanded $4.675 billion in restitution.  ¶¶ 189-90.

### 2. Express Scripts Belatedly Admits That Risk Of Non-Renewal Was Materially Understated In Its Financial Statements

On April 25, 2016, Express Scripts belatedly admitted that the Anthem Contract would likely not be renewed beyond 2019.  ¶ 192.  In its first quarter 2016 Form 10-Q, Express Scripts reported that it had belatedly adjusted its accounting treatment of the Anthem Contract to amortize the contract's costs over its ten-year term, rather than over a 15-year useful life.  *Id.*

In its filing, Express Scripts finally admitted that there was not a supportable basis to conclude under GAAP that the Anthem Contract likely would be renewed or extended beyond 2019, and that the useful life of the Anthem Contract was limited to its ten-year term:

> When we executed our agreement with Anthem in 2009, . . . ***[we] attributed a reasonable likelihood of renewal at the end of its terms in 2019.  Accordingly, we amortized the agreement using a modified pattern of benefit over an estimated useful like of 15 years.***
>
> ***However, due to the sequence of recent events regarding our discussions with Anthem, culminating in the filing of the lawsuit on March 21, 2016, we felt it prudent to consider the increased likelihood of either non-renewal or renewal on substantially different terms such that, beginning in March 2016, we began amortizing our agreement with Anthem over the remaining term of the contract*** (i.e. using a life of 10 years from the time the agreement was executed in 2009).  Previously, we amortized the agreement over 15 years.

¶¶ 194-95.  In other words, Express Scripts belatedly admitted, after contrary accounting treatment throughout the Class Period (including after receiving Anthem's notices of breach), that there was not a GAAP-supportable basis to represent that it was highly likely that the Anthem Contract would be renewed.  That belated change resulted in a significant offset to the Company's revenues of $10.5 million for the first quarter of 2016, and $32 million quarterly thereafter.  ¶¶ 195-96.  And, on an earnings conference call the next day, April 26, 2016, Defendant Paz finally admitted that an amicable resolution was unlikely, and the dispute with Anthem "is probably going to be quite

15

a long, drawn out situation." ¶ 197.  For the first time, and contrary to his Class Period statements, Paz disclosed his view of Anthem's $3 billion annual repricing demand as "***pretty ludicrous.***"  *Id.*  Similarly, Defendant Wentworth admitted:  "the position that they've taken is . . . not a position we agree with.  ***And if we can't get past that, then it's going to be a long couple of years.***"  ¶ 198.

## ARGUMENT

### I.    DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS

#### A.    Defendants Were Obligated To Speak Truthfully To Their Investors

"The federal securities laws impose an obligation on speakers to be both accurate and complete." *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 282 (S.D.N.Y. 2011). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

Defendants spoke to investors about the purported strength of the Company's relationship with Anthem (¶¶ 204, 211) as well as regarding the companies' supposed "current" and "productive" negotiations (¶¶ 226, 231-33).  As the Complaint alleges, having raised those topics, Defendants were obligated to speak fully and truthfully, but did not.  Instead, Defendants misleadingly represented to investors that the relationship was "great" and "very, very solid," and that the companies were "actively engaged in good faith discussions" (*id.*), misstating current facts.

"A corporation has a duty to disclose a major dispute or uncertainty that exists in an important business relationship where the company publicly touts that specific relationship and the uncertainty may significantly affect the corporation's financial success" because, "[g]iven the investing public's knowledge of the relationship, such uncertainty 'significantly alters the total mix of information available.'"  *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013) (citing *In re Time Warner Sec. Litig.*, 9 F.3d 259, 267-68 (2d Cir. 1993); *Globus v. Law Research Svc., Inc.*, 418 F.2d 1276, 1280-83 (2d Cir. 1969)).

16

*Hi-Crush* is squarely on point.  In that case, Hi-Crush had publicly touted the strength of its relationship with its customer Baker Hughes that represented 18% of its annual sales, but was engaged in a contract dispute with Baker Hughes that it did not disclose to investors.  Hi-Crush argued that it had no duty to disclose the dispute in part because it did not believe the customer's litigation position had merit.  The court squarely rejected that argument:

> Though the contract dispute with Baker Hughes **had not yet escalated to litigation** at the time of the investor presentation, Baker Hughes **had already asserted a breach of contract** and tried to terminate the contract. . . . [E]ven if Hi-Crush believed in good faith that it had not breached the agreement with Baker Hughes and was correct in its belief, a new fact had come to light: Baker Hughes disagreed. Baker Hughes had also acted on this belief and sent a letter to Hi-Crush . . . purporting to terminate the agreement.  So even if Baker Hughes was wrong, and the contract was technically in full force, Baker Hughes's repudiation produced a new set of uncertainties for Hi-Crush: it drew into question whether Baker Hughes would make purchases going forward **and raised the specter of expensive litigation over the parties' relationship.** . . . The fact that disclosure of the unresolved dispute was accompanied by an immediate 26% decrease in Hi-Crush's stock price . . . is itself evidence that the dispute was a highly material fact.

*Hi-Crush*, 2013 WL 6233561, at *14-16.

In this case, there can be no dispute that Anthem was Express Scripts' most important customer and news about the Anthem relationship was highly material to investors.  *See also Time Warner*, 9 F.3d at 268 ("Having publicly hyped strategic alliances, Time Warner may have come under a duty to disclose facts that would place the statements . . . in a materially different light.").[3]

---

[3] Defendants' cited cases, none of which are from this jurisdiction, do not concern actual misstatements regarding key customer relationships – a far different scenario than here.  *See Nasyrova v. Immunomedics, Inc.*, 2015 WL 382846, at *8 (D.N.J. Jan. 28, 2015) (no duty to disclose dispute because company refrained from making any explicit statements); *Freeburg v. Wolf*, 42 F. App'x 715, 716 (6th Cir. 2002) (no discussion of any misstatements concerning status of companies' negotiations); *City of Pontiac Gen. Emps.' Ret. Sys. v. Schweitzer-Mauduit Int'l, Inc.*, 806 F. Supp. 2d 1267, 1292 (N.D. Ga. Aug. 26, 2011) ("puzzle pleading" where complaint "d[id] not explain why any particular statement [wa]s false or misleading").  Defendants also cite to *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) to argue that they met their disclosure obligations by mentioning the "uncertainty" of the purportedly ongoing negotiations.  Def. Br. at 30 n.14.  But at that same time, Defendants actually misled rather than warned investors, stating that they were "currently in discussions" with Anthem, when that was simply not true.  ¶ 226.  As *Rombach* makes clear, such misrepresentation gives rise to Section 10(b) liability.  355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Defendants conveniently misconstrue the Complaint. Def. Br. at 30-31.[4] Plaintiff does not allege that Defendants were obligated to predict the future or disclose the ultimate outcome of the negotiations. Neither does Plaintiff claim that Defendants were obligated to disclose immaterial details of the companies' negotiations in a vacuum. Rather, having raised to investors current facts concerning the companies' purportedly "great" relationship and supposedly "active" negotiations, Defendants defrauded investors when they spoke falsely about currently existing facts. Regardless of whether non-renewal was a "foregone conclusion" (Def. Br. at 31), Defendants materially misled investors by misrepresenting the known (but undisclosed) contentious relationship between Express Scripts and Anthem – including formal notices of breach, a *$15 billion* pricing dispute, and the lack of any meaningful negotiations. In other words, Plaintiff does not allege that Defendants were required to engage in "pure speculation" (Def. Br. at 31), but rather that they misrepresented and omitted known, material, present facts. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("defendants may be liable for misrepresentations of existing facts").[5]

Defendants also wrongly argue that their alleged omissions "would have done nothing more than elaborate upon disclosed information." Def. Br. at 32. To the contrary, the omitted facts directly contradicted Defendants' reassuring misstatements. Rather than "extensive and consistent dialogue" and "negotiations between Express Scripts and Anthem [that] forged on" (Def. Br. at 32-33), the Complaint alleges that the parties had a *$15 billion* fundamental difference of view on the contract; were refusing to negotiate that gap at all; and repeatedly accused each

---

[4] References to "Def. Br. __" refer to the corresponding page numbers of Defendants' memorandum of law in support of their motion to dismiss (ECF No. 73). References to "Def. Ex. __" refer to the exhibits to the Declaration of Scott Musoff in support of Defendants' motion (ECF No. 74).

[5] In contrast, Defendants cite to cases that concerned the alleged failure to disclose the potential consequences of certain facts that had not yet (and might never) come to pass, and where defendants had not previously spoken on the issue. *See Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170 (S.D.N.Y. 2015) (possibility of investigation, which in turn might result in invalidation of contract, was "mere speculation"); *In re UBS AG Sec. Litig.*, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ("where a party does *not* put the topic of the cause of its financial success at issue, there is generally no duty to speculate about the risk of future investigation or litigation") (emphasis in original).

other of acting in bad faith.  ¶¶ 80, 93-95, 104, 106, 122, 129-32, 134-37, 143.  Moreover, Anthem

served Express Scripts with two formal notices of breach of contract (¶¶ 81, 95); and the companies

exhausted the Anthem Contract's three-step resolution process, including mediation, but could not

resolve their disputes (¶¶ 85, 93, 104, 130).  Those facts were not mere details of the companies'

negotiations, but rather ran directly counter to Defendants' public statements, including by

Defendant Paz as late as December 22, 2015, that the parties were "currently in discussions" and

were prepared to "continue productive discussions."  ¶ 226.  Accordingly, the omitted facts (or

"detail") that there were no discussions for "months" (¶ 134) would have substantially altered the

total mix of information on which investors relied.  *See, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838

F.3d 223, 240 (2d Cir. 2016) ("half-truths – representations that state the truth only so far as it

goes, while omitting critical qualifying information – can be actionable misrepresentations").[6]

### B.    Defendants' Anthem Contract Accounting Was False And Misleading

As the Complaint details, at the end of each and every quarter throughout the Class Period,

Defendants misleadingly (and in violation of GAAP) accounted for the Anthem Contract in

Express Scripts' publicly filed financial statements with an assumed "high probability" of renewal

by Anthem.  ¶¶ 203, 210, 217, 223, 231.  Defendants were obligated under GAAP to amortize the

contract over its existing 10-year life, unless there was a sufficiently supportable basis under

GAAP to conclude that the contract probably would be renewed.  ¶¶ 47-64.  Conversely, having

accounted for the Anthem Contract since 2009 as if it would be renewed for at least an additional

five years (based on the initial determination of a "high probability" of renewal as Express Scripts

---

[6] By contrast, Defendants merely cite older cases concerning omissions that did not contradict prior statements.  *See Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 535 (S.D.N.Y. 2008) (defendants "did not affirmatively create an impression that was materially different from the truth"); *Reiss v. Pan Am. World Airways*, 711 F.2d 11, 14 (2d Cir. 1983) ("partial call of debentures was not misleading" at the time because of a later merger agreement); *Howard v. Galesi*, 1987 WL 18460, at *6 (S.D.N.Y. Oct. 6, 1987) (no duty to disclose "secret negotiations" with outside investor).

explained to the SEC when questioned on this accounting (¶¶ 54-56)), if Defendants at any quarterly reporting period became aware that there was not a supportable basis to assume a "high probability" of renewal, they were obligated to revise the remaining period of amortization (¶ 59). Defendants failed to do so throughout the Class Period. Although Defendants knew that renewal was increasingly unlikely based on the companies' contentious and unresolved disputes, each quarter throughout the Class Period, Defendants continued to account for the Anthem Contract in a way that misleadingly represented to investors there was a sufficient supportable basis under GAAP for the 15-year amortization schedule Defendants applied. This misleading accounting treatment of the Anthem Contract was not corrected until after the end of the Class Period (¶ 61), notwithstanding the fact that Individual Defendants Paz, Havel and Slusser repeatedly certified the purported completeness and accuracy of the Company's financial statements in sworn Sarbanes-Oxley certifications throughout the Class Period (¶¶ 201, 208, 215, 221, 229).

Defendants argue that GAAP necessarily allows for a "range of reasonable treatments," and therefore their accounting treatment of the Anthem Contract was not false but simply a "judgment" they were permitted to make. Def. Br. at 36-37. Despite the judgment inherent in any form of accounting, however, courts hold accounting statements to be actionable when defendants know facts that undermine the basis for the accounting treatment. *See, e.g.*, *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 314-15 (S.D.N.Y. 2013) (defendants' accounting under GAAP was actionable despite "very subjective standard" where plaintiffs plausibly alleged defendants "knew they were disseminating false and misleading opinions"); *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 763 F. Supp. 2d 423, 496 (S.D.N.Y. 2011) (sustaining claim based on GAAP violations where "Defendants knew or should have known of the need for asset write down"). Individual Defendants' Paz, Havel and Slusser's false Sarbanes-Oxley

20

certifications are actionable as well.  *See, e.g.*, *Bear Stearns*, 763 F. Supp. 2d at 459 (SOX certifications actionable where defendants made no effort to address deficiencies in their assessment of assets despite warnings from the SEC); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 234 (S.D.N.Y. 2008) (certifications actionable where facts showing falsity "were known to [defendant] at the time she made the Sarbanes-Oxley certifications"); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007) (same).

Defendants further confuse the issue by citing to cases concerning whether an "interim impairment charge would reveal that . . . goodwill . . . was overvalued," rather than the accounting issue here – whether in light of Express Scripts' and Anthem's ***$15 billion*** fundamental disagreement, protracted refusals to even negotiate, and mutual accusations of bad faith conduct, Express Scripts had a sufficiently supportable basis under GAAP to misleadingly ***assume*** likely renewal of the Anthem Contract for at least five more years.  Simply put, the scope and depth of the companies' disputes should leave no question that renewal should not have been treated as "highly probable" in the Company's financial reporting to investors throughout the Class Period.[7]

## C.    Defendants' Misstatements Were Not Unactionable Opinions

Defendants cannot avoid liability for their numerous false statements merely by framing their statements as "opinions" rather than statements of fact.  *See* Def. Br. at 33-35.  Notably, Defendants do not even identify which of their alleged fraudulent misstatements are purportedly "opinions."  And, the Complaint specifically alleges misstatements of fact during the Class Period, not opinion.  ¶¶ 200-35.  Regardless, under controlling law, a statement of opinion is actionable if

---

[7] Defendants' cases are inapposite.  *See City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) (no factual allegations supported plaintiffs' allegations of GAAP violations); *Ford v. Voxx Int'l Corp.*, 2016 WL 3982466, at *8 (E.D.N.Y. July 22, 2016) (no facts "suggesting that Defendants knew at any point" that goodwill should have been tested for impairment); *In re Leapfrog Enter., Inc. Sec. Litig.*, 2016 WL 4091395, at *16 (N.D. Cal. Aug. 2, 2016) (same).

"it is formed on the basis of an omitted fact, not disclosed by the speaker, that would likely conflict with a reasonable investor's own understanding" of the underlying situation. *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 728-29 (S.D.N.Y. 2015) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1328-29 (2015)).  In this case, Defendants are liable for their statements, *inter alia*, that Express Scripts' relationship with Anthem remained "very, very solid" (¶ 204) and the repricing negotiations were "active" "good faith discussions" (¶ 231), in light of the numerous omitted then-existing facts, including the parties' contentious exchanges, mutual accusations of bad faith, and refusals to even negotiate with each other.

Far from Defendants' assertion that the Complaint has an "absence of allegations" that Defendants did not believe their statements about the strength of the Express Scripts-Anthem relationship (Def. Br. at 34), the Complaint is replete with detail demonstrating that Defendants lacked a reasonable basis for their statements and omitted to disclose the contrary facts – including the massive scope of the companies' ***$15 billion*** dispute, their mutual allegations of bad faith, and numerous refusals to even negotiate.  Such allegations necessarily inform whether Defendants made material misrepresentations and omissions, as "[t]he reasonable investor understands a statement of opinion in its full context." *Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 557 (S.D.N.Y. 2015).  Plaintiff's allegations do not evidence, as Defendants argue, "frequent and consistent dialogue."  Def. Br. at 35.  Rather, the Complaint alleges that Express Scripts consistently ***refused*** to enter into any dialogue with Anthem throughout the Class Period.  *See, e.g.*, ¶¶ 134, 136, 162, 171, 176.  As such, to the extent any of Defendants' false statements are considered "opinions," they are all still actionable under controlling law.[8]

---

[8] As Defendants' own cited cases recognize, a reasonable investor "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 135 S. Ct. at 1329); *Lopez v. Ctpartners Exec. Search Inc.*,

### D.    Defendants' Misstatements Were Not Mere Puffery

Defendants argue that many of their alleged misstatements "are classic non-actionable puffery," but (as with their claimed "opinion" statements) Defendants do not identify any particular instances of "puffery." Def. Br. at 35-36. However, the puffery defense is fact-intensive and thus "not an appropriate basis on which to dismiss a complaint." *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003). This is particularly true in this case where Defendants were discussing the status of Express Scripts' relationship with its most important client and the Complaint demonstrates that investors paid careful attention to all of their words on the subject. ¶¶ 91, 100, 102, 115, 120, 127, 133, 140. And, as discussed above, Defendants' false statements regarding Anthem were misstatements of present facts, and as such are actionable. *See Novak*, 216 F.3d at 315 (puffery defense not available for "misrepresentations of existing facts").[9]

## II.    THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER

### A.    The Complaint Adequately Alleges A Strong Inference Of Scienter

A plaintiff may adequately plead a "strong inference" of scienter by alleging "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *MF Global*, 982 F. Supp. 2d at 305. The Court must "accept all factual allegations in the complaint as true" and evaluate the allegations holistically, rather than piecemeal. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). An inference of scienter "need not be irrefutable" or of a "smoking-gun genre," but is sufficiently "strong" when it is as likely as any other inference. *See id.* at 323, 314. In this case, numerous well-pled facts easily demonstrate a "strong inference"

---

173 F. Supp. 3d 12, 24 (S.D.N.Y. 2016) (same). *See also Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 400 (S.D.N.Y. 2001) (no evidence that defendant knew contrary facts to positive statements).

[9] Defendants' cases are inapposite. *See, e.g.*, *In re GLG Life Tech Corp. Sec. Litig.*, 2014 WL 464762, at *3, 8-9 (S.D.N.Y. Feb. 3, 2014) (statements about customer "being happy now" were not false or misleading when made along with specific disclosure that the customer was making no further purchases for the year); *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *10 (S.D.N.Y. Sept. 14, 2015) (statements at issue reflected "only the slightest degree of optimism," and did not contradict true undisclosed facts).

of Defendants' scienter.  *See* ¶ 250.

First, the massive **$15 billion** size of Express Scripts and Anthem's dispute over the pricing terms of the Anthem Contract, total lack of progress, and repeated refusals to even negotiate their dispute for over one year, give rise to a strong inference that Defendants knew (or recklessly disregarded) that they could not fairly:  (i) describe Express Scripts' relationship with Anthem as "great" or "business as usual"; (ii) claim that the parties were "currently in discussions" and "actively involved in good faith discussions"; or (iii) account for the Anthem Contract in the Company's financial statements as if it had a "high probability" of renewal, without materially misleading investors.  The Complaint is replete with detailed allegations demonstrating these facts.  *E.g.*, ¶¶ 78-80, 93-95, 104, 106, 122, 129-32, 134-37, 143, 162, 166, 170-71, 176-77, 188-91.

As Express Scripts later ***admitted***, the parties' negotiations were troubled "[f]rom the outset."  ¶ 78.  Specifically, on October 17, 2014, Anthem demanded **$15 billion** in pricing concessions over the remaining four years and post-termination period of the Anthem Contract.  ¶ 79.  By December 2014, Express Scripts had taken the position that it was not obligated under the Anthem Contract to provide Anthem with "competitive benchmark pricing" ***at all***.  ¶ 80.  Anthem reiterated its $15 billion demand throughout the Class Period, including in the formal notice of pricing breach that Anthem served on April 1, 2015.  ¶ 95.  From April 1, 2015 through June 22, 2015, Express Scripts refused to negotiate with Anthem or make a counterproposal. ¶¶ 95, 106.  For the remainder of the Class Period, Anthem and Express Scripts repeatedly accused each other of failing to negotiate in good faith.  ¶¶ 122, 129-32, 134-37, 171, 176-77.  All the while, Express Scripts maintained and reiterated its position that it was under no obligation to negotiate Anthem's pricing proposal at all and could veto any such negotiation.  *Id*.  Express Scripts refused to even send Anthem a counterproposal until January 7, 2016, and that proposal actually ***increased***

prices overall.  ¶ 143.  All of these detailed facts, taken together, give rise to a strong inference of knowledge (or at least recklessness) that Defendants' statements were materially false and misleading when made.  *See Globus*, 418 F.2d at 1283 (scienter based on knowledge of "important" dispute between a company and its supplier); *Hi-Crush*, 2013 WL 6233561, at *25-26 (facts supported an inference that defendants concealed adverse development with a major customer with knowledge that the omission posed a high danger of misleading investors).

Second, given the critical importance of Express Scripts' relationship with Anthem to investors as the Company's largest and most important customer, there is a strong inference that Defendants knew (or recklessly disregarded) the underlying facts they misstated and omitted in their communications to investors about Anthem.  Anthem represented 16.3% of Express Scripts' consolidated revenue for the year ending December 31, 2015, and was Express Scripts' largest client.  ¶ 36.  The Complaint alleges detailed facts showing both the importance of Anthem to Express Scripts (¶¶ 34-36, 47) as well as the heavy weight investors placed on all statements Defendants and Anthem made on the subject of the parties' relationship (¶¶ 37-45, 70, 72, 91, 100, 109, 111, 115, 120, 127, 133, 140, 146-60, 163-65, 167-69, 174-75, 181-86).  Accordingly, the Second Circuit's "core operations doctrine" further supports a strong inference that the Company and its senior executives acted with knowledge or at least recklessly.  *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989); *Hi-Crush*, 2013 WL 6233561, at *26 (adverse status of customer contract that constituted 18% of projected revenues was within "core operations" such that senior managers would have knowledge of the facts at the time).

Third, Individual Defendants Wentworth's and Paz's active "key" personal involvement in the companies' disputes further supports a strong inference of scienter.  ¶¶ 77, 104, 122, 131, 135, 170, 176.  The Complaint alleges repeated instances of Defendant Wentworth's and Paz's direct

involvement in the Anthem dispute (given the importance of the dispute to Express Scripts and their roles as the senior-most officers of the Company). For example, on August 29, 2014, Anthem emailed Wentworth directly, demanding changes to the pricing provisions of the Anthem Contract. ¶ 77. Wentworth continued to be an active participant in the parties' pricing dispute throughout the Class Period, receiving emails from Anthem and attending meetings regarding the pricing dispute in November and December 2015 (¶¶ 131, 135) and February 2016 (¶ 170). As Anthem stated in a November 11, 2015 email to Wentworth, Wentworth "had been a key [Express Scripts] representative with respect to the pricing issue." ¶ 131. Wentworth also actively participated in the parties' material operational dispute, attending a meeting with the President of Anthem on May 27, 2015. ¶ 104. Defendant Paz also directly participated in the parties' contractual disputes, including a March 1, 2016 meeting with Anthem where Express Scripts continued to refuse to negotiate. ¶ 176. These further facts support a strong inference of scienter. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 198 (S.D.N.Y. 2010) ("[M]eetings, where the problems at issue were directly discussed with Defendants, evidence scienter"); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 221-22 (S.D.N.Y. 2004) (same).

Fourth, Defendants Queller, Paz, and Wentworth repeatedly held themselves out in their public statements to investors as personally familiar with the parties' relationship and negotiations. ¶¶ 89-90, 99, 102, 114, 133, 138-39, 172-75. These facts further support a strong inference that Defendants either possessed the knowledge they claimed to have, and thus their statements were false, or they acted recklessly. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d. 367, 395-96 (S.D.N.Y. 2012) (finding it "highly improbable" that defendant who publicly described issuer's finances did not inquire into basis for his statements); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 516 (S.D.N.Y. 2010) (scienter pled where defendants "told the investing public

that they monitored the value of their portfolio").

Fifth, Anthem's own public statements (as well as numerous non-public statements it made to Defendants) further support a strong inference that Defendants knew (or recklessly disregarded) that Anthem was, in fact, serious about obtaining more favorable pricing terms or otherwise looking at its alternative "options," and not just posturing. ¶¶ 70, 72, 78, 144-45. In this regard, in announcing its intention to acquire Cigna on July 24, 2015, Anthem further raised its "optionality vis-à-vis [its] Express Scripts agreement." ¶ 110. As multiple analysts observed, the acquisition made it more likely that Anthem would continue to pursue aggressive price concessions from Express Scripts in connection with the Anthem Contract. *See Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *6-7 (E.D.N.Y. Mar. 30, 2012) (scienter based on knowledge (or reckless disregard) that largest customer was soliciting competitive bids from other suppliers).

Sixth, the irreparable damage to the parties' relationship from the first round of bitter pricing negotiations under the Anthem Contract that took "approximately one year," nearly led to litigation, and left Anthem asserting that it was forced to pay "above market pricing" further supports a strong inference of scienter. ¶¶ 65-69. According to both Express Scripts and Anthem, those negotiations were lengthy, contentious, and involved Anthem threatening litigation against Express Scripts. *Id*. Anthem further claims that "[t]he length of such negotiations unfairly resulted in Anthem paying above market pricing for almost an extra year." ¶ 68. This prior history was followed by Anthem's appointment of Brian Griffin to lead its next round of negotiations with Express Scripts, who became even more aggressive with the Company, including demanding to start the negotiations even earlier than Anthem had begun in its first bitter round of discussions. ¶¶ 71-77. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre-class period data relevant to scienter); *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 690 (E.D. Mich.

2004) (scienter based on knowledge that relationship with key business partner was "increasingly ruptured").

Seventh, Express Scripts' and Anthem's dispute over dozens of operational terms of the Anthem Contract further supports a strong inference of scienter. ¶¶ 81-84, 96, 103-05, 117, 123. As early as 2012, and continuing throughout 2014 and 2015, Anthem repeatedly notified Express Scripts of numerous operational problems with Express Scripts' performance under the Anthem Contract. *Id.* Anthem delivered numerous corrective-action measures to Express Scripts (¶ 82) and repeatedly reported Express Scripts' failure to meet federal requirements to CMS (¶¶ 84, 117, 123). These and other issues culminated in Anthem serving Express Scripts with a 14-page single-spaced letter containing formal notice of operational breach of the Anthem Contract on February 16, 2015, eight days prior to the start of the Class Period. ¶ 81. On March 6, 2015, Express Scripts conceded that these operational breaches were material when it submitted to a formal resolution process that was reserved for "material" disputes. ¶¶ 85, 93. That effort, led by Wentworth, and the subsequent mediation failed, and the parties continued to accuse each other of failing to act in good faith. ¶¶ 104, 130. *See, e.g.*, *Hi-Crush*, 2013 WL 6233561, at *25-26 (scienter based on adverse developments with a major customer).

Eighth, Defendants' subsequent ***admission*** that the parties had engaged in a year-long dispute further supports scienter. ¶¶ 189-91, 197-98. Indeed, on June 9, 2016, at an investor conference after the end of the Class Period, Defendant Paz finally revealed what he had thought of Anthem's demand back in October 17, 2014 for $3 billion in annual price reductions by labelling it as "***pretty ludicrous***" and warning investors that if Anthem continued with that position the dispute would be "***a long couple of years***" of litigation. *Id.* Similarly, on April 25, 2016, Defendants finally ***admitted*** that the Anthem Contract should be amortized over the 10-year term

of the Contract (and not 15 years).    ¶¶ 192-96.    Finally, Express Scripts' own Counterclaim **admitted** the protracted nature of the parties' dispute and lack of any real negotiations, specifically alleging that Anthem rejected five separate proposals from June 2015 to March 2016 simply "out-of-hand."    *Id.*    Such post-Class Period admissions support scienter.    *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (citing to complaint filed by defendant after the class period that referred to failure of software developers to meet contractual obligations during the class period); *Burstyn v. Worldwide Xceed Grp., Inc.*, 2002 WL 31191741, at *6 (S.D.N.Y. Sept. 30, 2002) (magnitude of adjustments raised questions about defendant's credibility and made press statements suspect).

In sum, all of these numerous detailed facts, viewed collectively, easily give rise to a strong inference as to each of the Defendant's scienter.    *Tellabs,* 551 U.S. at 322-23; *In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *17 (S.D.N.Y. Oct. 19, 2009) (assessing scienter facts "holistically").

### B.    Defendants' Scienter Arguments Are Without Merit

Defendants make a series of arguments against a strong inference of scienter that all fail. At the start of their brief, Defendants question (with the benefit of hindsight) why they would have concealed the true adverse facts from their investors.    Def. Br. at 1.    But, the well-pled facts must control.    *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir 2008) ("The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with it having been a considered, though because of the risk a reckless, gamble.").

Defendants assert in a footnote that "Plaintiff makes no attempt to distinguish between the various defendants."    Def. Br. n.9.    This is not accurate.    The Complaint carefully specifies each Defendant who made a misleading public oral statement, signed a misstated quarterly filing, and/or signed a false Sarbanes-Oxley certification during the Class Period.    ¶¶ 200-35, 271-73.    Moreover,

the personal roles of each Individual Defendant are identified (in addition to the "core" facts set forth above showing that there is a strong inference that Defendants would each know of the troubled Anthem relationship and lack of any negotiations, given Anthem's importance to the Company and these executives' repeated statements claiming to have knowledge of the facts).

For example, Wentworth told investors that the Company's 2015 10-K complied with GAAP and that Express Scripts and Anthem were "actively engaged in good faith discussions." ¶ 231. But Wentworth was personally involved in the bitter, contentious dispute over the Anthem Contract and knew the contrary facts. ¶¶ 75-77, 122, 131, 135. Paz made similar claims. ¶¶ 201, 208, 211, 221, 226, 231. In actuality, Express Scripts *refused* to negotiate with Anthem even when Anthem's CEO traveled to Chicago on March 1, 2016 to meet directly with Paz. ¶ 176. Accordingly, the Complaint pleads far more than the "Individual Defendants' positions []or changes in those positions" (Def. Br. n. 9), and Defendants' cited authority is inapposite.[10] Moreover, allegations giving rise to a strong inference of at least one corporate agent's scienter satisfy the PSLRA as to the corporation's, Express Scripts', scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008); *Public School Emps. Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363-64 (S.D.N.Y. 2012) (same).

Defendants argue that "there are no particularized allegations that any Defendant possessed adverse information" because the Complaint does not sufficiently specify "reports or statements that are contradictory to the statements made" or "instances in which Defendants received information that is contrary to their public declarations." Def. Br. at 17-18. Defendants are wrong.

---

[10] *See UBS*, 2012 WL 4471265, at *11 (dismissing claims where complaint alleged executives' roles at the company but did "not allege that either executive made any actionable misstatement"); *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *20 (S.D.N.Y. Oct. 25, 2006) (complaint merely relied upon "generalized" allegations regarding "access to undisclosed information"); *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *19, 23 n.6 (S.D.N.Y. Sept. 29, 2014) (same).

The Complaint contains numerous, specific facts demonstrating that Defendants had or recklessly disregarded information contradicting their public statements that their relationship with Anthem was "great," "very, very solid," "business as usual," and that the parties were "currently in discussions" regarding renewal of the Anthem Contract, when that was not true. As detailed above, in communications authored and received by the Individual Defendants (¶¶ 75-77, 122, 131, 135) and meetings attended by the Individual Defendants (¶¶ 104, 170, 176), Express Scripts and Anthem reiterated their fundamental disagreement over the pricing terms of the Anthem Contract and refusals to even negotiate. In addition, Express Scripts held a failed mediation with Anthem. ¶ 130. No additional particularity is required at this early stage. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 495-96 (S.D.N.Y. 2004) (finding scienter where defendants had access to contrary information but no allegations as to specific reports).

Defendants argue that "[b]y failing to put forth any particularized allegations that support the theory that Defendants determined at any point during the Class Period that negotiations would ultimately prove fruitless and that the Anthem Litigation was imminent, Plaintiff falls short of its burden." Def. Br. at 18. This argument fails. Defendants made affirmative statements to investors about the "great" and "solid" nature of their relationship with Anthem and "current" negotiations regarding contract renewal that were not true at the time of their statements, regardless of what would occur in the future. Similarly, Defendants accounted for the Anthem Contract in the Company's financial statements as if contract renewal was "highly probable," when that was not true at the time. In truth, as Express Scripts has finally admitted, the parties' negotiations were troubled "from the outset" and, by no later than December 2014, Express Scripts and Anthem had reached a material $15 billion dispute which continued to deepen and worsen throughout the Class Period. Indeed, the parties were not negotiating at all. These facts show that Defendants knew or

recklessly disregarded that their statements during the Class Period were materially false and misleading when made, regardless of what would happen in the future.[11]

Defendants assert that the Complaint's reliance on "pleadings in the Anthem Litigation" instead of "confidential witnesses" undermines scienter. Def. Br. at 19. But those pleadings, from the parties to the underlying dispute itself, are far more reliable that facts attributed to anonymous sources. *See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006) ("Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant throughout this litigation"). To the extent that Defendants intended to suggest that Anthem's pleadings should be disregarded, this argument also fails. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 621 (S.D.N.Y. 2014) ("no Second Circuit precedent indicates such a broad rule"). Importantly, both Express Scripts' and Anthem's pleadings largely agree on the underlying facts of their dispute, including the lack of good faith negotiations and any progress, at the very same time that Defendants were telling Express Scripts investors that the parties' relationship was "great" and "very, very solid"; negotiations were "currently" in progress; and renewal for at least five years was assumed in Express Scripts' financial statements.

For example, Express Scripts and Anthem agree that Anthem demanded $15 billion (ES Counterclaims ¶ 185; Anthem Compl. ¶ 3) and served multiple notices of breach of contract on Express Scripts (*e.g.*, ES Ans. ¶ 45; Anthem Compl. ¶ 24). They also agree that they exchanged multiple letters and emails detailing their dispute and lack of good faith (*e.g.*, Anthem Compl. ¶¶ 17, 22, 30; ES Ans. ¶¶ 38, 43, 51) and that the November 2015 mediation was a failure (Anthem Compl. ¶ 115; ES Counterclaims ¶¶ 195, 249-50). The Complaint also carefully cites to and

---

[11] Defendants' cited authority is readily distinguishable. *See In re Neustar Sec.*, 83 F. Supp. 3d 671, 686 (E.D. Va. 2015) (concerning whether Defendant would win a bid to secure a future contract, not misstatements of present facts); *GLG*, 2014 WL 464762, at *6 (Defendant revealed customer's present lack of orders in the challenged statement itself, so no false statement was made).

footnotes each of its sources of information, including Anthem's own public statements.  ¶¶ 70-198.  These well-pled facts give rise to a strong inference of scienter because, as alleged in the Complaint, they demonstrate that Express Scripts knew or recklessly disregarded that the companies' relationship was fraught with a massive dispute and that renewal of the Anthem Contract was not "highly probable."  In any event, "corroboration" from anonymous sources is not required.  *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 478 (S.D.N.Y. 2004) (personal sources not required) (citing *Novak*, 216 F.3d at 314).[12]

Defendants assert that because the parties' first round of pricing negotiations "ended in a successful agreement," they "cannot possibly support an inference that later negotiations would not."  Def. Br. at 21.  This argument again fundamentally mischaracterizes the Complaint and misses the point.  First, the Complaint does not allege that Defendants knew that the parties' second round would fail.  Rather, it alleges that Defendants made numerous statements about present facts and circumstances (such as that the parties were "currently in discussions" regarding contract renewal when that was not true and the parties were refusing to negotiate).  ¶¶ 226, 231.  Second, the Complaint alleges that the parties' first round of bitter negotiations irreparably damaged Express Scripts' relationship with Anthem prior to the start of the Class Period and did not result in a "mutually beneficial agreement," as Express Scripts told investors.  ¶¶ 65-69, 226.  In support of those allegations, Plaintiff relies not solely on the "length" of the first negotiation process (Def. Br. at 20), but also cites corroborating statements from both Express Scripts and Anthem.

---

[12] In contrast, Defendants' cited cases involved complaints that relied only on anonymous sources whose knowledge was insufficiently tied to the individual defendants or contained no particularized facts from any source.  *See City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008) (no anonymous source provided information that defendants knew about accounting error); *Lopez*, 173 F. Supp. 3d at 41 (plaintiff's fraud theory was "a complete conjecture" attributed to no source at all); *Rahman v. Kid Brands, Inc.*, 2012 WL 762311, at *23 (D.N.J. Mar. 8, 2012) (lack of any "factual source" indicating scienter); *City of Monroe Emps. Ret. Sys. v. Hartford Fin. Grp., Inc.*, 2011 WL 4357368, at *18 (S.D.N.Y. Sept. 19, 2011) (agreeing with plaintiff that there is no "magic formula necessary to survive a motion to dismiss under the PSLRA," but finding no scienter because plaintiff's entire fraud theory rested on unfounded assumptions).

Specifically, in December 2011, Express Scripts announced that the parties were involved in a "dispute" and Anthem had threatened "litigation." ¶ 69. Moreover, according to Anthem, the first round "unfairly resulted in Anthem paying above market pricing for almost an extra year." ¶ 68. This difficult and lengthy negotiation set the stage for the parties' second round. ¶ 75.[13]

Defendants ask the Court to conclude at the pleading stage that Anthem's aggressive tactics and statements about operational breaches were merely "an attempt to maximize negotiation leverage." Def. Br. at 21. Similarly, Defendants contend that "Express Scripts' negotiation posture did not signal that negotiations would be unsuccessful." Def. Br. at 23. Again, there is no requirement that the Complaint allege that at some point during the Class Period, both Express Scripts and Anthem definitively concluded that negotiations would be unsuccessful. Rather, the relevant issue is whether Defendants knew (or recklessly disregarded) that their relationship with Anthem was not "great" and "very, very solid," and renewal of the Anthem Contract was not "highly probable" at the time of their statements. Not only were negotiations troubled "from the outset," as Express Scripts has admitted (¶ 78), but by at least December 2014, the parties had reached a fundamental *$15 billion* disagreement about the pricing terms of the Anthem Contract (¶ 80), which deepened and worsened throughout the Class Period as the parties refused to even negotiate (*e.g.*, ¶¶ 136, 166). On the operational side, Anthem accused Express Scripts of breach of contract (¶ 81), and repeatedly reported Express Scripts' operational violations to CMS (¶¶ 82, 84, 117, 123). This is not the way that parties act when they are "currently in discussions" or "actively engaged in good faith discussions" as Defendants stated to investors. At most, Defendants raise a factual dispute (that they were just "posturing" when they refused to negotiate

---

[13] Express Scripts contends that the December 2011 statements "say nothing about the parties' relationship" because they were made before the first round of pricing negotiations began in 2012. Def. Br. at n.11. This is baseless. The Complaint details Anthem's explicit position that this history impacted their second round of negotiations. ¶ 68.

with Anthem for over one year) which is inappropriate at this stage. *See, e.g.*, *Bear Stearns*, 763

F. Supp. 2d at 496 ("factual disputes are 'inappropriate for disposition on a motion to dismiss'")

(quoting *Joffee v. Lehman Bros., Inc.*, 2005 WL 1492101, at *6 (S.D.N.Y. June 23, 2005)).

Defendants claim that Anthem's demand for $15 billion contradicted statements that

Anthem made to its own investors indicating that it would accept less and that it hoped to reach a

resolution with Express Scripts. Def. Br. at 23. This is another factual issue inappropriate for

determination on the pleadings. *See Bear Stearns*, 763 F. Supp. 2d at 496. In any event, if what

Anthem may have told its investors about how much it would accept in pricing concessions were

hopeful to Express Scripts, Defendants could have negotiated. But, they did not and Express

Scripts' position was that Anthem was not entitled to any competitive benchmark pricing at all.

*See* ¶ 80. Anthem's statements to its own investors about whether it hoped to reach a resolution

with Express Scripts are also irrelevant because the parties' actual exchanges with each other and

mutual accusations of bad faith deflated any hope that Anthem's public statements may have

generated. In any event, consistent with its private dealings with Express Scripts, Anthem told its

investors throughout the Class Period that it intended to re-negotiate the Anthem Contract and was

considering all of its options, including options other than Express Scripts. ¶¶ 70, 72, 110, 144.

Defendants assert that scienter is undermined by Express Scripts' purported warnings on

December 22, 2015 and February 16, 2016 that the outcome of negotiations was uncertain. Def.

Br. at n.10, 24. In reality, however, Defendants made repeated statements on December 22 and

February 16 stating that the parties were currently negotiating when they were not. Thus, any

warning that the negotiations were uncertain and could fail does little to exculpate Defendants

when, contrary to their public statements, they were not negotiating at all. For example, on

December 22, Paz misrepresented the status of Express Scripts' negotiations with Anthem as "very

early on," "current," and "productive." ¶ 226.  None of those statements was true when made and Express Scripts told Anthem just a week earlier that it was under "no obligation to negotiate." ¶¶ 134-37.  On February 16, Defendants similarly misrepresented that Express Scripts was "currently in discussions" and "actively engaged in good faith discussions" with Anthem.  ¶ 234. Yet, Defendants continued to refuse to negotiate and litigation followed.  ¶¶ 176-77.[14]

Defendants assert that there was no clear duty to disclose that negotiations would ultimately fail and thus, "recklessness cannot be inferred from the failure to disclose."  Def. Br. at 25-26. However, the Complaint alleges specific statements about Express Scripts' relationship with Anthem that were materially false and misleading when made, regardless of whether Express Scripts' negotiations ultimately would fail.  Defendants cannot avoid liability for these misstatements.  *See, e.g.*, *Hi-Crush*, 2013 WL 6233561, at *13.

Defendants contend that the Complaint does not adequately allege that Defendants knew or recklessly disregarded that their accounting treatment of the Anthem Contract was incorrect. Def. Br. at 26-27.  Defendants also point to Express Scripts' auditors' approval of its accounting as undermining scienter.  *Id*.  But the facts show otherwise.  When Defendants were questioned on this accounting by the SEC in 2010, they told the SEC it was based on "a high probability" that Express Scripts would renew its contract with Anthem and that was "most probable." ¶¶ 54-56. Yet Defendants continued with this accounting treatment, notwithstanding the parties' bitter disputes and GAAP, which required a revision if circumstances changed.  ¶ 59.  Nor is there any support in the Complaint (or anywhere else) that Express Scripts' outside auditor was privy to any

---

[14] Defendants' cases, in contrast, involved situations where defendants disclosed, rather than suppressed or actively misstated data.  *See Borochoff v. GlaxoSmithKline PLC*, 2008 WL 2073421, at *8 (S.D.N.Y. May 9, 2008) (no scienter based on suppressing negative data where the company published the data on its website and disclosed it to the FDA); *In re Open Joint Stock Co. Vimpel-Cmmc'ns*, 2006 WL 647981, at *8-9 (S.D.N.Y. Mar. 14, 2006) (fact that defendants promptly disclosed tax authorities' preliminary conclusions against company undermined a finding of scienter).  Here, of course, all of the corrective disclosures came from Anthem and not Express Scripts.  ¶¶ 144-60, 178-87.

of these facts showing the massive dispute and complete lack of negotiation between the parties.

In any event, as for Express Scripts' reliance on its auditor, that is not a basis for a contrary finding at the pleading stage.  *See, e.g.*, *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[t]o hold otherwise would shift to accountants the responsibility that belongs to the courts" at the pleading stage).  To establish such a defense Defendants would have to show that they "made a complete disclosure, sought the advice of the appropriateness of the challenged conduct, received advice that the conduct was appropriate, and relied on that advice in good faith."  *SEC v. Caserta*, 75 F. Supp. 2d 79, 95 (E.D.N.Y. 1999).  All of that is premature at this stage.  *See W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 F. App'x 717, 720 (2d Cir. 2009) (finding inference that the company concealed its fraud from its outside auditor "objectively more compelling").[15]

Finally, Defendants repeat certain of their arguments to contend that the more plausible inference is that Express Scripts believed that its "negotiations" with Anthem would "reach a resolution."  Def. Br. at 28-29.  According to Defendants, it is "baseless" to allege that Express Scripts knew a year in advance that "the Anthem Litigation was a certainly [sic] on the horizon."  *Id.* at 28.  Again, this is not what the Complaint alleges, and for all of the reasons set forth above, this attempt to re-write the Complaint's allegations fails.  Defendants' reliance on *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573 (S.D.N.Y. 2011), is also misplaced.  There, the Court found that plaintiffs

---

[15] Defendants' cited cases are inapposite because they all relied solely on after-the-fact restatements to allege scienter. *See In re Bristol-Meyers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 565 (S.D.N.Y. 2004) ("the Restatement alone does not provide a basis for inferring scienter"); *Bd. of Trustees of City of Ft. Lauderdale Gen. Emps. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 881 (S.D.N.Y. 2011) (no "particularized facts demonstrating that any of the Individual Defendants, or other persons whose intent could be imputed to [defendant]" knew about the underlying conduct at issue); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008) ("The mere fact that B&L's financial reporting was inaccurate does not establish scienter"); *Casula v. Athenahealth, Inc.*, 2011 WL 4566115, at *6 (D. Mass. Sept. 30, 2011) ("'Allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim'") (internal citations omitted); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (same); *Zech Capital LLC v. Ernst & Young Hua Ming*, 636 F. App'x 582, 585 (2d Cir. 2016) (no allegations that auditing procedures that did not uncover alleged fraud were reckless); *Caiafa v. Sea Containers Ltd.*, 331 F. App'x 14, 16 (2d Cir. 2009) (GAAP violation alone insufficient to plead scienter).

had failed to allege (contrary to defendants' challenged statement) that "no talks between" the parties had occurred. *Id.* at 598. Of course, that is precisely what Plaintiff has alleged in this case, demonstrating that Defendants' statements were knowingly or at least recklessly false when made.

## III. THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

The Complaint's loss causation allegations are evaluated under liberal Rule 8 notice pleading standards, and pleading loss causation is "not meant to impose a great burden on plaintiffs." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at \*12 (S.D.N.Y. Mar. 27, 2013); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (requiring only a "short and plain statement" that provides "some indication of the loss and causal connection that the plaintiff has in mind"). A plaintiff pleads loss causation by alleging that the "market reacted negatively to a corrective disclosure of the fraud" or "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014) (quotation omitted). The Complaint easily meets that pleading standard, as it details the market declines in Express Scripts' stock price as the truth emerged over a series of corrective disclosures about the Company's relationship with Anthem and materialization of that risk. ¶¶ 144-60, 178-87, 236-48.

Defendants argue that neither Anthem's January 12, 2016 disclosure of its $15 billion dispute with Express Scripts and threat to sue Express Scripts (¶¶ 144-60), nor the details of Anthem's bitter dispute with Express Scripts when its pleading was unsealed (¶¶ 184-87), was a corrective disclosure because statements by Defendant Paz during a December 22, 2015 investor call purportedly disclosed the truth. Def. Br. at 39-40. But rather than reveal the truth, Paz falsely described the parties' negotiations as "current" and "productive," and merely stated that he was "unable to provide a timetable or the likely financial terms of the successful negotiation at this time." *Id*. Contrary to Defendants' mischaracterization, Paz did not at that point express sufficient

38

uncertainty as to the potential outcome of negotiations with Anthem or the likelihood of contract renewal to correct Defendants' misstatements. Far from it. Rather, Defendants continued to assure investors that Express Scripts was "excited to continue productive discussions," "fully committed to reaching a mutually beneficial agreement," and "it's just now a question of working through [the] details and trying to find out where we end up," even if the Company could not provide the specific terms "*of the successful negotiation at this time*." Def. Ex. 14 at 3, 7. Indeed, an analyst responded to these comments during the call, "Thank you for all the detail. George [Paz] let me just start with your comments around Anthem and the uncertainty around that timing, *but feeling confident that you will come to some mutually beneficial agreement.*" *Id*. at 4.

It was not until news emerged (from Anthem) that negotiations were protracted and highly contentious (rather than productive), and that Anthem's *$15 billion* demand would likely (and did) lead to litigation, that investors learned, and the market swiftly reacted to, the truth about Express Scripts' bitter relationship with Anthem and refusal to engage in any negotiations at all for over one year. This news was revealed both by Anthem's disclosures on January 12, 2016 (¶¶ 144-60) and, further, when the details emerged about the parties' bitter dispute upon the partial unsealing of Anthem's complaint (¶¶ 178-87), as demonstrated by the statistically significant declines in the price of Express Scripts stock upon that news and the securities analysts' reaction. *See, e.g.*, *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 595 (S.D.N.Y. 2010) ("allegations of significant price drops in response to disclosures of the alleged omissions or misstatements can establish loss causation"); *Scottish Re*, 524 F. Supp. 2d at 396 (same).

Defendants' (entirely factual) argument that Anthem's statements were somehow "new" developments, and thus unrelated "intervening events," raises "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d

161, 174 (2d Cir. 2005); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 188 (2d Cir. 2015) (loss causation disputes were "evidentiary matters for later phases of this lawsuit"); *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) ("when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, 'the chain of causation is . . . not to be decided on a Rule 12(b)(6) motion to dismiss.'") (quoting *Loreley*); *In re Am. Int'l Group, Inc.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) (claimed existence of intervening events that "break the chain" of causation is for trial and not a motion to dismiss).

Moreover, for an event to be deemed an "intervening event" it must have no relationship to the alleged misstatements and omissions, but be a truly separate cause for decline in the company's stock price. *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 123 (S.D.N.Y. 2004) ("intervening event" to show no loss causation must be "not related to the fraud"); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163-66 (S.D.N.Y. 2008) (refusing to dismiss loss causation events as arising from unrelated events at the pleading stage).

Loss causation, including the precise extent of and reasons for the market movements on various dates, will be the subject of expert analysis at later stages of this litigation, following discovery. At this stage, however, Defendants cannot show that Anthem's statements revealing its massive $15 billion dispute with Express Scripts or the parties' bitter refusals to even negotiate (as revealed by Anthem's unsealed Complaint) are so unrelated to Defendants' alleged misstatements and omissions that they must be dismissed as unforeseeable "intervening events" as a matter of law at the pleading stage. To the contrary, they are what Defendants knew was coming.

## CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

DATED:  February 7, 2017                    Respectfully submitted,


                                            BERNSTEIN LITOWITZ BERGER &
                                                GROSSMANN LLP

                                            ___/s/ Salvatore J. Graziano_____
                                            Salvatore J. Graziano
                                            Adam D. Hollander
                                            Rebecca E. Boon
                                            1251 Avenue of the Americas
                                            New York, New York 10020
                                            Tel: (212) 554-1400
                                            Fax: (212) 554-1444
                                            sgraziano@blbglaw.com
                                            adam.hollander@blbglaw.com
                                            rebecca.boon@blbglaw.com


                                            *Lead Counsel for Lead Plaintiff TIAA*