UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE EXPRESS SCRIPTS HOLDING
COMPANY SECURITIES LITIGATION

**OPINION AND ORDER**

16 Civ. 3338 (ER)

Ramos, D.J.:

This consolidated putative class action arises out of the breakdown of the business

relationship between Express Scripts Holding Company ("Express Scripts"), a provider of

pharmacy benefit services, and Anthem, Inc. ("Anthem"), its largest customer.  Lead Plaintiff,

Teachers Insurance and Annuity Association of America ("TIAA"), an Express Scripts

shareholder, asserts causes of action individually and on behalf of others similarly situated for

violations of Section 10(b) of the Exchange Act (and Rule 10b–5 promulgated thereunder) and

violations of Section 20(a) of the Exchange Act.  Plaintiff generally alleges that Express Scripts

made false and misleading statements in its public filings and comments regarding the state of its

relationship with Anthem.  Defendants Express Scripts, George Paz, Timothy Wentworth, Eric

Slusser, David Queller, and James M. Havel (the "Individual Defendants," and with Express

Scripts, "Defendants") bring this motion to dismiss the Amended Class Action Complaint (the

"CAC") for failure to state a claim.  For the reasons set forth below, Defendants' motion is

GRANTED.  However, the Court dismisses the CAC without prejudice and grants Plaintiff leave

to amend.

## I.  BACKGROUND[1]

### A. The Parties

Lead Plaintiff TIAA brings this action individually and on behalf of all proposed class members and entities who purchased or otherwise acquired Express Scripts common stock between February 24, 2015 and March 21, 2016 (the "Class Period").  CAC (Doc. 67) ¶ 2. Defendant Express Scripts is the largest standalone provider of pharmacy benefit services ("PBM") in the United States and manages prescription drug plans for health insurers, self-funded employers, the public sector, and government clients.  *Id.* ¶ 24.

The Individual Defendants occupied various executive positions at Express Scripts throughout the Class Period.  Defendant George Paz ("Paz") was the Chairman and Chief Executive Officer ("CEO") of Express Scripts.  *Id.* ¶ 18.  Defendant Timothy Wentworth ("Wentworth") was the President.  *Id.* ¶ 19.  Defendant Eric Slusser ("Slusser") was Chief Financial Officer ("CFO").  *Id.* ¶ 20.  Defendant David Queller ("Queller") was Senior Vice President of Sales and Account Management.  *Id.* ¶ 21.  Defendant James M. Havel ("Havel") was Executive Vice President and Interim CFO.  *Id.* ¶ 22. In September 2015, Havel became the Company's Executive Vice President of Finance.  *Id.*

### B. Anthem and the Pharmacy Benefit Management Agreement

Express Scripts' largest customer is Anthem, who represented 16.3% of Express Scripts' revenue for the year ending December 31, 2015.  *Id.* ¶¶ 34–37.  Anthem is one of two clients that

---

[1] The facts are drawn from the CAC, "together with those 'documents . . . incorporated in it by reference' and 'matters of which judicial notice may be taken.'"  *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 123 (2d Cir. 2011) (ellipsis in original) (citation omitted).  The Court may consider any document where the complaint "relies heavily upon its terms and effect," thereby rendering the document "integral to the complaint."  *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 Civ. 4665 (PGG), 2014 WL 4832321 at *12 (S.D.N.Y. Sept. 28, 2014) (internal quotation marks and citations omitted).  The Court "may also consider 'legally required public disclosure documents filed with the SEC'" and other publicly-available information, such as press releases and earnings call transcripts.  *See id.* (citation omitted).

Express Scripts identifies as its "large clients" (along with the Department of Defense). *Id.* ¶ 34. As Express Scripts recognized, including in its public filings, "[a] substantial portion of [Express Scripts'] business is concentrated in certain significant client contracts," including with Anthem, and modification or non-renewal of its contract with Anthem could "materially adversely affect[]" Express Scripts' financial results. *Id.* ¶ 35.[2]

On December 1, 2009, Express Scripts and Anthem entered into a pharmacy benefit management agreement (the "Contract") pursuant to which Express Scripts agreed to act as Anthem's exclusive provider of pharmacy benefit management services for Anthem-administered health insurance plans for a ten year period from 2009 to 2019. *Id.* ¶¶ 26, 33.[3]

Section 5.6 of the Contract, titled "Periodic Pricing Review," provides an avenue for Anthem to renegotiate pricing every three years. ("Section 5.6"). Section 5.6 states in full:

> **5.6 Periodic Pricing Review**. [Anthem] or a third party consultant retained by [Anthem] will conduct a market analysis every three (3) years during the Term of this Agreement to ensure that [Anthem] is receiving competitive benchmark pricing. In the event [Anthem] or its third party consultant determines that such pricing terms are not competitive, [Anthem] shall have the ability to propose renegotiated pricing terms to [Express Scripts] and [Anthem] and [Express Scripts] agrees [sic] to negotiate in good faith over the proposed new pricing terms. Notwithstanding the foregoing, to be effective any new pricing terms must be agreed to by [Express Scripts] in writing.

---

[2] Plaintiff avers that accordingly, "the market" was focused on the relationship between these two companies, specifically on the likelihood that the parties would renew their contract past its scheduled expiration in 2019. *Id.* ¶¶ 37–45.

[3] Though not relevant to the 12(b)(6) analysis, at the same time the parties entered into the Contract, Express Scripts agreed to purchase NextRx, Anthem's in-house PBM services provider. Declaration of Scott D. Musoff ("Musoff Declr.") (Doc. 74), Ex. 24 at 1. Defendants argue that the two transactions were related, and that in structuring the combined deal, Anthem elected to receive the highest available cash offer for NextRx – $4.675 billion upfront – in lieu of lower pricing during the life of the Anthem Contract. Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint ("Defs.' Mem.") (Doc. 73) at 5.

*See id.* ¶ 28.  As Defendant Paz stated publically, such "routine" price checks give Express Scripts' customers "the right to look at pricing and make sure that we are doing the right things for them." *Id.* ¶ 31.

The negotiations at issue here relate to the periodic pricing reviews provided under the Contract.

### C. The Pricing Negotiations Between Anthem and Express Scripts

Anthem and Express Scripts first renegotiated pricing in 2011–12 under Section 5.6 of the Contract. *Id.* ¶¶ 65–69.  Anthem did not believe Express Scripts had negotiated fairly, and has since claimed that the negotiations "unfairly resulted in Anthem paying above market pricing for almost an extra year." *Id.* ¶ 68 (citing Complaint in *Anthem Inc. v. Express Scripts, Inc.*, No. 16-cv-2048 (ER), ECF No. 3 (March 21, 2016) ("Anthem complaint") ¶ 17).  After approximately one year of negotiations, Express Scripts and Anthem agreed to revised pricing. *Id.* (citing Anthem complaint ¶ 17).

Anthem commenced a second round of pricing negotiations with Express Scripts on October 17, 2014. *Id.* ¶ 78.  These negotiations commenced early, as Anthem's right to trigger periodic pricing review had not yet ripened. *Id.*  Specifically, Anthem demanded from Express Scripts $13 billion in pricing concessions over the remaining four years of the Contract, plus $1.8 billion in pricing concessions in the post-termination period of the Contract. *Id.*  By December 2014, the pricing negotiations were not resolved, and the parties had reached fundamental disagreements about whether the contract imposed an affirmative obligation on Express Scripts to provide Anthem with "competitive benchmark pricing," and whether Anthem's $15 billion claim reflected "competitive benchmark pricing." *Id.* ¶ 80.

On February 16, 2015, Anthem served Express Scripts with notice of breach of the Contract. *Id.* ¶ 81. Anthem sent a 14-page single-spaced letter detailing numerous operational breaches by Express Scripts and threatening to terminate the Contract if the alleged breaches were not cured. *Id.*

**D. February 2015: The Class Period Begins**

The Class Period begins on February 24, 2015, eight days after Anthem served Express Scripts with its notice of breach and the day after Express Scripts filed its 2014 Annual Report on Form 10-K with the Securities and Exchange Commission ("SEC"). *Id.* ¶ 86. In the 10-K, signed by Defendants Paz and Havel, Defendants represented: "Customer contracts and relationships related to our 10-year contract with Anthem . . . under which we provide pharmacy benefit management services to Anthem and its designated affiliates are being amortized . . . over an estimated useful life of 15 years." *Id.* ¶ 87.[4] Thus, as Defendants explained, they were accounting for the 10-year Contract based on the assumption that it would be renewed for an additional five years. *Id.* However, in its SEC filings, Express Scripts also cautioned that changes to significant client contracts may "materially adversely" affect financial results or cause "a negative reaction in the investment community" resulting in "stock price declines or other adverse effects." Musoff Declr., Ex. 4 at 22.

On February 25, 2015, Defendants Paz, Wentworth, Queller and Havel held an earnings conference call with analysts. CAC ¶ 204. In response to a question from a Goldman Sachs analyst asking for an update on the Anthem relationsip, Defendant Queller assured investors that "we've got a great relationship with Anthem," and "[o]ur teams work closely each and every day. The relationship is very, very, solid." *Id.* Regarding the companies' negotiations and

---

[4] Subsequent filings and financial statements also referenced that the 10-year contract with Anthem would be amortized based on a 15 year estimate. *Id.* ¶¶ 203, 210, 217, 223, 231.

renewal of the Contract, Queller stated that "it's business as usual. And we look forward to having them as a client through the end of the contract term which is at the end of 2019 and we'd love to have them for a longer time as well. But we'll continue to work with them very, very closely just as we always do to make them successful." *Id.* Throughout the first quarter of 2015, Express Scripts and Anthem continued to negotiate over pricing and the alleged operational issues.

### E. March – May 2015: Anthem's Second Notice of Breach

Under Section 16.5 of the Contract, before a party can exercise a termination right, the parties must first submit material contractual disputes to a Joint Operating Pharmacy Committee ("JOPC"), which has 15 days to meet in person and make a good faith effort to resolve the dispute. *Id.* ¶ 85.[5] If the JOPC does not resolve the dispute, it must then be referred to the Presidents of Express Scripts and Anthem. *Id.* If the Presidents' meeting is not successful, the parties must then refer the dispute to non-binding mediation. *Id.* As described more fully below, the parties engaged in these steps, but were unable to resolve the disputes related to pricing and operational breaches. *Id.* ¶¶ 93, 104, 130.

---

[5] Section 16.5 states: "Neither Party shall exercise any termination right under Section 6.2(a) other than a termination by [Anthem] for a Material PG Breach, unless the following steps are followed:

   (a) In the event of any material dispute regarding this Agreement, the Parties agree that at the earliest time the dispute will be referred to the Joint Operating Pharmacy Committee. The Committee shall have a fifteen (15) day period to review the dispute during which the Committee will meet in person as soon as practicable and make good faith efforts to resolve the dispute to the satisfaction of the Parties.

   (b) If such dispute is not resolved by the Committee, the Parties agree that the dispute will be referred to the President of [Anthem] and the President of PBM. The Presidents shall have a fifteen (15) day period to review the dispute during which the Presidents will meet in person as soon as practicable and make good faith efforts to resolve the dispute to the satisfaction of the Parties.

   (c) In the event the dispute is not resolved by the Presidents, the Parties agree that the dispute will be subject to non-binding mediation under the rules of the American Arbitration Association.

On March 18, 2015, Anthem reiterated its demand that Express Scripts lower its pricing, provided Express Scripts with proposed new pricing terms, and requested a response by March 30, 2015. *Id.* ¶ 94. Express Scripts did not meet Anthem's demands, and on April 1, 2015, Anthem provided Express Scripts with a second formal notice of breach that, pursuant to Section 6.2(a)[6] of the Contract, Express Scripts was required to cure before June 22, 2015. *Id.* ¶ 95.

On April 29, 2015, Defendants Paz, Havel, and Wentworth held an earnings conference call during which, in response to an analyst's question, Defendant Paz assured investors that "Anthem is an incredibly important client to us," "we really enjoy that relationship," and "I do think it is a two-way street." *Id.* ¶ 211.

On May 27, 2015, the companies' Presidents met—the second step in the dispute resolution procedure in the Contract—but again failed to reach agreement. *Id.* ¶ 104. On June 22, 2015, Express Scripts rejected Anthem's proposal that was first communicated on March 18, 2015. *Id.* ¶ 106. In the process, Anthem and Express Scripts both accused the other of failing to negotiate in good faith. *Id.*

On September 9 and 10, 2015, Express Scripts announced that Defendant Paz would step down as CEO,[7] but would remain on the Company's board of directors as non-executive Chairman, Defendant Wentworth (then President) would succeed Paz as CEO, and Defendant Slusser would be appointed Executive Vice President and CFO. *Id.* ¶¶ 118–19.

On September 15, 2015, the parties met again, and Anthem again accused Express Scripts of refusing to negotiate in good faith. *Id.* ¶ 122. The parties did not agree on a proposal for

---

[6] Section 6.2(a) provides that "[s]ubject to Section 16.5, either Party may terminate this Agreement if the other Party fails to comply with a material term of this Agreement and such failure is not cured within sixty (60) days' written notice to the other Party."

[7] Paz's CEO employment contract was set to expire on March 31, 2017. *Id.*

competitive benchmark pricing at the meeting. *Id.* Thereafter on two occasions, October 2 and October 19, 2015, Express Scripts contacted Anthem, but Express Scripts did not negotiate regarding pricing. *Id.* On October 27, 2015, Express Scripts filed its third quarter 2015 Form 10-Q, which continued to represent that the Contract had a "high probability" of renewal for at least five years. *Id.* ¶ 223.[8]

### F. November – December 2015: Mediation is Unsuccessful

On November 5, 2015, Anthem asked Express Scripts to meet, but Express Scripts did not agree to a meeting. *Id.* ¶ 129. On November 9, 2015, as the third and final step in the Contract's conflict-resolution procedure, the companies held a mediation, but the mediation was unsuccessful. *Id.* ¶ 130. Subsequently, on November 11 and November 23, 2015, Anthem contacted Express Scripts to schedule a meeting, but Express Scripts declined to meet. *Id.* ¶ 131–32.

On December 2, 2015, Anthem sent Express Scripts a revised pricing proposal that outlined what Anthem believed was Defendants' failure since March 18, 2015 to negotiate competitive benchmark pricing as required, including Anthem's position that "the current pricing terms of the [Contract] [a]re not even close to competitive." *Id.* ¶ 134. Anthem again asked Defendant Wentworth on December 14, 2015 whether Express Scripts "was willing to reconsider its position that it is not required to offer Anthem competitive benchmark pricing?" and further requested a "meeting among the decision-makers." *Id.* ¶ 135. The next day, Express Scripts responded to the Anthem's letter and refused to meet, stating that it was under no obligation to negotiate Anthem's pricing proposal and could veto any such negotiation. *Id.* ¶ 136. Express

---

[8] The CAC alleges that for each quarter throughout the Class Period, Defendants accounted for the Contract in Express Scripts' publicly filed financial statements with an assumed "high probability" of renewal by Anthem. *Id.* ¶¶ 203, 210, 217, 223, 231.

Scripts further stated that it would not respond to Anthem's December 2 revised pricing proposal for another two weeks. *Id.* On December 17, 2015, Anthem responded that Express Scripts "already had nine months to consider the pricing issue and certainly must know its intentions." *Id.* ¶ 137.

### G. December 22, 2015 Investor Conference Call

On December 22, 2015 Express Scripts held a conference call with investors regarding financial guidance for 2016 and discussed the Anthem negotiations. *Id.* ¶ 138. During the call, Paz stated that Express Scripts was "currently in discussions with Anthem regarding the periodic pricing provisions of the agreement," and that "[w]e are excited to continue productive discussions with Anthem regarding our relationship." *Id.* ¶ 226. During the same call, in response to an analyst's question, Paz stated that the discussions were "very early on." *Id.* Paz also claimed that Express Scripts' practice was to "sit down" with its client and "identify[] opportunities for savings." *Id.* ¶ 139. Paz also reiterated that the Anthem relationship was unique:

> We are currently in discussions with Anthem regarding the periodic pricing review provisions of the agreement. We previously engaged in this review process in 2012 and following several months of discussions that process ultimately resulted in a mutually beneficial agreement between both Express Scripts and Anthem, because of the nature of the transaction with Anthem in 2009, their contract is unique within our book of business. Specifically the pricing review provided for in the Anthem agreement is unlike traditional provisions that exist elsewhere in the industry.

Musoff Declr., Ex. 14 at 3; *see also* CAC ¶ 138–39.

At the same time, Paz warned investors of risks with respect to the outcome of negotiations regarding the Contract, including the financial terms and the likelihood of renewal:

> ▪ "[T]here are any number of factors that could influence the terms and breadth of any financial agreement between the parties." Musoff Declr., Ex. 14 at 3.

▪ "Based on the range of variables that could influence our discussions with Anthem, we are unable to provide a timetable or the likely financial terms of the successful negotiation at this time." *Id.*

▪ "[W]e hope that as part of this whole – working through this contract will also be an extension of time, but that's still up to the parties to negotiate." *Id.* at 4.

▪ "[W]e would love to get an extension as part of this negotiation, but that's [sic] remains to be seen at this juncture." *Id.* at 7.

With respect to the Contract, Wentworth stated, "[T]here's just way too many variables in play which could impact how any new agreement with Anthem is structured for us to make a timetable or a financial impact for any of these arrangements at this time." *Id.* at 8.

### H. January – February 2016: Negotiations Continue and Information Becomes Public

On January 7, 2016, Express Scripts sent Anthem a counterproposal that lowered pricing by $1 billion (or less than 8% of the $13 billion that Anthem had demanded since October 2014), but increased prices overall by charging over $1 billion for the post-termination transition period. CAC ¶ 143. Anthem went public with the dispute less than one week later. *Id.* Specifically, on January 12, 2016, Anthem's CEO stated publically during a healthcare conference:

[W]e are entitled to improved pharmaceutical pricing that equates to an annual value-capture of more than $3 billion. To be clear, this is the amount by which we would be overpaying for pharmaceuticals on an annual basis. . . .

While our repricing provision was effective over a month ago, we do not yet have an agreement with our current vendor to effectuate the savings. We have not yet received an offer from [Express Scripts] that we believe represents market-competitive benchmark pricing. We're now trying to get them to engage in good faith negotiations as required under the terms of the repricing provision in our contract. To be clear, our shareholders are entitled to that value today and our team has been and continues to be focused on exercising our contractual rights to capture that value.

*Id.* ¶ 144. Anthem's General Counsel told reporters that Anthem was contemplating litigation against Express Scripts, stating, "Do I sit here and overpay $3B a year? Or do I go file a lawsuit saying 'you've breached the agreement' by not giving the competitive pricing that Anthem is

due?" *Id.* ¶ 145.  Express Scripts common stock declined the next day and for three consecutive

trading days thereafter—January 13, 14, 15 and 19, 2016.  *Id.* ¶¶ 147–60.

On January 13, 2016, one day after Anthem went public with the dispute, Anthem made a

counterproposal to Express Scripts "[i]n the interest of getting to a resolution, . . . to accept less

than competitive benchmark pricing."  *Id.* ¶ 162.  Express Scripts did not respond.  *Id.*  On

January 22, 2016, Anthem again proposed a resolution to Express Scripts, and Express Scripts

again refused to negotiate.  *Id.* ¶ 166.  Four days later, on January 26, 2016, Express Scripts

informed Anthem that it was not obligated to renegotiate Anthem's pricing.  *Id.*

On January 27, 2016, Anthem explained the nature of the dispute in its earning call:

[W]e believe we have set the table now for conversations in and around the possibility of recasting our pricing relationship with [Express Scripts].  So all I can tell you at this stage is that dialogue will continue and we're hopeful that still in 2016, we will reach a resolution to this matter that we are engaged in with [Express Scripts].

Musoff Declr., Ex. 23 at 9.

On February 3, 2016, Anthem representatives traveled to St. Louis to meet with

Defendant Wentworth and to offer a pricing reduction of $9.7 billion, or $3.4 billion less than the

$13.1 billion Anthem had previously demanded.  CAC ¶ 170.  Express Scripts did not engage,

and denied that it had any obligation to do so.  *Id.*  On February 5, 2016, Anthem submitted the

same proposal in writing, telling Express Scripts that it had now spent "almost one year" trying

to engage Express Scripts and that the current drug pricing terms were "unsustainable," and

stressing that "Anthem cannot continue under [Express Scripts'] current pricing, so please

respond to Anthem's proposal by next week."  *Id.* ¶ 171. On February 12, 2016, Express Scripts

responded with the same proposal it had previously sent on January 7, 2016, which lowered

pricing by only $1 billion.  *Id.*

In the Company's 2015 Form 10-K, filed on February 16, 2016, Defendants stated that Express Scripts was "currently in discussions with Anthem regarding the periodic pricing review process pursuant to the terms of our [contract] with Anthem," and further reassured investors that "we are actively engaged in good faith discussions with Anthem and intend to continue to comply with the requirements of the agreement." *Id.* ¶ 231. Express Scripts also identified challenges associated with predicting the outcome of the negotiations, stating: "At this time we are unable to provide a timetable or an estimate as to the potential outcome of these events, any of which could result in a material adverse effect on our business and results of operations." Musoff Declr., Ex. 5 at 21.

On a February 17, 2016 conference call with analysts, Defendant Paz told investors that Express Scripts "remain[ed] fully committed to good faith negotiations in hopes of reaching a mutually beneficial agreement within the framework of our 2009 contract. That has not changed." CAC ¶ 232. Paz further stated that Express Scripts was "focused on reaching agreement." *Id.* Paz also reiterated the position disclosed in December 2015 that any extension of the Contract beyond the ten-year term would depend on the outcome of the parties' negotiations, stating, "[O]bviously we would love to have an extension as part of this agreement. And I think it's up to us to negotiate with them and find out what's tolerable and works for them and what's good for us and our shareholders." Musoff Declr., Ex. 15 at 11.

### I. March 2016: The Anthem Complaint

Anthem's CEO traveled to a meeting in Chicago, IL on March 1, 2016 with Paz, and an additional round of counterproposals occurred. CAC ¶ 176. Express Scripts presented a previously rejected proposal, and the parties did not reach resolution. *Id.* On March 21, 2016, the last day of the Class Period in the instant action, Anthem commenced litigation against

Express Scripts with the filing of a complaint in this Court (the "Anthem Litigation"). *Id.* ¶ 178. In its complaint, Anthem revealed publicly for the first time that it had attempted to renegotiate drug pricing since early 2015, that negotiations with Express Scripts had never approached resolution, and that Anthem believed that Express Scripts had violated its operational obligations under the Contract. *Id.* ¶ 179. The Anthem complaint also revealed that Anthem had served Express Scripts with notices of breach on February 16, 2015 and April 1, 2015 concerning the Company's pricing and alleged operational obligations. *Id.* ¶ 180. On March 22, 2016, the market price of Express Scripts common stock declined $1.82, to close at $67.52 per share. *Id.* ¶ 187.

On April 19, 2016, Express Scripts countersued Anthem in the Anthem Litigation, raising its own breach-of-contract claims. *Id.* ¶ 188. Express Scripts alleged "repeated failures" by Anthem "to comply with its contractual obligation to negotiate in good faith," called Anthem's demand "unreasonable," accused Anthem of breaching the implied covenant of good faith and fair dealing, and demanded $4.675 billion in restitution. *Id.* ¶¶ 189–90.

In its first quarter 2016 Form 10-Q filed on April 25, 2016, Express Scripts reported that it had adjusted its accounting treatment of the Contract to amortize the contract's costs over the ten-year contractual term, rather than over a 15-year useful life, stating:

> When we executed our agreement with Anthem in 2009, . . . [we] attributed a reasonable likelihood of renewal at the end of its terms in 2019. Accordingly, we amortized the agreement using a modified pattern of benefit over an estimated useful life of 15 years.
>
> However, due to the sequence of recent events regarding our discussions with Anthem, culminating in the filing of the lawsuit on March 21, 2016, we felt it prudent to consider the increased likelihood of either non-renewal or renewal on substantially different terms such that, beginning in March 2016, we began amortizing our agreement with Anthem over the remaining term of the contract (i.e. using a life of 10 years from the time the agreement was executed in 2009). Previously, we amortized the agreement over 15 years.

*Id.* ¶¶ 192–94.  This change resulted in a significant offset to the Company's revenues of $10.5 million for the first quarter of 2016, and $32 million quarterly thereafter.  *Id.* ¶¶ 195–96.

On an earnings call the next day, April 26, 2016, Defendant Paz stated in response to questioning that the dispute with Anthem "is probably going to be quite a long, drawn out situation."  *Id.* ¶ 197.  Paz described his view of Anthem's pricing demand as "pretty ludicrous."  *Id.*  On June 9, 2016, Defendant Wentworth also stated that "the position that [Anthem has] taken is . . . not a position we agree with.  And if we can't get past that, then it's going to be a long couple of years."  *Id.* ¶ 198.

### J. The Instant Action

On May 5, 2016, Plaintiff filed the instant suit.  Doc. 1.  On October 14, 2016, Plaintiff filed the Amended Class Action Complaint.  Plaintiff asserts two causes of action:  violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder (Count I against all Defendants); and violations of Section 20(a) of the Exchange Act (Count II against all Individual Defendants).  CAC ¶¶ 266–283.

On December 7, 2016, Defendants filed their motion to dismiss.  Doc. 72.  On March 9, 2017, the Court granted a stay of the action pending a decision from the Judicial Panel on Multidistrict Litigation regarding whether this case would be transferred to the Eastern District of Missouri as part of a multidistrict litigation.  Doc. 85.  The MDL Panel denied the motion to transfer, Doc. 92, and on April 10, 2017, this Court terminated the stay.  Doc. 91.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss Standard

When ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 680.

### B.  Heightened Pleading Standard under Rule 9(b)

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity.  *See, e.g., ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–20 (2007)).  These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether

fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Fed. R. Civ. P. 9(b)) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'")

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g., Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citing Fed. R. Civ. P. 9(b)). Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); s*ee also, e.g., Slayton v. Am. Express, Co*., 604 F.3d 758, 766 (2d Cir. 2010).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.,* 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015) (citing *ECA & Local 134 IBEW*, 553 F.3d at 196).

## C. External Documents

The Court may consider documents that are "referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the

plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn*, 616 Fed. Appx. 448 (2d Cir. 2015) (summary order) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). To be incorporated into the complaint by reference, "the [c]omplaint must make a clear, definite and substantial reference to the documents." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (internal quotation marks and citation omitted). The Court may also "take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" *Silsby*, 17 F. Supp. 3d at 354 (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991)); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 566 Fed. Appx. 93 (2d Cir. 2014) (summary order).

Defendants attach the following documents to their motion to dismiss:

(1) the CAC;

(2) Complaint in *Anthem Inc. v. Express Scripts, Inc.*, No. 16-cv-2048 (ER), ECF No. 3 (March 21, 2016);

(3) Answer and Amended Counterclaims in *Anthem Inc. v. Express Scripts*, ECF No. 33 (June 13, 2016);

(4) excerpts from Express Scripts Form 10-K for the year ending December 31, 2014, filed February 23, 2015;

(5) excerpts from Express Scripts Form 10-K for the year ending December 31, 2015, filed February 16, 2016;

(6) excerpts from Express Scripts Form 10-Q for the quarter ending March 31, 2015, filed April 28, 2015;

(7) excerpts from Express Scripts Form 10-Q for the quarter ending June 30, 2015, filed July 28, 2015;

(8) excerpts from Express Scripts Form 10-Q for the quarter ending September 30, 2015, filed October 27, 2015;

(9) excerpts from Express Scripts Form 10-Q for the quarter ending March 31, 2016, filed April 25, 2016;

(10) Express Scripts presentation at the JP Morgan Chase Healthcare Conference, dated January 9, 2012;

(11) Express Scripts earnings conference call for the quarter ending September 30, 2014, dated October 29, 2014;

(12) Express Scripts 2015 Analyst/Investor Day, dated February 25, 2015;

(13) Express Scripts earnings conference call for the quarter ending March 31, 2015, dated April 29, 2015;

(14) Express Scripts 2016 guidance conference call, dated December 22, 2015;

(15) Express Scripts earnings conference call for the year ending December 31, 2015, dated February 17, 2016;

(16) Express Scripts earnings conference call for the quarter ending March 31, 2016, dated April 26, 2016;

(17) [Anthem] presentation at Leerink Partners Roundtable, dated September 30, 2014;

(18) Anthem earnings conference call for the quarter ending December 31, 2014, dated January 28, 2015;

(19) Anthem conference call regarding the Cigna acquisition, dated June 22, 2015;

(20) Anthem conference call regarding the Cigna acquisition, dated July 24, 2015;

(21) Anthem presentation at the Morgan Stanley Healthcare Conference, dated September 17, 2015;

(22) Anthem presentation at JP Morgan Chase Healthcare Conference, dated January 12, 2016;

(23) Anthem earnings conference call for the quarter ending December 31, 2015, dated January 27, 2016;

(24) Express Scripts and [Anthem] joint press release, "Express Scripts Completes Acquisition of [Anthem's] NextRx Subsidiaries," dated December 1, 2009;

(25) Bloomberg article, "Express Scripts Plunges as Biggest Client Threatens to Leave," dated January 12, 2016; and

(26) Dow Jones article, "Commodities: Anthem Seeks Better Deal with Express Scripts – Market Talk," dated January 12, 2016.

*See* Musoff Decl.

The CAC cites and relies on the majority of the attached documents, including, *inter alia*, the Forms 10-K and 10-Q, the Answer and Amended Counterclaims in *Anthem, Inc. v. Express Scripts, Inc.*, No. 16-cv-2048, and several earnings call transcripts. Accordingly, the Amended Complaint incorporates the majority of these documents by reference and the Court will consider them in deciding the present motion. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 809 (2d Cir. 1996) ("*Philip Morris*") (concluding "that the District Court was entitled to consider the full text of those documents [partially quoted in the Complaint but considered integral] in ruling on the motion to dismiss").

Regarding the documents not cited to or relied on in the CAC—including publicly-available information, such as the balance of the SEC filings and press releases—the Court may "take judicial notice of public disclosure documents that must be filed with the Securities and Exchange Commission ("SEC")[,] . . . documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law,'" *Silsby*, 17 F. Supp. 3d at 354, and of "press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 570 (citing *Staehr v. Hartford Fin. Serv. Grp., Inc.*, 547 F.3d 406, 425–26 (2d Cir. 2008)).

Plaintiff also does not raise any objection to the Court's consideration of any of the attached documents. Accordingly, this Court may take judicial notice of the documents attached to Defendants' motion to dismiss.

## III.    DISCUSSION

In short, the core allegations of Plaintiff's action is that Defendants, rather than informing investors of the true nature of Express Scripts' relationship with Anthem, repeatedly misrepresented what Plaintiff views as Express Scripts' contentious relationship with Anthem over the its pricing terms.  *See* Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint ("Pl.'s Mem.") (Doc. 78) at 6.  That is, Plaintiff avers that Defendants misleadingly assured investors and failed to make full and complete disclosures of the then-existing facts in violation of the securities laws.  *Id.* at 10.  Accepting the allegations in the CAC as true, the Court considers whether Plaintiff has adequately plead securities law violations.

### A.  Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b) (1934), while SEC Rule 10b-5, promulgated thereunder, creates liability for a person who makes "any untrue statement of a material fact or to omit[s] to state a material fact . . . in connection with the purchase or sale of any security."  *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)).  Rule 10b–5, promulgated by the SEC to implement Section 10(b), "more specifically delineates what constitutes a manipulative or deceptive device or contrivance."  *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999).  Under Rule 10b–5, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business

which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a private civil claim under Section 10(b) and Rule 10b–5, a plaintiff must plead that: (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. *Dura*, 544 U.S. at 341–42; *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007). Defendants challenge the adequacy of Plaintiff's allegations concerning whether they (1) made actionable misrepresentation or omissions; (2) acted with scienter; or (3) caused economic loss. The Court considers each argument in turn.

### 1. Plaintiff Fails to Allege Misstatements or Omissions of Material Fact

To survive a motion to dismiss, Plaintiff must establish that Defendants "made a statement that was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original). "A violation of Section 10(b) and Rule 10b–5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571 (S.D.N.Y. 2014) (citing *Philip Morris*, 75 F.3d at 812–13). Furthermore, the Second Circuit has indicated that plaintiffs cannot simply assert that a statement is false—"they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174.

With respect to material omissions, a defendant's silence is not misleading absent a duty to disclose. *Basic*, 485 U.S. at 239 n. 17. "Disclosure of an item of information is not required, however, simply because it may be relevant or of interest to a reasonable investor." *Resnik v.*

*Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). Rather, "[a] duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993).

Here, Plaintiff primarily alleges two distinct types of potentially misleading statements or omissions: (1) statements made by Express Scripts executives that falsely described Express Scripts' relationship and negotiations with Anthem or omissions regarding the Anthem relationship; and (2) Express Scripts' accounting treatment of the Contract in its securities filings—that is, whether Express Scripts should have revised the amortization period for the Contract earlier in light of the ongoing dispute between the parties. *See* Pl.'s Mem. at 11. The Court considers separately the potentially misleading statements and the accounting treatment of the Contract.

### i. Plaintiff Fails to Allege Actionable Misstatements or Omissions Related to its Relationship and Negotiations with Anthem

#### a) Duty to Disclose to Avoid Misleading Investors

Defendants argue that Plaintiff cannot point to any duty held by Express Scripts to disclose its ongoing negotiations with Anthem and that because there was no certainty as to the likelihood that negotiations between Express Scripts and Anthem would fail, no disclosure obligations were triggered. Defs.' Mem. at 30–31.

Where an outcome is merely speculative, the duty to disclose does not attach. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (finding no duty to disclose negative consequences from a failed factory inspection where it was not a "foregone conclusion" that consequences would materialize); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012) ("[d]efendants [a]re not bound to predict as the 'imminent' or 'likely'

outcome of the investigations that indictments of [the company] and its chief officer[s] would follow, with financial disaster in their train.") (alternations in original); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 471 (S.D.N.Y. 2006) ("With respect to a company's failure to disclose impending litigation, there is no requirement to make disclosures predicting such litigation, absent an allegation that the litigation was substantially certain to occur during the relevant period."). "Under certain circumstances," however, "a company could have a duty to disclose a breach of contract that puts an important, publicly-touted business relationship at great risk." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557 (CM), 2013 WL 6233561, at *9 (S.D.N.Y. Dec. 2, 2013). "Such a breach could be seen as 'significantly alter[ing] the total mix of information available'" such that failing to disclose the breach would mislead investors. *Id.*; (citing *Time Warner*, 9 F.3d at 267–68).

Plaintiff argues that because Defendants spoke to investors about the purported strength of the Company's relationship with Anthem and its allegedly productive negotiations, Defendants were obligated to speak fully and truthfully, but did not. Pl.'s Mem. at 16. Plaintiff argues that Express Scripts, having provided investors details concerning the companies' purportedly "great" relationship and supposedly "active" negotiations, defrauded investors when it spoke falsely about currently existing facts. *Id.* at 18.

As its primary support, Plaintiff points to *Hi–Crush Partners L.P. Securities Litigation,* in which the district court denied the defendant's motion to dismiss a § 10(b) claim based on its alleged failure to disclose a contract dispute with a major commercial partner. *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *13–14. In that case, the alleged material omissions included that defendant failed to disclose its "strained" relationship with its commercial partner, Baker Hughes, and that Baker Hughes believed that Hi-Crush had

committed a material breach of its agreement. *Id.* at *8. Hi-Crush argued that it had no duty to disclose the dispute in part because it did not believe the commercial partner's litigation position had merit, but the court rejected that argument on the following basis:

> Though the contract dispute with Baker Hughes had not yet escalated to litigation at the time of the investor presentation, Baker Hughes had already asserted a breach of contract and tried to terminate the contract. . . . [E]ven if Hi-Crush believed in good faith that it had not breached the agreement with Baker Hughes and was correct in its belief, a new fact had come to light: *Baker Hughes disagreed.* Baker Hughes had also acted on this belief and sent a letter to Hi-Crush . . . purporting to terminate the agreement. So even if Baker Hughes was wrong, and the contract was technically in full force, Baker Hughes's repudiation produced a new set of uncertainties for Hi-Crush: it drew into question whether Baker Hughes would make purchases going forward and raised the specter of expensive litigation over the parties' relationship. Thus, the repudiation undermined all the positive statements made in the investor presentation about the stable nature of Hi–Crush's relationship with Baker Hughes. The fact that disclosure of the unresolved dispute was accompanied by an immediate 26% decrease in Hi-Crush's stock price . . . is itself evidence that the dispute was a highly material fact.

*Id.* at *14–16 (emphasis in original). Furthermore, plaintiff there alleged that Hi–Crush "had publicly hyped the importance of its relationship with Baker Hughes, explicitly stating that Baker Hughes was one of its 'largest customers' and emphasizing the long-term nature of the contractual agreement." *Id.* at *14. Hi-Crush made these statements before and after Baker Hughes terminated the contract, including making express and specific statements about the relationship and its contribution to Hi–Crush's "long-term cash flow stability." *Id.* at *7, *14.

Here, as in *Hi-Crush*, Plaintiff alleges that the Contract was a significant source of income that accounted for 16.3% of Express Scripts' revenue for the year ending December 31, 2015. *See* CAC ¶¶ 34–37. Indeed, Anthem was Express Scripts' largest customer. *Id.* However, in *Hi-Crush*, the plaintiff further alleged that the customer had formally notified Hi–Crush by letter that "it was *terminating* the agreement" due to the defendant's breach, notwithstanding the defendant's dispute of the validity of the assertion of breach. *Id.* at *14 (emphasis added). Here, Anthem served Express Scripts with two formal notices of breach of

24

contract, CAC ¶¶ 81, 95, and the companies exhausted the Contract's three-step resolution process, including mediation, but could not resolve their disputes. *Id.* ¶¶ 85, 93, 104, 130. Although Anthem threatened to terminate the contract if certain operational breaches were not cured, *id.* ¶ 81, there is no allegation that any notice of termination was provided during the negotiation period. Indeed, on January 27, 2016, almost nine months after Anthem sent Express Scripts the second notice of breach, Anthem told analysts that it was "hopeful" that it would reach resolution with Express Scripts in 2016. *See* Musoff Declr., Ex. 23 at 9.

*Hi-Crush* involved a contract that was already terminated—unlike here, where during the Class Period the actual contractual negotiations were ongoing, the parties went through the agreed-upon dispute resolution procedure contemplated in the Contract, and no termination right was exercised. Moreover, *Hi-Crush* does not hold that a party has an obligation to disclose all disputes with a major customer. Instead, the court determined that the dispute "ripened" as to trigger a duty to disclose on the date that Baker Hughes "notified Hi-Crush via letter that it was terminating the agreement due to Hi-Crush's supposed breach of the confidentiality provision." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561 at *13–14. In the court's view, the notice of termination "definitively stated that [Baker Hughes] no longer intended to do business with Hi-Crush" and thus Hi-Crush "certainly had a duty to disclose the . . . momentous contract repudiation . . ." *Id.* at *15; *see also id.* ("Though the contract dispute with Baker Hughes had not yet escalated to litigation at the time of the investor presentation, Baker Hughes had already asserted a breach of contract and tried to terminate the contract.").

Here, Plaintiff fails to allege any definitive statement that Anthem no longer intended to do business with Express Scripts during the Class Period. Even though Express Scripts and Anthem did enter into litigation in March 2016, Plaintiff alleges no facts that triggered a duty to

disclose before December 2015—when Express Scripts disclosed on its investor call the uncertainty with respect to the timetable for the negotiations, stating, *inter alia*, that "there are a number of factors that could influence the terms and breadth of any financial agreement between the parties" and "based on the range of variables that could influence our discussions with Anthem, we are unable to provide a timetable or the likely financial terms of a successful negotiation at this time."  Musoff Declr., Ex. 14 at 3.  Unlike *Hi-Crush*, the duty to disclose did not ripen earlier because no intent of termination was provided during the Class Period.

### b)  No Misrepresentation of Then-Existing Facts

Plaintiff further alleges that Defendants materially misled investors by affirmatively misrepresenting the known contentious relationship between Express Scripts and Anthem— including formal notices of breach and the pricing dispute.  Pl.'s Mem. at 18.  Thus, Plaintiff argues that Defendants were not required to engage in speculation as to future consequences, but rather that they misrepresented and omitted known, material, present facts.  *Id.*  Specifically, the CAC alleges that the parties had a fundamental $15 billion difference of opinion on the contract; were refusing to negotiate that gap at all; and repeatedly accused each other of acting in bad faith.  *Id.* at 18–19 (citing CAC ¶¶ 80, 93–95, 104, 106, 122, 129–32, 134–37, 143).  Plaintiff argues that these facts ran directly counter to Defendants' public statements that Express Scripts' relationship with Anthem remained "very, very, solid," CAC ¶ 204, that repricing negotiations were "active," and that "good faith discussions" were occurring, *id.* ¶ 231.  Additionally, Plaintiff asserts that Defendants made statements that the parties were currently negotiating when they were not, including by Defendant Paz as late as December 22, 2015, that the parties were "currently in discussions" and were prepared to "continue productive discussions."  *Id.* at 19 (citing CAC ¶ 226).  Furthermore, Plaintiff alleges that on February 16, 2016 Defendants

similarly misrepresented that Express Scripts was "currently in discussions" and "actively engaged in good faith discussions" with Anthem. *Id.* (citing CAC ¶ 234).

Express Scripts did, however disclose that negotiations were ongoing and did not express certainty as to the outcome of the parties' discussions. Such statements about negotiations, which lack a definite outcome, are not actionable. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (statements of "hope . . . [that] the talks would go well," lack "definite positive projections" and do not become materially misleading when talks do not proceed well—unlike statements that a company "thought deals would be struck by a certain date" or "that it was likely that deals would be struck at all."). In fact, Plaintiff's assertion that Express Scripts falsely stated in December 2015 and February 2016 that Express Scripts and Anthem were "currently" in discussions and that "productive discussions" were continuing is rebutted by Plaintiff's own allegations. Indeed, the CAC is replete with allegations regarding correspondence, meetings, and participation in the contractually-provided dispute resolution procedure, all of which evidence ongoing dialogue between the parties. The CAC alleges that these ongoing negotiations that occurred through various dispute resolution mechanisms, including mediation and in-person meetings, continued right up until the time Anthem filed suit in March 2016. *See, e.g.*, CAC ¶¶ 176–77 (noting meeting in Chicago, IL that took place in March 2016). Although Anthem ultimately initiated litigation, the allegations in the CAC amount to little more than a suggestion that Defendants should have somehow guessed the outcome of the ongoing negotiations sooner or approached their negotiations with Anthem more pessimistically. As the Second Circuit has explained, "statements containing simple economic projections, expressions of optimism, and other puffery are insufficient." *Novak v. Kasaks*, 216

F.3d 300, 315 (2d Cir. 2000) (internal citations omitted). While a defendant can be held liable for misrepresentations of existing facts, *see id.*, the Court finds no such misrepresentations here.

Thus, the CAC fails to allege false or misleading statements of then-existing facts in Express Scripts' public statements regarding the Anthem negotiations and the relationship between the parties.

### ii. Plaintiff Fails to Allege Actionable Misstatements or Omissions Related to Express Scripts' Accounting Treatment of the Contract

According to Plaintiff, Express Scripts should have revised the amortization period for the Contract—from 15 years to 10 years—as early as February 2015 in light of (i) the prior repricing negotiations in 2012; (ii) the ongoing negotiations that Plaintiff alleges began in October 2014; (iii) the magnitude of Anthem's $13 billion repricing demand; and (iv) Anthem's notice of alleged operational breaches. CAC ¶ 205. Specifically, Plaintiff argues that Defendants misleadingly accounted for the Contract in Express Scripts' publicly-filed financial statements because the 15-year amortization period was based on a "high probability" that the contract would be renewed by Anthem for at least an additional five years. Pl.'s Mem. at 19 (citing CAC ¶¶ 203, 210, 217, 223, 231). Defendant argues in part that the decision to amortize the Contract over 15 years was based on Express Scripts' business judgment, including the probability of renewal and the availability of alternative PBM service providers. Defs.' Mem. at 36–37. Plaintiff argues that "if Defendants at any quarterly reporting period became aware that there was not a supportable basis to assume a 'high probability' of renewal, they were obligated to revise the remaining period of amortization." Pl.'s Mem. at 19. However, the Court finds no compelling argument or support to suggest that Express Scripts should have revised its accounting treatment of the Contract earlier than first quarter 2016—the first reporting period after negotiations broke down indefinitely and Anthem sued.

28

Courts hold accounting statements to be actionable when defendants know facts that undermine the basis for the accounting treatment. *See, e.g., In re MF Global Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 314–15 (S.D.N.Y. 2013) (defendants' accounting under generally accepted accounting principles ("GAAP") was actionable despite "very subjective standard" where plaintiffs plausibly alleged defendants "knew they were disseminating false and misleading opinions"). Indeed, Plaintiff does not attempt to dispute that knowledge must be plausibly plead, and cites approvingly to cases outlining that claims regarding violations of GAAP are actionable where "plaintiffs plausibly allege[] defendants knew that they were disseminating false and misleading opinions" and "did not honestly believe their stated opinions." *See* Pl.'s Mem. at 20 (listing cases and citing to *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277). Here, the CAC does not plausibly allege that Express Scripts did not believe its statements regarding the useful life of the Contract for accounting purposes at the time the statements were made, and thus a claim predicated on Express Scripts' failure to amortize the intangible asset over a shorter period of time must be dismissed. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112 (2d Cir. 2011) (holding complaint does not "plausibly allege that Defendants did not believe the statements regarding goodwill [or an asset representing the future economic benefits arising from other assets acquired in a business combination] at the time they made them" and such an omission is "fatal" to plaintiff's Securities Act claims); *accord. City of Omaha v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) (holding that even when a complaint "plausibly plead[s] that defendants were aware of facts that should have led them" to amend the accounting treatment of an intangible asset, "such pleading alone would not suffice to state a securities fraud claim after *Fait*" and would at most plead defendants' failure to comply with GAAP); *Oklahoma Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d

479, 495–96 (S.D.N.Y. 2013) (holding plaintiffs failed to state an actionable securities fraud claim with respect to alleged GAAP violations because the amended complaint "contain[ed] no allegations whatsoever contradicting the reasonableness of the estimated quarterly loss reserves at the time they were made" and alleged "no facts whatsoever to support their argument that defendants did not honestly believe their [reserve estimates] were adequate when made").

Moreover, Plaintiff's allegations related to the Contract's renewal are rebutted by Defendants' public disclosures on December 22, 2015 and February 16, 2016 discussed above. For example, on December 22, 2015, Paz stated that although Express Scripts was hopeful that negotiations would result in an extension of the Contract, whether an extension would occur "remains to be seen." Musoff Declr., Ex. 14 at 7. Similarly, Express Scripts' Form 10-K for fiscal year 2015 filed on February 16, 2016, warned that Express Scripts is "unable to provide a timetable or an estimate as to the potential outcome of [the Anthem negotiations], any of which could result in a material adverse effect on [Express Scripts'] business and results of operations." Musoff Declr., Ex. 5 at 21.

Accordingly, Plaintiff's assertion that Express Scripts should have amended the amortization period sooner based on its speculative predictions regarding the outcome of future negotiations is without merit.

### 2. Plaintiff Fails to Allege Scienter

As explained above, the CAC fails to allege that Defendants made any material misstatements or omissions sufficient to state a claim. This deficiency alone is sufficient to compel dismissal; however, even if the allegations in the CAC alleged a material misrepresentation or omission, the CAC fails to allege that the Defendants made the statements with the requisite scienter.

"[W]hile § 10(b) has been described and may have been contemplated as a 'catchall' provision, 'what it catches must be fraud.'" *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 413 (S.D.N.Y. 2001) (quoting *Chiarella v. U.S.*, 445 U.S. 222, 234–35 (1980)). Section 10(b) and Rule 10b–5 require plaintiffs to allege a state of mind demonstrating "an intent to deceive, manipulate or defraud," also known as scienter. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)); *see also, e.g., In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 469 (S.D.N.Y. 2004). To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind." *ECA & Local 134 IBEW*, 553 F.3d at 198.

As Supreme Court precedent dictates, a "strong inference" that a defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (emphasis added). This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* "The relevant inquiry for the Court 'is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *In re Magnum Hunter Res. Corp. Sec. Litig.*, No. 13 Civ. 2668 (KBF), 2014 WL 2840152, at *17 (S.D.N.Y. June 23, 2014) (emphasis in original) (citing *Tellabs*, 551 U.S. at 322–23, 127).

A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*,

459 F.3d 273, 290–91 (2d Cir. 2006); *see also, e.g., Ho v. Duoyuan Global Water, Inc.*, 887 F.

Supp. 2d 547, 574 (S.D.N.Y. 2012). When a plaintiff fails to allege a motive to commit fraud,

the plaintiff's allegations that indicate a defendant's recklessness "must be correspondingly

greater." *Kalnit*, 264 F.3d at 142 (internal citations omitted); *accord S. Cherry St., LLC v.

Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).

  Here, Plaintiff proceeds solely on the theory that Defendants acted recklessly with respect

to the falsity of their statements, and does not attempt to plead motive and opportunity. *See* Pl.'s

Mem. at 23–24.[9] To state a claim based on recklessness, plaintiffs may either specifically allege

defendants' knowledge of facts or access to information contradicting defendants' public

statements, or allege that defendants failed to check information that they had a duty to monitor.

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 574 (S.D.N.Y. 2012) ("*Longtop

I*") (citing *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009)).

Here, Plaintiff alleges only the former—that Defendants had knowledge of facts or access to

information contradicting Express Scripts' public statements. To the extent that plaintiffs assert

that defendants had access to contrary facts, the complaint must "specifically identify the reports

or statements containing this information." *Id.* at 574–75 (citing *Teamsters Local 445 Freight

Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 197 (2d Cir. 2008) (quoting *Novak*, 216

F.3d at 309)); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483–84 (S.D.N.Y. 2008).

Nonetheless, it is well-settled that "fraud by hindsight" is not a cognizable theory of relief;

"fraud is always obvious in retrospect, but it is not reckless to lack clairvoyance." *Longtop I*,

---

[9] Plaintiff does not address that it has failed to plead motive, and therefore the argument is conceded. *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (arguments not addressed in opposition are conceded).

910 F. Supp. 2d at 579; *see also, e.g., Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 Fed. Appx. 636, 640–41 (2d Cir. 2012) (summary order).

To allege the scienter of a corporate defendant, a plaintiff need not name a specific individual who acted with the requisite scienter—he need only plead facts that "create a strong inference that someone whose intent could be imputed to the corporation" did so. *Dynex Capital Inc.*, 531 F.3d at 195 (emphasis added). The scienter of an employee acting within the scope of employment can be imputed to the employer. *See Vining v. Oppenheimer Holdings Inc.*, No. 08 Civ. 4435 (LAP), 2010 WL 3825722, at *12 (S.D.N.Y. Sept. 29, 2010).

Plaintiff points to eight separate categories of allegations in the CAC to support its argument that a strong inference of Defendants' scienter must be drawn. Specifically, Plaintiff argues:

1.  The size of the pricing dispute over the Contract and the lack of progress and repeated refusals to negotiate the dispute give rise to a strong inference that Defendants knew or recklessly disregarded that they could not fairly describe Express Scripts' relationship with Anthem as "great" or "business as usual" or other statements such as that the parties were "actively involved in good faith discussions. Moreover, from the negotiations, Express Scripts knew that the Contract should not have been listed in the Company's financial statements as if it had a high probability of renewal. Pl.'s Mem. at 23–24 (citing CAC ¶¶ 78–80, 93–95, 104, 106, 122, 129–32, 134–37, 143, 162, 166, 170–71, 176–77, 188–91).

2.  The critical importance of Anthem as the company's largest client, representing 16.3% of the consolidated revenue for the year ending December 31, 2015, suggests that Defendants knew or recklessly disregarded the underlying facts they misstated and omitted in their communications to investors about Anthem. Pl.'s Mem. at 25 (citing CAC ¶¶ 37–45, 70, 72, 91, 100, 109, 111, 115, 120, 127, 133, 140, 146–60, 163–65, 167–69, 174–75, 181–86). Thus, Plaintiff argues that the Second Circuit's "core operations doctrine"[10] further supports a strong inference that the Company and its senior executives acted with knowledge or at least recklessly. *Id.*

---

[10] The "core operations doctrine . . . permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business, which include matters critical to the long term viability of the company and events affecting a significant source of income." *Cortina v. Anavex Life Scis. Corp.*, No. 15 Civ. 10162 (JMF), 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016).

3. The fact that Individual Defendants Wentworth and Paz, who were the senior-most officers in the Company, had active personal involvement in the negotiations.  Pl.'s Mem. at 25–28 (citing CAC ¶¶ 77, 104, 122, 131, 135, 170, 176).

4. Defendants Queller, Paz, and Wentworth repeatedly held themselves out in their public statements to investors as being personally familiar with the parties' relationship and negotiations.  Pl.'s Mem. at 26–27 (citing CAC ¶¶ 89–90, 99, 102, 114, 133, 138–39, 172–75).

5. Anthem's own public statements (as well as numerous non-public statements it made to Defendants) further support a strong inference that Defendants knew (or recklessly disregarded) that Anthem was, in fact, serious about obtaining more favorable pricing terms or otherwise looking at its alternative "options," and not just posturing.  Pl.'s Mem. at 27 (citing CAC ¶¶ 70, 72, 78, 144–45).

6. The "irreparable damage" to the parties' relationship from the first round of pricing negotiations under the Contract that took "approximately one year," nearly led to litigation, and left Anthem asserting that it was forced to pay "above market pricing."  Pl.'s Mem. at 27–28 (citing CAC ¶¶ 65-69).

7. That from as early as 2012, and continuing throughout 2014 and 2015, Anthem repeatedly notified Express Scripts of numerous operational problems with Express Scripts' performance under the Contract.  Pl.'s Mem. at 28 (citing CAC ¶¶ 81–84, 96, 103–05, 117, 123).

8. Defendants' subsequent admission that the parties had engaged in a year-long dispute and Express Scripts' own Counterclaim admitted the nature of the parties' dispute and lack of any real negotiations.  Pl.'s Mem. at 28–29 (citing CAC ¶¶ 189–91, 197–98).

The Second Circuit has "identified several important limitations on the scope of liability for securities fraud based on reckless conduct."  *Novak*, 216 F.3d at 309.  First, as applicable here, the Second Circuit has refused to allow plaintiffs to proceed with allegations of "fraud by hindsight."  *Id.* (citing *Stevelman*, 174 F.3d at 85).  "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."  *Id.* (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)).  "Second, as long as the public statements are consistent with reasonably available data, corporate officials need not present an

overly gloomy or cautious picture of current performance and future prospects." *Id.* (citing *Stevelman*, 174 F.3d at 85).

Plaintiff argues that Defendants made affirmative statements to investors about the "great" and "solid" nature of their relationship with Anthem and "current" negotiations regarding contract renewal that were not true at the time of their statements, "regardless of what would occur in the future." Pl.'s Mem. at 21. It is true that the "incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 487 (S.D.N.Y. 2011), *on reconsideration*, No. 07 Civ. 10453, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011), *and on reconsideration*, No. 07 Civ. 10453, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011) (citing *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494–495 (S.D.N.Y. 2004) (rejecting defendants' fraud-by-hindsight claim where plaintiffs' allegations that "the company failed to take into account information that was available to it" at the time it issued its incorrect financial results sufficiently pleaded fraud)). Plaintiff relies on *Globus v. Law Research Serv., Inc.*, 418 F.2d 1276, 1283 (2d Cir. 1969), and *Hi-Crush*, 2013 WL 6233561, at *25–26, to argue that all the facts taken together give rise to a strong inference of knowledge (or at least recklessness) that Defendants' statements were materially false and misleading when made.

In *Globus*, the defendant's public offering materials had promoted the defendant's contractual arrangement with another company for the supply of services. *Globus*, 418 F.2d at 1280. Prior to the offering, however, some of the services to be provided under that contract had been terminated by the supplier and the defendant had in fact filed suit against the supplier. *Id.* The *Globus* court noted that the offering circular failed to mention or even suggest the supplier's

termination of a portion of the agreement and the defendant's initiation of a lawsuit against the supplier, or that a dispute between defendant and its supplier had occurred. *Id.* at 1282. Likewise, *Hi-Crush* held that a customer's express repudiation of the parties' contract made the duty to disclose "clear" and Hi-Crush's failure to do so was "'highly unreasonable'" and "'an extreme departure from the standards of ordinary care.'" *Hi-Crush*, 2013 WL 6233561, at *23 (citation omitted). In short, the decisions on which Plaintiff relies involve the failure to disclose circumstances that had already occurred—namely contracts that had been terminated or repudiated in whole or in part.

Here, Plaintiff does not allege that Defendants had prior knowledge of a definitive repudiation of the Contract or litigation. Thus, the allegations here do not rise to the level of recklessness found in *Globus* and *Hi-Crush* because the dispute did not escalate to the point where the dispute would unequivocally result in termination or litigation. *Globus*, 418 F.2d at 1281 (litigation and termination of services triggered a duty to disclose). Indeed, as early as two months prior to initiating litigation, Anthem stated publically that it was "hopeful" that it would reach resolution with Express Scripts in 2016. *See* Musoff Declr., Ex. 23 at 9.

Moreover, Plaintiff's additional arguments fail because the CAC is devoid of factual allegations demonstrating that Defendants had knowledge of any specific contradictory information. *See, e.g., In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (granting motion to dismiss). While the allegations show that the relationship between Express Scripts and Anthem was increasingly precarious during the Class Period and that the parties vehemently disagreed about the proper pricing terms, they do not allege that Defendants had specific knowledge of or access to contradictory facts than those disclosed in their public statements. Thus, Plaintiff fails to "'specifically identify the reports or statements' that *contradict* [Defendants'] alleged

misrepresentations." *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 459-60 (S.D.N.Y. 2010) *aff'd sub nom. Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63 (2d Cir. 2011) (finding no scienter where plaintiff failed to allege specific facts establishing that defendants knew their public statements were inaccurate or failed to check information they had a duty to monitor) (citation omitted). The CAC's conclusory allegations do not satisfy the requirement to plead facts necessary to establish a strong inference of scienter in this regard.

Moreover, Plaintiff claims that several of the Individual Defendants had knowledge of the alleged materially false and misleading statements because of their positions at Express Scripts and because the information at issue went to the core of Express Scripts' business. However, to establish an inference of scienter, Plaintiff must do more than allege that the Individual Defendants had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions. *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (holding that generalized allegations that the individual defendants "knew, or should have known, that they were misrepresenting material facts, based on their senior positions in the company" are insufficient to establish scienter). Plaintiff's reliance on the Second Circuit's core operations doctrine for imputation of knowledge fails. This doctrine "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26. Core operations include matters "critical to the long term viability" of the company and events affecting a "significant source of income." *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989). Here, it is true that the Contract was unquestionably within the "core operations" of Express Scripts because it was a significant

source of income that was arguably "critical to the long term viability" of Express Scripts. *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26; *see also Cosmas,* 886 F.2d at 13. Thus, Express Scripts' senior executives would naturally be apprised of important developments relating to the Contract and negotiations. However, although this doctrine establishes an inference that the company and its executives had knowledge of the negotiations, the core operations doctrine applies only when "a plaintiff has adequately alleged that the defendant made false or misleading statements . . ." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig*., 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004). For the reasons discussed above, that is not the case here. Moreover, that an allegedly fraudulent statement concerned "core operations," standing alone, is insufficient to support strong circumstantial evidence of scienter. *Glaser v. The9, Ltd*., 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011). "Rather, the 'core operations' doctrine bolsters the strength of the inference of scienter when plaintiffs have already adequately alleged facts indicating that defendants might have known their statements were false." *Id.*; *see also Lipow v. Net1 UEPS Techs., Inc*., 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) (holding the core operations theory at most constitutes "supplemental support" for alleging scienter but does not independently establish scienter).[11]

Viewing all of Plaintiff's allegations as a whole, the inference of scienter is not "as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Indeed, competing inferences regarding scienter arise. One might infer that no one at Express

---

[11] "Whether a plaintiff may rely on the core operations doctrine in light of the PSLRA has not been decided by the Court of Appeals for the Second Circuit." *Schwab v. E*TRADE Fin. Corp.,* No. 16-CV-05891 (JGK), 2017 WL 2929501, at *10 (S.D.N.Y. July 10, 2017). "However, the Second Circuit has commented that the doctrine can provide supplemental support for allegations of scienter, even if it cannot establish scienter independently." *Id.* (internal quotation marks and citations omitted). For the reasons discussed below, the Court finds that even if plaintiffs may continue to rely on the core operations doctrine after the passage of the PSLRA, that doctrine does not support a finding of scienter here.

Scripts found the statements or omissions misleading because they believed that the contract was important to both companies, and thus both had a strong incentive to reach agreement. Moreover, it was just as likely that Express Scripts believed that Anthem's negotiating positions were just that—ongoing negotiating positions—that would ultimately result in a negotiated agreement between the two companies.[12]

In sum, Plaintiff's allegations do not demonstrate that Defendants knew of and either consciously or recklessly disregarded any alleged impropriety. Because the CAC does not raise a strong inference of scienter, Plaintiff's § 10(b) claim fails.

### 3. Loss Causation

Defendants argue the CAC should also be dismissed for the separate and independent reason that Plaintiff fails to adequately allege loss causation. Defs.' Mem. at 39. Plaintiff's failure to adequately plead either a misstatement or omission or scienter is dispositive. Thus, the Court need not reach the issue of loss causation. *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *22 (S.D.N.Y. Sept. 28, 2012) *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ( "Because the issue of scienter . . . proves fatal to Plaintiff's Section 10(b) . . . the Court need not reach the UBS Defendants' arguments regarding . . . loss causation[.]"); *Hutchinson v. Perez*, No. 12 Civ. 1073 (HB), 2012 WL 5451258, at *8 (S.D.N.Y. Nov. 8, 2012) *amended*, No. 12 Civ. 1073 (HB), 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013) ("Since the Court must dismiss the Amended Complaint if Plaintiff fails to adequately plead scienter, I need not reach loss causation or misleading statements and omissions under the PSLRA."); *Footbridge Ltd. v. Countrywide*

---

[12] Express Scripts had previous experience negotiating with Anthem, including in connection with the NextRx acquisition and the first pricing review that occurred in 2013. Each of these negotiations resulted in an agreement, thereby supporting the competing inference that Defendants reasonably believed the parties would again reach a resolution.

*Home Loans*, Inc., No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *22 (S.D.N.Y. Sept. 28, 2010) ("I need not reach the issue of whether the SAC alleges loss causation because the SAC fails to allege a misstatement or that defendants acted with scienter.").

* * *

For the reasons discussed above, Defendants' motion to dismiss Plaintiff's Section 10(b) claim is GRANTED.

### B. Section 20(a)

Section 20(a) of the Exchange Act provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

Defendants argue that because a claim under Section 20(a) is predicated on a primary violation of securities law, the Section 20(a) claims must be dismissed. Defs.' Mem. at 40 n.18. It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation. *See, e.g., In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297–98 (S.D.N.Y. 2006)) (in the absence of a primary violation, "control person" liability under Section 20(a) cannot exist). In light of Plaintiff's failure to adequately plead a primary violation, the Section 20(a) claims against the Individual Defendants cannot stand. Defendants' motion to dismiss Plaintiff's Section 20(a) claim is therefore GRANTED.

### C. Leave to Amend

Plaintiff in its opposition does not seek leave to amend the CAC. However, because leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), the

40

Court GRANTS Plaintiff leave to amend to correct the deficiencies noted in this Opinion if they can do so. Any repleading must be made within thirty days of the date of this Order.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. Plaintiff is granted leave to amend the pleading by **August 30, 2017.** The Clerk of the Court is respectfully directed to terminate the Motion, Doc. 72, and Defendants' request for oral argument, Doc. 84.

It is SO ORDERED.

Dated:  July 31, 2017
       New York, New York

Edgardo Ramos, U.S.D.J.