**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE EXPRESS SCRIPTS HOLDINGS
COMPANY SECURITIES LITIGATION

Master File No. 1:16-cv-03338-ER

**<u>JURY TRIAL DEMANDED</u>**

---

**SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    NATURE AND SUMMARY OF THE ACTION ............................................................ 2

II.   JURISDICTION AND VENUE ........................................................................................ 7

III.  THE PARTIES .................................................................................................................. 8

    A.    Lead Plaintiff ......................................................................................................... 8

    B.    Defendants ............................................................................................................. 9

IV.  BACKGROUND .............................................................................................................. 11

    A.    Express Scripts Is The Largest PBM In The Country........................................... 11

    B.    Express Scripts's Relationship With Its Most Important Customer, Anthem ...... 12

        1.    Express Scripts Enters Into A 10-Year Contract With Anthem That
              Provides For Periodic Pricing Reviews .................................................... 12

        2.    Anthem Was Express Scripts's Most Important Customer ..................... 14

    C.    Express Scripts's Obligation Under GAAP To Account For The Anthem
           Contract................................................................................................................ 19

    D.    Express Scripts And Anthem's Contentious 2011-12 Pricing Negotiations And
           Contract Dispute Cause A Lasting Rift In Their Relationship ............................ 25

V.   OVERVIEW OF THE EVENTS IMMEDIATELY PRIOR TO AND DURING THE
    CLASS PERIOD................................................................................................................ 27

    A.    The Second Round Of Pricing Negotiations Is Contentious "From The Outset". 27

        1.    Anthem Announces That It Will Renegotiate Pricing Under The
              Anthem Contract And Appoints Brian Griffin To Lead The Price
              Check ...................................................................................................... 27

        2.    Anthem Demands $15 Billion In Pricing Concessions Before Its Right
              To A Market Check Under The Contract Has Even Ripened................... 31

        3.    Anthem Serves Express Scripts With Notice of Breach Detailing
              Numerous Operational Breaches Of The Anthem Contract Prior To
              The Start Of The Class Period ................................................................ 33

    B.    February 24-25, 2015: Defendants Materially Misrepresent The Strength Of
           The Express Scripts-Anthem Relationship In Express Scripts's Financial

Statements For The Year Ended 2014 And Defendant Queller Falsely Assures Investors That Express Scripts's Relationship With Anthem Is "Very, Very Solid" .................................................................................................................. 36

C.    Unbeknownst To Investors, The Parties' Relationship Continues To Deteriorate When Anthem Serves Express Scripts With A Formal Notice Of Pricing Breach .......................................................................................... 39

D.    April 28-29, 2015: Defendants Materially Misrepresent The Strength Of The Express-Scripts-Anthem Relationship In Express Scripts's Financial Statements For Q1 2015 And Defendant Paz Continues To Falsely Assure Investors That Express Scripts's Relationship With Anthem Is Solid ................ 40

E.    May – June 2015: Express Scripts Continues To Describe Its Relationship With Anthem As "Strong" As Express Scripts's Operational Breaches Worsen, It Refuses To Negotiate Over Anthem's Pricing Terms At All, And Anthem Announces A Deal To Acquire Cigna .................................................... 43

       1.    The Dispute Over Express Scripts's Operational Breaches Worsens ....... 43

       2.    The Dispute Over The Pricing Terms In The Anthem Contract Worsens As Express Scripts Continues To Refuse To Negotiate............. 44

       3.    Defendants Face Mounting Pressure To Reassure Investors In The Face Of Reports That Anthem May Acquire A Rival PBM.................... 45

F.    July 28, 2015: Defendants Materially Misrepresent The Strength Of The Express Scripts-Anthem Relationship In Express Scripts's Financial Statements For Q2 2015 ...................................................................................... 47

G.    August 3, 2015: Anthem Reports Another Express Scripts Database Failure To CMS ............................................................................................................. 49

H.    September – October 2015:  Express Scripts Announces Changes In Senior Management, And Its Relationship With Anthem Continues To Deteriorate ...... 49

I.    October 27, 2015:  Defendants Materially Misrepresent The Strength Of The Express Scripts-Anthem Relationship In Express Scripts's Financial Statements For Q3 2015 ...................................................................................... 52

J.    November 9, 2015:  Mediation Fails, And Relations Deteriorate Further........... 53

K.    December 22, 2015: Defendant Paz Falsely Assures Investors That Defendants Were "Excited To Continue Productive Discussions" With Anthem, The Parties Were "Currently In Discussions" Regarding Pricing, Their Relationship Was "Successful," And Defendants Were "Fully Committed To Reaching A Mutually Beneficial Agreement" ............................ 57

L.      January 7, 2016: Express Scripts Forwards Anthem A Proposal That Actually Increases Pricing .................................................................... 59

M.      The Truth Is Revealed To Investors................................................ 59

    1.      January 12-14, 2016:  Anthem Takes The Terms Of Its Contract Dispute With Express Scripts Public ........................................ 59

    2.      January 15, 2016:  Investors Contrast News About The Broken Anthem-Express Scripts Relationship With Express Scripts's Prior Characterizations................................................................. 63

    3.      January 19, 2016:  Investors Understand The Likelihood That Anthem Will Leave Express Scripts And Contract With A Different PBM .......... 64

    4.      After Anthem Threatens Litigation In January 2016, Express Scripts's Already Strained Relationship With Anthem Worsens ........................... 65

    5.      February 17, 2016: Defendant Paz States Falsely That Express Scripts Was "Currently In Discussions" And Fully Committed To Good Faith Negotiations With Anthem ...................................................... 69

    6.      March 21-22, 2016:  Anthem Files The Anthem Complaint Detailing The Parties' Disputes, And The Complaint Becomes Available To The Market ........................................................................... 71

VI.     POST-CLASS PERIOD DEVELOPMENTS .................................................. 75

A.      Express Scripts Files A Counterclaim Against Anthem Further Detailing The Parties' Contentious Relationship And Failed Pricing Negotiations ................... 75

B.      Express Scripts Belatedly Admits That Its Financial Statements Materially Misrepresented The Soundness Of Express Scripts's Relationship With Anthem.................................................................................. 77

C.      Express Scripts Confirms That Its Relationship With Anthem Is Irreparable And Discloses Anthem's Contributions to the Company's Profits In Order To Prepare Investors For The Impact of Losing Anthem's Business After 2019 ...... 80

VII.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................................................ 83

A.      Express Scripts's Financial Reporting For Fourth-Quarter And Full-Year 2014. 83

B.      Express Scripts's Financial Reporting For First-Quarter 2015........................... 86

C.      Express Scripts's Financial Reporting For Second-Quarter 2015 ....................... 89

D.      Express Scripts's Financial Reporting For Third-Quarter 2015 ......................... 92

E.     Express Scripts's December 22, 2015 Financial Guidance Call............................ 95

F.     Express Scripts's Financial Reporting For Fourth-Quarter And Full-Year 2015. 97

VIII.   LOSS CAUSATION............................................................................................. 101

IX.    SUMMARY OF SCIENTER ALLEGATIONS.................................................. 104

X.     PRESUMPTION OF RELIANCE....................................................................... 117

XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE .................................................................... 119

XII.   CLASS ACTION ALLEGATIONS ................................................................... 120

XIII.  CLAIMS FOR RELIEF ...................................................................................... 122

XIV.  PRAYER FOR RELIEF ...................................................................................... 127

XV.   JURY DEMAND ................................................................................................ 128

iv

1.      Court appointed Lead Plaintiff, Teachers Insurance and Annuity Association of America ("TIAA," defined below), by its undersigned counsel, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts are based upon, among other things: (1) review and analysis of documents filed publicly by Defendant Express Scripts Holding Company ("Express Scripts" or the "Company") and Anthem, Inc. ("Anthem") with the Securities and Exchange Commission (the "SEC"); (2) Express Scripts and Anthem press releases and other public statements; (3) transcripts of Express Scripts and Anthem investor conference calls; (4) research reports concerning Express Scripts and Anthem by financial analysts; (5) publicly available information from other legal actions arising out of the issues giving rise or related to this action; and (6) other publicly available sources described below.  Lead Counsel Bernstein Litowitz Berger & Grossmann LLP's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further discovery, including a review of documents already produced in other related legal actions arising out of the issues giving rise to this action.  Indeed, on August 2, 2017, counsel who reviewed documents obtained from Express Scripts through a shareholder demand for books and records under Section 220 of the Delaware General Corporation Law represented to the Court, "we have even seen the opinion[] from yesterday – [w]e think that some of the documents belie arguments made in the motion to dismiss," specifically referencing the Court's August 1, 2017 opinion granting Defendants' motion to dismiss the First Amended Class Action Complaint in this case.

## I.      NATURE AND SUMMARY OF THE ACTION

2.      This is a federal securities investor class action brought by Lead Plaintiff, TIAA, individually and on behalf of a proposed class of all persons and entities who purchased or otherwise acquired Express Scripts common stock between February 24, 2015 and March 21, 2016, inclusive (the "Class Period").

3.      This action involves a series of material misstatements and omissions about Express Scripts's relationship with its largest client, Anthem, at a time (unbeknownst to investors) that the relationship between Express Scripts and Anthem was seriously troubled in the face of a $15 billion pricing dispute, repeated assertions of breach of contract, and failures to negotiate the pricing dispute at all.  Notwithstanding the true behind-the-scenes facts detailed herein, throughout the Class Period, Defendants repeatedly and consistently accounted for Express Scripts's contract with Anthem in Express Scripts's publicly filed financial statements as if there were a "high probability" that the contract would be renewed and extended for at least five more years. Moreover, the individual Express Scripts officers named as Defendants herein publicly described Express Scripts's then-existing relationship with Anthem falsely as "***great***," "***very, very solid***," "***business as usual***," and "***strong and sound***."[1]  As set forth below, given the size and importance of Express Scripts's relationship with Anthem, investors and securities analysts following the Company paid particular attention to those statements, which were materially false and misleading when made.  Defendants could have chosen not to comment at the time, particularly given the parties' very contentious pricing dispute, but having decided to comment and to account for the Anthem Contract repeatedly throughout the Class Period as if there were a "high probability" that the Anthem Contract would be renewed for at least five more years, they were obligated to make

---

[1] Unless otherwise indicated, all emphasis in quotation marks has been added.

full and complete disclosure of the true then-existing contrary facts, which they failed to do repeatedly throughout the Class Period.  Instead, Defendant Paz falsely told investors, as late as December 22, 2015, that Express Scripts was "*currently in discussions*" with Anthem about re-pricing and was "*very early on*" in the process when, in truth, Express Scripts had refused to negotiate or even respond to Anthem's repeated requests for $3 billion of lower annual pricing for *over ten months*.  When Express Scripts finally did respond to Anthem, it suggested *raising*, not lowering, pricing, and litigation between Anthem and Express Scripts quickly followed, revealing the truth to investors.

4.    Express Scripts is the largest independent pharmacy benefit manager ("PBM") in the country.  As a PBM, Express Scripts administers the prescription drug benefit component of its customers' health plans.  Anthem, one of the largest health benefits companies in the United States, was Express Scripts's most important client, representing approximately *14%* of Express Scripts's annual revenues and more than *33%* of Express Scripts's adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA").   As a result, the Company's relationship with Anthem was of paramount importance to investors and analysts.

5.    Express Scripts's and Anthem's relationship was governed by a 10-year contract that the parties entered into in 2009 (as amended from time to time, the "Anthem Contract").  Due to the importance of Anthem to Express Scripts, both prior to and during the Class Period, investors and analysts were heavily focused on Express Scripts's relationship with Anthem and on whether the parties would renew the Anthem Contract when it expired in 2019.

6.    Unbeknownst to investors, even prior to the start of the Class Period, the history of the parties' pricing negotiations under the Anthem Contract already had damaged the parties' relationship.  Specifically, the Anthem Contract provided that every three years, Anthem could

conduct a market analysis to ensure that it was receiving "competitive benchmark pricing" on drugs purchased through plans administered by Express Scripts. If Anthem determined that the pricing terms under the Anthem Contract were not market competitive, then Anthem could propose new terms, and Express Scripts was obligated to negotiate in good faith over such proposal.

7.     The parties' first round of pricing negotiations under the Anthem Contract was completed in November 2013. That process took over a year, was extremely contentious, and damaged the parties' relationship. Beginning in March 2014, Anthem publicly indicated that it expected to renegotiate the pricing provisions of the Anthem Contract for a second time in the following three to five years. By October 2014, before Anthem's right to trigger periodic pricing review under the Anthem Contract had even ripened, Anthem privately demanded approximately *$15 billion* in pricing concessions from Express Scripts over the remaining four years (plus the post-transition period) of the Anthem Contract. On February 16, 2015, Anthem privately sent Express Scripts a 14-page single-spaced letter detailing what it claimed were numerous operational breaches of the Anthem Contract by Express Scripts that, if uncorrected, gave Anthem the right to terminate the agreement. By April 1, 2015, Anthem privately provided Express Scripts with a second formal notice of breach of the Anthem Contract. The relationship between Anthem and Express Scripts did not improve, and contractually required mediation failed.

8.     By contrast, throughout the Class Period, Defendants repeatedly represented to investors publicly that the Company's relationship with Anthem remained strong, and Express Scripts accounted for the Anthem Contract in its publicly filed financial statements as if there were a "high probability" that the Anthem Contract would be renewed for at least another five years. Among other public statements and assurances during the Class Period, on February 25, 2015 (after Anthem had already served Express Scripts with its breach of contract notice), Express

Scripts Senior Vice President Defendant David Queller told investors, "we've got a great relationship with Anthem" and "*the relationship is very, very solid*."  During the same call, Defendant Queller assured investors with respect to Express Scripts's relationship with Anthem that "it's *business as usual*."  Months later (after required mediation had failed), Express Scripts Chairman and CEO George Paz stated on a December 22, 2015 investor call: "*We are excited to continue productive discussions with Anthem regarding our relationship* . . . . [W]e are fully committed to reaching a mutually beneficial agreement, and continuing our successful working relationship."

9.     In truth, Express Scripts had been engaged in a bitter, contentious, nearly *yearlong dispute* concerning the terms of the Anthem Contract, which Express Scripts simply refused to negotiate at all.  Moreover, the size of Anthem's nearly *$15 billion demand* – which would result in price changes of more than $3 billion per year – made it obvious to the parties (but not investors) that Express Scripts's relationship with Anthem was fraught and contract renewal for at least five more years was not "highly probable."  Indeed, Defendant Paz later called Anthem's re-pricing demand "*ludicrous*," and Express Scripts has *admitted* in related litigation that the parties' second round of pricing negotiations was troubled "*from the outset*."

10.     As noted above, on February 16, 2015, *a mere eight days before the start of the Class Period*, Anthem privately served Express Scripts with notice of breach of the Anthem Contract in the form of a 14-page single-spaced letter detailing numerous operational breaches. Those breaches included, *inter alia*, alleged systems defects that resulted in a failure to perform material operational duties in a "prudent and expert manner"; inadequate personnel training; high employee turnover; a failure to allocate sufficient resources to its work; and a lack of expertise. Anthem further threatened to *terminate the Anthem Contract* if such breaches were not cured

5

within an undisclosed specified time frame.  As a result of those and other claimed operational breaches, Anthem served Express Scripts with multiple corrective action plans, and reported Express Scripts's failure to comply with its obligations to federal regulators.

11.     On March 6, 2015, Express Scripts and Anthem privately submitted their dispute over Express Scripts's operational breaches to a formal committee charged with resolving ***material disputes*** as required under the Anthem Contract.  That effort failed.  Less than two weeks later on March 18, 2015, Anthem reiterated the nearly ***$15 billion demand*** that it made in October 2014, notifying Express Scripts that Anthem had performed a market check analysis under the Anthem Contract and determined that the pricing terms under the Anthem Contract were not competitive. On April 1, 2015, Anthem privately served Express Scripts with formal notice of pricing breach under Section 6.2(a) of the Anthem Contract, its second breach-of-contract notice in less than two months.

12.     For the next ten months, Express Scripts's relationship with Anthem continued to spiral downward, as the parties repeatedly accused each other of failing to act in good faith and Express Scripts vigorously disputed whether Anthem was entitled to any "competitive benchmark pricing" under the Anthem Contract at all – let alone the nearly ***$15 billion*** Anthem consistently demanded.  Express Scripts's alleged operational breaches under the Anthem Contract also continued and worsened.  Indeed, between April 17, 2015 and December 31, 2015 Anthem brought ***156 new issues*** relating to Express Scripts's performance of PBM services for Anthem to Express Scripts's attention.  The parties also attempted to privately mediate their disputes in November 2015 as required by the Anthem Contract, and the mediation failed.  In the meantime, Express Scripts announced a major senior management overhaul, including, among others, the early resignation of then-CEO Defendant George Paz.  Finally, on January 7, 2016, Express Scripts

made a counterproposal to Anthem (after eleven months of repeated demands from Anthem) that would lower pricing under the Anthem Contract by $1 billion in total – ***less than 7%*** of the $15 billion that Anthem had consistently demanded from Express Scripts since October 2014, but now also including a $1 billion ***increase*** for the post-termination period.  In other words, at the very time Anthem was demanding Express Scripts reduce its pricing, Express Scripts proposed an ***increase*** in pricing.

13.     Express Scripts investors began to learn the truth less than one week later, on January 12, 2016, when Anthem decided to go public, and began publicly stating that it was entitled to over $3 billion in pricing reductions annually over the remaining life of the Anthem Contract.  Anthem also threatened to terminate its relationship with Express Scripts.  Numerous securities analysts focused on the importance of this information to Express Scripts investors over a several-day period.  Then, on March 21, 2016, in an action styled *Anthem, Inc. v. Express Scripts, Inc.*, No. 16-cv-2048-ER (S.D.N.Y.) (the "Anthem Litigation"), Anthem sued Express Scripts, alleging in a detailed pleading that the Company breached the Anthem Contract by failing to even negotiate drug pricing and through numerous operational breaches.  Securities analysts began reporting on the details of the Anthem complaint after the close of trading on March 21, 2016.  These disclosures each had a statistically significant adverse impact on the price of Express Scripts common stock, causing TIAA and other members of the Class to suffer significant damages as the true, previously undisclosed facts about the deep, long-standing conflict between Express Scripts and Anthem and the likelihood that the parties would not renew their contract for at least five more years finally came to light as a result of the disclosures.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.

§ 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Express Scripts transacts business and holds investor conferences in New York, the Company's common stock trades in New York on the NASDAQ Stock Market, and a substantial part of the events giving rise to this litigation took place in New York.  In addition, as the Court recognized in its Order of September 14, 2016 (ECF No. 66), this Action is related to the Anthem Litigation, which is currently pending in this District.  In Express Scripts's Amended Counterclaims filed in that litigation, Express Scripts specifically alleged that "a substantial part of the events underlying [Express Scripts's] claim took place in New York."[2] This includes a November 25, 2014 meeting between Anthem's General Counsel and Express Scripts in New York.  Finally, the Anthem Contract – which is integral to Lead Plaintiff's claims in this action – states that "[a]ny dispute arising out of or related in any manner to this Agreement shall be referred exclusively to the United States District Court for the Southern District of New York."

## III.    THE PARTIES

### A.    Lead Plaintiff

16.     Lead Plaintiff Teachers Insurance and Annuity Association of America ("TIAA" or "Lead Plaintiff") was founded in 1918 and is a joint stock life insurance company incorporated in New York with its principal place of business in New York.[3]  CREF, a companion organization

---

[2] Answer and Amended Counterclaims, *Anthem, Inc. v. Express Scripts, Inc.*, No. 16-cv-2048 (S.D.N.Y. June 13, 2016), ECF No. 33 ("ES Ans." and "ES Counterclaims," respectively), ¶ 161.

[3] "TIAA" refers collectively to the College Retirement Equities Fund ("CREF"), TIAA-CREF Enhanced Large Cap Growth Index, TIAA-CREF Enhanced Large-Cap Value Index, TIAA-CREF Equity Index Fund, TIAA-CREF Growth & Income Fund, TIAA-CREF Large-Cap Growth Index Fund, TIAA-CREF Large-Cap Value Fund, TIAA CREF Large-Cap Value Index Fund, TIAA-CREF S&P 500 Index Fund

to TIAA, is a not-for-profit membership corporation incorporated in New York with its principal place of business in New York.  TIAA is a Fortune 100 financial services organization that forms the principal retirement system for the nation's education and research communities, and is one of the largest retirement systems in the world based on assets under management.  As set forth in the certification TIAA submitted to the Court on October 14, 2016 (ECF No. 67), TIAA purchased Express Scripts common stock during the Class Period and suffered damages as a result of the conduct complained of herein.  On July 27, 2016, the Court appointed TIAA as Lead Plaintiff for this litigation (ECF No. 49).

**B.     Defendants**

**1.     Corporate Defendant**

17.     Defendant Express Scripts Holding Company ("Express Scripts" or the "Company") is a Delaware corporation with its principal executive offices located at One Express Way, St. Louis, Missouri.  The Company's common stock trades on NASDAQ under the ticker symbol "ESRX."  As of August 30, 2017, Express Scripts had over 577 million shares of common stock outstanding.

**2.     Individual Defendants**

18.     Defendant George Paz ("Paz") was, at all relevant times, Chairman and Chief Executive Officer ("CEO") of Express Scripts.  On September 9, 2015, the Company announced that Defendant Paz would step down as CEO, effective following the Company's May 2016 shareholder meeting, but would remain on the Company's board of directors as non-executive Chairman.  During the Class Period, Paz signed the following SEC disclosures that contained

---

(collectively, the "TIAA-CREF Funds"), TIAA-CREF Life Growth & Income Fund, TIAA-CREF Life Large-Cap Value Fund, and TIAA-CREF Life Stock Index Fund (collectively, the "TIAA-CREF Life Large-Cap Value Funds").

materially false and misleading financial statements: Express Scripts's 2014 Annual Report filed with the SEC on Form 10-K (the "2014 10-K"), Express Scripts's Quarterly Reports for the first, second, and third quarters of 2015 filed with the SEC on Forms 10-Q (respectively, the "1Q15 10-Q," "2Q15 10-Q," and "3Q15 10-Q"), and Express Scripts's 2015 Annual Report filed with the SEC on Form 10-K (the "2015 10-K").   Moreover, Paz made additional materially false and misleading statements during the Company's April 29, 2015 earnings conference call, December 22, 2015 financial guidance conference call, and February 17, 2016 earnings conference call.

19.     Defendant Timothy Wentworth ("Wentworth") was, at all relevant times, President of Express Scripts.  On September 9, 2015, the Company announced that Wentworth would succeed Paz as the Company's CEO, effective following the Company's May 2016 shareholder meeting.  During the Class Period, Wentworth signed the following SEC disclosures that contained materially false and misleading financial statements: the 2015 10-K.

20.     Defendant Eric Slusser ("Slusser") was, from September 2015 to the present, Chief Financial Officer ("CFO") of Express Scripts.   During the Class Period, Slusser signed the following SEC disclosures that contained materially false and misleading financial statements: the 3Q15 10-Q, the Company's Form 8-K filed with the SEC on October 27, 2015 (the "October 27, 2015 8-K"), and the 2015 10-K.

21.     Defendant David Queller ("Queller") was, at all relevant times, Senior Vice President – Sales & Account Management of Express Scripts.  During the Class Period, Queller made materially false and misleading statements during the Company's February 25, 2015 earnings conference call.

22.     Defendant James M. Havel ("Havel") was, from January 2015 to September 2015, Executive Vice President and Interim CFO of Express Scripts.  In September 2015, Havel became

the Company's Executive Vice President of Finance.  During the Class Period, Havel signed the following SEC disclosures that contained materially false and misleading financial statements:  the 2014 10-K, the 1Q15 10-Q, the 2Q15 10-Q, and the Company's Form 8-K filed with the SEC on July 28, 2015 (the "July 28, 2015 8-K").

23.     Paz, Wentworth, Slusser, Queller, and Havel are collectively referred to herein as the "Individual Defendants."

## IV.     BACKGROUND

### A.     Express Scripts Is The Largest PBM In The Country

24.     Express Scripts is the largest standalone pharmacy benefit manager ("PBM") in the United States.  As a general matter, PBMs contract with, and administer pharmacy benefits and prescription drug programs for, health-insurance providers including commercial health plans, Medicare Part D plans, and state and federal government health plans.  In that capacity, PBMs among other things contract with pharmacies, negotiate drug pricing with manufacturers, and process health plan members' prescription drug claims.

25.     As the country's largest PBM, Express Scripts has been described as "a powerhouse in managing prescription drug benefits."  Indeed, for the fiscal year ended December 31, 2016, Express Scripts reported more than $100.2 billion dollars in revenues, and more than $3.4 billion in net income.  The Company's PBM business accounts for the vast majority of its earnings, representing 96.2% of Express Scripts's revenues for 2016, 97.3% of revenues for 2015, and and 97.5% of revenues for 2014.

**B.**     **Express Scripts's Relationship With Its Most Important Customer, Anthem**

     **1.**     **Express Scripts Enters Into A 10-Year Contract With Anthem That Provides For Periodic Pricing Reviews**

26.    Express Scripts's relationship with Anthem was rooted in a contract that the parties entered into in 2009.  On April 13, 2009, Express Scripts announced that the Company and Anthem[4] signed the Anthem Contract, a ten-year agreement for Express Scripts to serve as the exclusive PBM services provider to Anthem's health plans.  At the time, Defendant Paz, then-CEO and Chairman of Express Scripts, declared that "this collaboration between Express Scripts and [Anthem] represents a shared commitment to achieving optimal health outcomes while driving out wasteful spending," and "creates significant opportunities for accelerated growth for both organizations."

27.    Section 5.6 of the Anthem Contract contained a "Periodic Pricing Review" provision that was expressly designed "to ensure that [Anthem] is receiving competitive benchmark pricing."[5]  That provision protected Anthem from changes in the market pricing of drugs over the ten-year term of the Anthem Contract.

28.    Specifically, Section 5.6 of the Anthem Contract states in relevant part that:

**5.6 Periodic Pricing Review.**  [Anthem] or a third party consultant retained by [Anthem] will conduct a market analysis every three (3) years during the Term of this Agreement ***to ensure that [Anthem] is receiving competitive benchmark pricing***.  In the event [Anthem] or its third party consultant determines that such pricing terms are not competitive, ***[Anthem] shall have the ability to propose renegotiated pricing terms to [Express Scripts] and [Anthem] and [Express Scripts] agree[] to negotiate in good faith over the proposed new pricing terms***.

---

[4] Prior to December 2014, Anthem was known as WellPoint, Inc. ("WellPoint").  To avoid confusion, unless otherwise noted, the Complaint refers to that pre-2014 entity as "Anthem."

[5] ES Counterclaims ¶ 169.

29.     In other words, at regular intervals throughout the Anthem Contract's ten-year term, Anthem could either itself conduct, or contract out, a market check.  If it then determined that the drug pricing due Express Scripts was above market pricing, Anthem could then propose market-competitive pricing terms, and Anthem and Express Scripts were obligated to negotiate over those terms in good faith.

30.     As the health-care industry publication *Drug Benefit News* reported approximately one year prior to the start of the Class Period, health plans were increasingly using market checks "to ensure that they're not overpaying for certain elements of their pharmacy benefit."[6]  The market checks allow health plans to "make pricing revisions that are more in line with the current market," and are conducted "to quantify the value of difference between the current market and . . . contracted pricing."

31.     Defendant Paz has publicly discussed the role that such price checks play in Express Scripts's relationships with its clients.  During a February 17, 2016 conference call with analysts to discuss the Company's earnings for fourth-quarter and full-year 2015, Paz stated, "if you look at our total book of business, a lot of our clients do have what we call price checks.  And in those price checks they have the right to look at pricing and make sure that we are doing the right things for them.  Those are pretty routine and we go through those, bunches of those, every year."

32.     Contemporaneous with the agreement for Express Scripts to provide PBM services to Anthem, Express Scripts also acquired Anthem's "NextRx" subsidiaries, which served as Anthem's in-house provider of PBM services.  Express Scripts agreed to pay $4.675 billion up front as part of its acquisition of NextRx.

---

[6] Lauren Flynn Kelly, *Plans Have Various Surveillance Options to Keep PBMs in Check*, Drug Benefit News (Feb. 7, 2014), https://aishealth.com/archive/ndbn020714-04.

33.     The Anthem Contract, along with Express Scripts's acquisition of NextRx, closed on December 1, 2009.  In a press release that day, Defendant Paz again touted the benefits of Express Scripts's "strategic alliance" with Anthem.  According to Paz, "Two industry leaders have aligned in an unprecedented way to promote better health and value for millions of Americans," and "[a]t this pivotal moment in American healthcare, the strategic alliance opens new horizons for improving outcomes for members while driving down overall healthcare costs."

### 2.     Anthem Was Express Scripts's Most Important Customer

34.     Anthem was Express Scripts's most important customer, representing 17% of the Company's revenues for the year ended December 31, 2016.  Anthem was one of two clients that the Company identified as its "large clients" (the other was the U.S. Department of Defense).

35.     As Express Scripts recognized, including in its Annual Report filed on Form 10-K for the year ended December 31, 2015, "[a] substantial portion of [Express Scripts's] business is concentrated in certain significant client contracts," including with Anthem, and "[i]f one or more of our large clients either terminates or does not renew a contract for any reason or if the provisions of a contract with a large client are modified, renewed or otherwise changed with terms less favorable to us, our financial results could be materially adversely affected."

36.     Anthem was vitally important to Express Scripts since the two entities partnered in 2009.  Indeed, for each of the five years ended December 31, 2012 through 2016, at least 12.2% of Express Scripts's revenues came from its relationship with Anthem, for a total of approximately 14.6% during that period:

| Year | Express Scripts's Total Revenues | Anthem-Related Revenues | Anthem-Related Revenues as a Percentage of Total Revenues |
|---|---|---|---|
| 2016 | $100.3 billion | $17.1 billion | 17.0% |
| 2015 | $101.8 billion | $16.6 billion | 16.3% |
| 2014 | $100.1 billion | $14.0 billion | 14.0% |
| 2013 | $105.1 billion | $12.8 billion | 12.2% |
| 2012 | $93.9 billion | $12.9 billion | 13.7% |

37.     Moreover, Express Scripts's relationship with Anthem represented a substantial and outsized percentage of the Company's profits compared even to those high revenue figures. As Express Scripts disclosed on April 24, 2017 in connection with its earnings release for the first quarter of 2017, "Our Anthem contract generated approximately $2.2 billion and $1.9 billion of adjusted EBITDA, or approximately 31% and 26% of our total adjusted EBITDA, in 2016 and 2015, respectively."   Express Scripts further disclosed that, in the first quarter of 2017, $495 million of adjusted EBITDA, or approximately 33.1% of the Company's total adjusted EBITDA, was attributable to Anthem.  And on July 25, 2017, in connection with its second-quarter 2017 earnings release, Express Scripts disclosed that $609 million of adjusted EBITDA, or approximately 33.4% of total adjusted EBITDA, was attributable to Anthem.

| Time Period | Express Scripts's Total Adjusted EBITDA | Anthem-Related Adjusted EBITDA | Anthem-Related Adjusted EBITDA as a Percentage of Total Adjusted EBITDA |
|---|---|---|---|
| 2Q2017 | $1.824 billion | $609 million | 33.4% |
| 1Q2017 | $1.496 billion | $495 million | 33.1% |
| Full-Year 2016 | $7.260 billion | $2.248 billion | 31.0% |

| Time Period | Express Scripts's Total Adjusted EBITDA | Anthem-Related Adjusted EBITDA | Anthem-Related Adjusted EBITDA as a Percentage of Total Adjusted EBITDA |
|---|---|---|---|
| Full-Year 2015 | $7.046 billion | $1.863 billion | 26.4% |

38.     As Express Scripts reported in its first-quarter 2017 earnings release, "Under the terms of our contract with Anthem, Anthem's contribution to our profitability, as a percentage of our total EBITDA and adjusted EBITDA, has grown and ***we expect it will continue to increase and exceed its contribution to our revenues, as a percentage of our total revenues, and that revenues, EBITDA and adjusted EBITDA attributable to Anthem will increase as the contract nears its termination in 2019***."

39.     Given the significance of Express Scripts's relationship with Anthem to the Company's earnings, it is no surprise that the market was especially focused on that relationship, including whether the parties would renew their contract to continue past its scheduled expiration in 2019.

40.     For example, on a conference call with analysts on April 13, 2009 to discuss Express Scripts's contract with Anthem announced that day, a Goldman Sachs analyst asked whether, "from an amortization perspective, would 10 years be the proper way to think about this?" Express Scripts's then-CFO Jeff Hall responded that "15 years is the right way," advising investors that there was sufficient reason to conclude Anthem and Express Scripts would renew the Anthem Contract for at least an additional five years.

41.     Similarly, at the September 15, 2009 Global Healthcare Conference hosted by Morgan Stanley, an analyst asked, "[w]ith the [Anthem] deal, ten years down the road, what will be your strategy in terms of what you'll do over the next ten years to make it highly likely that

you'll retain that business at that time?"  Hall answered that Express Scripts planned "to build a deep relationship with them, where it's win win. . . . It's just building a strong relationship so that we are creating significant value for them, and it's a partnership that makes sense for both of us to continue.  I would say we are pretty confident and we think this is going to be a long term relationship."

42.     Moving into 2010, as Express Scripts began to provide PBM services to Anthem, analysts continued to focus on Anthem's contributions to Express Scripts's bottom line, with for instance a Deutsche Bank analyst remarking during a May 3, 2010 conference that the Anthem relationship "has been a game-changer for you guys."

43.     Analysts were also attuned to any potential rifts in the Anthem-Express Scripts relationship, including with regard to drug pricing under the Anthem Contract.  As discussed more fully below, in 2012, Anthem exercised its right to its first periodic pricing review, which led to a protracted dispute between Express Scripts and Anthem.  On January 9, 2012, at a J.P. Morgan Global Healthcare Conference, an analyst directly addressed that dispute, asking:  "[Anthem] is obviously your largest customer.  Can you talk about – I think in mid-December you disclosed that there was a dispute between you and [Anthem].  Can you talk about the dispute?  Can you talk about where you are around to resolution and how we all should be thinking about this?"  Hall responded, "You are right, [Anthem] is an extremely important client to us.  We are confident we will be able to come to a resolution."

44.     Express Script's relationship with Anthem was so important that analysts were even concerned about the impact that a change in Anthem management would have on Express Scripts.  Accordingly, during a February 19, 2013 conference call to discuss the Company's fourth-quarter and full-year 2012 earnings, a Bank of America analyst asked whether Defendant Paz had "had

17

any interaction as yet with the new [Anthem] CEO." Paz responded that although the two had not spoken yet, Paz "look[ed] forward to that opportunity. And starting a new page in our book with [Anthem]. Should be exciting."

45. Moving forward, the market continued to focus closely on the Express Scripts-Anthem relationship. During an October 25, 2013 conference call to discuss the Company's third-quarter 2013 earnings, Defendant Paz responded to an FBR Capital Markets analyst's question about Anthem by affirming that "[Anthem]'s a very great partner for us. We work very closely with them. . . . [Anthem]'s a very sophisticated client. And they understand that their ability to be competitive in the marketplace is hugely important."

46. Similarly, during an April 30, 2014 conference call to discuss the Company's first-quarter 2014 earnings, a Morgan Stanley analyst asked for "color on the [Anthem] relationship and any price checks that are embedded in that contract." Defendant Wentworth replied that "we really, really value that relationship," and assured investors we have a lot of years left to work together, we are very aligned in terms of growing our relationship and the more that we do that, the easier everything else will get. So, I feel very, very good about where we are with [Anthem]."

47. Likewise, in response to a UBS analyst's question during an October 29, 2014 conference call to discuss Express Scripts's third-quarter 2014 earnings, Defendant Paz stated that "[Anthem]'s a great company and a great partner. We're doing some phenomenal things together. . . . *I think we've got a great relationship with them*. We've still got five years plus left on the contract. We love servicing them, and *our relationship is very strong and sound. We're going to continue this relationship, and we'll let you know as things unfold*."

48. As noted above, *less than two weeks earlier on October 17, 2014, Anthem demanded approximately $15 billion in pricing concessions over the remainder of the Anthem*

**Contract**, which Paz only later admitted he viewed as "**pretty ludicrous**." As set forth below, rather than letting investors "know as things unfold," Defendants continued to describe Express Scripts's relationship with Anthem during the Class Period as "great," "very, very solid," and "business as usual," and to account for the Anthem Contract in Express Scripts's publicly filed financial statements as if there were a "high probability" that it would be extended for at least another five years, while Express Scripts's relationship with Anthem continued to deteriorate throughout the Class Period.

### C. Express Scripts's Obligation Under GAAP To Account For The Anthem Contract

49. The strength of Express Scripts's relationship with its largest and most important client, Anthem, was of paramount importance to Express Scripts investors, including the probability that Express Scripts would renew its contract with Anthem. As reflected in Express Scripts's annual and quarterly financial reports filed with the SEC, the revenues attributable to the Anthem Contract and the costs of servicing the contract were key metrics for the Company's investors. For that reason, Express Scripts, at all relevant times, was obligated to ensure that its public statements to investors and financial reporting accurately accounted for the Company's relationship with Anthem.

50. Generally Accepted Accounting Procedures ("GAAP") are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time, according to which financial statements should be presented. GAAP are the official accounting standards required by the SEC and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB") in the Accounting Standards Codification ("ASC"). SEC

Regulation S-X states that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading.

51.     In ASC 350 *Intangibles – Goodwill and Other* ("ASC 350"), GAAP provides rules to govern companies' accounting for "intangible assets" – *i.e.*, items such as contracts, customer lists, patents, and other quantifiable but not "fixed" assets that carry economic value.  Customer contracts and relationships related to the Anthem Contract are intangible assets of Express Scripts. Under ASC 350-30-35-1, "[t]he accounting for a recognized intangible asset is based on its useful life to the reporting entity," meaning that the Company is required to allocate the diminution in value or utilization of an intangible asset over the course of the asset's "useful life" – defined as "the period over which the asset is expected to contribute directly or indirectly to the future cash flows of that entity."  ASC 350-30-35-2.

52.     ASC 350 discusses how companies are to ascertain the useful life of an intangible asset, as well as how to properly amortize intangible assets.  Specifically, ASC 350 provides that "[t]he estimate of the useful life of an intangible asset to an entity shall be based on an analysis of all pertinent factors," including among others:

(a)  The expected use of the asset by the entity[;] . . .

(c)  Any legal, regulatory, or ***contractual provisions that may limit the useful life***. The cash flows and useful lives of intangible assets that are based on legal rights are constrained by the duration of those legal rights.  Thus, the useful lives of such intangible assets cannot extend beyond the length of their legal rights and may be shorter[;]

(d)  ***The entity's own historical experience in renewing or extending similar arrangements***, consistent with the intended use of the asset by the entity, regardless of whether those arrangements have explicit renewal or extension provisions.  In the absence of that experience, the entity shall consider ***the assumptions that market participants would use about renewal or extension*** consistent with the highest and best use of the asset by market participants, adjusted for entity-specific factors in this paragraph[; and]

(e) The effects of obsolescence, demand, competition, and other economic factors
. . . .

ASC 350-30-35-3.

53.     Consistent with these accounting rules, and to ensure that financial statements provide useful and accurate information, GAAP obligates companies to provide accurate estimates of the useful lives of intangible assets, and to report information supporting a conclusion that an intangible asset's useful life has changed.  ASC 275 *Risks and Uncertainties* ("ASC 275") governs disclosures regarding the useful lives of assets generally:

> Disclosure regarding an estimate shall be made when known information available before the financial statements are issued or are available to be issued . . . indicates that both of the following criteria are met:
>
> > a.  It is at least ***reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change*** in the near term due to one or more future confirming events.  (The term *reasonably possible* as used in this Subtopic is consistent with its use in Subtopic 450-20, to mean that the chance of a future transaction or event occurring is ***more than remote but less than likely***.)
> >
> > b.  ***The effect of the change would be material to the financial statements***.

54.     ASC 350-30-50 applies that general rule to the useful lives of intangible assets, and provides that:

> In determining whether disclosure about an estimate of the useful life of an intangible asset is required under paragraph [ASC] 275-10-50-8, the criterion in item (b) of that paragraph shall be considered met if the effect of either of the following would be material to the financial statements, either individually or in aggregate by major intangible asset class:
>
> > a.  ***A change in the useful life of an intangible asset.***
> >
> > b.  ***A change in the expected likelihood of renewal or extension*** of an intangible asset.

ASC 275-10-50-8.

21

55.     The latter of these is specifically pertinent to Express Scripts's accounting treatment for the customer contracts and relationships related to the Anthem Contract.  When Express Scripts initially entered into the Anthem Contract in 2009, it amortized the costs of the customer contracts and relationships related to that contract over a 15-year period, representing to investors that the Company had a sufficient basis under these GAAP rules to conclude it would renew the Anthem Contract for at least an additional five years beyond its scheduled expiration in 2019, as such renewal had (as Express Scripts told the SEC) a "*high probability*."

56.     On April 21, 2010, the SEC sent Express Scripts a comment letter regarding the Company's Annual Report on Form 10-K for the year ended December 31, 2009.  In that comment letter, the SEC asked Express Scripts to "[c]larify why [the Anthem Contract] is being amortized using a 'pattern of benefit method' over 15 years of which a greater portion of the expense is recorded in the first five years."  The SEC instructed Express Scripts to "[e]xplain why a 15 year life is appropriate considering the contractual term is 10 years."

57.     On May 10, 2010, Express Scripts sent its response to the SEC's April 21, 2010 comment letter, and wrote:

> In determining the useful life for the 10-year contract with [Anthem], we assumed a ***high probability that the contract with [Anthem] would be renewed for a second term*** after the initial 10-year contract expired.  This assumption is based on industry renewal rates, ***the Company's embedded relationship with [Anthem]*** and potentially significant efforts around the ability to change PBM providers.  ***We have no reason to believe that a future [Anthem] contract renewal will differ materially from this historical experience***. . . .  When combining the initial ten year contract length with our probability adjusted renewal length of five years, we determined a 15 year useful life was most appropriate.

58.     The SEC sent Express Scripts an additional, follow-up comment letter on May 25, 2010, in which the SEC asked that Express Scripts "[c]onfirm to us that the 15 year life you use to amortize the $1,585 million intangible asset is the same as the length of time expected to generate

cash flows from the agreement that you used to value this intangible asset."  Express Scripts responded on June 14, 2010:

> As discussed in our previous letter dated May 10, 2010, a probability-adjusted methodology was used to determine that *a 15 year pattern of benefit amortization period represents the most probable life, taking into account customer renewals*. Furthermore, substantially all (96%) of the present value of the cash flows related to the $1,520 million [Anthem] customer contract intangible asset is captured in the initial 15 year period.  Based on these factors, we believe our expected cash flow period and amortization period are consistent.

59.     Under ASC 350, "an entity shall disclose information that enables users of financial statements to assess the extent to which the expected future cash flows associated with the asset are affected by the entity's intent or ability (or both intent and ability) to renew or extend the arrangement."  ASC 350-30-50-4.

60.     Also under ASC 350, "[a]n entity shall evaluate the remaining useful life of an intangible asset that is being amortized each reporting period to determine whether events and circumstances warrant a revision to the remaining period of amortization.  *If the estimate of an intangible asset's remaining useful life is changed*, the remaining carrying amount of the intangible asset shall be amortized prospectively over that revised remaining useful life."  ASC 350-30-35-9.

61.     Under GAAP, if Express Scripts at any point became aware there was no longer a supportable basis to conclude that the Anthem Contract likely had a useful life beyond its ten-year term and therefore to amortize the costs of the Anthem Contract for a period longer than the agreed-upon ten-year contract timeframe, Express Scripts was required to revise the remaining period of amortization.  Indeed, Express Scripts had initially determined that the Anthem Contract had a

"high probability" of renewal and Express Scripts's outside audit firm, PricewaterhouseCoopers LLP, defines an event that is "probable" as an event that has "a 75-80 percent likelihood" to occur.[7]

62.     In the Company's Quarterly Report for the first quarter of 2016, filed with the SEC on Form 10-Q immediately after the Class Period on April 25, 2016, the Company finally acknowledged that its relationship with Anthem was so fractured that Express Scripts was unlikely to renew the Anthem Contract beyond its initial ten-year term.   In the section of that 10-Q discussing Express Scripts's intangible assets, the Company described how it had been amortizing the Anthem Contract over the course of a purported fifteen-year useful life:

> Included in total amortization expense is $34.3 million and $23.8 million related to our 10 -year contract with Anthem, Inc. ("Anthem") to provide PBM services to members of the affiliated health plans of Anthem which is included as an offset to revenues for the three months ended March 31, 2016 and 2015 , respectively.   ***When we executed our agreement with Anthem in 2009***, . . . [we] attributed a reasonable likelihood of renewal at the end of its term in 2019.   Accordingly, ***we amortized the agreement using a modified pattern of benefit over an estimated useful life of 15 years.***

63.     In the 10-Q, Express Scripts finally admitted that the Express Scripts-Anthem relationship was substantially impaired such that there was no supportable basis to conclude that there was a "high probability" that the Anthem Contract would be renewed or extended beyond 2019 under GAAP, and that the useful life of the Anthem Contract was limited to its ten-year term:

> ***However, due to the sequence of recent events regarding our discussions with Anthem, culminating in the filing of the lawsuit on March 21, 2016, we felt it prudent to consider the increased likelihood of either non-renewal or renewal on substantially different terms such that, beginning in March 2016, we began amortizing our agreement with Anthem over the remaining term of the contract*** (i.e. using a life of 10 years from the time the agreement was executed in 2009).   Previously, we amortized the agreement over 15 years.

64.     Further, Express Scripts described the financial impact of its revision to the Anthem Contract's useful life and amortization schedule:

---

[7] PricewaterhouseCoopers LLP, *Revenue from contracts with customers* § 2.6.1.5 (Global ed. 2014)

Therefore, ***the intangible asset amortization associated with the Anthem agreement will run through the remaining term of the contract at the end of 2019, reducing the previous amortization period by 5 years. This change increases intangible asset amortization by $10.5 million for the first quarter of 2016 and quarterly intangible asset amortization by approximately $32.0 million beginning in the second quarter of 2016***.

65.     In other words, since entering into the Anthem Contract in 2009, Express Scripts amortized the costs of the contract based on an assumed 15-year useful life, representing that the Company's relationship was strong enough to conclude that there was a "high probability" that the Anthem Contract would be renewed for at least another five years beyond 2019.  Shortly after the end of the Class Period, however, Express Scripts finally admitted that given the acrimony that led to the Anthem Litigation, it could not assume that the relationship between Express Scripts and Anthem was likely to continue beyond 2019.  As a result, Express Scripts belatedly shifted at that point to a ten-year amortization schedule, and announced that the Company would be offsetting its revenues by significantly greater amounts each reporting period throughout the remainder of the Anthem Contract's duration to reflect the lack of a supportable basis under GAAP to conclude that the Anthem Contract would be renewed.

66.     As discussed below, throughout the Class Period, Express Scripts's relationship with Anthem was severely fractured, and Defendants accordingly knew that there was not a sufficient basis to conclude that there was a "high probability" that the Anthem Contract would be renewed for at least another five years.  Thus, there was not a sufficient basis under GAAP at any point in time during the Class Period for continuing to utilize a 15-year useful life when amortizing intangible assets related to the Anthem Contract in Express Scripts's financial statements.

### D.    Express Scripts And Anthem's Contentious 2011-12 Pricing Negotiations And Contract Dispute Cause A Lasting Rift In Their Relationship

67.     The present, fractured Express Scripts-Anthem relationship, including the companies' dispute over drug pricing and their related rights and obligations under the Anthem

Contract, echoes the companies' highly contentious re-pricing negotiations and contract dispute in

2011 and 2012.  At that time, Anthem similarly had third parties perform a market check, and

initiated their first round of re-pricing negotiations under Section 5.6 of the Anthem Contract.  The

companies' first round of re-pricing negotiations were combative and evidenced a substantially

strained relationship.

68.    As the first step in that initial periodic pricing review, Anthem retained two third-

party consultants, Truveris and Milliman, to conduct a market check and determine whether

Express Scripts was charging Anthem "competitive benchmark pricing," consistent with other

PBM relationships.  Anthem provided the market pricing data it had collected to Express Scripts.

69.    Consistent with the market pricing data that Anthem presented to Express Scripts,

Anthem demanded a rate reduction from Express Scripts.  Although Express Scripts has since

characterized Anthem's proposed reduction as "small," Express Scripts and Anthem nevertheless

took several months to negotiate an agreement, which Defendant Paz later described on a

December 22, 2015 conference call with analysts as "a fairly long negotiation process."

70.    In its complaint in the Anthem Litigation, Anthem described the 2012 re-pricing

negotiations with Express Scripts as taking "approximately a year."[8]  Moreover, Anthem's

allegations make clear that it did not believe Express Scripts had negotiated fairly, leading to an

outcome that Anthem expressed substantial and lasting strain over:

> ***Those negotiations took approximately a year.  The length of such negotiations
> unfairly resulted in Anthem paying above market pricing for almost an extra
> year***.  Thus, the parties learned that, to comply with the Agreement, negotiations
> needed to start well in advance of the [redacted] anniversary date. [Express Scripts]
> specifically admitted that negotiations needed to start in advance of the [redacted]
> anniversary date to ensure that the required competitive pricing was timely made
> available to Anthem and its members every [redacted], as provided for under the
> Agreement.   For example, [Express Scripts]'s top executive in charge of the

---

[8] *See* ES Counterclaims ¶ 7 (asserting that the first periodic pricing review concluded in November 2013).

Anthem relationship . . . sent an e-mail to Anthem, on August 15, 2014, that unambiguously acknowledged the timing of the next market check and the importance of initiating and pursuing the process on an earlier time period to allow for a timely outcome.

Complaint, *Anthem, Inc. v. Express Scripts, Inc.*, No. 16-cv-2048 (S.D.N.Y. Mar. 21, 2016), ECF No. 3 ("Anthem Compl.") ¶ 17.  Anthem further quoted the Express Scripts executive as stating, "Just for historical perspective this took nearly a year last time so I think it is good that we start sooner rather than later."

71.    By all accounts, the 2012 negotiations and contract dispute placed a substantial strain on Express Scripts's relationship with Anthem well prior to the start of the Class Period. For example, on December 11, 2011, Express Scripts filed a Current Report with the SEC on Form 8-K revealing that the Company and Anthem were "involved in a contractual dispute regarding certain terms of the [Anthem Contract]," and Anthem "ha[d] raised the possibility of litigation to resolve these matters."  Express Scripts informed investors that it "[could] not provide any assurance that such matters will be settled without litigation."  Anthem likewise publicly stated that "[t]he dispute relates to the interpretation of certain financial contractual terms in the PBM agreement and certain operational matters associated with Express Scripts' performance thereunder."

## V.    OVERVIEW OF THE EVENTS IMMEDIATELY PRIOR TO AND DURING THE CLASS PERIOD

### A.    The Second Round Of Pricing Negotiations Is Contentious "From The Outset"

#### 1.    Anthem Announces That It Will Renegotiate Pricing Under The Anthem Contract And Appoints Brian Griffin To Lead The Price Check

72.    On March 21, 2014, during Anthem's Annual Investor Day, Anthem management explained to investors that the Anthem Contract expired in five years and indicated that Anthem

expected to renegotiate the pricing provisions of that contract in the following three to five years.[9]

Due to the critical importance to Express Scripts investors of its relationship with Anthem, its largest client, developments in that relationship were followed closely by market analysts.  For example, as Deutsche Bank immediately noted on March 21, 2014 in a report entitled *Who Says Money Can't Buy Friends – [Anthem] Begins PBM Chatter*, "At this early stage, we believe it is most likely that [Express Scripts] will retain the [Anthem] business, but expect [Express Scripts] may need to either renew the contract at much less attractive terms or be forced to make an incremental payment to [Anthem] to preserve the current terms."  Similarly, in a March 21, 2014 analyst report entitled *Takeaways from [Anthem] Analyst Day Related to ESRX – ALERT*, J.P. Morgan observed, "[Anthem] noted that they would typically begin contract renewal discussions well ahead of the expiration which could potentially allow them to capture better economics if they reach a new agreement ahead of the scheduled end date . . . ."

73.     On or about April 2014, shortly after Anthem's March 21, 2014 comments, Anthem appointed Brian Griffin ("Griffin") as President of Anthem's pharmacy division.[10]   In that capacity, Griffin was responsible for overseeing Anthem's business relationship with Express Scripts, which included the periodic pricing review process under the Anthem Contract.[11]  Griffin had a prior history with Express Scripts.  Griffin had worked at Medco Health Solutions ("Medco") before it was acquired by Express Scripts, Inc. ("ESI"), a subsidiary of Express Scripts, in May 2012.[12]  Griffin left ESI less than two months following the Medco acquisition, in June 2012.[13]

---

[9] Transcript of ANTM – WellPoint, Inc. Investor Day, at 36-39 (Mar. 21, 2014).

[10] ES Counterclaims ¶ 176.

[11] *Id.* ¶ 176.

[12] *Id.* ¶ 176 n.11.

[13] *See id.*; Transcript of WLP-WellPoint, Inc. at Goldman Sachs Healthcare Conference (June 10, 2014).

74.     On June 10, 2014 at a Goldman Sachs Healthcare Conference, Joe Swedish, President and CEO of Anthem, announced that Griffin was charged with re-negotiating the Anthem Contract and that Anthem was considering all of its options – including options other than Express Scripts.  Swedish stated:

> We have given [Griffin] the responsibility to kind of put his hand on the wheel regarding our PBM engagement with Express Scripts. . . . And given his experience, he's got line of sight into not only how we do business with Express Scripts, but also start building a strategy with respect to **how we're going to pivot given that we've got a five-year contract life left with Express Scripts**.  After having passed five years on a 10-year deal, we're now looking what are **our options with respect to how we might re-engage in the PBM landscape**.

As these remarks indicate, Anthem was willing to consider eventually replacing Express Scripts as a PBM.  This gave rise to concerns on the part of Express Scripts investors about the future of Express Scripts's relationship with Anthem.  For example, a July 11, 2014 J.P. Morgan report entitled *Express Scripts, Inc.: Thoughts on the [Anthem] Agreement* noted "recent concerns on ESRX related to the [Anthem] relationship following [Anthem]'s comments on PBM optionality . . . ."

75.     Under Griffin, Anthem's approach to the periodic pricing review process became more aggressive.[14]  For example, in an effort to accelerate the process,[15] Griffin initially took the position that the periodic pricing review (referred to as the "market check" or "price check") needed to be completed by the end of 2014.[16]  According to Express Scripts, Griffin's position was inconsistent with both the timing provision in Section 5.6 of the Anthem Contract, which permits Anthem to conduct a periodic pricing review every three years,[17] and the timing of Anthem's

---

[14] ES Counterclaims ¶ 176.

[15] *Id.* ¶ 181.

[16] *Id.* ¶ 177.

[17] *Id.* ¶ 178.

commencement of the first periodic pricing review process, which began three years into the Contract in 2012 and was completed in November 2013.[18]

76.     In addition, under Griffin, Anthem has consistently taken the position that any pricing proposal based on recommendations about modernizing Anthem's benefit design did not comply with Section 5.6 of the Anthem Contract.[19]   Express Scripts's market checks with other clients typically include such recommendations, which are standard industry practice.[20]   This is because the pricing that a PBM like Express Scripts provides to a client depends on that client's benefit design.[21]   For example, broader networks that allow their participants to procure drugs from a broad array of pharmacies typically result in higher prices.[22]   Similarly, higher prices typically result from participants being given access to a wider variety of drugs.[23]

77.     Thus, from the outset of negotiations, Anthem's aggressive approach exemplified the contentious and fraught nature of the parties' relationship and, as a result of their damaged and difficult relationship, Express Scripts knew (or at least recklessly disregarded) that a second round of pricing negotiations would be lengthy and contentious.   For example, as ESI's Vice President and General Manager (Anthem Division) and the top Express Scripts executive in charge of the Anthem relationship, Matt Totterdale ("Totterdale"), admitted in an August 15, 2014 email to Anthem concerning the parties' second round of pricing negotiations: "***Just for historical perspective this took nearly a year last time so I think it is good that we start sooner rather than***

---

[18] *Id*. ¶¶ 175, 178.

[19] *Id.* ¶ 198.

[20] *Id*.

[21] *Id*.

[22] *Id.*

[23] *Id.*

*later.*"[24]   In the same email, Totterdale referenced a discussion between Anthem and Defendant Wentworth indicating that renewal of the Anthem Contract was directly tied to the parties' pricing negotiations.   The email stated, "I am aware that your conversation with Tim [Wentworth] indicated that we may move to a more strategic tie of an extension with new pricing, and we should work to build a timeline that envisions that."[25]

78.   Also on August 15, 2014, Griffin sent an email to Totterdale, referencing additional discussions with Wentworth about pricing under the Anthem Contract:

> First, it is our expectation that the Market Check will become effective [redacted] consistent with the contract.   I've discussed this timing with you and Tim [Wentworth, ESI's President].   We have already done a quick cycle Market Check analysis and, consistent with my discussion with Tim, we would expect to begin discussing new Market Check pricing during my meeting with Tim on 8/27.[26]

79.   In addition, Griffin emailed Wentworth on August 29, 2014 demanding certain changes to Section 5.6 of the Anthem Contract, which Express Scripts now claims were an admission that Express Scripts was not required to agree to any pricing changes proposed by Anthem.[27]

### 2.   Anthem Demands $15 Billion In Pricing Concessions Before Its Right To A Market Check Under The Contract Has Even Ripened

80.   Anthem commenced the second round of pricing negotiations with Express Scripts in October 2014, when Anthem's right to trigger periodic pricing review under the Anthem Contract every three years had not yet ripened.[28]   Specifically, on October 17, 2014, Anthem demanded from Express Scripts *$13 billion* in pricing concessions over the remaining four years

---

[24] Anthem Compl. ¶ 17; *see* ES Ans. ¶ 38 (admitting that "the stated quote appeared in the stated reference source").

[25] *Id.*

[26] ES Counterclaims ¶ 177.

[27] *Id.* ¶ 182.

[28] ES Ans. ¶ 6; ES Counterclaims ¶ 185.

of the Anthem Contract, plus an additional **$1.8 billion** in pricing concessions in the post-termination period, for a total of nearly **$15 billion** in pricing concessions.[29]  The size of Anthem's demand – which would result in price changes of more than **$3 billion per year**[30] – made it immediately clear to Express Scripts that the Company's relationship with Anthem was fraught and it was not "highly probable" or likely that the Anthem Contract would be renewed for at least five more years..  Indeed, as detailed below, Express Scripts has **admitted** in the Anthem Litigation: "**From the outset of negotiations in October 2014** . . . **Anthem took positions regarding the parties' rights and obligations** – including but not limited to Anthem's erroneous claim that [Express Scripts] is obligated to provide Anthem with 'competitive benchmark pricing' – **that were inconsistent with the plain terms of the [Anthem Contract]**."[31]

81.     Consistent with its aggressive strategy, Anthem refused to provide Express Scripts with basic information that Express Scripts claimed was standard in the industry.  For example, Anthem informed Express Scripts that its $15 billion demand was based on analysis conducted by Health Strategy, LLC ("Health Strategy"), a third-party financial consultant, which had determined that the demand constituted "competitive benchmark pricing."[32]  Specifically, Health Strategy determined that the current pricing under the Anthem Contract exceeded competitive benchmark pricing by more than $3 billion annually, or $13 billion over the remaining four-year term of the Anthem Contract, plus an additional $1.8 billion during the "post-termination transition period."[33] However, Express Scripts has alleged that Anthem consistently refused to provide Express Scripts with any of Health Strategy's analysis or the underlying market information or data supporting

---

[29] ES Counterclaims ¶ 185.

[30] *Id.* ¶ 186.

[31] *Id.* ¶ 6; *see also id.* ¶ 176.

[32] *Id.* ¶ 187.

[33] Anthem Compl. ¶ 19.

that analysis, even though the provision of such information is standard in the industry and Anthem provided similar information to Express Scripts in connection with the first periodic pricing review.[34]

82.     By December 2014, with Anthem's $15 billion demand still outstanding, Anthem and Express Scripts had reached a fundamental disagreement about whether Section 5.6 of the Anthem Contract imposed an affirmative obligation on Express Scripts to provide Anthem with "competitive benchmark pricing" at all.[35]   The parties further vigorously disputed whether $15 billion reflected "competitive benchmark pricing" that Anthem was entitled to under Section 5.6 of the Anthem Contract.[36]   Indeed, it was and remains Express Scripts's position that there have not been any changes to the PBM industry since the conclusion of the first periodic pricing review in November 2013 that would justify price changes of more than *$3 billion per year.*[37]   Nor did Express Scripts believe it could agree to Anthem's demands without incurring a loss on the Anthem Contract.   Nonetheless, Defendants' public statements to investors throughout the Class Period continued to falsely portray that renewal of the contract was "*highly probable*."

### 3.     Anthem Serves Express Scripts With Notice of Breach Detailing Numerous Operational Breaches Of The Anthem Contract Prior To The Start Of The Class Period

83.     On February 16, 2015, Anthem served Express Scripts with notice of breach of the Anthem Contract.[38]   That notice consisted of a 14-page single-spaced letter detailing numerous operational breaches of the Anthem Contract by Express Scripts.[39]   Those breaches included a

---

[34] ES Counterclaims ¶ 188.

[35] *Id.* ¶ 184.

[36] *Id.* ¶ 185.

[37] *Id.* ¶ 186.

[38] *Id.* ¶ 201.

[39] *Id.*

failure to perform material operational duties in a "prudent and expert manner," as required under Section 3.1(a) of the Anthem Contract, due to alleged systems defects at ESI; inadequate personnel training; high employee turnover; a failure to allocate sufficient resources to its work; and a lack of expertise.[40] Anthem further threatened to terminate the Anthem Contract if such breaches were not cured within a specified time frame.[41] In addition, certain of ESI's breaches concerned Anthem's government-sector Medicare Part D plans which violated Centers for Medicare & Medicaid Services ("CMS") regulations.[42]

84. Even prior to the formal notice of breach, Anthem had notified Express Scripts about such operational issues multiple times. For example, over the course of 13 months prior to February 2015, Anthem repeatedly requested that Express Scripts correct functionality in its computer system that was preventing Express Scripts employees from correctly identifying certain necessary criteria.[43] Anthem also issued multiple corrective action plans to Express Scripts. These included CAP #104 in April 2012 for Express Scripts's failure to perform required functions related to the management of prescription drug event or "PDE" data,[44] and CAP #123 on February 4, 2014, for failure to process and provide notification of coverage determinations within the time periods required by CMS.[45]

85. As another example, for two years prior to February 2015, Express Scripts allegedly failed to implement certain CMS-required guidance, which resulted in incorrect claim processing

---

[40] Anthem Compl. ¶ 6.

[41] ES Counterclaims ¶ 201.

[42] Anthem Compl. ¶ 6.

[43] *Id*. ¶ 58.

[44] *Id*. ¶ 64.

[45] *Id*. ¶ 74.

and Express Scripts's inability to accurately bill certain of Anthem's clients.[46]  Those failures in turn caused Anthem to lose an account.[47]

86.  In addition, Anthem notified CMS of Express Scripts's failure to meet certain Medicare Part D functions multiple times throughout 2014.[48]  For instance, on September 22, 2014, Anthem notified CMS that Express Scripts had failed to build coverage determinations based on eligibility timelines.[49]  On November 10, 2014, Anthem notified CMS of Express Scripts's failure to contact members for the consent required for mail order prescriptions.[50]  On November 20, 2014, Anthem notified CMS that Express Scripts had failed to fill mail order prescriptions on a timely basis.[51]  On December 18, 2014, Anthem notified CMS that Express Scripts had an unscheduled system outage for approximately 24 hours due to operator errors and design deficiencies.[52]

87.  Section 16.5 of the Anthem Contract provides that in the event of a material dispute regarding that contract, the parties must first submit their dispute to a Joint Operating Pharmacy Committee ("JOPC"), which has 15 days to meet in person and make a good faith effort to resolve the dispute.[53]  Under the Anthem Contract, if the dispute is not resolved through the JOPC process, it must be referred to the Presidents of Express Scripts and Anthem, who have to meet within 15 days and make a good faith effort to reach a resolution.[54]  If the meeting between the Presidents is

---

[46] *Id.* ¶ 63.

[47] *Id.*

[48] *Id.* ¶ 85.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] ES Counterclaims ¶ 247.

[54] *Id.*

not successful, the parties must refer the dispute to non-binding mediation.[55] As detailed below, the parties' dispute concerning Express Scripts's alleged operational breaches of the Anthem Contract went through all three of these contractually required dispute-resolution procedures without resolution, thereby underscoring the troubled and fraught nature of the parties' relationship.

> **B.  February 24-25, 2015: Defendants Materially Misrepresent The Strength Of The Express Scripts-Anthem Relationship In Express Scripts's Financial Statements For The Year Ended 2014 And Defendant Queller Falsely Assures Investors That Express Scripts's Relationship With Anthem Is "Very, Very Solid"**

88.     The Class Period begins on February 24, 2015, a mere ***eight days*** after Anthem served Express Scripts with notice of breach of the Anthem Contract and the day after the Company filed with the SEC (after the close of trading on February 23, 2015) its Annual Report on Form 10-K for the year ended December 31, 2014 (the "2014 Form 10-K") and a Form 8-K and press release (the "February 23, 2015 8-K").

89.     In the 2014 Form 10-K, signed by Defendants Paz and Havel, among others, Defendants represented: "Customer contracts and relationships related to our 10-year contract with Anthem (formerly known as WellPoint) under which we provide pharmacy benefit management services to Anthem and its designated affiliates are being amortized using a modified pattern of benefit method over an estimated useful life of 15 years."[56]  Thus, as Defendants explained, they continued accounting for the 10-year Anthem Contract as if it were "highly probable" that it would be renewed for at least an additional five-years.  Consistent with the applicable accounting principles detailed in Section IV.C above, in so doing, Defendants represented to investors that the

---

[55] *Id.*
[56] 2014 Form 10-K at 45.

Company's relationship with Anthem was strong enough to conclude under GAAP that a five-year renewal was likely. The 2014 Form 10-K also contained sworn certifications by Defendants Paz and Havel that attested to the purported completeness and accuracy of the Form 10-K and stated that the Form 10-K was prepared in accordance with GAAP. In the 2014 Form 10-K, Defendants further emphasized the importance of the Anthem relationship, stating that Anthem represented *14%* of Express Scripts's consolidated revenue for the period ending December 31, 2014.

90.     The February 23, 2015 8-K and press release further represented: "Revenue amortization is related to the customer contract with Anthem (formerly known as WellPoint) which commenced upon closing of the NextRx acquisition in 2009. Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues. Intangible amortization of $26.9 million ($16.7 million net of tax) . . . is included as a reduction to revenue for the three months ended December 31, 2014 . . . . Intangible amortization of $112.4 million ($70.0 million net of tax) . . . is included as a reduction to revenue for the year ended December 31, 2014 . . . ."

91.     On February 25, 2015, Defendants Paz, Wentworth, Queller, Havel, and other Company executives held a conference call with analysts and investors to discuss the Company's reported earnings and present operations. During the call, Goldman Sachs analyst Bob Jones asked "if there was any update on the Anthem [ ] relationship? Obviously that's a big focus, big client for you guys." In response, Defendants could have declined comment given the undisclosed ongoing difficulties between the parties. Instead, Defendant Queller falsely assured investors of the purported strength and closeness of Express Scripts's relationship with Anthem. Specifically, Defendant Queller stated that "*we've got a great relationship with Anthem*. We're right now working with them very closely to help them prepare for their 1/1/16 business." Defendant Queller

further assured investors, "Our teams work closely each and every day.  ***The relationship is very, very solid.***"

92.     Defendant Queller also addressed the parties' contract negotiations and relationship, falsely stating that "***it's business as usual***.  And we look forward to having them as a client through the end of the contract term which is at the end of 2019 and we'd love to have them for a longer time as well.  But we'll continue to work with them very, very closely just as we always do to make them successful."

93.     Analysts responded positively to these false and misleading statements.  For example, in a February 25, 2015 report entitled *Notes from the Road – Investor Meeting*, Evercore ISI stated, "In addition, ESRX noted that it has a great relationship with Anthem, and . . . ESRX looks forward to servicing the account through 2019 and would love to work with ANTM longer than that."  Similarly, in a March 10, 2015 report entitled *Express Scripts Inc.: Momentum building with strong start to year*, analysts at RBC Capital Markets stated, "management noted the Anthem relationship (which runs through 2019) remains very positive . . . ."

94.     In truth, as detailed above, by the beginning of the Class Period – eight days after Anthem already had served Express Scripts with a formal notice of breach and months after Anthem already had demanded an additional ***$15 billion*** under the Anthem Contract – Defendants knew (or recklessly disregarded) that, because the Express Scripts-Anthem relationship was severely fractured, renewal of the Anthem Contract was in jeopardy and thus not likely.  As a result, the revenue reductions related to the amortization of intangibles for the Anthem Contract set forth herein at ¶ 90 were materially understated and violated GAAP.  Moreover, Defendants knew (or recklessly disregarded) that their relationship with Anthem was not "great," "very, very solid," or "business as usual" at all, due to the contentious nature of the lengthy first pricing

negotiations that damaged that relationship, and Anthem's aggressive approach to the second pricing negotiations, which by Express Scripts's own admission were troubled "from the outset."

**C.   Unbeknownst To Investors, The Parties' Relationship Continues To Deteriorate When Anthem Serves Express Scripts With A Formal Notice Of Pricing Breach**

95.     On March 6, 2015, the JOPC met to attempt to resolve the parties' material dispute concerning Express Scripts's operational breaches of the Anthem Contract as required by Section 16.5 of the Anthem Contract.[57]   That meeting was unsuccessful, and Express Scripts accused Anthem of failing to engage in a good faith effort to resolve the parties' material dispute during the meeting.[58]

96.     On March 18, 2015, Anthem reiterated its $15 billion demand, providing notice to Express Scripts that Anthem had performed a market analysis under Section 5.6 of the Anthem Contract and determined that the pricing terms under that contract were not competitive.[59]   At the same time, Anthem provided Express Scripts with proposed new pricing terms and requested that by March 30, 2015, Express Scripts confirm that Anthem's proposal constituted competitive market pricing, or propose alternative terms that Express Scripts in good faith believed constituted competitive benchmark pricing.[60]

97.     Express Scripts failed to engage in any negotiation, much less good faith negotiations.[61]   As a result, on April 1, 2015, Anthem provided Express Scripts with formal notice of pricing breach under Section 6.2(a) of the Anthem Contract.[62]   Pursuant to Section 6.2(a),

---

[57] ES Counterclaims ¶ 250.

[58] *Id.*

[59] Anthem Compl. ¶ 22; *see* ES Ans. ¶ 43 ("refer[ring] the Court to Anthem's March 18, 2015 letter").

[60] Anthem Compl. ¶ 22.

[61] Anthem Compl. ¶ 23.

[62] Anthem Compl. ¶ 24; *see* ES Ans. ¶ 45 (acknowledging Anthem's April 1, 2015 formal notice of breach by "refer[ring] the Court to th[at] document").

Express Scripts was obligated to cure the breach within a specified cure period, which ended before June 22, 2015.[63]  During the period from April 1, 2015 through June 22, 2015, Express Scripts refused to cure the purported breaches and according to Anthem continued to breach Section 5.6 of the Anthem Contract by, *inter alia*, refusing to negotiate with Anthem at all, let alone in good faith, concerning the proposed pricing terms, or make a counterproposal.[64]

98.      At the same time, the parties' operational disputes continued to deepen and worsen. For example, under the Anthem Contract, the parties established a joint database called the WellPoint RX Issues Tracking System, or "WRIT," to track and monitor issues related to Express Scripts's performance of PBM services for Anthem.[65]  The WRIT system allows Anthem to submit issues relating to Express Scripts's failure to perform its obligations, and Express Scripts is required to research and resolve those issues.[66]  Anthem brought ***156 new and unresolved issues*** to Express Scripts's attention through the WRIT system between April 17 and December 31, 2015.[67]

**D.      April 28-29, 2015: Defendants Materially Misrepresent The Strength Of The Express-Scripts-Anthem Relationship In Express Scripts's Financial Statements For Q1 2015 And Defendant Paz Continues To Falsely Assure Investors That Express Scripts's Relationship With Anthem Is Solid**

99.      On April 28, 2015, the Company issued a press release announcing its financial results for the first quarter of 2015, ended March 31, 2015.  In the press release, which was also filed with the SEC on Form 8-K, Defendants represented:  "Revenue amortization is related to the customer contract with Anthem (formerly known as WellPoint) which commenced upon closing

---

[63] Anthem Compl. ¶ 24; *see id.* ¶ 27 (alleging that "June 22, 2015 [is] long after the cure period had expired").

[64] *Id.* ¶ 26.

[65] *Id.* ¶ 80.

[66] *Id.* ¶¶ 80-81.

[67] *Id.* ¶ 82.

of the NextRx acquisition in 2009.  Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues. Intangible amortization of $23.8 million ($14.9 million net of tax) . . . is included as a reduction to revenue for the three months ended March 31, 2015 . . . ."

100.    The same day, Express Scripts filed with the SEC its Form 10-Q for the first quarter of 2015, reiterating the financial results announced by the Company in its April 28 press release. The Form 10-Q was signed by Defendants Paz and Havel and contained sworn certifications by Defendants Paz and Havel that attested to the purported completeness and accuracy of the Form 10-Q and stated that the Form 10-Q was prepared in accordance with GAAP.  In the Form 10-Q, Defendants represented that "[a]mortization of $23.8 million . . . for customer contracts related to our agreement to provide PBM services to members of the affiliated health plans of Anthem (formerly known as WellPoint) has been included as an offset to revenues for the three months ended March 31, 2015 . . . ."

101.    On April 29, 2015, Defendants Paz, Havel, Wentworth, and other Company executives held an earnings conference call with analysts and investors to discuss the Company's financial results for the first quarter of 2015.  During the call, Leerink Partners analyst David Larsen asked, "[c]an you please talk about your relationship with Anthem?  I'm sure you guys have a very good relationship with them.  I think you're about 5 years into a 10-year deal."  In response, Defendant Paz assured investors of the strength and closeness of Express Scripts's relationship with Anthem.  Specifically, Defendant Paz stated, "Anthem is an incredibly important client to us.  And I think we do very good things together."  Defendant Paz further represented that Express Scripts "***really enjoy[s] that relationship***," "really enjoy[s] providing services to their members," and that his views were "***a two-way street***."

102.   The market was assuaged by these assurances.  For example, in an April 29, 2015 report entitled *Express Scripts, Inc.: ESRX Likely to Remain a Standalone PBM, 2016 Retention on Track; PT to $95*, Leerink Partners reported, "We continue to believe ESRX will retain Anthem (OP) and management also noted the relationship is 'a two-way street' . . . ."

103.   In truth, the revenue reductions related to the amortization of intangibles for the Anthem Contract set forth herein at ¶¶ 99-100 were materially understated and violated GAAP. As Defendants explained in the 2014 Form 10-K and set forth herein at ¶ 89, they amortized intangibles in connection with the 10-year Anthem Contract over a period of 15 years.  In so doing, Defendants accounted for the Company's relationship with Anthem as if it continued to be "highly probable" that Express Scripts would renew the Anthem Contract for at least five more years. However, as detailed in ¶¶ 72-87 and 95-98 above, Defendants knew (or recklessly disregarded) that the companies' relationship was fraught and impaired, and accordingly that renewal of the 10-year contract was not likely.  As described above in ¶¶ 83, 95, and 97, before April 28, 2015, Anthem had served Express Scripts with formal notice of breach of both the operational and pricing provisions of the Anthem Contract, and the parties' effort to resolve their material operational dispute through the JOPC process had failed.  Defendants also knew (or recklessly disregarded) that their relationship with Anthem was damaged by the first pricing negotiations, and had rapidly deteriorated further due to the parties' material disputes in connection with the second pricing negotiations, which included repeated accusations of failing to act in good faith and breach of contract, and a difference of approximately $15 billion, a massive amount of money that the parties would not be able to consensually resolve.

E.     **May – June 2015: Express Scripts Continues To Describe Its Relationship With Anthem As "Strong" As Express Scripts's Operational Breaches Worsen, It Refuses To Negotiate Over Anthem's Pricing Terms At All, And Anthem Announces A Deal To Acquire Cigna**

104.    On May 8, 2015, Morgan Stanley hosted a conference call with Defendants Paz, Wentworth, and Havel as part of a "CEO/CFO conference series." During that call, as reported in Morgan Stanley's May 8, 2015 analyst report entitled *ESRX: CEO/CFO Conference Call Takeaways*, Defendants provided further assurances that Express Scripts's relationship with Anthem was "strong." Morgan Stanley reported:

> Anthem benefit from Express' scale may not be easy to replicate. ***Management continues to view a strong relationship with Anthem*** . . . just over the halfway point of the original contract term, which goes to 2019. ***Management does not think that Anthem could replicate scale and access to lower drug pricing and rebates on its own.***[68]

### 1.     The Dispute Over Express Scripts's Operational Breaches Worsens

105.    Express Scripts's and Anthem's dispute over Express Scripts's operational breaches of the Anthem Contract continued to worsen. On May 21, 2015, after conducting a mock audit of Express Scripts, Anthem reported to CMS that Express Scripts did not have an automated process for paper claims in place, and that its process lacked adequate internal controls and could fail in various ways.[69]

106.    On May 27, 2015, pursuant to the dispute resolution procedures in the Anthem Contract and discussed above in ¶ 87, the Presidents of Express Scripts and Anthem held a meeting in another required contractual step concerning the parties' dispute regarding Express Scripts's

---

[68] Ricky R. Goldwasser, et al., *ESRX: CEO/CFO Conference Call Takeaways*, Morgan Stanley (May 8, 2015). Lead Plaintiff reserves the right to include this statement as a false and misleading statement in Section VII below, along with other additional statements, after discovery.

[69] Anthem Compl. ¶ 87.

operational breaches of the Anthem Contract.[70]  Express Scripts again accused Anthem of failing to negotiate in good faith during the meeting.[71]

107.   On June 10, 2015, Anthem reported to CMS an Express Scripts system error that had resulted in 37,524 Part D plan members paying a higher copayment than they should have for certain drugs.[72]  Anthem sent follow-up notifications to CMS regarding the same issue on June 11, June 17, June 18, June 30, and July 27, 2015.[73]

### 2.   The Dispute Over The Pricing Terms In The Anthem Contract Worsens As Express Scripts Continues To Refuse To Negotiate

108.   The parties also continued to bitterly dispute the pricing terms of the Anthem Contract.  Specifically, on June 22, 2015, Express Scripts contacted Anthem nearly three months after Anthem had delivered its pricing proposal and after Anthem provided Express Scripts with formal notice of breach under the Anthem Contract.[74]  Express Scripts rejected and refused to even negotiate Anthem's pricing terms.[75]  According to Anthem, Express Scripts did not act in good faith because it failed to negotiate over Anthem's proposed terms or make any counterproposal, notwithstanding Anthem's request that Express Scripts do so.[76]  According to Express Scripts, Anthem did not act in good faith because Express Scripts did make a counterproposal in June 2015 (among numerous others), which Anthem "rejected out-of-hand" and refused to negotiate.[77]  The Express Scripts-Anthem relationship continued to deteriorate as the companies both vigorously

---

[70] ES Counterclaims ¶ 250.

[71] *Id.*

[72] Anthem Compl. ¶ 87.

[73] *Id.*

[74] *Id.* ¶ 27.

[75] *Id.*

[76] *Id.*

[77] ES Ans. ¶ 9.

disputed the appropriate pricing terms under the Anthem Contract and accused each other of failing to negotiate in good faith.

### 3. Defendants Face Mounting Pressure To Reassure Investors In The Face Of Reports That Anthem May Acquire A Rival PBM

109. On May 29, 2015, in an article entitled "Health Insurer Humana Explores Sale: Aetna, Cigna express interest in rival, a big provider of Medicare Advantage plans," *The Wall Street Journal* reported that Anthem might acquire Humana, Inc. ("Humana"), one of the top five health insurers in the industry and a rival of Anthem.[78]  In light of that news, analysts focused even more closely on the Express Scripts-Anthem relationship.  Specifically, multiple analysts observed that if Anthem acquired Humana, it would effectively be able to replace Express Scripts because Humana owned its own PBM.  For example, in a June 1, 2015 report entitled *Possible Sale of HUM Poses Potential Issues for ESRX*, analysts at Cowen and Company explained that if Anthem acquired Humana, "the likelihood of ANTM allowing its contract with ESRX to expire at the end of 2019 becomes more probable, if not sooner, given that ANTM could take its commercial book of business in-house as HUM's carved-in PBM would provide ANTM with the necessary infrastructure."

110. Similarly, in a June 11, 2015 report entitled *Express Scripts, Inc.: Highlights from William Blair's 35th Annual Growth Stock Conference*, William Blair observed, "Commentary suggested if Anthem buys an entity that owns a PBM (such as Humana), it is up for debate whether that would be folded into [Express Scripts and Anthem's] existing relationship."  However, at the same William Blair conference, in which Defendants Paz and Havel participated, Defendants made additional assurances that their relationship with Anthem was secure.  As reported by William

---

[78] Liz Hoffman, et al., *Health Insurer Humana Explores Sale*, The Wall Street Journal (May 29, 2015), http://www.wsj.com/articles/humana-considers-sale-of-company-1432919621.

Blair, "management comments . . . suggest the contract's status and pricing is secure.  We continue to believe the contract is likely to persist . . . ."

111.    Analysts similarly focused on the Express Scripts-Anthem relationship in connection with Anthem's potential acquisition of Cigna Corp. ("Cigna"), another top health insurer.  Anthem made a number of bids for Cigna in June 2015, which it disclosed on June 21, 2015.[79]  As reported by Deutsche Bank on June 22, 2015 in an analyst report entitled *In the Passenger Seat for the MCO Consolidation Joy Ride*, based on a recent meeting in New York City between Deutsche Bank and Express Scripts's Chief Marketing Officer and Vice President of Supply Chain, Phyllis Anderson, Deutsche Bank observed that a Cigna acquisition by Anthem "means that Anthem will likely press harder to renegotiate its current contract with [Express Scripts] and drive a deep price concession."  Thus, it became more important than ever to Express Scripts for its investors to believe that its relationship with Anthem was strong and that the renewal of the Anthem Contract was therefore secure.

112.    On July 24, 2015, Anthem announced that it intended to acquire Cigna for $54.2 billion.[80]  During a July 24, 2015 conference call to discuss the acquisition, Anthem underscored that it was actively "examining our optionality vis-à-vis our Express Scripts agreement."  During the call, Joe Swedish, Anthem's President and CEO, further reiterated that Anthem was going to make "some key decisions . . . related" to the Anthem Contract in 2016, and that "timing [of the Cigna acquisition] couldn't be better for us related to our Express Scripts agreement coming to a close in 2019."

---

[79] Dana Cimilluca, et al., *Anthem Raises Offer for Cigna; Aetna Bids for Humana*, The Wall Street Journal (June 21, 2015), http://www.wsj.com/articles/anthem-bids-184-a-share-in-cash-and-stock-for-cigna-1434821349.
[80] Anthem, Inc., Current Report Form 8-K (July 24, 2015).

113.    Multiple analysts questioned the impact that the Cigna acquisition would have on Anthem's relationship with Express Scripts.   For example, in a July 28, 2015 report entitled *Express Scripts, Inc.: Second Quarter in Line Operationally, ASR Drives Guidance Revision; 2016 Script Commentary Seems Reasonable,* William Blair noted, "We believe the key factors for the stock over the next 12 months are the Anthem (ANTM $154.20) relationship, which will be scrutinized even more closely given the pending acquisition of Cigna (CI $145.87) . . . ."[81] Analysts and investors thus looked to Defendants to provide clarity concerning Express Scripts's relationship with Anthem in connection with the release of Express Scripts's financial statements for the second quarter of 2015.[82]

### F.    July 28, 2015: Defendants Materially Misrepresent The Strength Of The Express Scripts-Anthem Relationship In Express Scripts's Financial Statements For Q2 2015

114.    Notwithstanding the parties' material disputes and the increased risk of non-renewal of the Anthem Contract, Express Scripts continued to amortize intangibles in connection with the Anthem Contract over a contractual life of 15 years, thus falsely representing to investors that it was "highly probable" that the Anthem Contract would be renewed for at least five more years.   Specifically, in its Form 8-K and press release announcing its financial results for the second quarter ended June 30, 2015, filed with the SEC on July 28, 2015 and signed by Defendant Havel, Defendants reported the offset to revenue relating to the amortization of intangibles for the Anthem Contract as $23.8 million ($14.8 million net of tax) for the three months ended June 30, 2015.

---

[81] *See also* Ross Muken, et al, *ESRX – ANTM/CI merger impact – Hurry up and wait*, Evercore ISI (July 24, 2015); Lisa G. McGill, et al., *Express Scripts, Inc.: We Continue to Believe There Is a High Likelihood Anthem Reaches a New Deal with ESRX – ALERT*, J.P. Morgan (July 24, 2015).

[82] *See, e.g.*, Steve Valiquette, et al., *Express Scripts Inc.: Assessing Potential EPS Impact from ANTM/CI*, UBS Global Research (July 27, 2015).

Defendants further reported that intangible amortization of $47.6 million ($29.7 million net of tax) was included as an offset to revenue for the six months ended June 30, 2015.

115.    Defendants included the same statements set forth in ¶ 114 above in their Form 10-Q for the second quarter of 2015 filed with the SEC on July 28, 2015, and signed by Defendants Paz and Havel.  The quarterly report also contained sworn certifications by Defendants Paz and Havel that attested to the purported accuracy and completeness of the Form 10-Q and stated that the Form 10-Q was prepared in accordance with GAAP.

116.    On July 29, 2015, Defendants Paz, Havel, Wentworth, and other Company executives held a conference call with analysts and investors to discuss the Company's second quarter of 2015 earnings.  During that call, Defendant Wentworth touted the Company's strong client-retention rate, stating that Express Scripts's "performance to date and the positive feedback we continue to receive gives us confidence that we have strong retention across the board." Defendant Wentworth further stated that the Company's "business outlook remains strong and our momentum continues," and touted the Company's "close collaboration with our clients."

117.    Analysts responded positively.  For example, in a July 29, 2015 report entitled *Our Outlook for Express Remains Strong as the Firm Reports Solid 2015 and 2016 Guidance*, Morningstar noted that Anthem "has been vocal with its intention to renegotiate the economics of the current 10-year deal . . . . [B]ut we believe this headwind is not as strong as it may initially seem."

118.    In truth, the revenue reductions related to the amortization of intangibles for the Anthem Contract set forth herein at ¶¶ 114-15 were materially understated and violated GAAP. As Defendants explained in the 2014 Form 10-K and set forth herein at ¶ 89, Express Scripts amortized intangibles in connection with the 10-year Anthem Contract over a period of 15 years.

However, as detailed above, Defendants knew (or recklessly disregarded) that the Express Scripts-Anthem relationship was severely impaired, and accordingly that renewal of the 10-year contract for an additional five years was not likely due to the parties' material operational and pricing disputes, as evidenced by the two notices of breach of the Anthem Contract that Anthem had already served on Express Scripts.

### G.   August 3, 2015: Anthem Reports Another Express Scripts Database Failure To CMS

119.    On August 3, 2015, Anthem reported yet another Express Scripts database failure to CMS.[83]  Specifically, due to a coding error in the Express Scripts database, claims were rejected at the point of sale for over 1,500 Medicare claims, negatively impacting 1,458 Medicare members' access to care.[84]  This database failure and Anthem's need to report it to CMS further damaged the parties' relationship and deepened the parties' operational disputes.

### H.   September – October 2015:  Express Scripts Announces Changes In Senior Management, And Its Relationship With Anthem Continues To Deteriorate

120.    In a Form 8-K and press release filed with the SEC on September 9, 2015, Express Scripts announced that Defendant Paz would step down as CEO, effective following the Company's May 2016 shareholder meeting.  Defendant Paz would remain on the Company's board of directors as non-executive Chairman.  In the same 8-K, Defendants also announced that Defendant Wentworth (then-President of Express Scripts) would succeed Defendant Paz as the Company's CEO.  As analysts observed, investors questioned the timing of Defendant Paz's

---

[83] Anthem Compl. ¶ 87.

[84] *Id.*

resignation because his current CEO employment contract was not set to expire until March 31, 2017.[85]

121.   In a second Form 8-K and press release filed with the SEC on September 10, 2015, Defendants announced that Defendant Slusser had been appointed as Executive Vice President and CFO of Express Scripts, effective September 9, 2015.  In the same 8-K, Express Scripts explained that Defendant Havel would continue to be employed with the Company as Executive Vice President, Finance for an indeterminate period of time in order to facilitate the transition of Defendant Slusser.

122.   Analysts observed that the timing of the announcement of Express Scripts's changes in executive management was designed to reassure investors about Express Scripts's relationship with Anthem.  For example, in a September 10, 2015 report entitled *The Appointment of New CEO And CFO Sets The Stage For A New Chapter At ESRX*, Cowen and Company stated that the shift in senior management "was announced sooner rather than later [to] allow[] new management to better address challenges that lie ahead, such as the company's relationship with [Anthem]."  In a September 10, 2015 report entitled *Express Scripts, Inc.: CEO Transition Increases Likelihood of Two Key Catalysts*, William Blair similarly reported, "we suspect this leadership transition will make Express Scripts more likely to pursue early renewals with key clients such as Anthem . . . ."  UBS Global Research further noted in a September 24, 2015 report entitled *Takeaways From PBM Consultant Meeting*, based on a discussion with a former Express Scripts Chief Supply Chain Officer at the 8th Annual UBS Healthcare Supply Channel and HCIT

---

[85] Steve Valiquette, et al., *Express Scripts Inc.: Investors Likely to Have Mixed Views On CEO Transition*, UBS Global Research (Sept. 9, 2015); Peter Costa, *ESRX: George Paz Announces Plans To Retire As CEO – Tim Wentworth To Take Over*, Wells Fargo (Sept. 9, 2015).

Conference in Boston, "the pressure will be quite intense for incoming CEO Tim Wentworth to retain ESRX's largest health plan customer [Anthem] . . . ."

123.     Unbeknownst to investors, negotiations concerning the pricing terms of the Anthem Contract were non-existent and the companies' relationship continued to rapidly deteriorate notwithstanding Wentworth's promotion, and Anthem was forced once again to report Express Scripts's operational breaches to federal regulators.

124.     Specifically, on September 15, 2015, Express Scripts and Anthem held a meeting concerning their relationship.[86]  Anthem continued to accuse Express Scripts of failing to negotiate at all.[87]  On October 2, 2015, Express Scripts contacted Anthem,[88] but again refused to negotiate over the pricing terms of the Anthem Contract.[89]  On October 8, 2015, by email, Anthem reiterated that Express Scripts was obligated under the Anthem Contract to ensure that Anthem was receiving competitive benchmark pricing.[90]  On October 19, 2015, Defendant Wentworth asked Anthem to meet, but continued to refuse to negotiate at all over the pricing terms of the Anthem Contract.[91] According to Anthem, Wentworth would refuse to even meet with Anthem over pricing for nearly four months (ignoring or refusing Anthem's requests to meet made on October 27, 2015, November 5, 11, and 23, 2015, December 2, 14, and 17, 2015, and January 13, 2016), and then the meeting that finally took place on February 3, 2016 was "a complete waste" as Express Scripts refused to negotiate over pricing terms at all.[92]

---

[86] Anthem Compl. ¶ 28; ES Ans. ¶ 49.

[87] Anthem Compl. ¶ 28.

[88] *Id.* ¶ 29; ES Ans. ¶ 50.

[89] Anthem Compl. ¶ 29.

[90] Anthem Compl. ¶ 30; *see* ES Ans. ¶ 51 (acknowledging the Oct. 8, 2015 email by "refer[ring] the Court to th[at] document").

[91] Anthem Compl. ¶ 31; *see* ES Ans. ¶ 52 (acknowledging Defendant Wentworth's Oct. 19, 2015 request by "refer[ring] the Court to th[at] document").

[92] Anthem Compl. ¶¶ 32-45.

125.    On October 15, 2015, Anthem notified CMS of another Express Scripts database issue that had resulted in over **53,000** Medicare Part D Plan members requiring an adjustment to the amounts they had paid for certain drugs.[93]

**I.      October 27, 2015:  Defendants Materially Misrepresent The Strength Of The Express Scripts-Anthem Relationship In Express Scripts's Financial Statements For Q3 2015**

126.    On October 27, 2015, Express Scripts issued a press release announcing its financial results for the third quarter of 2015, ended September 30, 2015.  In the press release, which was also filed with the SEC on Form 8-K and signed by Defendant Slusser, Defendants reported the offset to revenue relating to the amortization of intangibles for the Anthem Contract as $23.8 million ($14.9 million net of tax) for the three months ended September 30, 2015. Defendants further reported that intangible amortization of $71.4 million ($44.6 million net of tax) was included as an offset to revenue for the nine months ended September 30, 2015.

127.    Defendants included the same statements set forth in ¶ 126 above in their Form 10-Q for the third quarter of 2015 filed with the SEC on October 27, 2015 and signed by Defendants Paz and Slusser.  The quarterly report also contained sworn certifications by Defendants Paz and Slusser that attested to the purported accuracy and completeness of the Form 10-Q and stated that the Form 10-Q was prepared in accordance with GAAP.

128.    The next day, on October 28, 2015, Defendants Paz, Slusser, Wentworth, and other Company executives held a conference call with analysts and investors to discuss the Company's third quarter of 2015 earnings.  During that call, Defendant Wentworth stated, among other things, that the Company's "strong client relationships position us well for 2016."

---

[93] *Id.* ¶ 87.

129.     Analysts responded positively to these and Defendants' prior assurances.   For example, in a report entitled *CVS Still "Stellar" – ESRX May Be Pricing More Aggressively to Retain Business*, dated October 27, 2015, Leerink Partners stated, "ESRX is working hard to retain business and based on our specialists' commentary, we believe there is high likelihood that ESRX will retain Anthem (OP)."

130.     In truth, the revenue reductions for amortization of intangibles in connection with the Anthem Contract set forth herein at ¶¶ 126-27 were materially understated and violated GAAP. As Defendants explained in the 2014 Form 10-K and discussed above at ¶ 89, they amortized intangibles in connection with the 10-year Anthem Contract over a period of 15 years.   However, as detailed above, Defendants knew (or recklessly disregarded) that Express Scripts's relationship with Anthem was severely impaired and, therefore, that renewal of the 10-year contract for an additional five years was not likely due to the parties' material operational and pricing disputes, as evidenced by the two notices of breach of the Anthem Contract that Anthem had already served on Express Scripts.   For the same reason, Defendants knew (or recklessly disregarded) that their retention of Anthem as a client was in serious jeopardy.

### J.     November 9, 2015:  Mediation Fails, And Relations Deteriorate Further

131.     On November 5, 2015, Anthem again contacted Express Scripts in an attempt to meet, but Express Scripts did not agree to a meeting.[94]

---

[94] Anthem Compl. ¶ 33; *see* ES Ans. ¶ 54 (acknowledging Anthem's Nov. 5, 2015 communication by "refer[ring] the Court to th[at] document").

132.   On November 9, 2015, pursuant to the dispute resolution process for material disputes in the Anthem Contract and discussed above at ¶ 87, Express Scripts and Anthem attempted to mediate their disputes as required by the Anthem Contract.[95]  That mediation failed.[96]

133.   On November 11, 2015, Anthem contacted Defendant Wentworth to request a meeting to negotiate competitive benchmark pricing under the Anthem Contract.[97]  Anthem reached out to Defendant Wentworth because he "had been a key [Express Scripts] representative with respect to the pricing issue."[98]  However, Express Scripts refused to meet or negotiate.[99]

134.   On November 23, 2015, Anthem again emailed Express Scripts to request a meeting to negotiate the pricing terms of the Anthem Contract, but Express Scripts did not meet with Anthem or otherwise negotiate its pricing proposal.[100]

135.   By contrast, later that same week, as reported by J.P. Morgan in a November 27, 2015 analyst report entitled *Express Scripts, Inc.: Management Meetings Serve to Reinforce our Positive View*, J.P. Morgan met with Defendants Wentworth and Slusser, as well as Ben Bier (VP of Investor Relations) to discuss Defendant Wentworth's strategic direction over the next several years.  During the meeting, Defendants made additional false assurances regarding the strength and soundness of the Express Scripts-Anthem relationship.  As reported by J.P. Morgan, "Anthem ranks very high on Wentworth's priority list as incoming CEO," and Express Scripts "pointed to a near-term focus on maintaining very high service levels . . . so there is little incentive [on

---

[95] ES Counterclaims ¶¶ 195, 249-50.

[96] *Id.*

[97] Anthem Compl. ¶ 34; *see* ES Ans. ¶ 55 (acknowledging Anthem's Nov. 11, 2015 communication by "refer[ring] the Court to th[at] document").

[98] Anthem Compl. ¶ 34.

[99] *Id.*

[100] *Id.* ¶ 35; *see* ES Ans. ¶ 56 (acknowledging Anthem's Nov. 23, 2015 communication by "refer[ring] the Court to th[at] document").

Anthem's part] to leave."  With respect to the Express Scripts-Anthem relationship "going forward," Express Scripts reportedly "indicated a potential willingness to trade price in the near term for a contract extension that could maximize profits over the long term," thereby reiterating that the parties had a strong relationship and would be able to reach agreement to renew the Anthem Contract.

136.   In stark contrast to Express Scripts's statements to investors and analysts, on December 2, 2015, Anthem sent Express Scripts a revised pricing proposal that expressly detailed Defendants' failure *since March 18, 2015* to negotiate competitive benchmark pricing under the Anthem Contract.[101]  Anthem's revised proposal stated:

> Attached please find a revised proposal for competitive benchmark pricing, pursuant to Section 5.6 of the [Anthem Contract].  As you know, on 3/18/2015 Anthem proposed pricing terms based on a market analysis of competitive benchmark pricing conducted by it and a third-party consultant, [Health Strategy], which determined that the current pricing terms of the [Anthem Contract] were not even close to competitive.  *Months have elapsed, but [Express Scripts] has refused to negotiate for competitive benchmark pricing, as required under Section 5.6 of the [Anthem Contract]* . . . .[102]

137.   But, Express Scripts again did not respond.[103]  On December 14, 2015, Anthem again emailed Defendant Wentworth concerning Express Scripts's failure to negotiate competitive benchmark pricing or even respond to its proposal.[104]  Among other things, Anthem's letter asked whether Express Scripts "was willing to reconsider its position that it is not required to offer Anthem competitive benchmark pricing?"[105]  The letter further inquired whether Express Scripts

---

[101] Anthem Compl. ¶ 36; ES Ans. ¶ 57 (admitting that "the stated quote appeared in the stated reference source").

[102] *Id.*

[103] Anthem Compl. ¶ 37.

[104] Anthem Compl. ¶ 37; ES Ans. ¶ 58 (admitting that "the stated quote appeared in the stated reference source").

[105] *Id.*

was "willing to reconsider its position that it has the right to veto competitive benchmark pricing to Anthem?"[106]  Anthem asked whether Express Scripts "agreed to provide, or offered to provide, pricing terms to any other customer or potential customer on terms consistent with those that Anthem is requesting?"  In addition, the letter asked Defendant Wentworth for a "meeting among the decision-makers."[107]

138.   On December 15, 2015, Express Scripts responded to Anthem's December 14 email.[108]  ***Express Scripts stated that it was under no obligation to negotiate Anthem's pricing proposal and could veto any such negotiation.***[109]  Express Scripts also refused to meet or disclose the pricing terms it was offering to other current or prospective customers, as Anthem had requested.[110]  Express Scripts further stated that it would not respond to Anthem's December 2 revised pricing proposal for another two weeks.[111]

139.   On December 17, 2015, Anthem responded to Express Scripts's December 15 email.[112]  Anthem asked Express Scripts to respond sooner, pointing out that Express Scripts ***"already had nine months to consider the pricing issue and certainly must know its intentions."***[113]

---

[106] *Id.*

[107] *Id.*

[108] Anthem Compl. ¶ 38; *see* ES Ans. ¶ 59 (acknowledging Express Scripts's Dec. 15, 2015 correspondence by "refer[ring] the Court to th[at] document").

[109] Anthem Compl. ¶ 38.

[110] *Id.*

[111] *Id.*

[112] *Id.* ¶ 39; *see* ES Ans. ¶ 60 (acknowledging Anthem's Dec. 17, 2015 correspondence by "refer[ring] the Court to th[at] document").

[113] Anthem Compl. ¶ 39.

**K.     December 22, 2015: Defendant Paz Falsely Assures Investors That Defendants Were "Excited To Continue Productive Discussions" With Anthem, The Parties Were "Currently In Discussions" Regarding Pricing, Their Relationship Was "Successful," And Defendants Were "Fully Committed To Reaching A Mutually Beneficial Agreement"**

140.     On December 22, 2015, Defendants Slusser, Wentworth, Paz, and other Company executives held a conference call with analysts and investors to discuss the Company's financial guidance for 2016.  During the conference call, Defendant Paz expressly addressed the pricing negotiations concerning the Anthem Contract.  Specifically, Defendant Paz falsely stated, "We are *currently in discussions* with Anthem regarding the periodic pricing provisions of the agreement." Paz added:  "We previously engaged in this review process in 2012, and following several months of discussions, that process ultimately resulted in a *mutually beneficial agreement* between both Express Scripts and Anthem . . . . We are excited to *continue productive discussions with Anthem regarding our relationship*, and particularly the powerful savings they can achieve and pass along to their clients, under the range of cost saving programs we offer."  Defendant Paz further represented, "*we are fully committed to reaching a mutually beneficial agreement, and continuing our successful working relationship*.  Since 2009, we have delivered quality care for Anthem's members, and I am proud of what our teams have accomplished."

141.     During the same call, Deutsche Bank analyst George Hill asked, "Is an Anthem re-pricing considered in the 2016 guidance?  And if not, can you quantify the earnings risk that could be related to the re-pricing?"  In response, Defendant Paz falsely stated that negotiations with Anthem were "*very early on*."  Defendant Paz continued:

> It is our – it is the common practice in our book of business, across the industry, that when a client comes forward with a price check request, *we sit down with that client to carefully examine those areas* driving drug spend, and identifying opportunities for saving.  Specifically, *we work closely with our clients to optimize their position in the market and drive savings through the use of the very powerful tools and cost saving programs*, including formulary and network management and changes.  These types of activities can be *mutually beneficial*,

and help drive significant value to both parties, and all clients and members.  We think there's a great deal of opportunity for Anthem to take advantage of a number of these programs, and *we're excited about the opportunity they present for both companies*.

142.    Analysts responded positively to these false and misleading statements.  For example, in a December 22, 2015 report entitled *Better Than Expected FY16 Guidance; See Mutually Beneficial Resolution To ANTM*, Cowen and Company reported: "We also find the incremental commentary around ANTM positive and given the parties have gone through a pricing review in 2012, we think a resolution again here is more than likely and will likely come in better than we had previously expected."  Similarly, in a December 22, 2015 report entitled *2016 Straight Down The Fairway – Bumping Estimates*, SunTrust Robinson Humphrey reported, "The company is in the process of negotiating a price check with Anthem.  It has previously negotiated a price check back in 2012, and anticipates another mutually beneficial outcome.  The potential Anthem re-pricing is still in the early stages of negotiations . . . we continue to expect a favorable resolution."

143.    In truth, Express Scripts had refused to engage in any "productive discussions" with Anthem for over ten months as detailed herein, and the parties were embroiled in multiple material disputes concerning Express Scripts's pricing and operational breaches of the Anthem Contract which weeks earlier had resulted in a failed mediation.  As a result and as Defendants knew (or recklessly disregarded), the parties did not have a "successful working relationship."  Indeed, as discussed above at ¶¶ 67-71, the parties' relationship was damaged due to the first round of pricing negotiations in 2012 and weakened further throughout the Class Period.

144.    Moreover, as set forth in ¶¶ 131, 133-34, and 136-37 above, Defendant Paz's statements that Express Scripts would "sit down" with their clients and "work closely" together to negotiate a price check request are belied by the fact that in the prior five weeks alone, Anthem

had requested a meeting with Express Scripts five times, all of which Express Scripts had ignored or refused.  Indeed, on December 23, 2015, the very next day after the Company's December 22 conference call, Express Scripts responded by letter to Anthem's December 17 email requesting a response to the pricing issues by stating only that it would provide a substantive response at a later time.[114]

### L.    January 7, 2016: Express Scripts Forwards Anthem A Proposal That Actually Increases Pricing

145.    On January 7, 2016, after 9:00 p.m., Express Scripts finally sent Anthem a proposal that lowered pricing under the Anthem Contract by $1 billion but was inflated by more than $1 billion for the post-termination transition period.[115]  The $1 billion in savings offered during the remaining period of the Contract (prior to post-termination) constituted less than 8% of the $13 billion that Anthem had consistently demanded from Express Scripts since October 2014.  Express Scripts's proposal was also unacceptable to Anthem because, among other reasons, it was inflated by $1 billion during the post-termination period and sought to *increase* Medicaid pricing.[116] Anthem went public with its disputes with Express Scripts less than one week later.

### M.    The Truth Is Revealed To Investors

### 1.    January 12-14, 2016:  Anthem Takes The Terms Of Its Contract Dispute With Express Scripts Public

146.    On January 12, 2016, the truth began to emerge to investors regarding Defendants' misrepresentations about Express Scripts's relationship with Anthem, including that the relationship was so fraught that the companies likely would not renew the Anthem Contract.  At

---

[114] Anthem Compl. ¶ 40; *see* ES Ans. ¶ 61 (acknowledging Express Scripts's Dec. 23, 2015 response by "refer[ring] the Court to th[at] document").

[115] Anthem Compl. ¶ 41; *see* ES Ans. ¶ 62 (acknowledging Express Scripts's Jan. 7, 2016 proposal by "refer[ring] the Court to th[at] document").

[116] Anthem Compl. ¶ 41.

J.P. Morgan's Healthcare Conference that day, after the close of the markets, Anthem took the

terms of its contract dispute with Express Scripts public.  Anthem CEO Swedish told participants:

> I want to update you on the substantial savings capture we believe is available by improving pharmaceutical pricing, for which we are contractually entitled under our current agreement with [Express Scripts]. . . .
>
> As you would expect from us, our management team has done a substantial amount of homework in evaluating the pharmaceutical marketplace to assess the value of our re-pricing provision to drive lower costs for our customers.  We believe that there is a significant value capture to be realized by our customers and our shareholders.
>
> ***The current contract with [Express Scripts] entitles us to that value effective December 1 of 2015, which was just over a month ago***.  In our existing contract, there's a very specific language that states that Anthem will conduct a market analysis and enter into good faith negotiations to ensure our members are receiving competitive benchmark pharmaceutical pricing.
>
> ***Importantly, the language in this re-pricing provision does not include any requirement for a contract extension*** or any other contingencies for us to receive market-competitive pricing.
>
> To quantify the gross savings afforded under our contract, we've used multiple independent reference points to determine and validate appropriate competitive benchmark pricing.  These include the issuance of RFIs to competitive vendors and third party expert consultants who performed their own market analysis.
>
> These reference points consistently showed that ***we are entitled to improved pharmaceutical pricing that equates to an annual value-capture of more than $3 billion.  To be clear, this is the amount by which we would be overpaying for pharmaceuticals on an annual basis***.  Obviously, this represents a substantial adjustment to drive lower care costs for our customers and improve our competitive position in the marketplace.
>
> While our re-pricing provision was effective over a month ago, ***we do not yet have an agreement with our current vendor to effectuate the savings.  We have not yet received an offer from [Express Scripts] that we believe represents market-competitive benchmark pricing.  We're now trying to get them to engage in good faith negotiations as required under the terms of the re-pricing provision in our contract***.  To be clear, our shareholders are entitled to that value today and ***our team has been and continues to be focused on exercising our contractual rights to capture that value***.

147.    After Swedish revealed the ***massive $15 billion*** gap between the present pricing terms in the Anthem Contract and what Anthem believed was competitive benchmark pricing, Anthem General Counsel Tom Zielinski told reporters that Anthem was contemplating litigation against Express Scripts.  As *Dow Jones* reported on January 12, 2016 in an article entitled *Anthem Seeks Better Deal with Express Scripts – Market Talk*, "Anthem str[uck] a pugnacious note about its negotiations with Express Scripts," and Zielinski asked rhetorically, "'Do I sit here and overpay $3B a year?  Or do I go file a lawsuit saying you've breached the agreement' by not giving the competitive pricing that Anthem is due?"

148.    In a January 12, 2016 article entitled *Express Scripts Plunges as Biggest Client Threatens to Leave*, *Bloomberg* reported additional comments by Zielinski, who stated:  "We have a very involved dispute resolution process in the contract that has been fully exhausted."  Although Zielinski acknowledged that Anthem and Express Scripts "remain[ed] in dialogue," he went on to say, "Both of us have to step back and see whether we're honoring the contractual terms of the agreement," and if not, "you have your legal remedies."

149.    The market reacted negatively to the revelation of Anthem's dispute with Express Scripts, including the possibility of litigation.  For example, an analyst report by J.P. Morgan on January 12, 2016 discussed Swedish's announcement at length, noting that Anthem "believes it has exhausted the dispute resolutions process, but is still attempting to negotiate with Express, noting that if it cannot reach an agreement, the company will explore legal action."

150.    Between the evening of January 12 and the next trading day of January 13, the market began reacting to Anthem's announcement of the companies' dispute and potential litigation, as analysts and investors digested the announcement.

151.    In reports issued on January 13, 2016, in the wake of Anthem's announcement, numerous analysts covering Express Scripts expressed surprise and concern that Anthem's relationship with Express Scripts was damaged.  Among others that day, Deutsche Bank reported that "***Something Changed – The Relationship Seems Difficult to Salvage***," and "***it is hard to imagine [Express Scripts] now retaining the Anthem PBM contract beyond 2019***, and the earnings risk to [Express Scripts] now becomes even more difficult to quantify."  Leerink expressed its surprise in a report entitled ***ANTM Contract Re-pricing Comments May Pressure ESRX Stock Today***, noting that "$3B is Significantly more than the Potential Savings Previously Cited by ANTM."  Leerink reported:

> **Bottom Line:**  Yesterday ANTM (OP) presented at a competitor conference, and management provided an update on its contract with ESRX (OP).  As a reminder, ESRX hosted a guidance call in December 2015 on which management confirmed that the company is in re-pricing negotiations with ANTM, which is its largest customer.  ***While ESRX didn't provide meaningful details around the terms of the contract or magnitude of a re-pricing, ANTM did provide additional color in its presentation yesterday.  Overall, ANTM believes it is entitled to ~$3B in gross annual savings based on current pharmaceutical market rates***. . . . [W]e believe ESRX will come under some pressure today.

152.    Also on January 13, 2016, UBS reported that Express Scripts's "***Largest Customer Lays Down the Gauntlet***," while attributing "the sell-off in ESRX today" to "the timing and alleged certainty of contract language communicated by ANTM."  Cowen and Company issued a report, entitled *Life Without ANTM Could Be More Likely Than Previously Thought*, and reporting that "it is clear that ANTM sees enough potential [savings] to consider moving its PBM in-house."

153.    Moreover, on January 13, 2016, Morgan Stanley issued a report stating that, in light of Anthem's announcement of its dispute with Express Scripts, "visibility around renewal post 2019 will likely not be resolved in foreseeable future."  In its report, Morgan Stanley provided its projections of three scenarios, two of which accounted for the Company's loss of $3 billion in

annual revenue due to re-pricing, and the third accounting for "***the 'nuclear' scenario:  Express loses the Anthem contract in 2019 or earlier*** if contract is terminated for cause."  In that "nuclear scenario," Morgan Stanley predicted that Express Scripts would lose between $1 billion and $1.2 billion in EBITDA, representing $0.95 to $1.14 in earnings per share.

154.    On January 13, 2016, in response to learning that Express Scripts's relationship with Anthem was strained to the point of possible litigation and/or Anthem abandoning the relationship, the magnitude of the $3 billion Anthem claimed it was owed in annual savings, and the likelihood that the Anthem Contract would not be extended after its 10-year expiration in 2019, the market price of Express Scripts common stock had a statistically significant drop of $5.89 per share, or 6.9%, to close at $79.69 per share, representing a $3.9 billion loss in market value.

155.    The market continued to digest Anthem's announcement and threatened litigation on January 14, 2016.  That day, analyst William Blair issued a report entitled *Anthem Concerns Again Cloud Solid 2016 Outlook; Lowering 2017 Estimate to Reflect Re-pricing*.  William Blair reported that "Anthem [was] Likely to Be Re-priced," and reported "[t]he most pessimistic outcome, in our opinion, is that the companies do not come to terms and Anthem shifts the business to a competitor."  Express Scripts common stock continued to drop on January 14, 2016.  That day, the Company's common stock had a statistically significant drop of $2.18 per share, or 2.7%, to close at $77.51 per share.

156.    In total, between January 13 and 14, 2016, Anthem's revelations caused the Express Scripts common stock price to drop by $8.07 per share, or 9.4%.

**2.      January 15, 2016:  Investors Contrast News About The Broken Anthem-Express Scripts Relationship With Express Scripts's Prior Characterizations**

157.    On Friday January 15, 2016, analyst Baird lowered its price target for Express Scripts that morning, and reported that:

Anthem angst reached [a] fever pitch this week.  ESRX's largest client claims substantial savings are contractually owed it based on significant market diligence. The re-pricing was effective December 1 and isn't contingent on other adjustments (i.e., extension, expansion).  ***We can't true up ESRX's cautiously optimistic tone on its late-December guidance call and Anthem's increasingly strong public stance***.

158.     On January 15, 2016, Express Scripts common stock had another statistically significant drop of $2.92 per share, or 3.8%, to close at $74.59 per share.

### 3.     January 19, 2016:  Investors Understand The Likelihood That Anthem Will Leave Express Scripts And Contract With A Different PBM

159.     January 19, 2016, was the next consecutive trading day after January 15.  During the intervening three-day weekend (including Martin Luther King, Jr. Day on January 18), investors continued to digest news concerning Express Scripts's contentious relationship with its largest customer Anthem.  Among other things, Leerink published a report on January 18, 2016, stating that it was downgrading Express Scripts and was "now more cautious on the stock over the next 12 months.  Our price target moves lower to $80 (previously $95)."  Leerink further reported that, even if the companies resolved their dispute, "***we believe there is a fairly high probability that ANTM and Cigna (OP) will eventually seek to bring the entire book of business in-house***."

160.     Leerink's January 18, 2016 report went on to explain:

**ANTM's $3B Savings is Sending a Clear Signal to ESRX and Shareholders**. While we had been skeptical on the meaning of the ~3B in annual savings that ANTM highlighted at a competitor conference last week, we believe ANTM has increased projected savings from $500-700M per year to $3B per year, and this may be due in part from the "RFIs" (requests for information) it has received from the market.  ***It's possible in our view that Cigna and Optum provided a response to ANTM's RFI and, as a result, the incremental savings expected may be far higher than originally anticipated.***  The CEO of Cigna, David Cordani, has been very vocal about the quality of Cigna's PBM, and we suspect that ***as President of a combined entity he would push very hard to in-source the PBM***.

161.     On January 19, 2016, *Dow Jones Newswires* reported on Leerink's January 18 report in a piece titled "Pressure Points Pile Up Against Express Scripts."

162.    On January 19, 2016, Express Scripts common stock dropped by an additional $2.21 per share, or 3.0%, to close at $72.38 per share, a fourth consecutive trading day of statistically significant declines in Express Scripts's common stock price.

### 4.    After Anthem Threatens Litigation In January 2016, Express Scripts's Already Strained Relationship With Anthem Worsens

163.    Throughout January and February of 2016, the dispute between Express Scripts and Anthem only deepened, as resolution became increasingly unlikely.

164.    Indeed, on January 13, 2016, the day after Anthem informed the public that the companies' dispute might result in litigation and/or Anthem exiting the relationship, Anthem made a proposal to Express Scripts, "[i]n the interest of getting to a resolution, . . . to accept less than competitive benchmark pricing."[117]  But, once again, Express Scripts did not respond.[118]

165.    Analysts and investors continued to reel from the news that Express Scripts's relationship with its most important customer was in dire condition, and to focus on Express Scripts's relationship with Anthem as crucial to properly valuing the Company.  On January 20, 2016, Barclays issued a report entitled *Considering Express without Anthem*, reporting that "Express holds considerable leverage relative to the 2016 re-pricing but ***Anthem holds all the leverage relative to the 2020 expiration***."  Barclays noted that "[w]e expect the situation is going to get worse before it gets better as ANTM is likely to reiterate its call for $3bn of savings during the company's Jan 27th call, whereas ESRX cannot easily comment without weakening its position."

166.    On January 21, 2016, J.P. Morgan issued a 23-page report, entitled *Express Scripts: Revisiting the Story Post Anthem Newsflow*, discussing the companies' relationship and the news

---

[117] Anthem Compl. ¶ 42.

[118] *Id*. ¶ 43.

that had emerged since January 12, including the uncertain future of that relationship.  J.P. Morgan wrote that "*[t]he $3B cited by ANTM last week was clearly surprising*," and noted that Anthem had "done a substantial amount of homework in evaluating the pharmaceutical marketplace to assess the value of the re-pricing provision."  J.P. Morgan further reported that, "[w]hile a potential resolution of this uncertainty is likely to be a clearing event, *since there is no definitive timeline for resolution of this overhang, we believe shares are likely to trade sideways in the near term*."  The report expressed J.P. Morgan's belief that a renewal or extension of the Anthem Contract "*appears increasingly unlikely at this point*."

167.    Also on January 21, 2016, Leerink issued a report estimating that "ESRX will face ~$500M of annual EBITDA pressure from a market-check with ANTM," and that "*[l]onger term we believe that there is a ~40-50% chance that ANTM and Cigna (OP) as a combined enterprise will bring the business in-house*."  A Morgan Stanley report that same day noted both that "*ANTM contribution to ESRX profit is more than we had assumed*," and that "*Near term earnings risk may be reflected in shares but limited transparency regarding Anthem's total contribution coupled with no likely near-term resolution on the potential for 2019 renewal should continue to weigh on shares.*"

168.    On January 22, 2016, Anthem again proposed what it believed was a below-market resolution to Express Scripts, and Express Scripts again refused to engage in negotiations.[119]  Four days later, on January 26, 2016, Express Scripts informed Anthem that it was not obligated to renegotiate Anthem's pricing.[120]  On the same day, Express Scripts reiterated that it would not disclose pricing terms it was offering to its other customers, as Anthem had requested.[121]  On

---

[119] *Id.*

[120] *Id.* ¶ 44.

[121] *Id.*

January 27, 2016, during Anthem's fourth quarter earnings call, Anthem CEO Joe Swedish was asked if there was any update regarding Anthem's PBM contract.  Swedish responded, "Nothing's changed since our statement . . . earlier this month at the conference."

169.    Analysts maintained their focus on the Express Scripts-Anthem relationship, with Cowen and Company reporting on January 28, 2016 that "it seems increasingly likely that ANTM will look to break its contract with ESRX in 2016," and that Anthem's January 12 announcement concerning the companies' dispute "appear[s] designed to give it a reasonable grounds to exit the contract early."  In Cowen and Company's view, "***[t]he best case scenario at this point would be ANTM's leaving in 2020 after the contract runs its course . . . . although its actions don't seem to point in that direction.***"  Additionally, in order to help investors understand precisely the impact of the Anthem Contract on Express Scripts's earnings, UBS published a report on February 2, 2016 devoted to "Dissecting ESRX's ANTM v. Non-ANTM Profits."

170.    Likewise, on February 10, 2016, investment analyst Nicholas Mushaike published an article on *Seeking Alpha* titled "The Clause That Could Twist Express Scripts' Fate."  Mushaike's article addressed the question:  "why would a $3 billion loss matter to a company with $100 billion in revenues?"  The answer to that question is that "Express Scripts incurs huge costs relative to margins.  *Express Scripts is a $100 billion revenue company that has only $2 billion in net income.  **Siphoning anything north of $2 billion can wipe out all of its net income***." (italics in original).

171.    According to Mushaike, Anthem's periodic review and re-pricing demand were Express Scripts's "greatest adversary yet," because, for Express Scripts, "***A Future Without Anthem Is Financial Suicide.***"  As Mushaike wrote," ***Express Scripts cannot afford to lose Anthem.  It is too big a client.  Anthem is Express Scripts' biggest client constituting 14% or***

*$14.124.194 billion of 2014 revenues*."  Mushaike also reported that the value of Express Scripts's relationship with Anthem is far more than Anthem's contribution to revenues, and derives in large part from Express Scripts's ability to use Anthem's large customer base as leverage to help negotiate cheaper drug pricing:  "Losing Anthem implies that *Express Scripts would no longer be the U.S.'s biggest manager of prescription drug benefits*.  In negotiating drug prices, size has been Express Scripts' biggest leverage.  Once the company loses that privilege, *the stock would take a nosedive because the amount of potential future drug cost savings it will be able to negotiate will greatly diminish*."  Anthem, and the negotiating leverage its customer base provided, would be "even more important if the $54 billion Cigna merger is finalized."

172.    In an attempt to move negotiations forward, on February 3, 2016, representatives from Anthem traveled to St. Louis to meet with Defendant Wentworth and to offer a pricing reduction worth $9.7 billion, or $3.4 billion less than the $13.1 billion Anthem had previously demanded over the term of the contract.  But, again, Express Scripts refused to engage, and denied that it had any obligation to do so.[122]

173.    Anthem followed up on its February 3 in-person proposal by submitting the proposal in writing to Express Scripts on February 5, 2016.  Anthem's tone was strident, telling Express Scripts:

> As you know, Anthem has now spent *almost one year* trying to engage [Express Scripts] in negotiations for competitive benchmark pricing, but [Express Scripts] has refused to do so.  Consequently, Anthem and its members are paying inflated prices to [Express Scripts], *which is unsustainable*. . . . Anthem is prepared to overpay [Express Scripts] by approximately $3.4 billion in an effort to get [Express Scripts] to provide repricing, as it is required to do (at much lower amounts) under Section 5.6 of the Agreement. . . . [W]e urge [Express Scripts] to move quickly with respect to Anthem's proposal. Otherwise, *Anthem reserves all rights*, including the right to the full amount of the pricing reduction necessary to achieve competitive benchmark pricing.

---

[122] *Id.* ¶ 45.

We have tried to avoid stating the obvious problem that [Express Scripts], as a competitor of Anthem's, is inflating Anthem's prices so that it can then undercut Anthem's prices.  We ask [Express Scripts] to reconsider that approach. . . .

**Anthem cannot continue under [Express Scripts]'s current pricing, so please respond to Anthem's proposal by next week**.[123]

174.   On February 12, 2016, Express Scripts responded with the same proposal it had previously sent on January 7, 2016, showing that Express Scripts and Anthem were nowhere near resolving their dispute.[124]

### 5.   February 17, 2016: Defendant Paz States Falsely That Express Scripts Was "Currently In Discussions" And Fully Committed To Good Faith Negotiations With Anthem

175.   Following Anthem's announcement of its dispute with Express Scripts, and as the companies' relationship became even more broken, Express Scripts falsely reassured the market that it was committed to good faith negotiations, which it claimed were "*currently*" ongoing.  In the Company's 2015 Annual Report filed on Form 10-K with the SEC on February 16, 2016, Express Scripts falsely stated that it was "*currently in discussions* with Anthem regarding the periodic pricing review process pursuant to the terms of our PBM agreement with Anthem," and further reassured investors that "we are **actively engaged in good faith discussions** with Anthem and intend to continue to comply with the requirements of the agreement."

176.   Likewise, on a February 17, 2016 conference call with analysts, Defendant Paz stated that "[o]ur team is delivering great service to Anthem and its members," "[w]e are committed to helping Anthem control costs and win business," and accordingly, "***remain fully***

---

[123] *Id*. ¶ 46.
[124] *Id*. ¶ 47.

*committed to good faith negotiations* in hopes of reaching a mutually beneficial agreement within the framework of our 2009 contract. *That has not changed.*"

177.    Analysts were intently focused on Express Scripts's relationship with Anthem, with analysts from J.P. Morgan, Goldman Sachs, Citigroup, Deutsche Bank, Morgan Stanley, and UBS all asking questions about the companies' dispute and its effect on Express Scripts's operations and earnings during the February 17, 2016 conference call.   In response to Morgan Stanley's question, which referenced Defendant Paz's December 2015 indication that "the negotiation could potentially include an extension beyond the 2019 contract terms," Paz responded that Express Scripts "would love to have an extension as part of this agreement."

178.    Further, in response to a question from UBS, Defendant Paz represented that Anthem's price check and the Company's dispute were routine and likely to be resolved. Specifically, Paz noted that "a lot of our clients do have what we call price checks," and "have the right to look at pricing and make sure that we are doing the right things for them.  Those are pretty routine and we go through those, bunches of those, every year."  Paz reiterated falsely that "*we are focused on reaching agreement.*"

179.    Yet, on February 18, 2016, the very next day after Paz's statements, Express Scripts again refused to negotiate with Anthem, telling Anthem that it was not obligated to negotiate the pricing terms proposed by Anthem.  Indeed, Express Scripts once again refused to negotiate at all.[125]

180.    Express Scripts would not negotiate even when Anthem CEO Swedish traveled to Chicago on March 1, 2016, specifically to meet with Defendant Paz directly.[126]   Thereafter, on

---

[125] *Id*. ¶ 49.
[126] *Id*. ¶ 50.

March 17, 2016, Express Scripts merely recycled its previously rejected proposal, which actually *increased* prices in the post-termination period.  As alleged by Anthem, Express Scripts "made Anthem wait seventeen days for a new proposal that did not reduce pricing by a single dollar."[127]

181.    Analysts continued to express concern about the uncertainty over and lack of visibility into the Express Scripts-Anthem relationship.  On March 15, 2016, Credit Suisse reported that although the partial disclosures about the companies' intense disputes had caused some "correction this year" in the price of Express Scripts stock, "the future of [Express Scripts's] Anthem relationship" remained "*the only issue of consequence for the near-term performance of ESRX's stock [and] the one on which we have the least visibility*."  Credit Suisse further reported that "[t]he public commentary of [Anthem] *and limited disclosure by ESRX have not been particularly helpful in terms of enabling the investment community to arrive at a reasonable estimate as to the value of the arrangement*," while noting that "Anthem is holding most of the cards in this dispute."

182.    Express Scripts's relationship with Anthem continued to worsen as the companies moved farther from, rather than closer to, a resolution.  Litigation followed.

**6.    March 21-22, 2016:  Anthem Files The Anthem Complaint Detailing The Parties' Disputes, And The Complaint Becomes Available To The Market**

183.    On March 21, 2016, Anthem filed the Anthem Complaint, commencing the Anthem Litigation against Express Scripts.  News of the Anthem Complaint became public at 10:57 a.m., when Anthem issued a press release titled "Anthem Files Suit against Pharmacy Benefit Manager to Recover Damages for Pricing and Operations Issues."  The price of Express Scripts common stock immediately began to decline upon this news, but recovered as the complaint was filed under

---

[127] *Id.* ¶ 51.

seal and did not become available to investors in redacted form until after the close of trading on March 21, 2016.

184.    In its complaint, Anthem alleged that Express Scripts breached the Anthem Contract by failing to negotiate pricing terms in good faith under Section 5.6 of the contract and, further, that Express Scripts breached its contractual obligation to perform operational duties in a "prudent and expert manner."   In the Anthem Complaint, Anthem revealed for the first time that it had attempted to renegotiate drug pricing since early 2015, that negotiations with Express Scripts had never even approached resolution, and that Anthem believed Express Scripts had violated its operational obligations under the Anthem Contract, including by failing to comply with governing Medicare and Medicaid regulations.   Contrary to Defendants' Class Period statements regarding the companies' relationship and purported ongoing negotiations, the Anthem Complaint alleged that Express Scripts "refused to negotiate, let alone in good faith, over Anthem's pricing proposals for competitive benchmark pricing . . . [and] refused to negotiate at all over Anthem's proposals for pricing in excess of competitive benchmark pricing . . . ." [128]

185.    The Anthem Complaint also revealed that Anthem had served Express Scripts with notices of default on February 16, 2015 and April 1, 2015 concerning the Company's pricing and operational obligations.

186.    Beginning on March 21, 2016, analysts expressed surprise to learn that Express Scripts's relationship with its most important customer had deteriorated to the point described in the litigation.   For example, in a March 21, 2016 report entitled *ANTM's approach turns to litigate and terminate*, Evercore wrote that Anthem "noted that it has worked for more than a year to engage ESRX in good faith negotiations (one of the key debate points), something it claims ESRX

---

[128] Anthem Compl. ¶ 4.

has not been willing to do (big dispute appears to be definition of market pricing basket/competitive benchmark)."  Evercore expressed its view that "we do not expect this process to be smooth, with various disagreements that will likely be made public as well as court filings . . . . While there is always a possibility for a settlement at some point, *that likelihood is becoming increasingly LESS likely (particularly with ANTM looking for a declaration of right to terminate the contract) and would view a split of ANTM and ESRX as looking more and more like the base case assumption (reflected now in our model).*"  Evercore lowered its price target for Express Scripts due to a "*heightened degree of risk surrounding the Anthem contract (either from termination/litigation/lower profitability)*," and published key excerpts from the Anthem Complaint so that investors could more easily understand Anthem's allegations and the new information contained therein.

187.    Similarly, Leerink reported that, on the news of Anthem's lawsuit, "*'good faith negotiations' appear to be at an impasse*."  As Leerink wrote, the "Anthem Lawsuit [was] an Indicator that there may be No Renewal Beyond 2019," as "ANTM has become increasingly hostile . . . . *The lawsuit announced today is a negative in our view and a sign that the companies have not been able to reconcile key differences.  The lawsuit increases the likelihood that ANTM will bring the ESRX contract in-house in late 2019*."  Leerink continued, "today's lawsuit could represent additional pressure on the profitability of the contract and could put the contract at risk, long term, in our view.  We believe that the odds are fairly high that ANTM and ESRX will go their separate ways beyond 2019, and possibly sooner."  Morningstar likewise reported on March 21, 2016 that Anthem's lawsuit "is an escalation of the current contract re-negotiations," and that "the increased hostility of the negotiations is a reflection of issues beyond the current business

dynamics of the partnership, and these personal issues have hindered a mutually beneficial outcome."

188.     When Anthem filed suit on March 21, 2016, it moved for permission to file its complaint under seal and to publicly file a redacted version of the complaint.  The Court granted Anthem's sealing motion at 9:35 a.m. on the morning of March 22, 2016, and it was not until the morning of March 22, 2016 that the public could view and learn the full extent of Anthem's detailed allegations against Express Scripts.

189.     After reviewing the Anthem Complaint, Leerink issued another report on March 22, 2016, telling investors that it was "surprised" by the details in the Anthem Complaint.  Leerink wrote:

> Earlier today, a redacted version of Anthem's lawsuit against ESRX became accessible (Case 1:16-cv-02048-ER).  Overall we are surprised by the amount of detail provided by ANTM (OP) around 'alleged' breaches related to (1) competitive pricing, and (2) operational challenges.  In our view ***this litigation is a way for ANTM to publicly show the investment community and customers ANTM's view of its relationship with ESRX***, and in our opinion it is increasingly likely that ANTM and Cigna (OP) – assuming the deal goes through – will seek to bring the PBM in-house.  ***We believe ESRX and some shareholders of ESRX are under-estimating ANTM's desire and willingness to walk away from their contract. . . . [W]e believe the relationship with ANTM has deteriorated to a point where the most likely outcome is termination of the contract*** either before or at the 2019 end-date.  We are more cautious on ESRX.  If ANTM and [Cigna] bring the contract in-house, we believe shares of ESRX could trade to $50.

190.     Deutsche Bank issued a similar report on March 22, 2016, entitled *Divorce Court: Thoughts on Anthem/ESI Complaint*.  In the report, Deutsche Bank wrote that "[a] full read of the Anthem complaint filed against Express Scripts indicates ***the companies remain far apart on the price check and have not been able to negotiate in good faith***.  The complaint also details numerous operational and software failures by [Express Scripts] . . . . Anthem is looking for damages related to the failure to execute the price check, damages for the operational issues, and

the right to terminate the agreement.  We believe ***there remains significant risk for [Express Scripts] related to the Anthem contract and maintain our Sell rating on ESRX shares***." Deutsche Bank noted that Anthem's "request for a termination of the agreement indicates that the impact to [Express Scripts] financials could be earlier than expected," including "a risk of full termination in 2018 and a risk in 2016 and 2017 of a re-priced contract."

191.    Likewise, Morgan Stanley reported on March 22, 2016 that, "[w]ith ANTM/ESRX dispute escalating to litigation, ***probability of contract renewal in 2019 decreases*** and brings to forefront a bear case where ANTM could terminate before '19.  ***Our base case now assumes no renewal***."  Morgan Stanley further reported that "[i]n our conversations, Anthem management said all options are on the table going forward," including "changing PBM vendors," "a hybrid approach with bringing part of the PBM business in house," and "early contract termination."

192.    On March 22, 2016, in response to the news of Anthem's suit against Express Scripts, and that the parties' relationship was likely irreparable and that renewal of the Anthem Contract was not likely, the market price of Express Scripts common stock had a statistically significant drop of $1.82, or 2.6%, to close at $67.52 per share.

## VI.    POST-CLASS PERIOD DEVELOPMENTS

### A.    Express Scripts Files A Counterclaim Against Anthem Further Detailing The Parties' Contentious Relationship And Failed Pricing Negotiations

193.    On April 19, 2016, Express Scripts countersued Anthem, raising the Company's own breach-of-contract claims and further detailing the contentious nature of their relationship and their re-pricing negotiations.  While Anthem's initiation of litigation informed investors that Anthem believed Express Scripts had not acted in good faith, Express Scripts's counterclaims further confirmed that both companies believed their relationship was broken, and that resolution on re-pricing or contract renewal was unlikely.

194.    Indeed, in the Amended Counterclaims that it filed on June 13, 2016, Express Scripts alleged that it was "regrettably forced to bring these counterclaims in order to seek redress for Anthem's repeated failures to comply with its contractual obligation to negotiate in good faith."[129]  Express Scripts alleged "Anthem's failure to negotiate in good faith over its proposed new pricing terms,"[130] called Anthem's demand "unreasonable,"[131] contended that "Anthem has concocted a new interpretation of the parties' rights and obligations,"[132] accused Anthem of breaching the implied covenant of good faith and fair dealing,[133] and demanded $4.675 billion restitution under an unjust enrichment theory.[134]

195.    Express Scripts's counterclaims against Anthem detailed Express Scripts's views of the companies' re-pricing negotiations, including that "Anthem [r]epeatedly [r]ejected [o]ffers from [Express Scripts] that were [w]ell [w]ithin the [r]ange of what Anthem was [t]elling the [m]arket [i]t [e]xpected to [r]eceive."[135]  Express Scripts claimed to have made five separate pricing proposals to Anthem between June 2015 and March 2016, each of which Anthem allegedly rejected "out-of-hand."[136]  According to Express Scripts, Anthem's allegations "demonstrate[d] the lack of good faith that has typified Anthem's pricing negotiations over the past two years."[137]

196.    Regardless of whether Anthem or Express Scripts is ultimately proven right in the Anthem Litigation, the allegations from both companies leave little question that Defendants'

---

[129] ES Counterclaims ¶ 148.

[130] *Id.* ¶ 152.

[131] *Id.* ¶ 153.

[132] *Id.* ¶ 154.

[133] *Id.* ¶ 155

[134] *Id.* ¶ 156.

[135] *Id.* ¶ 197.

[136] *Id.*

[137] *Id.* ¶ 203.

statements to investors detailed herein were materially false and misleading when made. It was never "highly probable" that the parties would reach agreement and renew or extend the Anthem Contract for at least five more years consistent with Express Scripts's accounting of the contract over the entire Class Period. Given the allegations of bad faith from both sides, as well as the shocking magnitude of the companies' $15 billion pricing dispute, the companies' relationship was fractured, and it was highly unlikely that the parties would agree to extend the Anthem Contract beyond its expiration in 2019.

### B. Express Scripts Belatedly Admits That Its Financial Statements Materially Misrepresented The Soundness Of Express Scripts's Relationship With Anthem

197. On April 25, 2016, Express Scripts belatedly admitted that the Company's relationship with Anthem had deteriorated to such extent that the Anthem Contract would likely not be renewed beyond 2019. In its Quarterly Report that day for the first quarter of 2016, filed with the SEC on Form 10-Q, Express Scripts reported that it had finally adjusted its accounting treatment of the Anthem Contract to amortize the contract's costs over its ten-year term, rather than over a 15-year useful life (that was based on an assumed likelihood of renewal under GAAP).

198. Specifically, in the section of the 10-Q discussing Express Scripts's intangible assets, the Company first described how it had been amortizing the Anthem Contract over the course of a purported fifteen-year useful life:

> Included in total amortization expense is $34.3 million and $23.8 million related to our 10-year contract with Anthem, Inc. ("Anthem") to provide PBM services to members of the affiliated health plans of Anthem which is included as an offset to revenues for the three months ended March 31, 2016 and 2015, respectively. **When we executed our agreement with Anthem in 2009**, . . . [we] attributed a reasonable likelihood of renewal at the end of its term in 2019. Accordingly, **we amortized the agreement using a modified pattern of benefit over an estimated useful life of 15 years.**

199.    Express Scripts then finally admitted that the Company's relationship with Anthem was so fraught that there was not a supportable basis to conclude under GAAP that the Anthem Contract likely would be renewed or extended beyond 2019, and that the useful life of the Anthem Contract was limited to its ten-year term:

> *However, due to the sequence of recent events regarding our discussions with Anthem, culminating in the filing of the lawsuit on March 21, 2016, we felt it prudent to consider the increased likelihood of either non-renewal or renewal on substantially different terms such that, beginning in March 2016, we began amortizing our agreement with Anthem over the remaining term of the contract* (i.e. using a life of 10 years from the time the agreement was executed in 2009). Previously, we amortized the agreement over 15 years.

200.    Further, Express Scripts described the impact of its revision to the Anthem Contract's useful life and amortization schedule:

> Therefore, the intangible asset amortization associated with the Anthem agreement will run through the remaining term of the contract at the end of 2019, reducing the previous amortization period by 5 years. *This change increases intangible asset amortization by $10.5 million for the first quarter of 2016 and quarterly intangible asset amortization by approximately $32.0 million beginning in the second quarter of 2016*.

201.    In other words, Express Scripts finally admitted, after years of contrary accounting treatment (including after receiving Anthem's notices of breach prior to and during the Class Period), that the Company's relationship with Anthem was so damaged that there was not a supportable basis to represent (as manifest in Express Scripts's accounting treatment of the Anthem Contract) that it was likely that the Anthem Contract would be renewed for at least five more years. That decision resulted in a significant offset to the Company's revenues of $10.5 million for the first quarter of 2016, and $32 million quarterly beginning in the second quarter of 2016.

202.    On an earnings conference call the next day, April 26, 2016, an analyst from Cowen and Company asked Defendant Paz for more insight into the Anthem Litigation. Paz admitted that

an amicable resolution was unlikely, responding that "this is probably going to be quite a long, drawn out situation. . . . If they want to come in and have a conversation that's reasonable in nature, nothing to do with $3 billion, ***that's pretty ludicrous***.  You've heard me say that before.  We're open to that. . . . But at the end of the day, we're in a legal process now."

203.    Analysts continued to focus on Express Scripts's relationship with Anthem, while recognizing that by the end of the Class Period, investors had learned the truth (which caused the price of Express Scripts stock to drop) – that the companies' relationship was so fractured that it was exceedingly unlikely that the Anthem Contract would be renewed.  For example, on April 26, 2016, Wells Fargo reported that its "estimates do not reflect any change to the ANTM contract," while noting that the Anthem Contract "represents risk of 10-25% of EPS, depending on if (and when) it reprices or is terminated, and potentially more if ANTM is successful . . . in court." SunTrust Robinson Humphrey also reported that day that "Anthem remains a key area of focus . . . as investors await resolution. . . . We continue to view much of the risk around Anthem as 'in the stock' given the ~14% sell-off since the uptick in noise around the contract."

204.    In addition, Oppenheimer also reported on April 26, 2016 Defendants' representations that the Company "***believes it will probably be a long, drawn-out (legal) process . . . though said ANTM's $3B/year savings target is 'ludicrous.'***"  Deutsche Bank similarly reported that day that Express Scripts's "[m]anagement expects the legal process to be long and drawn out and described the Anthem claim for a $3B/year price adjustment as extreme," and "maintain[ed] our Sell rating on ESRX shares on concerns over a significant negative revision from the ANTM contract."  Likewise, William Blair reported that the Company's disclosures "provided further evidence that the contract is not likely to extend beyond the 2019 expiration."

205.    Wells Fargo, Oppenheimer, and William Blair each also reported on April 26, 2016 that Express Scripts had shortened the amortization period of the Anthem Contract, resulting in lowered revenues for the Company over the remaining life of the contract.

206.    Defendants again confirmed that Express Scripts's relationship with Anthem was fundamentally broken, and that the companies' litigation would likely be protracted and contentious.  During Goldman Sachs's June 9, 2016 Global Healthcare Conference, Defendant Wentworth answered an analyst's question and described the state of the Anthem Litigation as "in the very early innings of a discovery process that could well take until the end of next year. . . . And, in fact, one of the things I'd want to say is it is going to be a long process, . . . it has to start with understanding that *the contractual claim that is the core of the dispute is the position that they've taken that is not a position we agree with*.  And if we can't get past that, then it's going to be a long couple of years."

**C.    Express Scripts Confirms That Its Relationship With Anthem Is Irreparable And Discloses Anthem's Contributions to the Company's Profits In Order To Prepare Investors For The Impact of Losing Anthem's Business After 2019**

207.    By late 2016, on calls with analysts and in the Company's public filings, Defendants belatedly confirmed what investors now knew and understood – that Express Scripts's relationship with Anthem could not be repaired or saved, and that the companies would not be renewing the Anthem Contract.  For example, on October 16, 2016, during a conference call in connection with Express Scripts's third-quarter 2016 earnings release, a Maxim Group analyst asked for an update on Express Scripts's relationship with Anthem.  Defendant Wentworth replied, "We believe, and I think it's probably known, that Anthem is likely to put an RFP [Request for Proposals] out early next year. . . . They would put an RFP out for their 2020 and beyond business. It wouldn't even shock me if we didn't get a copy of it initially."

208.    Then, on April 24, 2017, in connection with Express Scripts's first-quarter 2017 earnings release, the Company disclosed in a press release filed on Form 8-K that Anthem management told Defendants "that Anthem intends to move its business when the Company's current contract with Anthem expires on December 31, 2019, and that Anthem is not interested in continuing discussions regarding pricing concessions for 2017-2019 or in receiving the Company's proposed pricing for the period beyond 2019." Indeed, the press release stated that while Anthem put out an RFP for a PBM service provider following the end of its contract with Express Scripts, the Company did not even formally participate in the RFP process.

209.    Defendants further admitted in the April 24, 2017 press release that events throughout the Class Period demonstrated that the relationship between Express Scripts and Anthem was so fraught that renewal of the Anthem Contract was not probable. Specifically, the press release included a discussion by Defendant Wentworth of "Anthem's conflicting demands for annual PBM savings, ranging from $700 million in September 2015 to $3 billion in January 2016, its subsequent litigation against us, and now its decision to discontinue discussions altogether." The press release stated that Express Scripts could never agree to Anthem's repeated demands for $3 billion in annual savings under the Anthem Contract, as Express Scripts "makes well below $3 billion annually on the Anthem contract."

210.    In addition, on June 13, 2017, in response to an analyst's question at the Goldman Sachs Global Healthcare Conference, Defendant Wentworth further confirmed that "our operating assumption is [Anthem is] gone in 2020."

211.    Also on April 24, 2017, in connection with the Company's first-quarter 2017 earnings release, Defendants disclosed for the first time that Anthem's contribution to Express Scripts's profits far exceeded Anthem's substantial contribution to Express Scripts's revenues.

Specifically, Defendants disclosed, "Our Anthem contract generated approximately $2.2 billion and $1.9 billion of adjusted EBITDA, or approximately 31% and 26% of our total adjusted EBITDA, in 2016 and 2015, respectively."  Express Scripts further disclosed that, in the first quarter of 2017, $495 million of adjusted EBITDA, or approximately 33.1% of the Company's total adjusted EBITDA, was attributable to Anthem.

212.    And on July 25, 2017, in connection with its second-quarter 2017 earnings release, Express Scripts disclosed that $609 million of adjusted EBITDA, or approximately 33.4% of total adjusted EBITDA, was attributable to Anthem.

| Time Period | Express Scripts Total Adjusted EBITDA | Anthem-Related Adjusted EBITDA | Anthem-Related Adjusted EBITDA as a Percentage of Total Adjusted EBITDA |
|---|---|---|---|
| 2Q2017 | $1.824 billion | $609 million | 33.4% |
| 1Q2017 | $1.496 billion | $495 million | 33.1% |
| Full-Year 2016 | $7.260 billion | $2.248 billion | 31.0% |
| Full-Year 2015 | $7.046 billion | $1.863 billion | 26.4% |

213.    As Express Scripts reported in its first-quarter 2017 earnings release, "Under the terms of our contract with Anthem, Anthem's contribution to our profitability, as a percentage of our total EBITDA and adjusted EBITDA, has grown and *we expect it will continue to increase and exceed its contribution to our revenues,* as a percentage of our total revenues, and that revenues, EBITDA and adjusted EBITDA attributable to Anthem *will increase as the contract nears its termination in 2019*."

## VII. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

214. As set forth herein, Defendants each made numerous materially false and misleading statements and omissions during the Class Period, which communicated falsely to investors that Express Scripts and Anthem had a strong working relationship and that the Anthem Contract (which was a material driver of Express Scripts's reported revenues and profit) likely would be renewed after it expired in 2019 for at least five more years.

### A. Express Scripts's Financial Reporting For Fourth-Quarter And Full-Year 2014

215. On February 23, 2015, one day before the start of the Class Period, Express Scripts issued and filed with the SEC (after the close of trading on February 23, 2015) a Form 8-K and press release (the "February 23, 2015 8-K"), as well as its Annual Report on Form 10-K (the "2014 10-K"), announcing the Company's financial results for the fourth quarter of 2014 and full-year 2014.

216. The 2014 10-K attested that the Company's financial statements "conform[ed] to generally accepted accounting principles in the United States," and was signed by Defendants Paz and Havel, among others. The 2014 10-K contained sworn certifications by Defendants Paz and Havel that attested to the purported accuracy and completeness of the 2014 10-K and its financial statements, including that Paz and Havel "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

217. The February 23, 2015 8-K and press release stated:

Revenue amortization is related to the customer contract with Anthem (formerly known as WellPoint) which commenced upon closing of the NextRx acquisition in 2009.  Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues. Intangible amortization of $26.9 million ($16.7 million net of tax) and $28.5 million ($18.0 million net of tax) is included as a reduction to revenue for the three months ended December 31, 2014 and 2013, respectively.  Intangible amortization of $112.4 million ($70.0 million net of tax) and $114.0 million ($70.1 million net of tax) is included as a reduction to revenue for the year ended December 31, 2014 and 2013, respectively.

218.   Also in the 2014 10-K, Express Scripts discussed its accounting treatment of the Anthem Contract.  Specifically, Express Scripts reported: "Customer contracts and relationships related to our 10-year contract with Anthem (formerly known as WellPoint) under which we provide pharmacy benefit management services to Anthem and its designated affiliates are being amortized using a modified pattern of benefit method over an estimated useful life of 15 years." That statement represented to investors that Express Scripts's relationship with Anthem continued to be strong enough to account for the ten-year Anthem Contract in its publicly reported financial statements as if there were a "high probability" that the Anthem Contract would be renewed for at least an additional five years.

219.   On February 25, 2015, Defendants Paz, Wentworth, Queller, and Havel, among others, held an investor conference call with analysts.  During that meeting, a Goldman Sachs analyst asked whether "there was any update on the Anthem [] relationship," as "[o]bviously that's a big focus, big client for you guys."  Defendant Queller answered:

> *[W]e've got a great relationship with Anthem*.  We're right now working with them very closely to help them prepare for their 1/1/16 business . . . . Our teams work together closely each and every day.  *The relationship is very, very, solid*.  I know they've made mention in Investor Days about contract negotiations, things of that nature. . . . I can tell you that we're helping them rollout new states . . . *and it's business as usual*.  And we look forward to having them as a client through the end of the contract term which is at the end of 2019 and we'd love to have them for a longer time as well.  But we'll continue to work with them very, very closely just as we always do to make them successful.

220.    The statements set forth in Paragraphs 215-19 were materially false and misleading when made because the Express Scripts-Anthem relationship was so impaired that there was insufficient supportable basis under GAAP to conclude that the Anthem Contract likely would be renewed beyond its initial ten-year term, set to expire in 2019.  In light of, among other things, (i) the companies' pricing dispute in 2011 and 2012, which caused severe damage to their relationship; (ii) the contentious negotiations over pricing that had persisted since October 2014 and that Express Scripts has admitted were troubled "from the outset"; (iii) the magnitude of Anthem's $15 billion demand on Express Scripts; and (iv) the notice of breach of the Anthem Contract that Anthem served on Express Scripts on February 16, 2015 (only eight days before the 2014 10-K), it was likely that Anthem would not renew the Anthem Contract, or that Express Scripts and Anthem would modify or renew the Anthem Contract on terms materially less favorable to Express Scripts.  Accordingly, contrary to Defendant Queller's statement to investors, Express Scripts's *then-existing* relationship with Anthem was not "*great*," "*very, very solid*," or "*business as usual*." Given the true, undisclosed facts, Defendant Queller could have declined to comment on Express Scripts's then-exisitng relationship with Anthem, but once he did comment, he was obligated to speak truthfully and completely which he failed to do at the time of his statements.  Given these facts, Express Scripts was required by GAAP (ASC 350-30-35-9) to reevaluate and revise the remaining useful life of the intangible assets related to the Anthem Contract in its publicly filed financial statements and amortize the carrying amount of such assets over a period of less than 15 years as had been set at the outset of the Anthem Contract when Express Scripts "assumed a high probability" that the Anthem Contract would be renewed for a second term after the initial 10-year contract expired.  In addition, Defendants Paz, Wentworth,

and Havel were all present during the February 25, 2015 investor call, but said and did nothing to correct Defendant Queller's false and misleading statements.

221.    Defendants Paz's and Havel's sworn certifications were materially false and misleading when issued because Express Scripts's financial statements were not presented in accordance with GAAP and there were not internal controls sufficient to ensure that the Company's financial statements in the 2014 10-K complied with GAAP, as there was insufficient supportable basis to conclude that Express Scripts's relationship with Anthem continued to be strong enough to account for the Anthem Contract in its publicly reported financial statements as if there were a "high probability" that the Anthem Contract would be renewed for another five years.

**B.    Express Scripts's Financial Reporting For First-Quarter 2015**

222.    On April 28, 2015, Express Scripts issued and filed with the SEC a Form 8-K and press release (the "April 28, 2015 8-K"), as well as its Quarterly Report on Form 10-Q (the "1Q15 10-Q"), announcing the Company's financial results for the first quarter of 2015.

223.    The 1Q15 10-Q stated that "the disclosures contained in this Form 10-Q are adequate to fairly state the information when read in conjunction with the Notes to the Consolidated Financial Statements included in" the 2014 10-K, which attested that the Company's financial statements "conform[ed] to generally accepted accounting principles in the United States." The 1Q15 10-Q was signed by Defendants Paz and Havel and contained sworn certifications by Paz and Havel attesting to the purported completeness and accuracy of the 1Q15 10-Q and its financial statements, including that Paz and Havel "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial

reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

224.   In the April 28, 2015 8-K and press release, Express Scripts stated:

Revenue amortization is related to the customer contract with Anthem (formerly known as WellPoint) which commenced upon closing of the NextRx acquisition in 2009.   Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues. Intangible amortization of $23.8 million ($14.9 million net of tax) and $28.5 million ($17.6 million net of tax) is included as a reduction to revenue for the three months ended March 31, 2015 and 2014, respectively.

225.   The 1Q15 10-Q discussed Express Scripts's accounting treatment of the Anthem Contract.   Specifically, Express Scripts reported:

Amortization of $23.8 million and $28.5 million for customer contracts related to our agreement to provide PBM services to members of the affiliated health plans of Anthem (formerly known as WellPoint) has been included as an offset to revenues for the three months ended March 31, 2015 and 2014, respectively.   The future aggregate amount of amortization expense of other intangible assets is expected to be approximately $1,747.0 million for 2015, $1,741.0 million for 2016, $1,324.0 million for 2017, $1,313.0 million for 2018 and $1,307.0 million for 2019.

The offset amounts related to Express Scripts's amortization of costs related to the Anthem Contract were based on a useful life of 15 years for the Anthem Contract, and represented that Express Scripts's relationship with Anthem continued to be strong enough to account for the contract in Express Scripts's publicly filed financial statements as if there were a "high probability" that the Anthem Contract would be renewed for at least another five years, beyond its initial 10-year term that would expire in 2019.   The future aggregate amortization amounts that Express Scripts reported likewise incorporated those assumptions.

226.   On April 29, 2015, Defendants Paz, Wentworth, and Havel, among others, held an earnings conference call with analysts.   During that call, an analyst from Leerink Partners asked: "Can you please talk about your relationship with Anthem?   I'm sure you guys have a very good

relationship with them.  I think you're about 5 years into a 10-year deal."  Defendant Paz responded

that "Anthem is an incredibly important client to us.  And I think we do very good things together.

***So we really enjoy that relationship***.  We really enjoy providing services to their members. . . . So

***I do think it is a two-way street***."

227.   The statements set forth in Paragraphs 222-26 were materially false and misleading

when made because the Express Scripts-Anthem relationship was so impaired that there was

insufficient supportable basis under GAAP to conclude that the Anthem Contract likely would be

renewed beyond its initial ten-year term, set to expire in 2019.  In light of, among other things, (i)

the companies' pricing dispute in 2011 and 2012, which caused severe damage to their

relationship; (ii) the contentious negotiations over pricing that had persisted since October 2014

and that Express Scripts has admitted were troubled "from the outset"; (iii) the magnitude of

Anthem's $15 billion demand on Express Scripts; (iv) the notice of breach of the Anthem Contract

that Anthem served on Express Scripts on February 16, 2015; (v) the unsuccessful March 6, 2015

JOPC meeting that led Express Scripts to accuse Anthem of failing to engage in good faith; (vi)

Anthem's March 18, 2015 reiteration of its $15 billion re-pricing demand; and (vii) Anthem's

April 1, 2015 second formal notice of breach of the Anthem Contract, it was likely that Anthem

would not renew the Anthem Contract or that Express Scripts and Anthem would modify or renew

the Anthem Contract on terms materially less favorable to Express Scripts.   Accordingly,

Defendant Paz's statements that both Express Scripts and Anthem were at that time "***really

enjoying***" the relationship and it was "***a two-way streeet***" were false and misleading when made.

Given the true, undisclosed facts, Defendant Paz could have declined to comment on Express

Scripts's then-existing relationship with Anthem, but once he did comment, he was obligated to

speak truthfully and completely which he failed to do at the time of his statements.  Given these

facts, Express Scripts was required by GAAP (ASC 350-30-35-9) to reevaluate and revise the remaining useful life of the intangible assets related to Anthem Contract in its publicly filed financial statements and amortize the carrying amount of such assets over a period of less than 15 years as had been set at the outset of the Anthem Contract when Express Scripts "assumed a high probability" that the Anthem Contract would be renewed for a second term after the initial 10-year contract expired.  In addition, Defendants Wentworth and Havel were present during the April 29, 2015 earnings conference call, but said and did nothing to correct Defendant Paz's false and misleading statements.

228.    Defendants Paz's and Havel's sworn certifications were materially false and misleading when issued because Express Scripts's financial statements were not prepared in accordance with GAAP and there were not internal controls sufficient to ensure that the Company's financial statements in the 1Q15 10-Q complied with GAAP, as there was insufficient supportable basis to conclude that Express Scripts's relationship with Anthem continued to be strong enough to account for the Anthem Contract in its publicly filed financial statements as if there were a "high probability" that the Anthem Contract would be renewed for at least another five years.

### C.    Express Scripts's Financial Reporting For Second-Quarter 2015

229.    On July 28, 2015, Express Scripts issued and filed with the SEC a Form 8-K and press release (the "July 28, 2015 8-K"), as well as its Quarterly Report on Form 10-Q (the "2Q15 10-Q"), announcing the Company's financial results for second quarter of 2015.

230.    The 2Q15 10-Q stated that "the disclosures contained in this Form 10-Q are adequate to fairly state the information when read in conjunction with the Notes to the Consolidated Financial Statements included in" the 2014 10-K, which attested that the Company's financial statements "conform[ed] to generally accepted accounting principles in the United

States."   The 2Q15 10-Q was signed by Defendants Paz and Havel, and contained sworn certification by Paz and Havel that attested to the purported accuracy and completeness of the 2Q15 10-Q and its financial statements, including that Paz and Havel "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

231.   In the July 28, 2015 8-K signed by Defendant Havel and press release, Express Scripts stated:

> Revenue amortization is related to the customer contract with Anthem which commenced upon closing of the NextRx acquisition in 2009.  Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues.  Intangible amortization of $23.8 million ($14.8 million net of tax) and $28.5 million ($17.7 million net of tax) is included as a reduction to revenue for the three months ended June 30, 2015 and 2014, respectively.  Intangible amortization of $47.6 million ($29.7 million net of tax) and $57.0 million ($35.3 million net of tax) is included as a reduction to revenue for the six months ended June 30, 2015 and 2014, respectively.

232.   The 2Q15 10-Q discussed Express Scripts's accounting treatment of the Anthem Contract.  Specifically, Express Scripts reported:

> Amortization of $23.8 million and $28.5 million for the three months ended June 30, 2015 and 2014, respectively, and $47.6 million and $57.0 million for the six months ended June 30, 2015 and 2014, respectively, for customer contracts related to our agreement to provide PBM services to members of the affiliated health plans of Anthem (formerly known as WellPoint) has been included as an offset to revenues.  The annual aggregate amount of amortization expense of other intangible assets is expected to be approximately $1,757.0 million for 2015, $1,744.0 million for 2016, $1,329.0 million for 2017, $1,317.0 million for 2018 and $1,311.0 million for 2019.

The offset amounts related to Express Scripts's amortization of costs related to the Anthem Contract were based on a useful life of 15 years for the Anthem Contract, and represented that

Express Scripts's relationship with Anthem continued to be strong enough to account for the Anthem Contract in its publicly filed financial statements as if there were a "high probability" that the Anthem Contract would be renewed for at least another five years, beyond its initial 10-year term that would expire in 2019. The future aggregate amortization amounts that Express Scripts reported likewise incorporated those assumptions.

233. The statements set forth in Paragraphs 229-32 were materially false and misleading when made because the Express Scripts-Anthem relationship was so impaired that there was insufficient supportable basis under GAAP to conclude that the Anthem Contract likely would be renewed beyond its initial ten-year term, set to expire in 2019. In light of, among other things, (i) the companies' pricing dispute in 2011 and 2012, which caused severe damage to their relationship; (ii) the contentious negotiations over pricing that had persisted since October 2014 and that Express Scripts has admitted were troubled "from the outset"; (iii) the magnitude of Anthem's $15 billion demand on Express Scripts; (iv) the notice of breach of the Anthem Contract that Anthem served on Express Scripts on February 16, 2015; (v) the unsuccessful March 6, 2015 JOPC meeting that led Express Scripts to accuse Anthem of failing to engage in good faith; (vi) Anthem's March 18, 2015 reiteration of its $15 billion re-pricing demand; (vii) Anthem's April 1, 2015 second formal notice of breach of the Anthem Contract; (viii) Express Scripts and Anthem's unsuccessful May 27, 2015 dispute-resolution meeting, after which Express Scripts accused Anthem of failing to negotiate in good faith; (ix) Express Scripts's June 22, 2015 refusal to even negotiate Anthem's re-pricing demand; and (x) Anthem's July 24, 2015 announcement that it had agreed to acquire Cigna (just four days prior to the 2Q15 10-Q), and concurrent announcement that Anthem was "examining our optionality vis-à-vis our Express Scripts agreement," it was likely that Anthem would either not renew the Anthem Contract or that Express Scripts and

Anthem would modify or renew the Anthem Contract on terms materially less favorable to Express Scripts. Given these facts, Express Scripts was required by GAAP (ASC 350-30-35-9) to reevaluate and revise the remaining useful life of the intangible assets related to the Anthem Contract in its publicly filed financial statements and amortize the carrying amount of such assets over a period of less than 15 years as had been set at the outset of the Anthem Contract when Express Scripts "assumed a high probability" that the Anthem Contract would be renewed for a second term after the initial 10-year contract expired.

234. Defendants Paz's and Havel's sworn certifications were materially false and misleading when issued because Express Scripts's financial statements were not presented in accordance with GAAP and there were not internal controls sufficient to ensure that the Company's financial statements in the 2Q15 10-Q complied with GAAP, as there was insufficient supportable basis to conclude that Express Scripts's relationship with Anthem continued to be strong enough to account for the Anthem Contract in its publicly filed financial statements as if there were a "high probability" that the Anthem Contract would be renewed for at least another five years, beyond its initial ten-year term.

### D. Express Scripts's Financial Reporting For Third-Quarter 2015

235. On October 27, 2015, Express Scripts issued and filed with the SEC a Form 8-K and press release (the "October 27, 2015 8-K"), as well as its Quarterly Report on Form 10-Q (the "3Q15 10-Q"), announcing the Company's financial results for second quarter of 2015.

236. The 3Q15 10-Q stated that "the disclosures contained in this Form 10-Q are adequate to fairly state the information when read in conjunction with the Notes to the Consolidated Financial Statements included in" the 2014 10-K, which attested that the Company's financial statements "conform[ed] to generally accepted accounting principles in the United States." The 3Q15 10-Q was signed by Defendants Paz and Slusser, and contained sworn

certifications by Defendants Paz and Slusser that attested to the purported accuracy and completeness of the 3Q15 10-Q and its financial statements, including that Paz and Havel "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

237. In the October 27, 2015 8-K signed by Defendant Slusser and press release, Express Scripts stated that:

> Revenue amortization is related to the customer contract with Anthem which commenced upon closing of the NextRx acquisition in 2009. Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues. Intangible amortization of $23.8 million ($14.9 million net of tax) and $28.5 million ($18.0 million net of tax) is included as a reduction to revenue for the three months ended September 30, 2015 and 2014, respectively. Intangible amortization of $71.4 million ($44.6 million net of tax) and $85.5 million ($53.3 million net of tax) is included as a reduction to revenue for the nine months ended September 30, 2015 and 2014, respectively.

238. The 3Q15 10-Q discussed Express Scripts's accounting treatment of the Anthem Contract. Specifically, Express Scripts reported:

> Amortization of $23.8 million and $28.5 million for the three months ended September 30, 2015 and 2014, respectively, and $71.4 million and $85.5 million for the nine months ended September 30, 2015 and 2014, respectively, for customer contracts related to our agreement to provide PBM services to members of the affiliated health plans of Anthem (formerly known as WellPoint) has been included as an offset to revenues. The annual aggregate amount of amortization expense of other intangible assets is expected to be approximately $1,759.0 million for 2015, $1,743.0 million for 2016, $1,329.0 million for 2017, $1,317.0 million for 2018 and $1,311.0 million for 2019.

The offset amounts related to Express Scripts's amortization of costs related to the Anthem Contract were based on a useful life of 15 years for the Anthem Contract, and represented that Express Scripts's relationship with Anthem continued to be strong enough to account for the

Anthem Contract in its publicly filed financial statements as if there were a "high probability" that the Anthem Contract would be renewed for at least another five years, beyond its initial 10-year term that would expire in 2019. The future aggregate amortization amounts that Express Scripts reported likewise incorporated those assumptions.

239.   The statements set forth in Paragraphs 235-38 were materially false and misleading when made because the Express Scripts-Anthem relationship was so impaired that there was insufficient supportable basis under GAAP to conclude that the Anthem Contract likely would be renewed beyond its initial ten-year term, set to expire in 2019. In light of, among other things, (i) the companies' pricing dispute in 2011 and 2012, which caused severe damage to their relationship; (ii) the contentious negotiations over pricing that had persisted since October 2014 and that Express Scripts has admitted were troubled "from the outset"; (iii) the magnitude of Anthem's $15 billion demand on Express Scripts; (iv) the notice of breach of the Anthem Contract that Anthem served on Express Scripts on February 16, 2015; (v) the unsuccessful March 6, 2015 JOPC meeting that led Express Scripts to accuse Anthem of failing to engage in good faith; (vi) Anthem's March 18, 2015 reiteration of its $15 billion re-pricing demand; (vii) Anthem's April 1, 2015 second formal notice of breach of the Anthem Contract; (viii) Express Scripts and Anthem's unsuccessful May 27, 2015 dispute-resolution meeting, after which Express Scripts accused Anthem of failing to negotiate in good faith; (ix) Express Scripts's June 22, 2015 refusal to even negotiate Anthem's re-pricing demand; (x) Anthem's July 24, 2015 announcement that it had agreed to acquire Cigna (just four days prior to the 2Q15 10-Q), and concurrent announcement that Anthem was "examining our optionality vis-à-vis our Express Scripts agreement," and (xi) the failed September 15, 2015 meeting between Express Scripts and Anthem concerning re-pricing, and multiple other failed attempts by the parties to negotiate in October 2015, it was likely

that Anthem would not renew the Anthem Contract or that Express Scripts and Anthem would modify or renew the Anthem Contract on terms materially less favorable to Express Scripts.  Given these facts, Express Scripts was required by GAAP (ASC 350-30-35-9) to reevaluate and revise the remaining useful life of the intangible assets related to the Anthem Contract in its publicly filed financial statements and amortize the carrying amount of such assets over a period of less than 15 years as had been set at the outset of the Anthem Contract when Express Scripts "assumed a high probability" that the Anthem Contract would be renewed for a second term after the initial 10-year contract expired.

240.    Defendants Paz's and Slusser's sworn certifications were materially false and misleading when issued because Express Scripts's financial statements were not presented in accordance with GAAP and there were not internal controls sufficient to ensure that the Company's financial statements in the 3Q15 10-Q complied with GAAP, as there was insufficient supportable basis to conclude that Express Scripts's relationship with Anthem continued to be strong enough to account for the Anthem Contract in its publicly filed financial statements as if there were a "high probability" that the Anthem Contract would be renewed for at least another five years, beyond its initial ten-year term.

### E.    Express Scripts's December 22, 2015 Financial Guidance Call

241.    On December 22, 2015, Defendants Paz, Wentworth, Slusser, and others hosted a conference call with analysts to discuss Express Scripts's financial guidance for 2016.  At the start of that call, Defendant Paz told the analysts that he "want[ed] to address the status of our contract with Anthem, a topic many of you have asked us about."  Paz falsely told investors, "We are *currently in discussions* with Anthem regarding the periodic pricing provisions of the agreement." He added:  "We previously engaged in this review process in 2012, and following several months of discussions, that process ultimately resulted in *mutually beneficial agreement* between both

Express Scripts and Anthem" and misleadingly stated that "We are excited to **_continue productive discussions with Anthem_** regarding our relationship."   Paz further stated that "**_we are fully committed to reaching a mutually beneficial agreement, and continuing our successful working relationship_**.  Since 2009, we have delivered quality care for Anthem's members, and I am proud of what our teams have accomplished."   On the call, a Deutsche Bank analyst asked:  "Is an Anthem repricing considered in the 2016 guidance?  And if not, can you quantify the earnings risk that could be related to the repricing?"   Paz falsely responded that "it is not included in the guidance, because **_we're very early on_**.  And we're in that process, and we're working our way through it."

242.   Defendant Paz's statements set forth in Paragraph 241 were materially false and misleading when made because Paz misrepresented Express Scripts's relationship and the status of its then-existing negotiations with Anthem as "**_current_**," "**_productive_**," and "**_very early on_**," as well as the parties' prior 2012 negotiations as "mutually beneficial" and that there was a substantial likelihood that Express Scripts and Anthem would continue their "successful working relationship" and extend the Anthem Contract beyond 2019.   Moreover, Defendant Paz's statements set forth in Paragraph 241 were materially false and misleading when made in light of, among other things, all of the reasons set forth in Paragraph 239, as well as the numerous failed attempts by both Anthem and Express Scripts thereafter to negotiate re-pricing in October, November, and December 2015, and Anthem's and Express Scripts's failed mediation on November 9, 2015.   Given the true, undisclosed facts, Defendant Paz could have declined to comment on Express Scripts's then-existing relationship with Anthem and the present status of the parties' negotiations, but once he did comment, he was obligated to speak truthfully and completely, which he failed to do at the time of his statements.   For all those reasons, Express

Scripts's relationship with Anthem was fractured and fraught, and it was likely that Anthem would not renew the Anthem Contract, or that Express Scripts and Anthem would modify or renew the Anthem Contract on terms materially less favorable to Express Scripts.  Given these facts, Express Scripts was required by GAAP (ASC 350-30-35-9) to reevaluate and revise the remaining useful life of the intangible assets related to the Anthem Contract in its publicly filed financial statements and amortize the carrying amount of such assets over a period of less than 15 years as had been set at the outset of the Anthem Contract when Express Scripts represented that its relationship with Anthem was strong enough to "assume[] a high probability" that the Anthem Contract would be renewed for a second term after the initial 10-year contract expired.  Defendants Wentworth and Slusser were present during the December 22, 2015 financial guidance call, but said and did nothing to correct Defendant Paz's false and misleading statements.

### F.     Express Scripts's Financial Reporting For Fourth-Quarter And Full-Year 2015

243.    On February 16, 2016, Express Scripts issued and filed with the SEC a Form 8-K and press release (the "February 16, 2016 8-K"), as well as its Annual Report on Form 10-K (the "2015 10-K"), announcing the Company's financial results for the fourth quarter of 2015 and full-year 2015.

244.    The 2015 10-K was signed by Defendants Paz, Slusser, and Wentworth, among others, who attested that the Company's financial statements "conform[ed] to generally accepted accounting principles in the United States."  The 2015 10-K contained sworn certifications by Defendants Paz and Slusser that attested to the purported accuracy and completeness of the 2015 10-K, including that Paz and Slusser "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of

financial statements for external purposes in accordance with generally accepted accounting principles."

245.    The February 16, 2016 8-K and press release stated:

Revenue amortization is related to the customer contract with Anthem which commenced upon closing of the NextRx acquisition in 2009.  Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues.  Intangible amortization of $23.7 million ($14.8 million net of tax) and $26.9 million ($16.7 million net of tax) is included as a reduction to revenue for the three months ended December 31, 2015 and 2014, respectively.  Intangible amortization of $95.1 million ($59.4 million net of tax) and $112.4 million ($70.0 million net of tax) is included as a reduction to revenue for the year ended December 31, 2015 and 2014, respectively.

246.    In the 2015 10-K, Express Scripts discussed its accounting treatment of the Anthem Contract.  Specifically, Express Scripts reported: "Customer contracts related to our 10-year contract with Anthem under which we provide pharmacy benefit management services to Anthem and its designated affiliates ("the PBM agreement") are being amortized using a modified pattern of benefit method over an estimated useful life of 15 years."  In the Company's 2015 Annual Report filed on Form 10-K with the SEC on February 16, 2016, Express Scripts falsely stated that it was "*currently in discussions* with Anthem regarding the periodic pricing review process pursuant to the terms of our PBM agreement with Anthem," and further reassured investors falsely that "we are actively engaged *in good faith discussions* with Anthem and intend to continue to comply with the requirements of the agreement."

247.    On February 17, 2016, Defendants Paz, Slusser, and Wentworth, among others, held an earnings conference call with analysts.  At the start of that call, Defendant Paz told the analysts that "Our team is delivering great service to Anthem and its members.  That has not changed," and that "*we remain fully committed to good faith negotiations* in hopes of reaching a

mutually beneficial agreement within the framework of our 2009 contract.   ***That has not***

***changed***."

248.   Also on that call, a UBS analyst asked Paz:

George, I do appreciate . . . you not wanting to get into the weeds on Anthem so
I'm hoping this is a fairly general question.  I think on your 2016 guidance call back
in December when you voluntarily brought up that 2012 Anthem price review, I
think the point you were trying to make is that these reviews are somewhat routine
and evenutally resolved and that investors shouldn't get too worked up about this.
. . . [I]s there any color on why you think that review back in 2012 seemed to reach
a mutually beneficial conclusion without much fanfare but this one just seems to be
more contentious?  What's changed so much since then, in your view, just generally
speaking?

In response, Paz stated that "I think part of it is, if you look at our total book of business, a lot of

our clients do have what we call price checks.  And in those price checks they have the right to

look at pricing and make sure that we are doing the right things for them.  Those are pretty routine

and we go through those, bunches of those, every year."  Paz further represented that Express

Scripts was "***focused on reaching agreement***" with Anthem.

249.   The statements set forth in Paragraphs 243-48 were materially false and misleading

when made because the Express Scripts-Anthem relationship was so impaired that there was

insufficient supportable basis under GAAP to continue accounting for the Anthem Contract as if

there were a "high probability" that the Anthem Contract would be renewed for at least another

five years, beyond its initial ten-year term which would expire in 2019.  In light of, among other

things, the reasons set forth in Paragraph 239, the failed negotiations by Express Scripts and

Anthem throughout December 2015, January 2016, and February 2016, and Anthem's January 12,

2016 public statements concerning the companies' contract dispute and threatenging litigation, it

was likely that Anthem would not renew the Anthem Contract, or that Express Scripts and Anthem

would modify or renew the Anthem Contract on terms materially less favorable to Express Scripts.

In addition, Defendants' statements in the 2015 10-K that Express Scripts was "***currently in discussions***" and "***actively engaged in good faith discussions***" with Anthem and Defendant Paz's statements that Express Scripts remained "***fully committed to good faith negotiations***" and was "***focused on reaching agreement***" with Anthem were materially false and misleading when made as, among other things, they failed to disclose that mediation between the parties had failed in November 2015 and that on December 15, 2015, Express Scripts advised Anthem that it was under no obligation to negotiate Anthem's pricing proposal, and, thereafter on January 7, 2016, Express Scripts responded to Anthem's demands with a proposal that ***increased*** Anthem's pricing over the life of the contract and post-termination transition period.  Given these facts, Express Scripts was required by GAAP (ASC 350-30-35-9) to reevaluate and revise the remaining useful life of the intangible assets related to the Anthem Contract in its publicly filed financial statements and amortize the carrying amount of such assets over a period of less than 15 years as had been set at the outset of the Anthem Contract when Express Scripts "assumed a high probability" that the Anthem Contract would be renewed for a second term after the initial 10-year contract expired.  In addition, Defendants Slusser and Wentworth were present during the February 17, 2016 conference call, but said and did nothing to correct Defendant Paz's false and misleading statements.

250.   Defendants Paz's and Slusser's sworn certifications were materially false and misleading when issued because Express Scripts's financial statements were not presented in accordance with GAAP and there were not internal controls sufficient to ensure that the Company's financial statements in the 2015 10-K complied with GAAP, as there was insufficient supportable basis to conclude that Express Scripts's relationship with Anthem continued to be

strong enough to account for the Anthem Contract as if there were a "high probability" that the Anthem Contract would be renewed for at least another five years beyond its initial ten-year term.

## VIII.   LOSS CAUSATION

251.   Defendants' materially false and misleading statements alleged herein directly caused the losses incurred by Lead Plaintiff and the Class.  The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public, misrepresenting (i) the true, contentious and broken state of Express Scripts's relationship with its largest customer, Anthem, including their lack of good faith negotiations over re-pricing under the Anthem Contract, and (ii) based on the true, broken state of the Express Scripts-Anthem relationship, the low likelihood that Anthem would renew its contract with Express Scripts for at least another five years after the Anthem Contract expired in 2019. Those materially false and misleading statements and omissions artificially inflated the price of Express Scripts common stock.

252.   That artificial inflation was removed when the conditions misstated and omitted by Defendants were revealed to the market through partial disclosures in January and March 2016. Investors suffered losses as the price of Express Scripts common stock declined when those statements were corrected and the risks concealed by Defendants materialized.

253.   In response to disclosures partially revealing Express Scripts's misstatements, the price of Express Scripts common stock declined in a statistically significant amount net of market movements on four consecutive trading days, from January 13, 2016 to January 19, 2016.

254.   On January 12, 2016, after the market closed, Anthem executives publicly announced that Anthem believed it was entitled under the Anthem Contract to a $3 billion annual decrease in pricing from Express Scripts, totaling approximately $13 billion over the remainder of the Anthem Contract, and that Anthem would consider terminating or not renewing its relationship

with Express Scripts if Express Scripts did not provide that pricing adjustment, and was considering litigation.  In response to these disclosures, as set forth in ¶¶ 146-54 above, numerous security analysts issued negative reports and Express Scripts common stock dropped from a closing price of $85.58 per share on January 12, 2016, to a closing price of $79.69 per share on January 13, 2016, a statistically significant 6.9% decline.

255.    On January 14, 2016, the market continued to digest Anthem's announcement and threatened litigation.  As set forth in ¶ 155 above, analyst William Blair issued a report noting that the Anthem Contract was likely to be re-priced or shifted to a competitor.  Express Scripts common stock dropped by an additional $2.18 per share to close at $77.51 per share on January 14, 2016, an additional statistically significant decline of 2.7%.

256.    In total, between January 13 and 14, 2016, Anthem's revelations caused Express Scripts's common stock price to drop by $8.07 per share, or 9.4%.

257.    On January 15, 2016, the market continued to react to the wide gulf between Anthem's characterizations of its fraught relationship with Express Scripts and Express Scripts's own prior, positive, characterizations.  As set forth in ¶ 157 above, analyst Baird lowered its price target for Express Scripts and noted that it could not "true up" Express Scripts's cautiously optimistic tone in its December 22, 2015 guidance call and Anthem's January 12, 2016 statements.  In response to that news, Express Scripts common stock dropped by $2.92 per share to close at $74.59 per share on January 15, 2016, a statistically significant 3.8% decline.

258.    On January 19, 2016, the next consecutive trading day after a three-day weekend, the market continued to digest news concerning Express Scripts's contentious relationship with Anthem, including the substantial likelihood that Anthem would leave Express Scripts to partner with a different PBM and/or bring its PBM services in house, including the report from Leerink

set forth in ¶¶ 159-60 above.  In response to that news, Express Scripts common stock dropped by $2.21 per share to close at $72.38 per share, a statistically significant 3.0% decline.

259.    Express Scripts stock never meaningfully recovered from its significant drops between January 13 and 19, 2016, through the end of the Class Period.  Indeed, despite the February 25, 2016 announcement of a stock repurchase that drove up the price of the Company's common stock by a statistically significant amount, Express Scripts common stock closed above $72.38 per share only once and just barely, when it closed at $72.40 per share on March 3, 2016.

260.    On March 21 and 22, 2016, the full truth about Express's Scripts irreparably broken relationship with Anthem was revealed when Anthem filed its complaint in the Anthem Litigation. When the market opened on March 21, 2016, Express Scripts common stock was trading at $69.39 per share.  News of the lawsuit became public at 10:57 a.m. through an Anthem press release.  The market reacted immediately, and Express Scripts's common stock price dropped to a price of $67.08 at or about 11:15 a.m.  By the close of the market on March 21, 2016, the Anthem Complaint was not publicly available.  Express Scripts rebounded to close at $69.34 per share on March 21, 2016, a $0.14 drop from the prior day's close.

261.    On March 22, 2016, at 9:35 a.m., the Court granted Anthem's sealing motion, and a redacted version of the Anthem Complaint became publicly available shortly thereafter.  The allegations in the Anthem Complaint further revealed the truth and were covered by securities analysts as discussed in ¶¶ 183-91 above.  In response, Express Scripts common stock dropped by $1.82 per share to close at $67.52, a statistically significant 2.6% decline.

262.    Accordingly, the decline in Express Scripts's common stock price was a direct and proximate result of Defendants' material misstatements and omissions being revealed to investors and to the market through a series of disclosures.  As a result of their purchases of Express Scripts

publicly traded common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss and damages.

263.    The timing and magnitude of Express Scripts's stock price decline negates any inference that the economic losses and damages suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

## IX.    SUMMARY OF SCIENTER ALLEGATIONS

264.    As alleged herein, Express Scripts and the Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company detailed in Section VII above were materially false or misleading, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

265.    The following allegations detailed in Sections IV-VI above, viewed collectively, support a strong inference that Express Scripts and each of the Individual Defendants acted with scienter:

a.      The First Round Of Pricing Negotiations Damaged The Anthem Relationship.    As described above in ¶¶ 67-71, Anthem and Express Scripts's 2012 pricing negotiations damaged the parties' relationship even prior to the start of the Class Period.    Those negotiations took "approximately one year," nearly led to litigation, and left Anthem asserting that it was forced to pay "above market pricing."    ¶¶ 67-71.    These facts support a strong inference that Defendants knew (or were at least reckless in not knowing) that those prior negotiations did not result in "mutually beneficial agreement" as Defendants later stated, and that Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

b.      Anthem Announced Its Intention To "Pivot" And "Re-engage" The Anthem Contract.    As described above in ¶¶ 72 and 74, on March 21, 2014, during Anthem's Annual Investor Day, Anthem management explained that the Anthem Contract expired in five years and that Anthem expected to

renegotiate the pricing provisions of that contract in the following three to five years.  During a June 10, 2014 Goldman Sachs Healthcare Conference, Anthem reiterated that Anthem was going to "start building a strategy with respect to how we're going to pivot given that we've got a five-year contract life left with Express Scripts" and that Anthem was "now looking what are our options with respect to how we might re-engage in the PBM landscape." These facts support a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound," and renewal of the Anthem Contract after 2019 for at least five more years was not likely nor "highly probable."

c.  <u>Anthem Took A Very Aggressive Approach To The Second Price Check Under Griffin And Refused To Provide Industry-Standard Information To Express Scripts</u>.  As described above in ¶¶ 73, 75-79, and 81, on or about April 2014, Anthem appointed Griffin as President of Anthem's pharmacy division and made him responsible for overseeing Anthem's business relationship with Express Scripts.  As Express Scripts admitted in its Counterclaims, under Griffin, Anthem's approach to the periodic pricing review process became more aggressive.  For example, Griffin initially took the position that the price check needed to be completed by the end of 2014, which according to Express Scripts was inconsistent with the timing provision of the Anthem Contract and the timing of Anthem's commencement of the first round of pricing negotiations.  In addition, Anthem refused to share with Express Scripts analysis conducted by Health Strategy, which supported Anthem's demand, even though the provision of such information is standard in the industry.  Moreover, Anthem took the position that any pricing proposal that is based on recommendations about modernizing Anthem's benefit design does not comply with Section 5.6 of the Anthem Contract.  These facts support a strong inference that Defendants knew (or were at least reckless in not knowing) that negotiations over the second price check would be contentious, lengthy, and difficult to predict, rendering renewal of the Anthem Contract after 2019 for at least five more years neither likely nor "highly probable."  These facts further support a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

d.  <u>Anthem Delivered Corrective Actions Measures To Express Scripts</u>.  As described above in ¶ 84, Anthem issued multiple corrective action measures to Express Scripts, thereby indicating to Express Scripts that Anthem was deeply unhappy with Express Scripts's failure to perform its obligations. These corrective action measures included, among others, CAP #104 in April 2012 and CAP #123 on February 4, 2014.

e. Anthem Notified CMS Repeatedly Regarding Express Scripts's Failure To Meet Certain Federal Requirements. As described above in ¶¶ 86 and 119, Anthem notified CMS of Express Scripts's failure to meet certain Medicare Part D functions multiple times throughout 2014 and 2015.

f. Anthem Commenced The Second Round Of Pricing Negotiations Before Its Right To A Market Check Had Even Ripened. As described in ¶ 80 above, Anthem commenced a second round of pricing negotiations with Express Scripts in October 2014, when Anthem's right to trigger periodic pricing review under the Anthem Contract had not yet ripened. The timing of the demand demonstrates Anthem's aggressive approach to the price check and lack of confidence in the parties' ability to reach a resolution.

g. Anthem Demanded *$15 Billion* In Pricing Concessions From Express Scripts. As described above in ¶ 80, on October 17, 2014, Anthem demanded from Express Scripts $15 billion in pricing concessions over the remaining four years and post-termination period of the Anthem Contract. The size and magnitude of this demand would result in price changes of more than $3 billion per year. These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that the Company's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

h. Negotiations Over The Second Price Check Were Troubled "From The Outset." As described above in ¶ 80, Express Scripts admitted in its Counterclaims that "[f]rom the outset of negotiations in October 2014 . . . Anthem took positions regarding the parties' rights and obligations . . . that were inconsistent with the plain terms of the [Anthem Contract]." These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

i. The Parties Fundamentally Disagreed About Whether Anthem Was Entitled To "Competitive Benchmark Pricing" At All. As described above in ¶ 82, by December 2014, with Anthem's $15 billion demand still outstanding, Anthem and Express Scripts had reached a fundamental disagreement about

whether Section 5.6 of the Anthem Contract imposed an affirmative obligation on Express Scripts to provide Anthem with "competitive benchmark pricing" at all.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

j.   <u>The Parties Vigorously Disputed Whether $15 Billion Constituted "Competitive Benchmark Pricing" Under The Anthem Contract</u>.  As described above in ¶ 82, by December 2014, with Anthem's $15 billion demand still outstanding, Anthem and Express Scripts vigorously disputed whether $15 billion reflected "competitive benchmark pricing" that Anthem was entitled to under Section 5.6 of the Anthem Contract.  Indeed, it was and is Express Scripts's position that there have not been any changes to the PBM industry since the conclusion of the first periodic pricing review in November 2013 that would justify price changes of more than $3 billion per year nor was Anthem entitled to any such adjustment in all events.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

k.   <u>Anthem Served Express Scripts With Notice Of Operational Breaches Of The Anthem Contract</u>.  As described above in ¶ 83, on February 16, 2015, Anthem served Express Scripts with a 14-page single-spaced letter detailing numerous operational breaches of the Anthem Contract by Express Scripts. These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

l.    <u>Anthem Reiterated Its $15 Billion Demand In A March 18, 2015 Letter</u>.  As described above in ¶ 96, on March 18, 2015, Anthem reiterated its $15 billion demand, providing notice to Express Scripts that Anthem had performed a market analysis under Section 5.6 of the Anthem Contract, and determined that the pricing terms under that contract were not competitive.  As described above in ¶ 80, the size and magnitude of the $15 billion demand would result in price changes of more than $3 billion per year, which was massive.  Moreover, as described above in ¶ 82, by March 2015, Express Scripts and Anthem already disputed whether Anthem was entitled to "competitive market pricing" under the Anthem Contract at all, and also whether $15 billion constituted such pricing.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

m.    <u>Express Scripts And Anthem Submitted Their Operational Dispute To The JOPC, Thereby Conceding That Such Dispute Was Material</u>.  As described above in ¶ 87, Section 16.5 of the Anthem Contract required a three-step dispute resolution procedure for material disputes.  The first step of that procedure was for the parties to submit their dispute to a Joint Operating Pharmacy Committee ("JOPC"), which has 15 days to meet in person and make a good faith effort to resolve such dispute.  As described above in ¶ 95, on March 6, 2015, the JOPC met in an effort to resolve the parties' dispute concerning Express Scripts's operational breaches of the Anthem Contract.  That meeting was unsuccessful and Express Scripts accused Anthem of failing to engage in a good faith effort to resolve the parties' material dispute during the meeting.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

n.    <u>Anthem Served Express Scripts With Notice Of Pricing Breaches Under The Anthem Contract</u>.  As described above in ¶ 97, on April 1, 2015, Anthem provided Express Scripts with formal notice of pricing breach under Section 6.2(a) of the Anthem Contract.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not

knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

o.     <u>Express Scripts Refused To Cure The Pricing Breaches Under The Anthem Contract</u>.  As described above in ¶ 97, pursuant to Section 6.2(a) of the Anthem Contract, Express Scripts was obligated to cure its pricing breach of the Anthem Contract within a specified cure period, which ended before June 22, 2015.  During the period from April 1, 2015 through June 22, 2015, Express Scripts refused to cure the pricing breaches and continued to breach the Anthem Contract by, *inter alia*, refusing to negotiate with Anthem concerning the proposed pricing terms or making a counterproposal.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

p.     <u>Anthem Reported Over 150 Issues With Express Scripts's Performance Through The WRIT</u>.  As described above in ¶ 98, under the Anthem Contract, the parties established a joint database to track and monitor issues relating to Express Scripts's performance of PBM services for Anthem. Using this system, Anthem brought 156 new issues to Express Scripts's attention between April 17 and December 31, 2015.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

q.     <u>Defendant Wentworth And The President Of Anthem Met And Failed To Resolve Their Material Operational Dispute</u>.  As described above in ¶ 87, Section 16.5 of the Anthem Contract required a three-step dispute resolution process for material disputes.  The second step of that procedure was for the

Presidents of ESI and Anthem to meet.  As described above in ¶ 106, on May 27, 2015, the Presidents of Express Scripts (Defendant Wentworth) and Anthem held a meeting concerning their material operational disputes. The meeting was not successful, and Express Scripts again accused Anthem of failing to act in good faith during the meeting.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

r.  <u>Express Scripts Rejected Anthem's Pricing Terms And Failed To Negotiate Or Make A Counterproposal</u>.  As described above in ¶ 108, on June 22, 2015, Express Scripts contacted Anthem and refused to accept Anthem's pricing terms.  Express Scripts also failed to negotiate over Anthem's proposed terms or make any counterproposal.  Moreover, Express Scripts and Anthem accused each other of failing to act in good faith.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

s.  <u>Anthem's Acquisition Of Cigna Made It Less Dependent On Express Scripts And More Committed To Obtaining Aggressive Price Concessions</u>. As described above in ¶ 112 on July 24, 2015, Anthem announced that it intended to acquire Cigna for $54.2 billion.  As multiple analysts observed, the acquisition made it more likely that Anthem would continue to pursue aggressive price concessions from Express Scripts in connection with the re-negotiation of the Anthem Contract.  Indeed, Anthem stated during a July 24, 2015 conference call when it announced the acquisition that it was actively "examining our optionality vis-à-vis our Express Scripts agreement."  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing

relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

t.     <u>Express Scripts And Anthem Met Concerning The Pricing Renewal, And Express Scripts Continued To Refuse To Negotiate In Good Faith</u>.  As described above in ¶ 124, on September 15, 2015, Express Scripts and Anthem held another meeting concerning the companies' relationship, including contract renewal.  At the meeting, the parties did not agree on a proposal for competitive benchmark pricing, and Anthem accused Express Scripts of failing to negotiate in good faith.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

u.     <u>Express Scripts Continued To Refuse To Negotiate Over The Pricing Terms Of The Anthem Contract</u>.  As described above in ¶ 124, on October 2, 2015, Express Scripts contacted Anthem, but again refused to negotiate over the pricing terms of the Anthem Contract.  On October 8, 2015, Anthem reiterated in an email that Express Scripts was obligated under the Anthem Contract to ensure that Anthem was receiving competitive benchmark pricing.  On October 19, 2015, Defendant Wentworth asked Anthem to meet, but continued to refuse to negotiate over the pricing terms of the Anthem Contract.  Similarly, as described above in ¶ 131, on November 5, 2015, Anthem again contacted Express Scripts in an attempt to meet, but Express Scripts did not agree to a meeting.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

v.     <u>Express Scripts And Anthem Mediated Their Material Disputes And The Mediation Failed</u>.  As described above in ¶ 132, on November 9, 2015, pursuant to the dispute resolution process for material disputes in the Anthem Contract, Express Scripts and Anthem engaged in required mediation.  The mediation failed.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely

nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

w.  <u>Anthem Contacted Defendant Wentworth Directly Concerning The Pricing Dispute Because "He Had Been A Key [Express Scripts] Representative With Respect To The Pricing Issue."</u>  As described above in ¶ 133, on November 11, 2015, Anthem contacted Defendant Wentworth to request a meeting and negotiate concerning competitive benchmark pricing under the Anthem Contract because Wentworth "had been a key representative with respect to the pricing issue."  Express Scripts again refused to meet or negotiate.  As described above in ¶ 134, on November 23, 2015, Anthem again emailed Express Scripts to request a meeting to negotiate concerning the pricing terms of the Anthem Contract.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

x.  <u>Anthem Sent Express Scripts A Revised Pricing Proposal That Expressly Detailed Defendants' Failure Since March 18, 2015 To Negotiate Competitive Benchmark Pricing Under The Anthem Contract</u>.  As described above in ¶ 136, on December 2, 2015, Anthem sent Express Scripts a revised pricing proposal that expressly detailed Defendants' failure since March 18, 2015 to negotiate competitive benchmark pricing under the Anthem Contract.  Among other things, the letter stated, "Months have elapsed, but ESI has refused to negotiate for competitive benchmark pricing, as required under Section 5.6 of the [Anthem Contract]." These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

y.  <u>Anthem Again Contacted Defendant Wentworth Directly Concerning The Pricing Dispute</u>.  As described above in ¶ 137, on December 14, 2015, Anthem again emailed Defendant Wentworth concerning Express Scripts's

failure to negotiate competitive benchmark pricing.  Among other things, the letter asked whether Express Scripts would be willing to reconsider its positions that "it is not required to offer Anthem competitive benchmark pricing" and that "it has the right to veto competitive benchmark pricing to Anthem," thereby confirming the parties' ongoing disputes.  The letter further asked Defendant Wentworth for a "meeting among the decision-makers."  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

z.   <u>Express Scripts Reiterated To Anthem That It Was Under No Obligation To Negotiate Anthem's Pricing Proposal And Could Veto Any Such Negotiation</u>.  As described above in ¶ 138, on December 15, 2015, Express Scripts responded to Anthem's December 14 email by stating, *inter alia*, that it was under no obligation to negotiate Anthem's pricing proposal and could veto any such negotiation.  Express Scripts also refused to meet or discuss the pricing terms it was offering to other current or prospective customers, as Anthem had requested.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

aa.  <u>Express Scripts Sent Anthem An Unacceptable Proposal That Would Actually Increase Pricing</u>.  As described above in ¶ 145, on January 7, 2016, Express Scripts sent Anthem a proposal that lowered pricing under the Anthem Contract by $1 billion – ***less than 8%*** of the $13 billion that Anthem had consistently demanded through the end of the contract from Express Scripts since October 2014 – but actually ***increased*** prices overall when considering the post-termination period.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly

described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

bb.     <u>Express Scripts Reiterated That It Was Not Obligated To Provide Competitive Benchmark Pricing Or Disclose The Pricing Terms It Offered Other Customers.</u>  As described above in ¶ 168, on January 26, 2016, Express Scripts reiterated to Anthem that it was not obligated to provide competitive benchmark pricing.  On the same day, Express Scripts reiterated that it would not disclose pricing terms it was offering to its other customers, as Anthem had requested.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

cc.     <u>Express Scripts Refused To Engage In Good Faith Negotiations During A Meeting Between Defendant Wentworth And Anthem</u>.  As described above in ¶ 172, on February 3, 2016, Anthem met with Defendant Wentworth in St. Louis.  During the meeting, Express Scripts refused to engage in good faith negotiations and reiterated its position that it was not obligated to negotiate over Anthem's pricing terms.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

dd.     <u>Express Scripts Reiterated Its January 7, 2016 Counterproposal That It Knew Was Unacceptable To Anthem</u>.  As described above in ¶ 173, on February 12, 2016, Express Scripts sent Anthem a proposal that was the same as its January 7, 2016 counterproposal.  As described above in ¶ 144, the January 7, 2016 proposal was unacceptable to Anthem because it actually increased pricing.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-

existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

ee.  <u>Express Scripts Refused To Negotiate In Good Faith At Meetings In February And March 2016</u>.  Anthem and Express Scripts met on February 18, 2016 and March 1, 2016.  As described above in ¶ 180, Defendant Paz attended the March 1, 2016 meeting.  At both meetings, Express Scripts refused to negotiate in good faith or make a proposal for competitive benchmark pricing.  Express Scripts further reiterated its position that it was not obligated to share pricing information for its customers, as Anthem had requested.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP; and Express Scripts's then-existing relationship with Anthem could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

ff.  <u>Express Scripts Admitted That The Anthem Contract Should Be Amortized Over The Remaining Term Of The Contract</u>.  As described above in ¶¶ 197-201, on April 25, 2016, Express Scripts finally admitted that due to the "***sequence of recent events regarding our discussions with Anthem***, culminating in the filing of the lawsuit on March 21, 2016," it had amortized the Anthem Contract over the remaining term of the 10-year contract instead of 15 years.  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable" and Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract were materially understated in violation of GAAP.

gg.  <u>Express Scripts Admitted That The Parties Were Engaged In A Yearlong Dispute In Its Counterclaims</u>.  As described above in ¶ 194, on June 13, 2016, Express Scripts filed a 267-paragraph-long answer and amended counterclaims against Anthem in the Anthem Litigation.  The Answer and Counterclaims admit that the parties were engaged in a nearly yearlong bitter dispute concerning the pricing and operational terms of the Anthem Contract.  On April 26, 2016, Defendant Paz finally revealed that he thought Anthem's October 17, 2014 demand for $3 billion in annual price reductions was "pretty ludicrous" (¶ 202), and on June 9, 2016, Defendant Wentworth and warned that if Anthem continued with that position the dispute would be " a long couple of years" of litigation (¶ 206).  These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem

was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract during the Class Period were materially understated in violation of GAAP; and Express Scripts's relationship with Anthem could not be fairly described to investors during the Class Period as "great," "very, very solid," "business as usual," or "strong and sound."

hh.   <u>Defendants Queller, Paz And Wentworth Repeatedly Represented That Express Scripts And Anthem "Work Closely" Together, And Held Themselves Out As Personally Familiar With The Parties' Negotiations</u>. As described above in ¶¶ 91-92, 116, and 140-41, throughout the Class Period, Defendants Queller, Paz and Wentworth repeatedly represented that Express Scripts and Anthem, its largest customer, "work closely" together and they were each aware of and personally familiar with the interactions between Express Scripts and Anthem. For example, on February 25, 2015, Defendant Queller stated, "we're right now working with [Anthem] very closely" and "[o]ur teams work closely each and every day." During the same call, Defendant Queller addressed the parties' relationship, including negotiations and renewal of the Anthem Contract, reiterating, "we'll continue to work with [Anthem] very, very closely just as we always do . . . ." As another example, on July 29, 2015, Defendant Wentworth touted the Company's "close collaboration with our clients." On December 22, 2015, Defendant Paz underscored, "we work closely with our clients . . . ." During the same call, Defendant Paz stated with respect to the Anthem Contract, "We are excited to continue productive discussions with Anthem regarding our relationship . . . ." These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship during the Class Period with Anthem was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract during the Class Period were materially understated in violation of GAAP; and Express Scripts's relationship with Anthem during the Class Period could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

ii.   <u>Defendants Paz And Wentworth Had Active "Key" Personal Involvement In The Anthem Dispute</u>. As described above in ¶¶ 72-192, throughout the Class Period, Defendants Paz and Wentworth had active "key" personal involvement in the Anthem discussions, given the importance of the Anthem Contract to Express Scripts's business. For example, on August 29, 2014, Anthem emailed Wentworth directly, demanding changes to the Anthem Contract. ¶ 79. Wentworth continued to be an active participant in the parties' pricing dispute throughout the Class Period, receiving emails from Anthem and attending meetings regarding the pricing dispute in November and December 2015 (¶¶ 133,137) and February 2016 (¶ 172).

As Anthem stated in a November 11, 2015 email to Wentworth, Wentworth "had been a key [Express Scripts] representative with respect to the pricing issue. ¶ 133. Wentworth also actively participated in the parties' required meeting of the Presidents of each organization on May 27, 2015. ¶ 106. Defendant Paz also directly participated in the parties' disputes, including in a March 1, 2016 meeting with Anthem where Express Scripts continued to refuse to negotiate. ¶ 180.

jj.   <u>Anthem Was At The Core Of Express Scripts's Business</u>. As described above in ¶¶ 36-37, Anthem represented 16.3% of Express Scripts's consolidated revenue and 26.4% of adjusted EBITDA for the period ending December 31, 2015, and was Express Scripts's largest and most important client. As such, Express Scripts's relationship with Anthem was at the core of Express Scripts's business. These facts give rise to a strong inference that Defendants knew (or were at least reckless in not knowing) that Express Scripts's relationship with Anthem during the Class Period was so fraught that renewal of the Anthem Contract after 2019 for at least five more years was neither likely nor "highly probable"; Express Scripts's recorded offsets to revenue relating to the amortization of intangibles for the Anthem Contract during the Class Period were materially understated in violation of GAAP; and Express Scripts's relationship with Anthem during the Class Period could not be fairly described to investors as "great," "very, very solid," "business as usual," or "strong and sound."

266.   All of these facts, viewed collectively, support a strong inference of Express Scripts's and the Individual Defendants' scienter.

## X.   PRESUMPTION OF RELIANCE

267.   Lead Plaintiff and Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

268.   Lead Plaintiff and Class members are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Express Scripts common stock was open, efficient and well developed for the following reasons, among others:

a. Express Scripts common stock met the requirements for listing and was listed and actively traded on NASDAQ, a highly efficient and automated market;

b. The price of Express Scripts common stock reacted promptly to the dissemination of new information regarding the Company. Express Scripts common stock was actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional investor participation. The average daily trading volume for Express Scripts common stock during the Class Period was 4,493,739 shares and the average weekly volume as a percentage of shares outstanding was 3.23%;

c. As a regulated issuer, Express Scripts filed periodic reports with the SEC and NASDAQ;

d. Express Scripts regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

e. Express Scripts was followed extensively by the media, and by numerous securities analysts employed by major brokerage firms who wrote at least 350 analyst reports about Express Scripts during the Class Period that were distributed to those brokerage firms' sales forces and certain customers. Each of those reports was publicly available and entered the public marketplace.

269.    As a result of the foregoing, the market for Express Scripts common stock promptly digested current information regarding Express Scripts from all publicly available sources and reflected such information in Express Scripts's stock price.  Under these circumstances, all purchasers of Express Scripts common stock during the Class Period suffered similar injury through their purchase of Express Scripts common stock at artificially inflated prices, and a presumption of reliance applies.

## XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

270.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.

271.   None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Express Scripts's existing relationship with Anthem.

272.   Further, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, including Express Scripts's public filings issued throughout the Class Period.

273.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.   As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Express Scripts's relationship with Anthem and the risk of non-renewal of the Anthem Contract.   Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Express Scripts were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

274.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false and misleading forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the false and

misleading forward-looking statement was authorized and/or approved by an executive officer of Express Scripts who knew that the statement was false or misleading when made.

## XII.    CLASS ACTION ALLEGATIONS

275.    Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the common stock of Express Scripts between February 24, 2015 and March 21, 2016, inclusive (the "Class Period"), and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and directors of Express Scripts at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, and any entity in which Defendants or their immediate families have or had a controlling interest. For the avoidance of doubt, "affiliates" are persons or entities that directly, or indirectly through one or more intermediaries, control, are controlled by, or are under common control with one of the Defendants, and include any employee benefit plan organized for the benefit of Express Scripts's employees.

276.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Express Scripts shares were actively traded on the NASDAQ.  As of August 30, 2017, Express Scripts had over 577 million shares of common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of thousands of members of the proposed Class.  Class members who purchased Express Scripts common stock may be identified from records maintained by Express Scripts or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

277.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

278.    Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation.

279.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

  a. Whether the federal securities laws were violated by Defendants' acts as alleged herein;

  b. Whether the SEC filings, press releases, reports, and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

  c. Whether and to what the extent the market prices of the Company's securities were artificially inflated during the Class Period due to the non-disclosures and/or misrepresentations complained of herein;

  d. Whether Defendants acted with scienter; and

  e. Whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and if so, the proper measure thereof.

280.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  In addition, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   CLAIMS FOR RELIEF

### COUNT I

**For Violation Of Section 10(b) Of The Exchange Act And
SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

281.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

282.    This Count is asserted on behalf of all members of the Class against all Defendants (Express Scripts, Paz, Wentworth, Slusser, Queller, and Havel) for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

283.    During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

284.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases or other acquisitions of Express Scripts common stock during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to, Express Scripts's damaged relationship with Anthem and the risk of non-renewal of the Anthem Contract.

285.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above materially false and misleading statements intentionally or with reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Express Scripts common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Express Scripts's relationship with Anthem and the risk of non-renewal of the Anthem Contract; (b) artificially inflate and maintain the market price of Express Scripts common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Express Scripts common stock at artificially inflated prices, and suffer losses when the true facts became known.

286.    Defendant Express Scripts is liable for all materially false and misleading statements made during the Class Period, as alleged above, including the false and misleading statements in:

       a.    The 2014 10-K;

       b.    The February 23, 2015 8-K;

       c.    The 1Q15 10-Q;

       d.    The April 28, 2015 8-K;

       e.    The 2Q15 10-Q;

       f.    The July 28, 2015 8-K;

       g.    The 3Q15 10-Q;

       h.    The October 27, 2015 8-K;

     i.      The 2015 10-K; and

     j.      The February 16, 2016 8-K.

287.    Defendant Express Scripts is further liable for the false and misleading statements made by Express Scripts officers in press releases and during conference calls and at conferences with investors and analysts, as alleged above, as the makers of such statements under the principle of respondeat superior.  These statements are set forth in Section VII above.

288.    Defendants Paz, Wentworth, Slusser, Queller, and Havel, as top executive officers of the Company during their respective tenures, are liable as direct participants in the wrongs complained of herein.  Defendants Paz, Wentworth, Slusser, Queller, and Havel are liable for the false and misleading statements they personally made and/or signed as follows:

     a.      Defendant Paz: the 2014 10-K, 1Q15 10-Q, 2Q15 10-Q, 3Q15 10-Q, and 2015 10-K, and on the Company's April 29, 2015 earnings conference call, December 22, 2015 financial guidance conference call, and February 17, 2016 earnings conference call;

     b.      Defendant Wentworth: the 2015 10-K;

     c.      Defendant Slusser: the 3Q15 10-Q, the October 27, 2015 8-K, and 2015 10-K;

     d.      Defendant Queller: the Company's February 25, 2015 earnings conference call; and

     e.      Defendant Havel: the 2014 10-K, 1Q15 10-Q, 2Q15 10-Q, and the July 28, 2015 8-K.

289.    As described above, the Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers of Express Scripts common stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

290.    The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Express Scripts, which resulted in continuous and material misstatements and omissions about the Company's relationship with Anthem and the risk of non-renewal of the Anthem Contract, establish a strong inference that Defendants Express Scripts, Paz, Wentworth, Slusser, Queller, and Havel acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

291.    Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Express Scripts common stock, which inflation was removed from the prices of their shares when the true facts became known. Lead Plaintiff and the Class would not have purchased Express Scripts common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially false and misleading statements.

292.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of Express Scripts common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against The Individual Defendants)

293.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

294.    This Count is asserted on behalf of all members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

295.    During their tenures as officers and/or directors of Express Scripts, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Express Scripts, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  Each of these Defendants was able to and did control, directly and indirectly, the content of the public statements made by Express Scripts during their tenures at Express Scripts during the Class Period, which include Express Scripts's materially false and misleading financial statements contained therein, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

296.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its financial, regulatory and legal compliance, internal control procedures, and its accounting and reporting functions.   Defendants Paz, Wentworth, Slusser, and Havel signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and/or certifying and/or approving the false statements disseminated by Express Scripts during the Class Period.  Defendant Paz, as Chairman and CEO, Defendant Wentworth, as President, Defendant Slusser, as CFO,  Defendant Queller, as Senior Vice President – Sales & Account Management, and Defendant Havel, as Executive Vice President and Interim CFO, were also directly responsible for controlling, and did control, the Company's violations of GAAP, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by Express Scripts during the Class Period.  As

a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of Express Scripts within the meaning of Section 20(a) of the Exchange Act.

297.   As set forth above, Express Scripts violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Express Scripts and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Express Scripts common stock.  Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Express Scripts, each of these Defendants was culpable for the material misstatements and omissions made by Express Scripts, as set forth above.

298.   As a direct and proximate result of the Individual Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Express Scripts common stock.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

    a.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

    b.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    c.    Awarding Lead Plaintiff and members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

     d.      Awarding such equitable, injunctive and other relief as the Court may deem just

and proper.

## XV.    JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated:  August 30, 2017

                                    **BERNSTEIN LITOWITZ BERGER
                                    & GROSSMANN LLP**

                                    /s/ Salvatore J. Graziano
                                    Salvatore J. Graziano
                                    Adam D. Hollander
                                    Rebecca E. Boon
                                    1251 Avenue of the Americas
                                    New York, NY 10020
                                    Telephone: (212) 554-1400
                                    Facsimile: (212) 554-1444
                                    Email: Salvatore@blbglaw.com
                                    Email: Adam.Hollander@blbglaw.com
                                    Email: Rebecca.Boon@blbglaw.com

                                    Blair Nicholas
                                    12481 High Bluff Drive, Suite 300
                                    San Diego, CA  92130
                                    Telephone: (858) 793-0070
                                    Facsimile:  (858) 793-0323
                                    Email:  BlairN@blbglaw.com

                                    *Counsel for Lead Plaintiff TIAA*