UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE EXPRESS SCRIPTS HOLDING
COMPANY SECURITIES LITIGATION

**OPINION AND ORDER**

16 Civ. 3338 (ER)

Ramos, D.J.:

In this putative class action against Express Scripts Holding Company ("Express Scripts"), Lead Plaintiff Teachers Insurance and Annuity Association ("Plaintiff" or "TIAA"), asserts causes of action individually and on behalf of similarly situated shareholders based on the breakdown of the relationship between Express Scripts and its largest customer, non-party Anthem, Inc. ("Anthem"). Current and/or former Express Scripts executives George Paz, Timothy Wentworth, Eric Slusser, David Queller, and James M. Havel are also named as Defendants. On December 7, 2016, Defendants moved to dismiss the Amended Class Action Complaint ("CAC"), and on August 1, 2017, that motion was granted without prejudice. *See* Docs. 72, 93. The Second Amended Complaint ("SAC") asserts claims for violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78a *et seq*. *See* SAC (Doc. 100). Defendants bring this motion to dismiss the SAC under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. *See* Doc. 107. For the reasons set forth below, Defendants' motion is GRANTED.

## I. BACKGROUND[1]

### A. The Parties

Plaintiff TIAA,[2] a joint stock life insurance company, purchased Express Scripts common stock throughout the Class Period (February 24, 2015 through March 21, 2016). SAC ¶ 16. On July 27, 2016, the Court appointed TIAA as Lead Plaintiff for the instant litigation. *Id.*

Express Scripts is the largest standalone pharmacy benefits manager ("PBM") in the United States. *Id.* ¶ 24. As a PBM, Express Scripts contracts with pharmacies, negotiates drug pricing with manufacturers, and processes prescription drug claims for the members of the health-insurance providers with whom it works. *Id.* Express Scripts common stock trades on NASDAQ under the ticker symbol "ESRX." *Id.* ¶ 17.

The Individual Defendants were all executives at Express Scripts throughout the Class Period. George Paz ("Paz") was the Chairman and Chief Executive Officer ("CEO") of Express Scripts. *Id.* ¶ 18. Timothy Wentworth ("Wentworth") was the President. *Id.* ¶ 19. Eric Slusser ("Slusser") was Chief Financial Officer ("CFO") beginning in September 2015. *Id.* ¶ 20. David Queller ("Queller") was Senior Vice President of Sales and Account Management. *Id.* ¶ 21. James M. Havel ("Havel") was, until September 2015, Executive Vice President and Interim

---

[1] The facts are drawn from the SAC, "together with those 'documents . . . incorporated in it by reference' and 'matters of which judicial notice may be taken.'" *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 123 (2d Cir. 2011) (ellipsis in original) (citation omitted). The Court may also consider any document where the complaint "relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11 Civ. 4665 (PGG), 2014 WL 4832321, at *12 (S.D.N.Y. Sept. 29, 2014) (internal quotation marks and citations omitted). The Court "may also consider 'legally required public disclosure documents filed with the SEC'" and other publicly-available information, such as press releases and earnings call transcripts. *See id.* (citation omitted).

[2] TIAA refers collectively to the TIAA College Retirement Equities Fund ("CREF"), TIAA-CREF Enhanced Large Cap Growth Index, TIAA-CREF Enhanced Large-Cap Value Index, TIAA-CREF Equity Index Fund, TIAA-CREF Growth & Income Fund, TIAA-CREF Large-Cap Growth Index Fund, TIAA-CREF Large-Cap Value Fund, TIAA-CREF Large-Cap Value Index Fund, TIAA-CREF S&P 500 Index Fund, TIAA-CREF Life Growth & IncomeFund, TIAA-CREF Life Large-Cap Value Fund, and TIAA-CREF Life Stock Index Fund. SAC ¶ 16 n.3.

CFO. *Id.* ¶ 22. In September 2015, he became the Company's Executive Vice President of Finance. *Id.*

### B. Anthem and Express Scripts' Relationship

On April 13, 2009, Express Scripts announced that it had entered into a ten-year agreement with Anthem (the "PBM Agreement"), under which Express Scripts would provide exclusive PBM services for Anthem. *Id.* ¶ 26. Anthem became Express Scripts' most important customer, and between 12.2% and 17% of Express Scripts' revenues were attributable to the Agreement between 2012 and 2016. *Id.* ¶¶ 34–36.

Express Scripts accounted for the PBM Agreement in its annual and quarterly financial reports filed with the SEC. The SEC requires that companies use generally accepted accounting procedures ("GAAP") in their filings, which are primarily promulgated by the Financial Accounting Standards Board ("FASB"). *Id.* ¶ 50. Under the FASB's accounting standards codification, a company should account for intangible assets like contracts based on its "useful life;" that is, "the period over which the asset is expected to contribute directly or indirectly to the future cash flows of [the company]." *Id.* ¶ 51. A company's estimate for the useful life of an intangible asset should be based, among other factors, on any relevant contractual provisions, as well as the company's experience "renewing or extending similar arrangements" and "assumptions that market participants would use about renewal or extension." *Id.* ¶ 52.

Although the initial term of the PBM Agreement was ten years, Express Scripts estimated the useful life of the Agreement as fifteen years, representing that there was a sufficient basis under FASB rules to conclude that the Agreement would be renewed for at least five years after its expiration. *Id.* ¶ 55. On May 10, 2010, Express Scripts wrote to the SEC to justify its accounting treatment of the PBM Agreement, and explained that the company "assumed a high

3

probability that the contract [with Anthem] would be renewed for a second term . . . based on industry renewal rates, the Company's embedded relationship with [Anthem] and potentially significant efforts around the ability to change PBM providers." *Id.* ¶ 57.

Under GAAP, Express Scripts was required to revise the useful life of the PBM Agreement if it became aware that there was no longer a supportable basis for the fifteen-year estimate. *Id.* ¶ 61. Express Scripts did not revise its estimate of the PBM Agreement's useful life until its disclosures filed on April 25, 2016. *Id.* ¶ 62.[3]

### C. Pricing Renegotiations

Section 5.6 of the PBM Agreement, titled "Periodic Pricing Review," provides an avenue for Anthem to renegotiate pricing every three years. *Id.* ¶ 27. Section 5.6 states in full:

> **5.6 Periodic Pricing Review**. [Anthem] or a third party consultant retained by [Anthem] will conduct a market analysis every three (3) years during the Term of this Agreement to ensure that [Anthem] is receiving competitive benchmark pricing. In the event [Anthem] or its third party consultant determines that such pricing terms are not competitive, [Anthem] shall have the ability to propose renegotiated pricing terms to [Express Scripts] and [Anthem] and [Express Scripts] agree[] to negotiate in good faith over the proposed new pricing terms. Notwithstanding the foregoing, to be effective any new pricing terms must be agreed to by [Express Scripts] in writing.

*Id.* ¶ 28. Defendant Paz later referred to price checks, like the one embodied in Section 5.6, as "pretty routine" among PBM clients. *Id.* ¶ 31. In 2011 and 2012, Express Scripts and Anthem engaged in their first pricing renegotiation under Section 5.6. *Id.* ¶ 67. Those negotiations lasted for almost a year before both parties agreed to pricing terms. *Id.* ¶¶ 69–70. According to Plaintiffs, these negotiations "placed a substantial strain" on the Anthem-Express Scripts relationship. *Id.* ¶ 71.

---

[3] Express Scripts made SEC filings that included this estimate on February 23, 2015, April 28, 2015, July 28, 2015, October 27, 2015, and February 16, 2016. *Id.* ¶¶ 218, 224–25, 231–32, 237–38, 245–46.

Anthem began the second round of pricing negotiations in October 2014 by demanding $15 billion in pricing concessions. *Id.* ¶ 80. The parties quickly reached a "fundamental disagreement" about their obligations under Section 5.6. *Id.* ¶ 82. On February 16, 2015, Anthem served Express Scripts with notice of breach of the PBM Agreement based on several operational issues that had arisen during the pendency of the Agreement. *Id.* ¶ 83. The parties then submitted that dispute to their Joint Operating Pharmacy Committee ("JOPC"). *Id.* ¶ 87.

D.     **Negotiations and Public Statements During the Class Period**

The Class Period began on February 24, 2015. *Id.* ¶ 88. On February 25, 2015, during an investor conference call, Defendant Queller stated that Express Scripts had "a great relationship with Anthem. . . . The relationship is very, very solid." *Id.* ¶ 91. He added that they were operating "business as usual. And we look forward to having [Anthem] as a client through the end of the contract term . . . and we'd love to have them for a longer time as well." *Id.* ¶ 92.

On March 6, 2015, the JOPC met to attempt to resolve the dispute over the operational breaches, but the meeting was unsuccessful. *Id.* ¶ 95. On March 18, 2015, Anthem reiterated its $15 billion pricing demand. *Id.* ¶ 96. Two weeks later, on April 1, 2015, Anthem provided Express Scripts with a formal notice of a "pricing breach" of the PBM Agreement. *Id.* ¶ 97. But on April 29, 2015, Defendant Paz stated that Express Scripts "really enjoy[ed]" the Anthem relationship and that the relationship was "a two-way street." *Id.* ¶ 101.

On May 27, 2015, pursuant to the dispute resolution process laid out in the PBM Agreement, the presidents of Anthem and Express Scripts met in an attempt to resolve the dispute over the operational breaches. *Id.* ¶ 106. The meeting, however, was unsuccessful, and Anthem continued to notify Express Scripts of operational failures. *Id.* ¶¶ 106–07, 119, 125. The next month, on June 22, 2015, Express Scripts rejected Anthem's pricing proposal and both

companies accused the other of failing to negotiate in good faith. *Id.* ¶ 108. Despite this, just one month later, on July 29, 2015, Defendant Wentworth stated on a conference call that Express Scripts' "business outlook remains strong" and that Express Scripts enjoyed "strong retention across the board." *Id.* ¶ 116.

On September 15, 2015, following management changes at Express Scripts,[4] Anthem and Express Scripts met again. *Id.* ¶ 124. Anthem accused Express Scripts of failing to negotiate under Section 5.6. *Id.* On October 2, 2015 and October 19, 2015, Express Scripts contacted Anthem, but refused to negotiate over Anthem's pricing proposal. Only a short time later, on an October 28, 2015 conference call, Defendant Wentworth touted Express Scripts' "strong client relationships." *Id.* ¶ 128.

On November 5, 2015, Anthem requested a meeting with Express Scripts, but Express Scripts did not agree to a meeting. *Id.* ¶ 131. On November 9, 2015, the parties attempted to mediate their disputes over the operational breaches as required by the PBM Agreement, but once again were unable to resolve their disputes. *Id.* ¶ 132. Two days later, on November 11, 2015, and again on November 23, 2015 Anthem contacted Express Scripts and requested a meeting to negotiate pricing. *Id.* ¶¶ 133–34. However, Express Scripts refused to meet. *Id.* On December 2, 2015, Anthem sent Express Scripts a revised pricing proposal, and stated that "months have elapsed, but [Express Scripts] has refused to negotiate for competitive benchmark pricing." *Id.* ¶ 136. Express Scripts, however, did not respond, and Anthem reached out again on December 14, 2015. *Id.* ¶ 137. The next day, Express Scripts responded, but stated that it was under no obligation to negotiate Anthem's pricing proposal, and refused to meet or disclose

---

[4] On September 9, 2015, Express Scripts announced that Defendant Paz would step down as CEO as of May 2016, although he would remain on the company's Board of Directors. *Id.* ¶ 120. It also announced that Defendant Wentworth would succeed Defendant Paz. *Id.* On September 10, 2015, Express Scripts announced that Defendant Slusser would be appointed Executive Vice President and CFO. *Id.* ¶ 121.

the pricing terms it was offering to other clients. *Id.* ¶ 138. On December 22, 2015, Express Scripts held a conference call with investors and analysts, in which Defendant Paz stated that Express Scripts was "currently in discussions with Anthem regarding the periodic pricing provisions of the [PBM] agreement," and that the last set of pricing negotiations had "resulted in a mutually beneficial agreement." *Id.* ¶ 140. He added that the negotiations were "very early on," but that Express Scripts generally would "sit down with [a client making a pricing proposal] to carefully examine those areas driving drug spend, and identifying opportunities for saving." *Id.* ¶ 141.

On January 7, 2016, Express Scripts sent Anthem a pricing proposal. *Id.* ¶ 145. Under the proposal, pricing during the term of the Agreement would decrease by $1 billion, but pricing during the post-termination period would increase by more than that amount, leading to a net increase in price for Anthem. *Id.* A few days later, on January 12, 2016, Anthem's CEO stated during a healthcare conference that Anthem was "entitled to improved pharmaceutical pricing that equates to an annual value-capture of more than $3 billion," but that it did "not yet have an agreement with [its] current vendor to effectuate the savings." *Id.* ¶ 146. On that same day, *Dow Jones* reported that Anthem's general counsel was contemplating litigation against Express Scripts. *Id.* ¶ 147. One day later, on January 13, 2016, Express Scripts' common stock dropped in price by $5.89 per share, representing a $3.9 billion loss in market value. *Id.* ¶ 154. The value of the stock also dropped over the following days. *Id.* ¶¶ 155, 158, 162.

Anthem again reached out to Express Scripts on January 13, 2016 with a pricing proposal. *Id.* ¶ 164. Again, Express Scripts failed to respond. *Id.* Anthem made another proposal on January 22, 2016, and on January 26, 2016, Express Scripts told Anthem that it was not obligated to renegotiate Anthem's pricing. *Id.* ¶ 168. On February 3, 2016, representatives

from Anthem traveled to St. Louis to meet in-person with representatives from Express Scripts and discuss a proposal that would lower prices by $9.7 billion over the term of the contract. *Id.* ¶ 172. Express Scripts did not engage with this proposal. *Id.* Anthem also submitted this proposal in writing on February 5, 2016, and told Express Scripts that it had spent "almost one year trying to engage" with Express Scripts, and that it believed current prices were "inflated" and "unsustainable." *Id.* ¶ 173. On February 12, 2016, Express Scripts responded by sending the same proposal it sent on January 7, 2016, which would have resulted in a net pricing increase. *Id.* ¶ 174.

The next week, on February 16, 2016, Express Scripts filed its 2015 Form 10-K and stated that it was "actively engaged in good faith discussions with Anthem" over the pricing review. *Id.* ¶ 175. On a subsequent conference call, Defendant Paz stated that Express Scripts was "fully committed to good faith negotiations in hopes of reaching a mutually beneficial agreement." *Id.* ¶ 176. He added that several Express Scripts clients had "what we call price checks . . . [which] are pretty routine." *Id.* ¶ 178. But Express Scripts refused to negotiate with Anthem on February 18, 2016, and again on March 1, 2016, when Anthem's CEO traveled to Chicago to meet with Defendant Paz directly. *Id.* ¶¶ 179–80. Express Scripts then sent Anthem the same pricing proposal from January 2016 on March 17, 2016. *Id.*

Finally, on March 21, 2016, the last day of the Class Period, Anthem commenced litigation against Express Scripts. *Id.* ¶ 183.

### E. Post-Class Period Allegations

On March 22, 2016, one day after the Class Period closed, a redacted version of the Anthem's complaint against Express Scripts became available. *Id.* ¶ 188. The market price of Express Scripts common stock fell again that day. *Id.* ¶ 192. Express Scripts filed counterclaims

on June 13, 2016, and revealed that between June 2015 and March 2016, it made five separate pricing proposals to Anthem that were rejected. *Id.* ¶¶ 193–95.

One April 25, 2016, Express Scripts filed its Form 10-Q and, for the first time, estimated a ten year useful life for the PBM Agreement rather than a period of fifteen years. *Id.* ¶ 197. Specifically, Express Scripts disclosed that:

> When we executed our agreement with Anthem in 2009 . . . [we] attributed a reasonable likelihood of renewal at the end of its term in 2019. . . . However, due to a sequence of recent events regarding our discussions with Anthem, culminating in the filing of the lawsuit on March 21, 2016, we felt it prudent to consider the increased likelihood of either non-renewal or renewal on substantially different terms such that, beginning in March 2016, we began amortizing our agreement with Anthem over the remaining term of the contract . . . .

*Id.* ¶¶ 198–99. The next day, Defendant Paz referred to Anthem's pricing proposal as "pretty ludicrous" and anticipated a "long, drawn out situation" between the parties. *Id.* ¶ 202. In October 2016, Defendant Wentworth confirmed on a conference call that Express Scripts no longer expected to work with Anthem past the ten-year contract term, and on April 24, 2017, Express Scripts disclosed in its Form 8-K that "Anthem intends to move its business when the Company's current contract with Anthem expires on December 31, 2019 . . . ." *Id.* ¶¶ 207–08. Express Scripts also revealed that it could never have agreed to Anthem's demand for $3 billion in savings annually because Express Scripts made "well below $3 billion annually" from the PBM Agreement. *Id.* ¶ 209.

**F.     Procedural History**

On May 5, 2016, Plaintiff filed the instant suit. Doc. 1. On October 14, 2016, the Amended Class Action Complaint ("CAC") was filed. Doc. 67. Defendants filed their first

motion to dismiss on December 7, 2016. Doc. 72. On August 1, 2017, the Court dismissed both of Plaintiff's claims without prejudice. *See* Doc. 93.

Specifically, the Court determined that Express Scripts' statements, which "disclose[d] that negotiations were ongoing and did not express certainty as to the outcome of the parties' discussions," were not actionable. *Id.* at 27. With respect to Express Scripts' accounting treatment of the useful life of the PBM Agreement, the Court found that the CAC did not "plausibly allege that Express Scripts did not believe its statements regarding the useful life of the Contract for accounting purposes at the time the statements were made, and thus a claim predicated on Express Scripts' failure to amortize the intangible asset over a shorter period of time must be dismissed." *Id.* at 29. The Court also found that Express Scripts' public disclosures sufficiently warned investors that renewal was not definite. *Id.* at 30. Further, the Court determined that Plaintiff had not alleged facts rising to the level of recklessness needed to establish an inference of scienter because "while the allegations show[ed] that the relationship between Express Scripts and Anthem was increasingly precarious during the Class Period and that the parties vehemently disagreed about the proper pricing terms, they [did] not allege that Defendants had specific knowledge of or access to contradictory facts than those disclosed in their public statements." *Id.* at 36. The Court did not reach the issue of loss causation. *Id.* at 39.

On August 30, 2017, Plaintiff filed the SAC. *See* Doc. 100. Like the Amended Complaint, the SAC raises two causes of action, for violations of Sections 10(b) and 20(a) of the Exchange Act. *Id.*

## II. LEGAL STANDARDS

### A. Motion to Dismiss Standard

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 680.

### B. Heightened Pleading Standard under Rule 9(b)

A complaint alleging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–20 (2007)). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether

11

fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'")

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach*, 355 F.3d at 170). Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)). Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); s*ee also Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd* 604 F. App'x 62 (2d Cir. 2015) (citing *ECA & Local 134 IBEW*, 553 F.3d at 196).

## III. DISCUSSION

### A. Misstatements or Omissions of Material Fact

As in its opposition to Defendants' first motion to dismiss, Plaintiff raises two types of allegedly misleading statements or omissions made by Defendants: (1) that Defendants "misleadingly represented to investors that [Express Scripts and Anthem] were 'actively engaged in good faith discussions' regarding contract renewal;" and (2) that Defendants "repeatedly and consistently accounted for the Anthem Contract as if it were 'highly probable that the contract would be renewed for at least five more years.'" *See* Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.'s Mem.") (Doc. 110), at 12.

#### 1. Statements about Negotiations

Plaintiff argues that Defendants' statements to investors about the PBM Agreement were material misstatements because Defendants chose to discuss Express Scripts' relationship with Anthem but failed to disclose "the companies' refusal to even negotiate and mutual assertions of bad faith." Pl.'s Mem. at 12 (citing *Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23–24 (2d Cir. 2017)). Defendants argue that the Court already rejected this argument in its August 1, 2017 Opinion. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss ("Def.'s Mem.") (Doc. 108), at 24 ("The SAC also repeats the [CAC]'s rejected theory that Defendants materially mislead investors by affirmatively misrepresenting the known contentious relationship between Express Scripts and Anthem . . . ."); Reply Memorandum of Law in Support of Defendants' Motion to Dismiss ("Reply Mem.") (Doc. 111), at 5.

Plaintiff does not address the Court's earlier opinion, and relies on the same statements made by Express Scripts executives on conference calls or in filings made on February 25, 2015, April 29, 2015, December 29, 2015, and February 16 and 17, 2016. *See* Pl.'s Mem. at 12 (citing

13

SAC ¶¶ 219, 226, 241, 246–48). These are the same statements that Plaintiff put forward on the prior motion to dismiss, which the Court summarized in its Opinion before finding that the CAC did not plausibly allege false or misleading statements of then-existing facts:

> Such statements about negotiations, which lack a definite outcome, are not actionable. . . . Although Anthem ultimately initiated litigation, the allegations in the CAC amount to little more than a suggestion that Defendants should have somehow guessed the outcome of the ongoing negotiations sooner or approached their negotiations with Anthem more pessimistically. As the Second Circuit has explained, "statements containing simple economic projections, expressions of optimism, and other puffery are insufficient." *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (internal citations omitted). While a defendant can be held liable for misrepresentations of existing facts, *see id.*, the Court finds no such misrepresentations here.

Doc. 93 at 27–28. Plaintiff has failed to allege new facts in support of its argument that Defendants misled investors about the strength of Express Scripts' relationship with Anthem and the nature of the renewal negotiations. The Court therefore finds that Plaintiff has not stated a claim with respect to statements made on the investor calls that discussed, at a high level, the companies' relationship and ongoing negotiations.

### 2. Amortization of the Useful Life of the PBM Agreement

Next, Plaintiff argues that "Defendants repeatedly and consistently accounted for the Anthem Contract as if it were 'highly probable' that the contract would be renewed for at least five more years when that was not true given, among other things, the companies' massive $15 billion pricing dispute, mutual breach-of-contract assertions, and repeated failures to engage in any meaningful negotiations for months." Pl.'s Mem. at 12–13.

As discussed above, GAAP requires that an intangible assert be amortized over its useful life, which is "the period over which the asset is expected to contribute directly or indirectly to the future cash flows" of the company. SAC ¶ 51. GAAP instructs companies to consider any

14

contractual provisions limiting the useful life of the asset, as well as the company's "own historical experience in renewing or extending similar arrangements." *Id.* ¶ 52. The SAC does not allege that GAAP requires that a company determine that renewal of a contract is "highly probable" before incorporating renewal into its estimate of that asset's useful life. GAAP rules do, however, require "disclosure about an estimate of the useful life of an intangible asset" if there is "a change in the expected likelihood of renewal or extension" that would be material to financial statements. *Id.* ¶ 54. When Express Scripts first amortized the PBM Agreement over a fifteen year useful life, it stated in a letter to the SEC that it "assumed a high probability" that the PBM Agreement would be renewed for a second term. *Id.* ¶ 57. Plaintiff argues that at some point, "GAAP required Defendants to adjust the amortization schedule" because the useful life of the PBM Agreement changed. Pl.'s Mem. at 13–14. Plaintiff does not offer an estimate of *when* the useful life of the Agreement changed, but states that "renewal was no longer 'probable' by the start of the Class Period." *Id.*

Defendants argue that Plaintiff "invented" its theory that GAAP required Defendants to amortize the PBM Agreement over ten years if renewal of the Agreement no longer became highly probable. Def.'s Mem. at 17. According to Defendants, "even if renewal was not highly probable at all times during the Class Period, that still would not render Express Scripts' accounting improper or actionable under the securities laws." *Id.*

Plaintiff's argument is similar to rejected arguments put forth in *City of Omaha, Nebraska Civilian Employees' Retirement System v. CBS Corp.* 679 F.3d 64 (2d Cir 2012). In *City of Omaha*, CBS announced in late 2008 that it was performing an interim impairment test

15

on its goodwill,[5] and that, as a result, the company would incur a "charge" of $14 billion during the third quarter of 2008. *Id.* at 66. Although the plaintiffs alleged that CBS should have known that it needed to perform an impairment test earlier in 2008, the Second Circuit affirmed the district court's dismissal:

> Plaintiffs' allegations regarding the downward trajectory of CBS's overall market capitalization, declining advertising revenues for some CBS reporting units, analysts' expectations regarding the media business environment, and CBS's own anticipation of an economic slowdown may suggest that CBS expressed overly optimistic views regarding its overall business outlook. But these allegations, even viewed in combination, do not plausibly demonstrate that defendants knew, nor even had reason to know, at any specific time during this period that it was more likely than not that interim impairment testing would reveal that the goodwill of any specific reporting unit was overvalued.
>
> Moreover, even if the second amended complaint did plausibly plead that defendants were aware of facts that *should* have led them to begin interim impairment testing earlier, such pleading alone would not suffice to state a securities fraud claim after *Fait*. Plaintiffs' second amended complaint is devoid even of conclusory allegations that defendants did not believe in their statements of opinion regarding CBS's goodwill at the time they made them. *See Fait v. Regions Fin. Corp.,* 655 F.3d at 112. In sum, we conclude that plaintiffs here have at most pleaded defendants' failure to comply with Generally Accepted Accounting Principles, rather than their commission of securities fraud, *see id.,* and thus, that plaintiffs' Section 10(b), Rule 10b-5, and Section 20(a) claims against defendants were properly dismissed by the district court.

*Id.* at 68–69. Plaintiff argues that *City of Omaha* is inapposite because here, Plaintiff is alleging that Defendants "spoke falsely about currently existing facts" and "were required to adjust their accounting to 10 years, even while they pursued renewal." Pl.'s Mem. at 15. But as with the plaintiffs in *City of Omaha*, Plaintiff offers only general facts about the breakdown between the

---

[5] In other words, CBS announced that it needed to amend its valuation of its goodwill. The FASB requires that "goodwill be tested for impairment annually, or 'more frequently if events or changed circumstances indicate that the asset might be impaired.'" *Id.* at 68 (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011)).

relationship between Express Scripts and Anthem and still offers "no compelling argument or support to suggest that Express Scripts should have revised its accounting treatment of the [PBM Agreement] earlier than first quarter 2016." *See* Doc. 93 at 28. Even if Plaintiff had plausibly plead facts to show that Express Scripts' accounting treatment should have been different, Plaintiff did not allege that Defendants "did not believe" that the accounting treatment was appropriate during the Class Period; and therefore they have not stated a claim for commission of securities fraud under Sections 10(b) and 20(a). *See City of Omaha*, 679 F.3d at 69.

### B. Scienter

As the Court explained in its prior Opinion, "[t]o satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts with particularity that would give rise 'to a strong inference that the defendant acted with the required state of mind.'" Doc. 93 at 31(quoting *ECA & Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 198). The "strong inference" standard is met when a plaintiff pleads facts "rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007).

Plaintiff argues that that standard is met here based on the same allegations that it presented in the CAC, which the Court acknowledged showed that the Anthem-Express Scripts relationship "was increasingly precarious." Doc. 93 at 36. Plaintiff argues that "those same facts, particularly in combination with Express Scripts' repeated refusals to negotiate at all . . . are more than sufficient to plead a strong inference of scienter." Pl.'s Mem. at 18. But the Court already held that those facts were *insufficient* to plead a strong inference of scienter because the allegations "do not allege that Defendants had specific knowledge of or access to contradictory facts than those disclosed in their public statements." Doc. 93 at 36.

<mark>17</mark>

Although Plaintiff admits that it can point to no new factual allegations in support of scienter, it argues that the Court misapprehended its argument, which is "based on misstatements regarding the accounting for the Anthem Contract on the basis that it falsely asserted a high probability of renewal beyond the initial 10-year term of the contract." Pl.'s Mem. at 22. But the problem with Plaintiff's claim is the same: Plaintiff has failed to point to any evidence that Defendants knew their public statements about renewal (whether embodied in SEC filings or statements made in investor calls) were incorrect. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 459–60 (S.D.N.Y. 2010) *aff'd* 430 F. App'x 63 (2d Cir. 2011). Therefore, Plaintiff's claims must also fail because it has not plead facts that raise a strong inference of scienter.[6]

## C. Amendment

The Court has already granted Plaintiff leave to amend once after a meritorious motion to dismiss. Doc. 93 at 40–41. This is therefore not the case in which a plaintiff, "without the benefit of a ruling," mistakenly does not see "the necessity of amendment" or is not "in a position to weigh the practicality and possible means of curing specific deficiencies." *See Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). Further, Plaintiff has not made a request for further amendment in the event that the Court grants the instant motion to dismiss. *See* Pl.'s Mem. The Court therefore does not find that granting further amendment would be in the interests of justice, *see* Fed. R. Civ. P. 15(a)(2), and dismisses the SAC with prejudice.

---

[6] In its August 1, 2017 Opinion, the Court declined to address the parties' arguments with respect to Plaintiff's allegations of loss causation because it dismissed the Consolidated Amended Complaint on other grounds. *See* Doc. 93 at 39–40. For the same reasons, the Court will not reach the issue of loss causation in deciding the instant motion.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss with prejudice is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 107, and close the case. It is SO ORDERED.

Dated: May 21, 2018
        New York, New York

                                      Edgardo Ramos, U.S.D.J.